# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **SUNIL NAYYAR,** | : | |
| | : | **Case No. 2:10-cv-00135** |
| **Plaintiff,** | : | **Judge Marbley** |
| | : | **Magistrate Judge King** |
| **v.** | : | |
| **MOUNT CARMEL HEALTH SYSTEM** | : | |
| C/O Donald A Davies | | |
| 10 West Broad St. | : | **SECOND AMENDED** |
| Columbus, Ohio 43215 | | **COMPLAINT** |
| | : | |
| **and** | : | |
| **DR. JOHN WEISS,** | : | |
| **Individually,** | : | **JURY DEMAND** |
| **Program Director** | | **ENDORSED HEREON** |
| **Internal Medicine Residency** | : | |
| 793 West State Street | | |
| Columbus, OH 43222 | : | |
| **and** | : | |
| **DR. LI TANG,** | : | |
| **Individually,** | | |
| **Director of Medical Education** | : | |
| 793 West State Street | | |
| Columbus, OH 43222 | : | |
| **Defendants.** | : | |

## NATURE OF CLAIMS

Now Comes Plaintiff Dr. Sunil Nayyar (hereinafter " Nayyar"), by and through the undersigned counsel, and for his Complaint states as follows:

1.      This action is brought because of the unlawful and retaliatory conduct and employment practices of Defendants Mount Carmel Health Systems (hereinafter "MC"), and Defendants Doctor John C. Weiss, Program Director, Internal Medicine Residency, and Doctor Li Tang, Director of Medical Education, both employees of MC.  The action arises out of the illegal and retaliatory targeting, investigation, discipline and termination of Plaintiff Nayyar in violation of Ohio whistleblower statute, Federal False Claims Act Anti-Retaliation statute, and termination in violation of Ohio law public policy, among other claims.

## JURISDICTION AND VENUE

2.      This action is instituted and authorized by 42 U.S.C. §2000e-*et. seq.*, 102 of the Civil Rights Act of 1991, 42 U.S.C. §1981, 31 U.S.C. §3730 (h), 28 U.S.C. §§ 1331, 1343 and 1367 (a).

3.      Venue is proper in this Court as all the acts complained of herein occurred in the State of Ohio, County of Franklin.

## PARTIES

### Plaintiff

4.      Plaintiff Nayyar, a resident of Franklin County, Ohio, was employed as a resident physician by Mount Carmel Health Systems from July 2006 to July 2009 at its West facility in Franklin County, Ohio.

### Defendants

5.      At all times material herein, Defendant MC's principal place of business or agent is located in Franklin County, Ohio.

6.      Defendant MC conducts business as a hospital system and represents on its website that it has "healthcare facilities throughout central Ohio to take care of you and your family." The Mount Carmel Health System has four major hospitals within the Columbus area, Mount Carmel West ("MCW"), Mount Carmel East, Mount Carmel St Ann's, and the New Albany Surgical Hospital in Franklin County, Ohio.  MCW has a residency training program accredited by the Accreditation Council for Graduate Medical Education ("ACGME").

7.      Defendant John C. Weiss, Program Director, Internal Medicine Residency at Mount Carmel in Franklin County, Ohio is being sued in his individual capacity.

8.      Defendant Li Tang, Director of Medical Education at Mt. Carmel in Franklin County, Ohio, is being sued in her individual capacity.

## FACTS

9.      MCW is located on the West side of Columbus, Ohio, in an underprivileged neighborhood and frequently treats patients who either have no insurance or pay for services with Medicaid/Medicare.

10.      Upon information and belief, MC places licensed on-site physicians, trained in the critical care of patients, at its intensive care units ("ICU") at its' Mount Carmel East and St. Ann's hospitals, which are located in middle and upper income areas.

11.      By contrast, MC has only residents and interns at its' ICU located at MCW and no licensed, critical care physician on-site to supervise and assist residents (who have no critical care license) in treatment of patients.

12.      Plaintiff Nayyar was hired as a resident physician by MC in July 2006 and assigned to MCW. Plaintiff has been an exemplary employee at MC and received exceptional reviews from his Program Directors prior to his termination on July 22nd 2009.

3

13.     No licensed physician was placed on-site with Plaintiff Nayyar and other residents and interns in the ICU unit.

14.     Plaintiff Nayyar was placed in the ICU at MCW despite the fact that he does not have a critical care license and has limited training in the critical care of patients.

15.     On or about January of 2009, Plaintiff Nayyar and 16 other residents became increasingly alarmed about the safety of the patients within the ICU at MCW. Plaintiff Nayyar was specifically worried that the lack of adequate critical care staff with the proper training in the critical care within the ICU would result in the death of patients, or the substantial deterioration in their medical conditions.

16.     Plaintiff Nayyar conveyed his concerns about patient safety to his Program Director, Dr. Weiss.

17.     Plaintiff Nayyar and 16 other residents signed a petition to the hospital administration which stated that "without an in-house critical care supervisor, [patient] safety is an active issue." (See Exhibit A, patient safety petition).

18.     The petition was submitted to Dr. Weiss, Dr. Li Tang, and MC administration.

19.     Despite the petition, no steps were taken by either MCW or Drs. Weiss and Tang to address the safety issues in the ICU at MCW.

20.     On or about July 2009, Dr. Weiss gave the staffing chart in the MCW-ICU for the month of July 2009 to Plaintiff Nayyar.

21.     Upon immediate review of the staffing schedule, Plaintiff Nayyar became alarmed that July 2009 ICU staffing would result in increased death and irrevocable harm to patients.

22.      Plaintiff Nayyar immediately confronted Dr. Weiss about the July 2009 ICU staffing proposed by him and stated it would, in all likelihood, cause death and irrevocable harm to ICU patients.

23.     Dr. Weiss responded that it was his intent that patients die in the ICU because he believed that the death of patients was necessary for MCW to staff the ICU with licensed on-site critical care physicians.

24.     Plaintiff promptly informed Dr. Li Tang, Director of Medical Education about Dr. Weiss's remarks and provided her with ICU staff schedules prepared by Defendant Weiss.

25.     In the course of submitting the ICU schedule, Plaintiff also informed Dr. Tang that the ICU at MCW was critically understaffed and there was a strong likelihood that patients in the ICU would die if the staffing assignments of Dr. Weiss were followed.

26.     Plaintiff also pointed out to Dr. Tang that the ICU units at Mount Carmel East and St. Ann's were adequately staffed with experienced professionals, but not MCW, which is located in an underprivileged neighborhood.

27.     Dr. Tang dismissed Plaintiff's concerns and indicated that the ICU was adequately staffed with one resident at night and agreed with Dr. Weiss's decision.

28.     In response, Plaintiff asked Dr. Tang: "would you bring your loved ones to Mt. Carmel West's ICU with only one resident in-house and with no trained critical care staff attending."

29.     Dr. Tang responded, "No."

30.     MCW nevertheless proceeded with Dr. Weiss ICU staffing schedule and placed ICU patients at unreasonable risk of harm and death.

31.     On July 7, 2009, Plaintiff attempted to place an A-Line (arterial line) into a patient. In the process of placing the A-Line into the patient, Plaintiff Nayyar developed a cramp. As a result, he requested his assistant, Nurse Amanda Bowers, to hold the A- Line while he relieved his cramp. A few minutes later, Plaintiff took control of the A- Line and successfully inserted the line into the

patient. There were no adverse consequences to the patient during this process.

32.     On July 9, 2009, Defendant Weiss called Plaintiff and orally informed him that there "may" be an investigation into the A-Line incident.

33.     No <u>written notice</u> was ever given to Plaintiff Nayyar formally stating that he was being investigated and being put on probation or that he was not to speak to any hospital staff.

34.     On July 10, 2009, Plaintiff Nayyar submitted a report narrating the events surrounding the A-Line incident that occurred on July 7, 2009, per Defendant Weiss' request.

35.     On July 16, 2009, Plaintiff Nayyar requested a meeting with MC-Human Resources due to the lack of communication between Defendant Weiss and Plaintiff Nayyar. At the meeting Plaintiff Nayyar was asked to provide details about the events surrounding the A-Line incident of July 7th 2009. Plaintiff Nayyar was also asked whether he had spoken to anyone about the incident. Plaintiff Nayyar responded that he had spoken to a few colleagues to make sure that his shift was covered and to ensure that an intern was okay.

36.     At no time did Plaintiff Nayyar threaten to fire any employee or resident of MCW regarding this incident.

37.     At no time did he attempt to influence the investigation.

38.     On July 22, 2009, Plaintiff Nayyar was terminated from the residency training program at MCW on the grounds that he lacked the necessary communication and professionalism to work effectively within the health care delivery system.

39.     In contrast to other MCW residents who signed the petition, Defendants targeted Plaintiff Nayyar for termination because he effectively led the reporting from January 2009 through the date of his termination by reporting ongoing patient safety issues and by protesting to management staff at MCW.

40.     Defendants knew that Plaintiff Nayyar collected and forwarded the petition to MCW managers, that Plaintiff Nayyar alone reported the ICU scheduling and resulting danger to patients to MCW managers, and that Plaintiff Nayyar alone continued to protest and object to patient safety issues in the ICU.

41.     As a consequence of patient safety issue in MCW's ICU, upon information and belief, patients have died or have suffered unreasonably, including a patient who may have died on November 8, 2009 of the H1N1 disease as a result of improper staffing of the ICU at MCW.

42.     Plaintiff, in the past three years at MC, has never had any prior disciplinary misconduct.

43.     Despite Plaintiff Nayyar's exemplary performance record and the lack of prior misconduct, MCW terminated him from the residency program.

44.      In August 2009, after Plaintiff Nayyar filed a petition, an ACGME hearing was convened.  In addition, an ACGME appeal was held regarding Plaintiff Nayyar's termination.

45.     Despite ACGME guidelines and MC's internal human resource and medical investigation guidelines and procedures, MC failed to:  (1) include a "peer" on the Program Education Committee hearing panel, which was comprised of only MC licensed physicians and not one resident; (2) failed to provide ample files and records in order for Plaintiff Nayyar to defend himself; and (3) barred his counsel from appearing during the hearing and appeal process, despite the fact that counsel demanded that he be permitted to appear at the hearing and appeal.

46.     In October 2009, MC instructed staff persons to destroy the January 2009 resident petition complaining about patient safety.

47.     MC instructed staff to destroy the petition to conceal the fact that patient safety then and now is an active issue in the MCW-ICU.

48.     Because of Plaintiff Nayyar's objection to his termination and pursuit of his rights in the ACGME mandated hearing and appeal process, Defendants knew that it was probable that Plaintiff Nayyar may bring a lawsuit arising from the January 2009 resident petition and July 2009 ICU staffing.

## ALLEGATIONS RELEVANT TO RACE AND NATIONAL ORIGIN DISCRIMINATION

49.     Plaintiff Nayyar is Indian by race and national origin.

50.     Defendants have predominately terminated or failed minorities and Indian residents within the past 5 years.

51.     Defendants' termination of Plaintiff Nayyar was motivated also by his race and national origin.

52.     Similarly situated Caucasian residents have not been subjected to termination or disciplinary for conduct that was more egregious than the conduct alleged against Plaintiff Nayyar.

53.     Caucasian residents have engaged in conduct that has unreasonably placed patient care at risk, but no disciplinary action was taken and no investigation was initiated.

54.     By contrast, when Indian, African, and African-American residents engage in conduct less egregious and serious, they are punished and in some cases terminated.  In the two years under Defendant Weiss's supervision, three Indian and one Asian were fired but no Caucasian persons were fired, despite having engaged in similar and/or more egregious conduct.

55.     Plaintiff Nayyar's alleged conduct—lack of communication skills and professionalism—did not endanger patient care.

56.     Plaintiff Nayyar alleged conduct also did not cause deterioration in morale and was not directed to a person under his supervision.

57.     As a proximate result of Defendants' actions, Plaintiff Nayyar will not be able to join another residency program and has lose substantial resident time and credit due his absence from the program.  Moreover, the damage to his reputation and standing in the medical community has been irreparably damaged.

## ADDITIONAL ALLEGATIONS REGARDING ACGME WORK HOUR LIMITATION AND BILLABE SERVICES VIOLATIONS AND FEDERAL MEDICARE GRADUATE MEDICAL EDUCATION REGULATION VIOLATIONS

58.     MCW's residency program is accredited and governed by the ACGME guidelines.

59.     MCW's residency program is funded by the United States of America by direct medical education payments to MCW to cover the expense of the residents' education, and by indirect payments by adding costs to patient care associated with the operation of a teaching program.

60.     The direct and indirect funding is provided by the federal Medicare Act program.

61.     To receive Medicare graduate medical education funds, MCW's residency program must comply with ACGME accreditation program requirements.

62.     Federal Medicare funding regulations and ACGME accreditation requirements place work hour limits on residents' work schedules and hours.

63.     At all relevant times, the work hour limits regulations limited residents to a maximum of 30 consecutive hours ("30 hour rule") and maximum of 80 weekly work hours averaged over 4weeks ("80 hour rule").

64.     At all relevant times, mandated "rest" periods after 10 hour shifts are provided to residents between work shifts and residents

may not be contacted about a medical/treatment matter during the mandated rest periods.

65. MCW is currently and/or was recently on probation for serious ACGME violations that occurred in the MCW residency program.

66. MCW intimidated and pressured Plaintiff Nayyar and other residents to violate ACGME rules and regulations.

67. From 2006 through 2009, Plaintiff Nayyar was pressured and intimidated to report to ACGME fewer work hours than actually performed by him to comply with federal and ACGME work hour limitations.

68. From 2006 to 2009, Plaintiff Nayyar complained to MCW that it was violating the 80 and 30 hour rules, but was intimidated by MCW to show compliance.

69. In addition to work hour rule limitation violations, MCW engaged in intimidation by causing Plaintiff Nayyar to submit favorable evaluations each year so that MCW would not lose its ACGME accreditation.

70. Plaintiff Nayyar objected to providing favorable evaluations and reported his objection to MCW officials and staff.

71. Plaintiff Nayyar also reported that he was forced by MCW to work longer hours than permitted under the ACGME rules.

72. ACGME's policy is that residents, such as Plaintiff Nayyar, should not be retaliated against for reporting violations of the American Medical Association Rules and Medicare and Medicaid violations.

73. In July 2009, MCW initiated a medical investigation into a matter involving Plaintiff Nayyar's placement of an A-line in a patient's arm in MCW's ICU ("A-line incident").

74.     In violation of ACGME and federal regulations, MCW contacted Plaintiff Nayyar during his "rest period" regarding the A-line incident, by contacting him less than 10 hours after his shift ended.

75.     Plaintiff Nayyar's performance of this A-line procedure occurred without the direct participation of a licensed physician as a billable service
.

76.     Defendant St. John failed to adequately supervise Plaintiff Nayyar insofar Plaintiff Nayyar and other residents were told to not contact Defendant St. John during the late night through morning shift and disturb his sleep at home, resulting in residents making medical decisions without adequate supervision by a licensed physician.

77.     As a result of the Defendant St. John's practice of not permitting residents to contact him during the late night through morning shift, MCW failed to provide services in compliance with 42 U.S.C. §1320c-5 and endangered patients.

78.     MCW's failure to adequately supervise and provide appropriate staff in the ICU violated ACGME and federal Medicare regulations regarding education and supervision of patients, insofar as MCW failed to provide medical treatment services in accordance with professional medical standards and endanger patients.

79.     As a result of Plaintiff Nayyar's past and continuous complaints of ACGME violations and federal Medicare regulations MCW and defendants retaliated against Plaintiff Nayyar by investigating the A-line incident and terminating his employment.

80.     MCW placed residents in the ICU to provide critical and key treatment to patients without the presence of a licensed, teaching physician.

81.     Defendant St. John, director of ICU, as well as other critical care licensed physicians was not present during critical care services performed by unlicensed residents in violation of Medicare and ACGME rules.

82.     As a consequence of the absence of Defendant St. John and other critical care physicians in the ICU during critical care, as well as Defendant St. John's practice of intimidating residents who called him during late night to morning shift, ICU patients suffered unreasonable risk, substandard care, and in one instance a patient, who was being treated for H1N1 died as a result of MCW and defendants violations of ACGME and federal Medicare regulations.

83.     From 2007 through July 2009, Plaintiff Nayyar and other residents protested and complained about violation of the ACGME regulation governing the total number of patients that could be admitted within a 24 hour period to MCW administrators and supervising physicians.

84.     From 2007 though July 2009, Plaintiff Nayyar and other residents admitted more patients than authorized by ACGME rules, and complained about these violations.

85.     MCW responded to Plaintiff Nayyar's and residents' protests and complaints by ordering Plaintiff Nayyar and residents to admit more patients than authorized.

86.      MCW intimidated all residents to not report ACGME patient admission violations.

87.     MCW's failure to comply with federal Medicare regulations and ACGME regulations (federal Medicare requires ACGME compliance) defrauded the United States of America.

88.     MCW retaliated against Plaintiff Nayyar because his complaints and protests would result in violation and loss of federal Medicare direct and indirect funding of resident education programs.

**ADDITIONAL ALLEGATIONS REGARDING ABUSE OF PROCESS**

89.     MCW had the legal right to investigate the A-line incident.

90.     MCW initiated the investigation by contacting Plaintiff Nayyar in violation of the 10 hour rule to obtain information from Plaintiff Nayyar.

91.     MCW wrongfully charged Plaintiff Nayyar with violating professionalism standards because of the A-line incident.

92.     MCW used the alleged A-line incident to initiate termination proceedings against Plaintiff Nayyar.

93.     MCW manipulated the termination proceedings to punish Plaintiff Nayyar for protesting federal Medicare and ACGME violations.

94.     Since September 2009 through June 2010, Plaintiff Nayyar has applied to numerous residency programs and has been unable to gain admission.

95.     MCW's termination of his residency after completing two years of residency has significantly damaged his ability to gain admission because it is unusual for a program to terminate a resident after two years of training and investment.

96.     Plaintiff Nayyar is currently stigmatized as a result of MCW's actions and will not be able to gain admission to another residency program, effectively ending his medical career.

97.     Without completing residency and obtaining board certification or being board eligible (i.e., requires completion of residency), Plaintiff Nayyar is not able to practice medicine.

98.     MCW has no record of terminating a second resident for professionalism reasons relating to the treatment procedure, where the patient suffered no harm and was not at risk for harm during the A-line procedure

99.     Residents and physicians at MCW has been disciplined, investigated and reprimanded for drug and alcohol abuse on the job, during treatment of patients, failure to answer pages for immediate

patient care, and related problems and matters adversely affecting patient care and yet were not terminated.

100.　After Plaintiff Nayyar filed his suit, MCW terminated a Caucasian resident, who had numerous and frequent workplace violations, as a pretext to cover-up unlawful discrimination and retaliation.

## First Claim for Relief
## Retaliation in Violation of Ohio Law and Public Policy

101.　Plaintiff Nayyar hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 100 above.

102.　Defendants intentionally, willfully, and wantonly retaliated against Plaintiff Nayyar in response to his passionate advocacy regarding patient safety issues at Mount Carmel West.

103.　MC's failure to adequately protect patients within the ICU violates Ohio law and federal public policy regarding hospital and physician's duty and obligation to ensure patient safety and well being and graduate medical education rules and regulations, 42 U.S.C. §1320c-5, 42 U.S.C. Chapter 6A and 7,  42 CFR 413, and Ohio Revised Code 4731.22 (B)(18).

104.　As a direct and proximate result of Defendants' retaliatory conduct, as described herein, Plaintiff Nayyar has suffered loss of income and benefits, emotional distress, anxiety, anguish, humiliation, termination, and suffered false and malicious charges of misconduct and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof.

105.　As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff Nayyar's earning capacity is permanently impaired insofar as he will not obtain a residency at a new hospital program due to stigma and damage to his reputation arising from his termination after two years of residency.

**Second Claim for Relief**
**Retaliation in Violation of Ohio Whistleblower Statute**

106.     Plaintiff Dr. Nayyar hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 105 above.

107.     Upon becoming aware that Defendant Dr. Weiss was critically understaffing the ICU at Mount Carmel West with the expectation that its patients evidently die, Plaintiff conveyed his concerns about the imminent patient safety risk to Dr. Li Tang, Director of Medical Education at Mount Carmel, as required by 42 U.S.C. §1320c-5, Ohio Revised Code 4731.22 (B)(18), and ACGME regulations.

108.     Plaintiff also submitted written evidence to Dr. Li Tang indicating that there was an imminent risk of physical harm to patients if the ICU was staffed in the manner proposed by Defendant Dr. Weiss.

109.     In retaliation to Plaintiff's tireless efforts to prevent physical harm to the patients at Mount Carmel West, the Defendants decided to silence him by terminating his employment from the residency training program.

110.     As a direct and proximate result of Defendants' retaliatory conduct, as described herein, Plaintiff Dr. Nayyar has suffered loss of income and benefits and permanent impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, termination, and suffered false and malicious charges of misconduct and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof.

**Third Claim for Relief**
**Intentional Infliction of Emotional Distress in Violation of Ohio Law**

111.     Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 110 above.

112.    Defendants intended to cause Plaintiff emotional distress.

113.    Defendants were fully aware that their termination of Plaintiff from the residency program under a false pretext would cause Plaintiff Nayyar severe emotional distress. In addition, Defendants deliberately and publically humiliated Dr. Nayyar as a result of his tireless advocacy of patient safety issues at Mount Carmel West. For all the reasons mentioned here, Defendants conduct is outrageous and extreme.

114.    As a direct and proximate result of Defendants' outrageous conduct, Plaintiff suffered embarrassment, mental anguish, loss of reputation, and other harm.

## Fourth Claims for Relief
## Race, National Origin and Ancestral Discrimination in Violation of Title VII and Section 1981

115.    Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 114 above.

116.    Defendants discriminated against Plaintiff on the basis of his national origin and ancestry by harassing, targeting, investigating, disciplining, terminating, making false charges and irreparably damaging his academic and professional reputation.

117.    As a direct and proximate result of Defendants' creation of a hostile work environment and/or workplace harassment, employment termination, and other acts, as described herein, Plaintiff has suffered loss of income and benefits and impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof.

**Fifth Claim for Relief**
**<u>Spoliation of Evidence</u>**

118.    Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 117 above.

119.    It was probable that Plaintiff would bring a lawsuit for wrongful discharge in violation of common law public policy and the Ohio Whistleblower statute.

120.    Despite Defendant Mount Carmel's knowledge of probable litigation, Defendant MC, instructed its agents and/or employees to willfully destroy evidence with the intent to disrupt claims for liability and damages in this lawsuit.

121.    The residents' petition complaining about patient safety in the ICU is evidence favorable to the Plaintiff's claim liability and damages.

122.    Defendant Mount Carmel's willful destruction of evidence has disrupted Plaintiff's liability and damages claims.

123.    As a direct and proximate result, the Plaintiff's case has been disrupted and Plaintiff has thereby been damaged, subjecting Defendants to compensatory and punitive damages.

124.    With regard to the spoliation claim only, punitive damages are appropriate against Defendant Mount Carmel because its willful and malicious conduct constitutes a flagrant disregard for the rights and safety of the public and decedent for which they are liable.

**Sixth Claim for Relief**
**Race, National Origin and Ancestral Discrimination in Violation of**
**<u>Ohio Revised Code §§ 4112.01 and 4112.02</u>**

125.    Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 124 above.

17

126.     Defendants discriminated against Plaintiff on the basis of his national origin and ancestry by harassing, targeting, investigating, disciplining, terminating, making false charges and irreparably damaging his academic and professional reputation.

127.     As a direct and proximate result of Defendants' creation of a hostile work environment and/or workplace harassment, employment termination, and other acts, as described herein, Plaintiff has suffered loss of income and benefits and impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof.

### Seventh Claim for Relief
### Retaliation in Violation of 31 U.S.C. § 3730 (h)

128.     The forgoing allegations are restated herein, MCW receives funds through the federal Medicare program. As a condition of receiving such funds, MCW certifies that it will comply with all Medicare regulations and ACGME regulations for eligibility to receive direct and indirect funding of MCW's residency program.

129.     MCW failed to comply with federal Medicare and ACGME regulations governing medical residency programs

130.     From 2007 though July 2009, Plaintiff Nayyar complained and protested MCW's federal Medicare and ACGME violations to MCW's supervisory staff and physicians and administrators.

131.     MCW retaliated against Plaintiff Nayyar by terminating his employment.

132.     As a proximate result of MCW's conduct, Plaintiff Nayyar is entitled to relief for unlawful retaliation for reporting conduct that constituted a violation of the Medicare regulations.

### Eighth Claim for Relief
### Abuse of Process

133.    The forgoing allegations are restated herein.

134.    MCW had a legal right to initiate a medical investigation after a report regarding the A-line incident.

135.    Rather than discontinue the investigation upon determining no violation occurred, and that the patient had not been harmed, MCW used its investigative authority and employer status to continue the investigation and initiate termination proceedings.

136.    During the investigation and termination proceedings, MCW violated ACGME regulations and manipulated the termination process to retaliate against Plaintiff Nayyar for reporting and protesting Medicare and ACGME violations.

137.    As a proximate result of MCW's conduct, Plaintiff Nayyar has suffered damages and irreparable harm.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Nayyar respectfully requests that this Court:

A.      Immediately reinstate Plaintiff Nayyar in accordance with the terms and conditions of employment and residency prior to termination in order for him to graduate in 2011 or earlier from the residency program;

B.      Six Months Credit for non-credited first year Family Practice residency work to ensure that he completes his residency in June 2011 or earlier.

C.      Award Plaintiff Nayyar liquidated and consequential damages for economic loss he has suffered as a proximate result of Defendants' conduct;

D.      Award Plaintiff Nayyar compensation for past and future pecuniary losses resulting from Defendants' unlawful employment practices, including compensatory and punitive damages for humiliation, damage to reputation, mental and emotional distress, and pain and suffering that he experienced and endured as a result of Defendants' conduct;

E.     Award Plaintiff Nayyar punitive damages for malicious and reckless conduct by Defendants.

F.     Award Plaintiff Nayyar pre and post judgment interest on all sums awarded;

G.     Award Plaintiff Nayyar the costs incurred in this action and reasonable attorneys' fees; and

H.     Grant such other legal and equitable relief as is necessary and proper, including reinstate of his residency medical license.

I.     Grant Injunctive Relief directly against Defendant MC and individual defendants directing them to comply with Medicare, MCW and ACGME policy and procedures.

Respectfully submitted,

S/William W. Patmon III
William W. Patmon, III
(#0062204)
Ranjit Robinson, Esq.
Patmon LLC
Attorneys and Counselors at Law
4100 Regent Street, Suite U
Columbus, Ohio 43219
(614)  470-9860 (Phone)
(614)  470-9930 (Facsimile)
wpatmon@patmonlaw.com
*Attorney for Plaintiff Sunil Nayyar*

## JURY DEMAND

Plaintiff Nayyar requests a jury to hear and decide all issues of fact.

Respectfully submitted,

S/William W. Patmon III
William W. Patmon, III
(#0062204)
Patmon LLC
Attorneys and Counselors at
Law
4100 Regent Street, Suite U
Columbus, Ohio 43219
(614)  470-9860 (Phone)
(614)  470-9930 (Facsimile)
wpatmon@patmonlaw.com
*Attorney for Plaintiff Sunil Nayyar*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and accurate copy of the foregoing Second Amended Complaint was filed electronically on July 2, 2010. All parties and counsel will receive notice and service of this filing through the Court's CM/ECF electronic filing system and may access the filing through the Court's system.

<u>S/William W. Patmon III</u>
William W. Patmon III