UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

SUNIL NAYYAR,                    :
                                 :
        PLAINTIFF,               :
                                 :
        vs.                      : CASE NO. 2:10-CV-00135
                                 :
MOUNT CARMEL HEALTH              :
SYSTEM, ET AL.,                  :
                                 :
        DEFENDANT.               :

                        - - -


        Deposition of SUNIL NAYYAR, the Plaintiff

herein, called by the Plaintiff for cross-

examination under the applicable Federal Rules of

Civil Procedure, taken before Carol A. Kirk, a

Registered Merit Reporter and Notary Public in and

for the State of Ohio, by agreement of counsel and

without notice or other legal formality at the

Offices of Baker & Hostetler, 65 East State Street,

Suite 2100, Columbus, Ohio  43215 commencing on

Friday, February 26, 2010 at 9:20 a.m.

                        - - -

2

```
 1                  DEPOSITION OF SUNIL NAYYAR

 2                       APPEARANCES

 3                          - - -

 4          WILLIAM PATMON, III, ESQUIRE
            PATMON, LLC
 5          4100 Regent Street, Suite U
            Columbus, Ohio  43219
 6          (614) 470-9860

 7               On behalf of the Plaintiff.

 8

            KRISTOPHER J. ARMSTRONG, ESQUIRE
 9          M.J. ASENSIO, ESQUIRE
            BAKER & HOSTETLER
10          65 East State Street
            Suite 2100
11          Columbus, Ohio  43215
            (614) 228-1541
12               On behalf of the Defendants.

13

14      ALSO PRESENT:

15          John C. Weiss
            Steven E. Kile
16

17                          - - -

18

19

20

21

22

23

24
```

3

```
 1                        Friday Morning Session
                          February 26, 2010
 2                        9:20 a.m.

 3                             - - -

 4                        STIPULATIONS

 5             It is stipulated by and among counsel for the

 6   respective parties that the deposition of SUNIL NAYYAR,

 7   the Plaintiff herein, called by the Defendants under

 8   the applicable Federal Rules of Civil Procedure, may be

 9   taken at this time in stenotype by the Notary, by

10   agreement of counsel and without notice or other legal

11   formality; that said deposition may thereafter be

12   transcribed by the Notary out of the presence of the

13   witness; that proof of the official character and

14   qualification of the Notary is waived; that the witness

15   may sign the transcript of his deposition before a

16   Notary other than the Notary taking his deposition;

17   said deposition to have the same force and effect as

18   though signed before the Notary taking it.

19                             - - -

20

21

22

23

24
```

4

```
 1                    DEPOSITION OF SUNIL NAYYAR

 2                      INDEX TO EXHIBITS

 3    DEFENDANT'S   DESCRIPTION                      PAGE

 4

 5        1         DOCUMENT ENTITLED "INCIDENT      104
                    REPORT," DATED 7/9/09, WRITTEN
 6                  BY SUNIL NAYYAR, M.D.

 7        2         TERMINATION LETTER DATED         124
                    7/22/09
 8
          3         PETITION                         136
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

5

```
 1                    SUNIL NAYYAR

 2   being by me first duly sworn, as hereinafter certified,

 3   deposes and says as follows:

 4                    CROSS-EXAMINATION

 5   BY MR. ARMSTRONG:

 6       Q.   Dr. Nayyar, as we were just introduced prior

 7   to you being sworn, I'm Chris Armstrong representing

 8   the Defendants, Mount Carmel Health System, Dr. Weiss

 9   and Dr. Tang.  We're here for your deposition this

10   morning.

11            Have you ever been deposed before?

12       A.   Have I ever been to what?

13       Q.   Have you ever been deposed before?

14       A.   No.

15       Q.   Just to get started then, I'll tell you a

16   little bit about how things are going to go today.

17   I'll ask you questions, and the point of the exercise

18   today is that you just answer to the best of your

19   ability.

20            If you don't understand a question that I

21   ask, if it's confusing, if it's got too many parts to

22   it, you just want me to rephrase it, just let me know,

23   and I'll be glad to do that.  Okay?

24       A.   Okay.
```

6

1      Q.    The other thing is that if you answer a

2    question, because we've agreed that you're going to let

3    me know that you don't understand a question, I'm going

4    to assume if you answer it, that you understood it.

5    Okay?

6      A.    Okay.

7      Q.    And just as we get started, we need to make

8    sure for the court reporter's purposes that we answer

9    audibly rather than nod your head or anything like

10   that.  Okay?

11     A.    Okay.

12     Q.    If you need a break, just let me know, and

13   we'll take a break.  The other thing I have to ask is,

14   are you under the influence this morning of any drugs

15   or alcohol that can affect your memory or your ability

16   to answer questions today?

17     A.    No.

18     Q.    And just one last thing in terms of answering

19   and asking, I'll try not to talk over you if you try

20   and let me finish the question before answering; that

21   way it's easier for the court reporter to take

22   everything down.  Okay?

23     A.    Okay.

24     Q.    Just to start off, can you tell me what you

7

1    did to prepare for the deposition today?

2         A.   What I did?

3         Q.   To prepare.

4              MR. PATMON:  I'm going to object to that.

5         Q.   Let me clarify the question.  I don't want

6    you to tell me anything that you talked about with your

7    attorney, okay?

8         A.   Okay.

9         Q.   I'm not asking you what your conversation was

10   with Mr. Patmon, but just what you yourself did to

11   prepare for the deposition.

12        A.   I slept well.

13        Q.   Good.

14        A.   Ate a breakfast.  That's pretty much mainly

15   what I did.

16        Q.   Did you review any documents?

17        A.   I did.

18        Q.   What did you look at?

19             MR. PATMON:  Objection.

20             Go ahead and answer the question.

21        Q.   You can go ahead and answer.

22        A.   What I did was I looked at my A line report

23   that I turned in, as well as my entire summary that I

24   gave to Mr. Patmon.

8

1      Q.   Did you talk to anyone other than your lawyer

2  about the case or about your deposition today?

3      A.   Regarding today's event?  No.  Besides my

4  family, no.

5      Q.   Who in your family did you talk to?

6      A.   My mother, my father, my sister.

7      Q.   What did you tell them?

8      A.   That I had --

9           MR. PATMON:  I'm going to object, because

10  some of the stuff that you may have told them was

11  communicated by me to you.

12          His family has been involved in the

13  consultations, so I'm going to instruct him not to

14  answer.

15          MR. ARMSTRONG:  Well, if he's disclosed it

16  outside the attorney/client privileged relationship,

17  wouldn't it be a waiver of the privilege, Mr. Patmon?

18          MR. PATMON:  Well, I'm just going to note my

19  objection.

20          Go ahead.

21      A.   Okay.  We just talked about the fact that I

22  have a deposition today and it's early in the morning.

23  "You're going to be fine."  You know, that's pretty

24  much what we talked about.

9

1       Q.    Anything substantive about the case?

2       A.    We just went over again the A line procedure,

3  and they were pretty much encouraging me.

4       Q.    You've never had your deposition taken

5  before.  Have you ever been involved in a lawsuit

6  before?

7       A.    No, not to my knowledge.

8       Q.    Have you ever filed a charge or a complaint

9  of discrimination with an agency like the EEOC or the

10  Ohio Civil Rights Commission?

11       A.    Prior to this?

12       Q.    Prior to this.

13       A.    No.

14       Q.    Have you ever been involved in making a

15  formal or informal complaint of discrimination to an

16  employer or an educational institution that you've been

17  a member of?

18       A.    Prior to this?

19       Q.    Prior to this case.

20       A.    No.

21       Q.    Can you just kind of walk me through your

22  education history after high school.

23       A.    Okay.  After high school, I did -- I went

24  straight -- well, actually during my high school years,

10

 1  I did a post secondary option where I was going to OSU,

 2  as well as another community college during my high

 3  school year.  Following that, I went to Youngstown

 4  State University, finished in about three years.  I did

 5  research during that time as well.  And then following

 6  that, I went to study abroad at Netherlands Antilles;

 7  and following that, I finished up my medical degree,

 8  the last two years of medical school at UMKC, as well

 9  as in Chicago and Mt. Carmel.

10          After that, I did about 16 months of

11  cardiovascular research, and then I joined Mt. Carmel

12  Hospital, family medicine residency, and transferred

13  from there to the internal medicine department.

14      Q.   What were you studying in the post secondary

15  option at OSU?

16      A.   Just regular classes for undergrad.  It was

17  psychology, honors English, classes like that.

18      Q.   And what was your major at Youngstown State?

19      A.   Biology, minor in chemistry.

20      Q.   And did you graduate with a B.S.?

21      A.   Yes.

22      Q.   What year did you graduate from Youngstown

23  State?

24      A.   2000.

11

1          Q.   And your study abroad program in the

2     Netherlands Antilles, what was the subject of the

3     program?

4          A.   Medical.

5          Q.   What was the institution?

6          A.   Saba.

7          Q.   Is that S-a-b-a?

8          A.   That's correct.

9          Q.   And that's medical school essentially?

10         A.   Um-hmm.

11         Q.   And that's the school that you ultimately got

12    your M.D. from?

13         A.   Um-hmm.

14         Q.   You said you finished up your last two years

15    of med school at UMKC.  What is the name of that

16    institution?

17         A.   This is just where we do rotation.  We rotate

18    throughout the country.  This was in Kansas City.  We

19    also rotate other places, like Chicago.  I even did one

20    at Mt. Carmel as well in the family medicine

21    department.

22         Q.   How long were those rotations?

23         A.   A total of two years total time.

24         Q.   Do you know how long you spent in Mt. Carmel

12

1    rotating in the family medicine area?

2        A.    One month.

3        Q.    How about at Chicago, how long?

4        A.    Maybe six weeks.

5        Q.    Where was that rotation?  What institution?

6        A.    In Chicago?

7        Q.    Um-hmm.

8        A.    I don't know the exact name of the hospital.

9    It was Jackson -- if I remember correctly, Jackson

10   Hospital, but I'm not sure.

11       Q.    And then UMKC, what do those letters stand

12   for?

13       A.    University of Missouri, Kansas City.

14       Q.    And you were rotating there at their

15   hospital?

16       A.    Um-hmm.

17       Q.    From there you went directly to a family

18   medical residency at Mt. Carmel?

19       A.    Um-hmm.  Actually, I did research there.  I

20   was offered a research position.

21       Q.    Research where?

22       A.    At the same institute, at UMKC.

23       Q.    UMKC?

24       A.    It was St. Luke's in the cardiology

13

1    department.

2         Q.   What was the subject of your research?

3         A.   Echocardiology.

4         Q.   What was your role in the research?

5         A.   I was the head coordinator.

6         Q.   What were your duties as the head

7    coordinator?

8         A.   Research.

9         Q.   Can you tell me what you did on a day-to-day

10   basis?

11        A.   Research.  I mean this was -- in detail, what

12   we were doing is it's research involving post MI

13   patients, people who have heart attacks, and to see

14   what medications that can actually improve the heart

15   following a heart attack and imaging modalities in the

16   detection of coronary artery disease, as well as

17   subclinical trials for new medications or contrast for

18   echos.

19        Q.   Imaging modalities would be methods of taking

20   a picture, an image of the heart, correct?

21        A.   That's correct, improving those techniques.

22        Q.   So that's what the program was researching?

23   I'm just trying to get a handle on what your role was

24   as a researcher.  Were you conducting clinical trials?

14

1    Can you explain what your daily duties were?

2        A.   My daily duties were as a head coordinator, I

3    would manage patients in the research trial.  We would

4    also perform the research studies.  I would have an

5    echo tech who would do the echo, and I would be present

6    during that time.  I would administer the contrasts

7    during the echos.

8        Q.   What's the contrast?

9        A.   Definity, as well as in the subclinical

10   trial, it was known as A1700.  It's a profusion

11   contrast agent.

12       Q.   What's a contrast?

13       A.   A contrast is -- it's an agent used to

14   highlight the heart.  In other words, so we could see

15   the picture of the heart.  It's like a dye.

16       Q.   So you were administering that --

17       A.   The contrast, yes.

18       Q.   Okay.  Were you required to have an M.D. in

19   order to do that?

20       A.   I don't think so, but I do not know for sure.

21       Q.   Was that a position you sought out, or were

22   you asked to stay on by UMKC?

23       A.   I was interested in cardiology, so one of the

24   things required for cardiology is doing research, and I

15

```
 1   had another colleague of mine who was doing research

 2   and she was finishing, and she asked me to consider

 3   doing research, and I met with the physician, and he

 4   said, "We'd like to have you on board," and so I took

 5   the opportunity.

 6        Q.   And you gained clinical experience

 7   interacting with patients during that, correct?

 8        A.   Um-hmm.

 9        Q.   Were you involved in treating any patients,

10   or was this more for purposes of studying?

11        A.   For purposes of research only; because even

12   though I was an M.D., I did not have a DEA number, so I

13   could not actually treat patients.

14        Q.   Was that a paid position?

15        A.   Yes.

16        Q.   What was your salary; do you know?

17        A.   I think it was $17 an hour.

18        Q.   How many hours per week was it?

19        A.   It was salary, so there's no set hours.  You

20   just do the research.  You try to get as much as you

21   can done.

22        Q.   How many hours typically did you work in a

23   week?

24        A.   It would vary.  I do not know.
```

16

1     Q.   Was it full time, though?

2     A.   It was full time.

3     Q.   How long were you in that position?

4     A.   About 15, 16 months.  I'm not sure of the

5  exact number.

6     Q.   Why did you leave?

7     A.   Residency.

8     Q.   To take the family medical residency position

9  at Mt. Carmel?

10     A.   Um-hmm.

11     Q.   Were you seeking out residencies during that

12  time that you were there?

13     A.   Yes.  I did apply for residency during that

14  time.

15     Q.   It wasn't that you had applied before and

16  deferred or something?

17     A.   I do not recall the exact date.  This

18  opportunity came in March, and I took that.  Oh, yes,

19  now I recall, yes.  So I took the research in March,

20  and then I applied for residency.

21     Q.   Did you do that through the match program?

22     A.   Yes.

23     Q.   In any of the positions that you've held that

24  we talked about all the way through the internal

17

1    medicine residency program at Mt. Carmel, have you had

2    any positions developing or implementing or analyzing

3    at all standards of care in an institution?

4         A.   I don't understand what you mean by that.

5         Q.   With respect to the appropriate standard of

6    care of patients, have any of your positions involved

7    assessing what the standard of care should be or

8    implementing the proper standard of care, making sure

9    that the proper standard of care is achieved by the

10   institution?

11        A.   I do not know.  As a medical student, we just

12   rotate.  That's what we do.

13        Q.   So it's not your responsibility to set the

14   standard of care or ensure that it's complied with?

15        A.   I mean if something inappropriate or illegal

16   is occurring, yes, I should -- I have an ethical

17   obligation to report something like that.  Other than

18   that, I do not know.

19        Q.   But only if it's something illegal or against

20   a rule or some kind of medical guideline?

21        A.   Something inappropriate, yes.

22        Q.   And you should report that then?

23        A.   Yes, that's my ethical obligation to.

24        Q.   During any of your educational experiences,

18

1    did you have any occurrences or allegations of

2    dishonesty leveled against you?

3         A.   Not that I'm aware of.

4         Q.   Prior to your time in the Mt. Carmel internal

5    medicine and family medicine residency programs, I

6    understand your employment was rather limited, but did

7    you have any employee discipline that was issued to you

8    or any kind of write-ups or anything?

9         A.   During my research years?

10        Q.   Research would be the only one.

11        A.   No.

12        Q.   So when did you start in the family residency

13   program at Mt. Carmel?

14        A.   I think it was 2006, July.

15        Q.   How did you wind up in that program?  Were

16   you matched into that program through the match

17   process?

18        A.   Through ERAS.

19        Q.   What was the acronym?

20        A.   ERAS.  That's how you apply for residency.

21        Q.   What does that stand for?

22        A.   You know, I do not know the exact what it

23   stands for.

24        Q.   How does ERAS work?  Can you explain it?

19

```
1          A.    You pay for tokens.  You upload your entire

2    information, your CV.  Recommendations are sent there,

3    dean's letters, personal statements, and you select

4    schools you want to apply to; and then if you hear from

5    them, you hear rejections as well as acceptance for

6    interviews through the ERAS program.

7          Q.    So this is all done online, I take it?

8          A.    Um-hmm, yes.

9          Q.    You say you hear rejections or acceptance for

10   interviews.  So you're either going to hear back from a

11   school or a program knowing that you're rejected or,

12   yes, we'd like to interview you, correct?

13         A.    Some of them don't send "We don't want to

14   interview," some do.

15         Q.    So you may not hear about a rejection?

16         A.    That's a possibility, right.

17         Q.    Even though you've been rejected, they just

18   won't notify you; is that what you're saying?

19         A.    Most of the time.  You can call them and ask

20   them, and they will say, "We're not going to accept

21   you," but most do.

22         Q.    When you say accepts for an interview, is

23   that giving you a position in the residency program or

24   just giving you an interview?
```

20

1       A.   Giving you an interview.

2       Q.   What happens if you get an interview?

3       A.   You go to the interview.

4       Q.   Is there any guarantee of a spot based on

5   being selected for an interview?

6       A.   No.

7       Q.   Then what happens after the interview phase

8   of the process?

9       A.   After all the interview phase is done, you

10  rank the order of which school you want to go to based

11  on your interviews; and on a certain day, a match day,

12  which is known as the match day, and I don't know

13  exactly what date it is, you get an e-mail that says

14  you've been accepted or not.

15      Q.   And you only rank schools that you've

16  interviewed with, correct?

17      A.   That's correct.

18      Q.   You don't know when match day is this year?

19      A.   Sometime in March.

20      Q.   And you get an e-mail saying you've been

21  accepted to a program or not, correct?

22      A.   Right.

23      Q.   If you interview, are you guaranteed to get

24  selected for a program, or could you go through the

21

1    entire process and not get selected for a program at

2    all?

3         A.    If you're interviewed?

4         Q.    Yes.

5         A.    Yeah, you might not get accepted.

6         Q.    Is there a process after you find out -- say

7    you find out you've not been accepted into any program,

8    is there a process after that to try and get into a

9    program?

10        A.    There's a process called a scramble which is

11   through the same site.

12        Q.    How does the scramble work?

13        A.    It's very complicated.  They give you a list,

14   and I can't tell you if you have to pay again for that

15   or not.  I do not recall.  But they give you a list of

16   all the schools that are available that have open

17   spots, and you start faxing your materials to them.

18   It's a difficult process; because during that time,

19   there's thousands of people who are faxing to all those

20   sites.  So it's usually busy, the line, and you've got

21   to do it all night long, and you wait for a call.

22        Q.    Do you have to do that by fax, or can you

23   e-mail?

24        A.    I do not recall.  I do not know.

22

1      Q.   So was Mt. Carmel's family medicine program

2  the program that you were first matched with, or did

3  you get that through the scramble site?

4      A.   Scramble.

5      Q.   Were you ever matched into another program?

6      A.   Huh-uh, I scrambled.

7      Q.   Why did you choose to go into a family

8  medicine program?

9      A.   It was in the Columbus area.  I rotated

10  there.  The residents were really nice, and I thought

11  I'd take it.

12      Q.   Had you specifically applied to family

13  medicine programs to the exclusion of other disciplines

14  in the match process?

15      A.   Yes, I did apply during the scramble.

16      Q.   I guess my question is, had you applied to

17  any programs that weren't family medicine programs

18  during the match process, for example, to an internal

19  medicine program?

20      A.   Yes.

21      Q.   What all disciplines did you apply to in the

22  match?

23      A.   I do not know the exact, but mainly they were

24  internal medicine and family medicine, as well as some

23

1    preliminary positions.

2         Q.   When you say preliminary position --

3         A.   First year.

4         Q.   How was that different from the first year in

5    internal medicine or first year in a family medicine

6    program?

7         A.   It's sort of the same track, and I don't know

8    the details of all the courses the preliminary one

9    takes, but then you can actually transfer to an

10   internal medicine program based on that.  You've done

11   one year.

12        Q.   Is it like a transitional year concept?

13        A.   Yes.

14        Q.   What drew you to internal medicine and family

15   medicine?

16        A.   I'm sorry.  Say that again.

17        Q.   What drew you to internal medicine and family

18   medicine?

19        A.   Cardiology.

20        Q.   Can you explain that?

21        A.   I have a passion for cardiology, hence,

22   that's why I did the research, so you have to do three

23   years of medicine prior to doing cardiology.

24        Q.   So you want to be a cardiologist, right?

24

1       A.   That's correct.

2       Q.   So what do you need to do in order to become

3  a cardiologist?  What are the prerequisites for that?

4       A.   Completing three years of internal medicine,

5  being board certified in that; and then because

6  cardiology is very competitive, I was told research

7  improves your chances significantly, especially if you

8  publish papers, which is why I did a significant amount

9  of research prior to entering residency, as it is

10  difficult to do research during residency.

11       Q.   Did you publish any papers?

12       A.   Yes.

13       Q.   How many?

14       A.   Four.

15       Q.   Do you know their titles?

16       A.   Not off the top of my head, not all of them,

17  no.

18       Q.   Do you have copies still?

19       A.   (Indicates affirmatively.)

20       Q.   Was that a yes?

21       A.   Yes.  I'm sorry.

22       Q.   Just for the court reporter.

23       A.   Sorry.

24       Q.   Now, you said that family medicine could also

25

1   lead to cardiology?

2        A.   No, it cannot.

3        Q.   So why did you choose to go into a family

4   medicine program?

5        A.   My mother was diagnosed with breast cancer,

6   and I wanted to make sure that I stayed in the Columbus

7   area, and family medicine was in the Columbus area so I

8   chose family medicine.

9        Q.   Were you thinking at the time that you would

10  transfer then to an internal medicine program?

11       A.   During the interview, I said, "I have no

12  problems finishing family medicine," when I went

13  through the interviews, and then the conversation was

14  that if you feel like you're interested in cardiology,

15  then you can just go to internal medicine.

16       Q.   Do you know who said that to you in the

17  interview?

18       A.   Dr. Ruppel.

19       Q.   What was Dr. Ruppel's position?

20       A.   Program director.

21       Q.   Of which program?

22       A.   Family medicine.

23       Q.   But at the time, though, when you applied to

24  that program, you were willing to finish out the family

26

1    medicine program?

2        A.    That's correct, I did not mind finishing it

3    out.

4        Q.    And then going to an internal medicine

5    program?

6        A.    Yes.

7        Q.    So that would have been a total of six years

8    if you had done that?

9        A.    You would get credit for the family medicine

10   year, some credit for it.

11       Q.    How much credit; do you know?

12       A.    According to a previous resident who

13   transferred who completed family medicine and went to

14   Mt. Carmel, she said she got one year's credit.

15       Q.    So five years from the time you started until

16   the completion of the internal medicine residency?

17       A.    That's correct.

18       Q.    So when did you start in family medicine?

19       A.    2006, July.

20       Q.    So you would have finished that up, if my

21   math is correct, in July of 2011 or June of 2011 had

22   you done family medicine for three years and then two

23   years of internal medicine?

24       A.    That's correct.

27

1    Q.   Which you were willing to do when you applied

2    to the program?

3    A.   That's correct.

4    Q.   Would based on the times that you've taken

5    your Step 1 and Step 2 exams -- which I understand you

6    took in medical school; is that correct?

7    A.   Yes.

8    Q.   Would that timetable, starting in 2006 and

9    finishing up in 2011 timetable, have impacted at all

10   your ability to take Step 3 on time?

11   A.   That would have made me more prepared.

12   Q.   Would it have affected your ability at all to

13   take the ABIM internal medicine board and then seek a

14   cardiology program?

15   A.   I do not understand your question.  What do

16   you mean?

17   Q.   Would the timing, is there any kind of time

18   limit imposed between the time you start and the time

19   you complete that would have affected your ability to

20   take the ABIM internal medicine boards and seek out a

21   cardiology program if you hadn't finished up until

22   June of 2011?

23   A.   Only interruptions can affect it in a sense.

24   Q.   How would an interruption affect it?

28

1        A.    Usually from what I was told, that if your

2    cycle has been interrupted, most program directors ask

3    you what you have been doing during that time, if

4    you're away from the clinical scene for a while,

5    because they know that being out of the clinical scene

6    affects your knowledge over time since this is a

7    clinical training program.

8        Q.    Would your cycle being interrupted, though,

9    preclude you from obtaining entry to a cardiology

10   program?  Would it say you just can't get in?

11       A.    It can possibly affect it.  I'm not sure,

12   because I said interruption in your training looks bad.

13       Q.    But it doesn't make you ineligible?

14       A.    Nothing can make you ineligible, but it's a

15   possibility.

16       Q.    Okay.  During your first year when you were

17   in the family medicine program, was there an issue that

18   came up with you exceeding maximum hours?

19       A.    Yes.

20       Q.    Can you explain what happened with that?

21       A.    About -- I can't recall when the surgery

22   month was.  I think it was in the month of September,

23   but I'm not sure on that.  We got our schedule about

24   two weeks to three weeks before the actual rotation

29

1    started, and I looked at the schedule, and I noticed I

2    was on call, I think, eight times that month, and

3    previous senior residents said they only had five times

4    that month, and you start early in the morning at 5:00

5    a.m., but sometimes you have to show up earlier than

6    5:00 a.m. to prepare for rounds.

7            When I looked at the schedule and I counted

8    all the hours that would be based on what previous

9    residents told me, I went to the program director to

10   discuss my schedule with him, stating that with this

11   schedule, I will exceed the hours, the 80 hours a week.

12           The program director, Dr. Ruppel, stated,

13   "You will not exceed the hours," and I showed him the

14   schedule, gave him the schedule.  And he said -- and I

15   said, "If you're on call eight times a month and you

16   start early in the morning at 5:00 a.m., you will

17   exceed the hours," and he said, "You won't exceed the

18   hours," and I calculated myself.  I knew I exceeded the

19   hours.

20           So I went to other physicians in the program,

21   Dr. Hinkle.  I went to Dr. -- oh, gosh. I do not recall

22   all their names, but two other staff physicians.  One

23   was Dr. Benedict and the other one was Dr. Morgan, and

24   they said that "You have to talk to Dr. Ruppel about it

30

1    but also talk to the chief resident."

2          So I went to the chief resident, and I spoke

3    to her, and she said, "I will talk to the surgery chief

4    resident."  During that time, I knew that it would be

5    delayed, so I went to the surgery secretary, and I told

6    her, "Look, I'm going to go over these hours with the

7    schedule since the surgery department makes my call

8    schedule," and she said, "No one ever violates the

9    hours in surgery," and I said, "but with these amount

10   of calls, I will violate the hours," and she said, "No

11   one will violate the hours."

12         So then as I was leaving that -- and I think,

13   if I'm exactly correct on that, the chief resident in

14   family medicine was on the campus area, and I ran into

15   her, and she told me, "Listen.  Just do the hours.

16   You're causing a lot of problems.  Surgery is getting

17   upset that you're talking about this to other people.

18   Just do the hours and don't cause problems."

19         So based on that, I did my rotation.  When

20   the senior resident showed up, Dr. Kulwicki, I showed

21   him my schedule, and I said, "Listen.  I'm working

22   seven days a week the entire month, not one day off.  I

23   have eight calls.  You want me to be here before

24   5:00 a.m. to prepare for rounds at 5:00 a.m.  I will

31

```
 1    exceed the hours."  And he said, "A lot of us lie on
 2    GMEone," and gave me that look hinting that, you know,
 3    do it, and he said, "But if you are exceeding over the
 4    hours or close to the hours, inform me," and I told him
 5    "Already this schedule I'm going to go over the hours.
 6    I'm informing you now."  And we went on with the
 7    rotation.
 8              Post call days where you do a 30-hour shift,
 9    I was kept for 36 hours by the senior resident total,
10    some days 32 hours, and he made it very clear to me and
11    the intern that we are not allowed to leave until you
12    check out with the senior resident.  So you end up
13    staying there, and you would wait for him to come out
14    of surgery, because usually he's in surgery during the
15    days after rounds, and we just have to wait.
16              I paged him while he was in surgery, too,
17    during that day where I did 36 hours and I said, "Look,
18    I'm post call.  I need to check out with you."  And
19    he -- I guess he was finished with that surgery, came
20    out, I checked out, and then I left for home.
21              I was averaging from what I felt was around
22    over 100 hours a week, and the surgery intern had less
23    calls than me, and he was a surgery resident, and he
24    even felt that this schedule was ridiculous, and they
```

32

1    don't know why I'm doing more calls than the surgery

2    residents.

3          When I was logging my hours, the surgery

4    intern was helping me reduce the hours on GMEone.  And

5    I think Dr. Morgan at one point in time said, "How many

6    hours are you working?"  And I told her when I was in

7    the hospital that the hours are long.  "I am exceeding

8    80 hours a week.  I'm doing over 100 hours."  And she

9    felt bad, and I don't know what she did with that

10   information.

11        Q.   Let me double back on some of this.  So to

12   start off with, Dr. Ruppel said, "I don't think you're

13   going to exceed the 80 hours"?

14        A.   He was giving me the 80 hours are averaged

15   over the whole month, so it's not how much you do in

16   one week.  It's averaged over the whole month and you

17   will not go over it.

18        Q.   So he didn't anticipate a problem when you

19   spoke with him?

20        A.   (Indicates negatively.)

21        Q.   Did he ever tell you work more than 80

22   hours --

23        A.   I do not recall.

24        Q.   -- averaged over the month?

33

1       A.   I do not recall.

2       Q.   Did he tell you to violate the ACGME rule?

3       A.   I do not recall.

4       Q.   Did Dr. Hinkle ever tell you to violate the

5  ACGME rule?

6       A.   No.

7       Q.   Did Dr. Benedict ever tell you to violate the

8  ACGME rule?

9       A.   She never clearly said violate the ACGME

10  rule, no.

11       Q.   Did Dr. Morgan ever say to violate the ACGME

12  rule?

13       A.   No.

14       Q.   When you talked to Dr. Morgan, you told her

15  that you were working -- is Dr. Morgan a female?

16       A.   Um-hmm.

17       Q.   You said you were working a lot of hours and

18  that you were working more than 80 hours that week,

19  correct?

20       A.   I was working over 80.

21       Q.   Did you tell her "I'm going to be over 80

22  hours for the month"?

23       A.   She knew about it when I showed her my

24  schedule at the beginning of the month before I even

34

 1   started when I complained to all of them about it.

 2       Q.   But then later you went back to her?

 3       A.   She stopped me in the ER.  She was in the ER,

 4   and she said, "How are you doing?"  I said, "I am

 5   working over 100 hours a week."

 6       Q.   Was the month completed yet?  Was it clear

 7   you were going to violate the ACGME rule at that time?

 8       A.   I don't recall the exact week that I was in,

 9   but it was a big issue because other residents in the

10   family resident department knew the amount of hours I

11   was working, and it was a big concern.

12       Q.   Who is Dr. Morgan?

13       A.   She's a family medicine physician.

14       Q.   Is she a resident or an attending?

15       A.   No, she was an attending.

16       Q.   As I said before, was it clear at the time

17   you spoke to her, though, that you had violated the

18   rule or were about to violate the rule?

19       A.   I don't understand what you mean by "was it

20   clear to her."  I was telling her at that point I'm

21   working over 100 hours a week.  I don't know exactly

22   what timeframe I was in in the month.

23       Q.   So it wasn't clear that you were going to

24   violate the rule that says you can't have more than 80

35

1  hours per week averaged over the month, correct?

2      A.  If you work over 100 hours a week, that means

3  you have to work 60 or 40 hours the other week; and

4  based on my call schedule, you can't.  Each call is

5  worth 30 hours.

6      Q.  But you hadn't worked that time yet, correct?

7      A.  The entire month?

8      Q.  Right.

9      A.  I do not recall where I was in the month when

10  I approached her -- or when she approached me.

11      Q.  The day you were kept 36 hours, when you said

12  you were kept 36 hours, did you call Dr. Ruppel, your

13  program director?

14      A.  I do not recall that day.  That was a long

15  time ago.

16      Q.  Did you call any other attending to say "I've

17  been here too long"?

18      A.  We had work.  That's all we were doing.  I

19  was trying to get all the work done in the morning.  I

20  do not recall who I called.  I was trying to call the

21  senior resident, and that's who I was trying to call to

22  actually check out so I could leave.

23      Q.  Dr. Kulwicki didn't instruct you to lie on

24  GMEone, did he?

36

1       A.   He told me clearly, he said, "We all lie on

2   GMEone," and he gave me that look staring at me.

3       Q.   But he also said, "If you're close to the

4   hours, let me know"?

5       A.   He said, "Let me know if you're going to

6   violate the hours," yes.

7       Q.   And even though he said he did that, he

8   didn't tell you you should do that, too?

9           MR. PATMON:  Objection.

10          Go ahead and answer if you understand the

11  question.

12      A.   It was clearly understood what he was saying.

13      Q.   You interpreted that, but he didn't

14  explicitly say it, correct?

15          MR. PATMON:  Objection.

16      A.   When a guy comes to you and says, "We all lie

17  on GMEone," it was clearly understood what he was

18  saying to me.

19      Q.   And he's a resident, correct?

20      A.   Yes, he was a senior resident at that time.

21      Q.   Did you report the fact that he said, "We all

22  lie on GMEone," to your program director?

23      A.   I do not recall.  I think I mentioned that to

24  all the residents, as well as the chief resident, but I

37

1  do not recall if I mentioned that to attending

2  physicians.  I was specifically told by the chief

3  resident of family medicine to stop causing problems;

4  "You're going to cause a lot of problems between the

5  family medicine department and the surgery department,"

6  and that they were already upset with me complaining

7  about the schedule.

8      Q.   But, once again, that was another resident

9  who told you that, right?

10     A.   That was the chief resident of family

11 medicine.

12     Q.   Did you ever report that to your program

13 director?

14     A.   I do not recall.  At that point, I had no one

15 to go to.  I went to everyone I knew I was supposed to

16 go to regarding that.  I went beyond what I should have

17 done.  I went to the program director, the associate

18 program director, all staff physicians that were

19 available during that time, and I went to the secretary

20 of the surgery department.  And then I told the senior

21 resident on the surgery department -- or in my month,

22 my senior supervising surgery resident.

23     Q.   You told all those people that you believed

24 based on the schedule that hadn't happened yet that you

38

1  were going to violate the rules?

2       A.   It's obvious you'd violate the rules.  Each

3  call consists of 30 hours.  There's eight calls.  So if

4  you average that, that's two calls a week, which is 60.

5  The rest of the days you start at 5:00, but you end up

6  coming in before 5:00, and you leave anywhere from 4:00

7  to 6:00 p.m. depending on when they release you.  It's

8  quite obvious you would violate the hours.

9       Q.   But you never told any of those people that

10 you had been told to lie on GMEone, the attendings,

11 correct?

12      A.   I do not recall, but I told the residents,

13 and it was a big issue at that time, because they were

14 worried as future residents on what they would have to

15 do; and when the next month's schedule came out, Peter

16 Rafeal had more calls than I did, which was nine calls.

17      Q.   Do you know if anyone raised the issue?

18      A.   Peter Rafeal when he got his schedule.  We

19 were at Riverside Hospital at the time doing our ALSO

20 course, which is getting our certification for OB-GYN

21 to handle emergency situations.  It's called ALSO,

22 A-L-S-O, advanced life support for obstetrics, if I'm

23 correct on that, and I told him, "The schedule is out

24 for surgery," and I said, "You are going to have nine

39

1    calls, because the schedule was made," and he was

2    pretty upset because he knew I was working excessive

3    amount of hours, and he was saying, "I am not going to

4    work that many hours as you.  They can't force me."

5    During that time, that's what the conversation was

6    between me and him.

7        Q.   Do you know what he did, whether he worked

8    the hours, or did he complain?

9        A.   No, because at that point in time, the family

10    medicine secretary at Riverside overheard our

11    conversation, and apparently she reported it to

12    Mt. Carmel, and I don't know who she called at

13    Mt. Carmel, but that was reported.

14        Q.   Did anything come from the reporting of that?

15        A.   Yes.

16        Q.   What happened?

17        A.   I was told my post call day -- and I don't

18    know exactly which day from the time she reported it to

19    where I was.  I was told by the resident to "Leave now

20    or they're going to escort you off the property."

21        Q.   I'm sorry.  Someone told you to leave or they

22    would escort you off the property?  Who was that?

23        A.   That was the intern, Nicholas Limperos, after

24    their morning meeting.

40

```
 1        Q.    Who's morning meeting?

 2        A.    Surgery had a meeting in the morning.  It's

 3    like morning report.  I don't know if this was a

 4    special meeting for surgery at the time, because I did

 5    not go.  It was just -- I assume it was just for

 6    surgery, because usually I go to the morning meetings.

 7        Q.    Escort you off what property?  Where were

 8    you?

 9        A.    Mt. Carmel.  I was post call.  I was still

10    seeing patients.

11        Q.    What does post call mean?

12        A.    You do 24 hours.  You're on all day, all

13    night, and so you're post call after 24 hours; and then

14    at that point in time, you can't technically see new

15    patients or admit new patients, if I'm correct on the

16    rules.  At that point in time, they told me -- and I

17    don't know exactly -- it was during the morning hours,

18    and they told me, "You have to leave now."

19        Q.    Do you know why?

20        A.    They said, "Just leave now," and I told

21    Nicholas Limperos that "I haven't finished doing all my

22    work."  He said, "Don't worry about it.  Leave now

23    before they escort you off the property," and I did not

24    know why.
```

41

```
 1        Q.   And you believe that's connected to the
 2   family medicine secretary reporting your conversation?
 3        A.   Later on I did, yes.
 4        Q.   Why do you believe that?
 5        A.   They told me.
 6        Q.   What did they tell you?
 7        A.   They told me that someone from Riverside --
 8   and they mentioned her name.  If I remember correctly,
 9   Regina Gray, but I'm not sure of the name.  I don't
10   know her name now. -- contacted Mt. Carmel, and I am
11   not sure on this, but they told Dr. Travis and Dr.
12   Travis reported it to -- I don't know who.  I assume
13   the program director, because I was called in his
14   office regarding the hours, and there was a special
15   meeting for that.
16        Q.   How is that connected in your belief to being
17   asked to leave the property?
18        A.   They told me.
19        Q.   What did they tell you about that?
20        A.   Well, first of all, Nicholas Limperos told me
21   himself later on when I called him, and he said, "We
22   had a meeting, and it was about -- someone reported
23   you -- or you complained to someone at Riverside and
24   they reported resident abuse hours" because I didn't
```

42

1      know why.  I thought I did something wrong.  So I asked

2      him what happened, why was I told to leave.  And then

3      we had meetings, and the program -- it was a room full

4      of the program director, the associate program

5      director, Dr. McCreary, and I asked Dr. Travis as well

6      to come in.

7          Q.   Who is Dr. Travis?

8          A.   He is the psychologist involved in the family

9      medicine department.  He's part of the staff there.  He

10     gives us lectures.  He's sort of our support system.

11         Q.   So you asked him to be present as well at

12     these meetings?

13         A.   That's correct.

14         Q.   And what were the meetings to discuss?

15         A.   My hours and what happened on surgery.

16         Q.   So you think they sent you home because they

17     didn't want you to log any more hours?

18         A.   I do not know.

19         Q.   What was discussed in the meetings?

20         A.   Things that were discussed in the meeting was

21     Dr. Ruppel saying, "Why didn't you come to me with the

22     schedule?"  And I said, "I did and I showed you the

23     schedule," and he said, "You never told me about the

24     hours."  I said, "Yes, I did.  I told you about the

43

1    hours, and I also mentioned to you that" -- and he

2    said, "No, you never told me about the hours.  I never

3    knew you guys start at 5:00 a.m."  I said, "You're the

4    program director.  Every resident starts at 5:00 a.m.

5    there.  How can you not know?  I told you we started at

6    5:00 a.m.  I told you the hours.  I calculated the

7    hours for you when I gave you the schedule at the

8    beginning."  But he denied it, and he was yelling at

9    me.  He was very upset.

10          You could tell he was trying to push all this

11   blame on me, and Dr. Travis sitting there told another

12   resident that he felt bad for me, how I was getting all

13   the blame when he knew I reported it to everybody about

14   the hours I would work.

15        Q.   So when you say you calculated the hours for

16   him, did you give him anything in writing?

17        A.   I gave him the schedule, highlighted my hours

18   or the days I'm on call, and I showed him, "Look, every

19   call is 30 hours each.  There's eight calls in a month.

20   The rest of the days I'm working at least 12 plus

21   hours.  This is the schedule."  And I gave him the

22   schedule.

23        Q.   You didn't write out your calculations,

24   though, is my question?

44

```
 1        A.   I do not recall.  Before when we got the

 2   schedule, the first thing most residents do is they

 3   calculate how many calls they have, how many hours

 4   they're working in a week, especially when you first

 5   start out like I did.

 6        Q.   Why is that?

 7        A.   Because we don't -- because the hours are

 8   long.  They're painful.  You don't -- you're not used

 9   to working 80 plus hours a week.  It's not easy to get

10   used to.  It takes time.  There's some months that are

11   easy that you don't have that many calls, maybe four or

12   five calls or no calls, and there are some months that

13   are excessive; and in those months, you know one of

14   them is surgery or the inpatient service, you calculate

15   your hours.

16        Q.   And a call is the 24 hours of the 24 plus

17   six?

18        A.   Plus six, yes.  The call includes that.  So

19   it's a 30-hour shift.  Most of the time they keep you

20   up to 30 hours.

21        Q.   So my understanding, though, from what you

22   testified before was that when you were on post call,

23   that was the six, the last six?

24        A.   I don't know the exact definition of post
```

45

1   call.  Yeah, you could say that.

2        Q.   Okay.

3        A.   Post call I would assume -- I don't know the

4   exact definition of post call.  Whether that's a real

5   term or not, I don't know.

6        Q.   But that is what you were using it to mean

7   before?

8        A.   Yes.  When you're there all night, the day

9   shift comes, you're post call.  You know, you say, "Oh,

10  I'm post call.  I worked night, all day yesterday."

11       Q.   But that's still within the 30 hours?

12       A.   Post call?

13       Q.   Yes.

14       A.   Yes.

15       Q.   That was my question.

16            Didn't Dr. Ruppel tell you during your

17  meetings "We don't want you to exceed hours.  If you

18  are exceeding hours, you need to let us know"?

19            MR. PATMON:  Objection.

20            Go ahead and answer.

21       A.   At the meeting -- yes, he was telling me --

22  yeah, him and I think -- I don't know if any other

23  person said it, but he was saying that "Dr. Hinkle and

24  I want to know about the amount of hours you log into

46

1    GME and not to manipulate that, because then we won't

2    know if you're violating that."  But I mentioned at

3    that time that "I told you I'm going to violate that."

4         Q.   Did you, in fact, enter incorrect information

5    into GMEone?

6         A.   Yeah, with the assistance of the surgery

7    intern.

8         Q.   And did they tell you at the meeting you

9    shouldn't have done that?

10        A.   At the end of the month when we had the

11   meeting, yes.

12        Q.   And, in fact, didn't they say, "If you enter

13   the accurate information, that will allow us to step in

14   and know that there's been a violation and stop it?"

15             MR. PATMON:  Objection.

16        A.   Not necessarily, because that stuff -- I

17   don't know exactly when the program director reviews

18   the hours or if he can review the hours based on that

19   online site.  I do not know that.  Usually they tell

20   you at the end of the month, okay, here's your average

21   over the entire month, and it gives an average over the

22   entire month.  So like he said before, Dr. Ruppel, that

23   if you do it, it's an average over the entire month.

24        Q.   Do you recall that Dr. Ruppel and Dr. Hinkle

47

1    said that it's important to log your hours correctly

2    into GMEone so that there's proof if there's a

3    violation so they can address it with the appropriate

4    department?

5         A.    They mentioned it at the meeting, yes, but

6    like I said before, the entire department knew I was

7    going to violate the hours, including the surgery

8    department, because I mentioned it to almost everybody

9    that I could think of possible.

10        Q.    To the residents?

11        A.    No.  I mentioned it to staff family medicine,

12   and I mentioned it to the staff secretary of the

13   surgery department.

14        Q.    That was based on the schedule that you

15   believe was going to happen?

16        A.    That would happen.

17        Q.    Just for the record, GMEone is a system that

18   you log in your hours?

19        A.    Online.

20        Q.    And you don't know who that gets reported to

21   or how often within Mount Carmel, for example?

22        A.    As of now or back then?

23             MR. PATMON:  Objection.

24        Q.    Do you know now?

48

```
 1      A.   Now, not -- I don't know how each department
 2  works, how often they do it, but I do know in the past,
 3  Dr. Rutecki was really strict on logging the hours, and
 4  we would get e-mails all the time from Dr. Weiss or the
 5  secretary to log our hours; but in the family medicine,
 6  I do not know exactly how often.
 7      Q.   Okay.
 8      A.   But from what I understood, that Dr. Ruppel
 9  looks at it at the end of the month since he states
10  it's an average of the entire month.
11      Q.   And at the end of that meeting or at the end
12  of that process, they basically instructed you "Don't
13  falsify your hours," correct?
14           MR. PATMON:  Objection.
15           Do you know what meeting he's talking about?
16      A.   Are you talking about --
17      Q.   I'm talking about the meeting with Dr. Ruppel
18  at the end of this process, the meetings you referred
19  to where you asked Dr. Travis to be present.
20      A.   Okay.  Now, can you state the question again?
21      Q.   The question with respect to that meeting, is
22  that either in that meeting or at the end of this
23  process with respect to this talking about this surgery
24  rotation, they basically instructed "You don't falsify
```

49

```
 1   your hours"?

 2             MR. PATMON:  I'm going to object.  There were

 3   multiple meetings.

 4             He's talking about the end of the process.

 5   Do you know what process he's talking about?

 6        A.   No, I don't.  All I recall him saying was

 7   that it's important to log the hours correctly so that

 8   we can notify the exact department if we're violating

 9   them.

10        Q.   That's fine.

11             So at the end of your first year in family

12   medicine, you transferred to the internal medicine

13   residency program, correct?

14        A.   That's correct.

15        Q.   And why did you decide to transfer at that

16   time?

17        A.   The family medicine department is -- it's not

18   really a good program.  There's a lot of fighting

19   amongst each other from the staff to staffing

20   residents.  The support system was horrible.  For

21   example, with the hours, no one truly tries to fight

22   for you.  And then at the end, I felt that Dr. Ruppel

23   was blaming me to protect himself, and he was yelling

24   at me, and I found that inappropriate.
```

50

1          You get treated bad in that department.  You

2    could sense that they all hated me because I liked

3    cardiology, and there is a history of people

4    transferring from the family medicine department to the

5    internal medicine department, and they felt that that

6    was a risk.

7          Dr. Tamaskar saw me on the internal medicine

8    rotation at the beginning -- I think it was in the

9    month of August, but I am not sure, and he, quote

10   unquote, said, "Why are you in family medicine?  You

11   are beyond these residents here knowledgewise.  You

12   need to transfer to this program."  And he assisted in

13   that process.

14         You know, the family medicine department, the

15   education system is poor.  During our even M and M's or

16   our lectures, staff physicians aren't even present; and

17   when Dr. Rutecki found out that -- and I don't know who

18   reported it to him -- he was very upset about how the

19   family medicine department was running.

20         It was to the point where he started staffing

21   the rounds because we weren't really being taught on a

22   clinical basis.  You know, the attendings there just

23   want to finish and then go home or go do their other

24   job, and the education system was really, really poor.

51

1    Q.    And so you felt that the internal medicine

2    program would be better?

3    A.    I learned a lot on my rotation with

4    Dr. Tamaskar; and, yes, they have noon lectures where

5    staff physicians are present, so yes.  I learned more

6    in that one month than I did probably my entire year of

7    family medicine.

8    Q.    So in terms of that -- I mean other than that

9    month, was it a wasted year in family medicine?

10   A.    I don't call any time in the clinics wasted,

11   no.  I learned a little bit about OB-GYN.  I learned a

12   little bit about pediatrics.  I don't think anything is

13   wasted.

14   Q.    But it wasn't a high quality educational

15   experience from your point of view?

16   A.    That's correct.

17   Q.    Dr. Tamaskar, it sounds like he was an

18   advocate for you in terms of transitioning over to the

19   internal medicine program --

20   A.    That's correct.

21   Q.    -- is that fair to say?

22         Did you have any discussions about whether

23   you would start in the internal med program as a PGY1

24   or PGY2?

52

1       A.   I do not recall.  Not with Dr. Tamaskar, I

2   don't recall.

3       Q.   With anyone?

4       A.   I do not recall.  I think when I was talking

5   to Dr. Eckler, he was stating that because of the

6   resident numbers, he's not sure if I could get credit

7   for my six months, but I do not know for a fact.

8       Q.   But, in fact, you did start, and you knew you

9   would be starting as a PGY1?

10      A.   Yes.

11      Q.   And you were okay with that?

12      A.   Yeah.

13      Q.   So you knew they weren't going to give you

14  any credits for your --

15      A.   That's not correct.  I did not know that.

16      Q.   Did you have a discussion with anyone about

17  whether any of the rotations or time you had spent in

18  family medicine would transfer?

19      A.   Previous residents above me who transferred

20  got six months credit, that's correct.

21      Q.   But you didn't know what would happen with

22  yours at the time?

23      A.   Not at that time, no.

24      Q.   And do you recall asking specifically for

53

1    that to happen, or it just wasn't discussed?

2        A.   I do not recall.

3        Q.   Can you tell me a little bit about the

4    internal medicine program?  And go as basic as what

5    does the internal medicine discipline encompass?  What

6    areas do you study within that area?

7        A.   In internal medicine?

8        Q.   Internal medicine.

9        A.   What areas we study?

10       Q.   Versus family medicine.  You're now in

11   internal medicine.

12       A.   It focused mainly on -- it doesn't focus on

13   OB-GYN.  It doesn't focus on surgery.  It doesn't focus

14   on pediatrics.  Just general medicine that consists of

15   outpatient.  It consists of cardiology, pulmonary,

16   nephrology, endocrinology.  I mean every field of

17   internal medicine.

18       Q.   Was OB-GYN a rotation you had done in family

19   medicine?

20       A.   Yes.

21       Q.   And surgery obviously was, correct?

22       A.   Yes.

23       Q.   And pediatrics as well?

24       A.   Yes.

54

1      Q.    And you did one month in each of those?

2      A.    Surgery two months, and I don't recall -- and

3   just one month in pediatrics.

4      Q.    How about in OB-GYN, how long?

5      A.    I think that's -- I don't know.  I think it's

6   two to three months.  I'm not sure.

7      Q.    And none of those things are aspects of the

8   internal medicine program?

9      A.    That's correct.

10     Q.    I mean you have the right to take rotations,

11  like women's health which would possibly be OB-GYN or

12  gynecology.  That's an option.

13     A.    In internal medicine?  I would assume you

14  could take an elective in that.  I do not know for a

15  fact.

16     Q.    Some of these questions may seem rather basic

17  to you, but it just helps educate me.

18     A.    That's fine.

19     Q.    When you're a resident, what is your role in

20  the delivery of the healthcare to the patients?  I mean

21  I understand you've got attendings.  You've got

22  residents.  Explain a little bit about what you do as a

23  resident on a day-to-day basis.

24     A.    We see patients.  We diagnose, we treat; but

55

1    before we do most of that, we have to discuss that with

2    either a senior resident or a supervising physician.

3    Because this is a training program and we're not

4    licensed, there's a hierarchy system you go through to

5    prevent adverse outcomes from happening.

6         Q.   When you'd go and you'd talk about what your

7    plan is with an attending or a senior resident and you

8    have that conversation, is that an accurate description

9    of the process up to that point?

10        A.   I mean there's -- I mean are you talking

11   about when you're admitting a patient, or are you

12   talking about when you're on call?  Because there's --

13        Q.   Say you're on call.

14        A.   Okay.  And you're admitting a patient in the

15   ER?

16        Q.   Sure.

17        A.   Okay.  There's a hierarchy system we go

18   through.  If you're an intern, you see the patient.

19   That's part of your training.  You do a full H&P, full

20   history and physical exam.  That means you ask almost

21   every system base you can.  It's part of the training

22   process.

23            When you're done, you explain that to the

24   senior resident on call with you.  Then that senior

56

 1    resident will go and see the patient, interview

 2    himself, and also he has to write a report, because

 3    it's training on two levels, and you agree or disagree

 4    with what the intern says.  You educate him, and you

 5    call staff physicians if there's questions, or if you

 6    have to counsel and don't know what to do.  That's how

 7    the system goes.

 8        Q.   So when you're a senior resident, the staff

 9    physician doesn't have to see the patient before you

10    can take an action to treat that patient; is that fair

11    to say?  Am I understanding you correctly?

12        A.   If there's something -- that's correct.  If

13    there's something we don't understand, yes, we call

14    them immediately on a general call.

15        Q.   And they would give you an answer over the

16    phone rather than come right down and see the patient?

17        A.   Unless there's something urgent, and I would

18    assume they would come in; but, again, it's different

19    from every department.  Surgery has a surgery staff on

20    site is what I was told.  So, you know, we're talking

21    about general admissions.  These people aren't

22    critical, so it's not of that much concern.

23        Q.   What are the different rotations of the

24    internal medicine program?  Are there set rotations

57

1    that you rotate through?

2         A.    We kind of try to cover every field possible;

3    ICU, cardiology, pulmonary, nephrology, endocrinology,

4    basic hospital medicine.  There's outpatient rotations,

5    dermatology.  It's almost every field that I can think

6    of in internal medicine residency.  There's a list that

7    you have to -- I assume there's a list that you have to

8    have done before graduating.  There's criteria.

9         Q.    What is morning report?  Do you know what

10   that means?

11        A.    Morning report is a report where residents

12   usually give a case report so we can learn from it.  So

13   it's pretty much residents teaching other residents.

14   Staff physicians are usually present, because it's

15   designed so that we can all learn from it, because not

16   all resident or intern sees every patient.  If you come

17   across a good case, whether you made a mistake or you

18   did something good, you present that case so we can all

19   learn from it.

20        Q.    So it's an educational opportunity?

21        A.    Yes.

22        Q.    Is it an important part of the residency

23   program to educate the residents?

24        A.    I believe so.

58

1     Q.   If you're presenting, what are your duties?
2   What do you have to do in terms of if you're the person
3   who's got the case that's interesting and you're
4   telling everyone about it?
5     A.   You present it.  I mean what I do is I place
6   it on PowerPoint, and everyone, I guess, has a
7   different way of presenting it.  Some people just give
8   the case, pick labs, and they write it on the board.  I
9   have a PowerPoint presentation where I design it so
10  that I give this is the main complaint the patient came
11  in with, okay.  Here's a past medical history.  Here's
12  a past surgical history, social history, family
13  history.  Here's the vital signs.  And then I would ask
14  residents and interns "You decide.  What do you want to
15  order now?"  And I'd have it designed so that I'd click
16  if they wanted basic lab, for example, CBC, compete
17  blood count, I'd click on the complete blood count, and
18  I'd kind of -- it's sort of like teaching them; "Okay.
19  What else do you want to order?"
20       Then they give their differential diagnosis
21  of what they think it is.  We go over that, and then I
22  give a presentation at the end about the main disease
23  or whatever the diagnosis was.
24     Q.   Does morning report happen every morning?

59

```
 1        A.    No, no.  It's canceled sometimes.  It all
 2   depends on the situation.
 3        Q.    Do you know who has the authority or the role
 4   to cancel morning report?
 5        A.    From what I understood, chief residents,
 6   program directors, secretaries.  There's times where
 7   you're stuck in a snowstorm, can't come in, you know,
 8   you're late.  You tell the secretary you're coming in
 9   late.  There's times where the reporter is doing
10   something else.  He's unable to come in, and they
11   report that to either the chief resident or the
12   secretary.
13        Q.    Was there an incident in February of 2009
14   where you canceled a morning report?
15        A.    I personally never canceled a morning report.
16   If you're referring to when I was on the ICU month --
17   and I don't know if that's what you're referring to.
18   The senior resident -- I was a second year resident.
19   The third year resident did not show up that morning.
20   He called me and said he's unable to show up early in
21   the morning, he will be late, and there was a code blue
22   on the floor.
23             So I went along with all the interns to
24   address the patient.  The chief resident, Bhavesh
```

60

1  Patel, came down as well probably because he knew that

2  Satish Gonela was not able to come in, the senior

3  resident, and they usually -- third year residents are

4  always with the second year residents and interns

5  because we're not a second year resident fully trained

6  to do what a third year resident is capable of,

7  especially when it comes to running codes at night.

8         So he came there, and we were addressing the

9  patient, and I told Bhavesh Patel, the chief resident,

10  that "Look, I have morning report now," and he said,

11  "You can't.  Just cancel it.  You have to cancel it.

12  You have to be here."  Because I assume he didn't want

13  to stay during the whole transfer process.

14      Q.   So what did you do to effectuate the

15  cancellation of the morning report?

16      A.   I do not recall if he's the one that sent --

17  I cannot send a mass page to any resident to cancel

18  report.  That is only the chief resident has access to

19  that, the secretary or the program director, and I

20  don't know if he's the one who sent the mass page,

21  because I can't send the mass page, or if the secretary

22  did.

23      Q.   Do you know if someone did in that particular

24  incident?

61

1      A.   I cannot recall, but I think a mass page was

2  sent, and then Dr. Weiss asked me why was morning

3  report canceled.  I said, "Well, I had to attend a

4  critical patient on the floor," and he said -- and he's

5  like, "Well, why didn't you do it?"  I said, "Satish

6  didn't show up."  He goes, "Why?"  I go, "I don't know,

7  and Bhavesh told me to cancel the report, he's going to

8  cancel the report."

9      Q.   So Dr. Weiss talked to you about the

10  cancellation of that report?

11      A.   Yes, he did.

12      Q.   Do you remember why he was concerned about

13  it?

14      A.   I do not recall.  Morning report was

15  canceled.  You know, as a program director, I'm sure he

16  wants to know why it was canceled.

17      Q.   And you believe that the chief resident had

18  the ability to cancel it?

19      A.   Yes, he does.  He's the one who sent the mass

20  page.  I told him I had to go to morning report, and he

21  said, "You can't go.  You have to stay with this

22  patient."

23      Q.   And I believe you said you don't know whether

24  he actually sent the mass page or not?

62

1    A.   I don't know if he -- he took care of it.  I

2  don't know if he's the one who sent it or he called his

3  secretary to send it.  I don't know.

4    Q.   Do you know whether a mass page was sent as

5  we sit here today?

6    A.   I don't recall, but that's usually the

7  criteria so residents don't sit in a morning report

8  room wondering where the lecture is.

9    Q.   That makes sense.

10    A.   And that's usually how we handle those

11  situations, a mass page is sent.

12    Q.   In May of 2009, do you recall Dr. Weiss

13  speaking to you about an incident involving you and

14  Dr. Tamaskar?

15    A.   Him talking to me?

16    Q.   Yes.

17    A.   No, I approached them regarding that

18  incident.

19    Q.   What happened?

20    A.   The day before I was in the ICU, and if I

21  remember correctly, Hai was the senior resident on the

22  medicine clinic service, and his attending physician

23  was Dr. Tamaskar, and Hai calls me stating there's a

24  patient in the ER who's hypernatremic, which means low

63

1    sodium, but symptomatically he is okay.  He has no

2    symptoms whatsoever, and he's a big drinker, and he has

3    a history of hypernatremia, if I recall that correctly.

4    And I said, "Okay."

5              I looked up the patient online before I went

6    down to see the patient.  I went down to see the

7    patient.  I then went to the admitting physician in the

8    ICU, Dr. Collar.  I showed him and talked to him about

9    the patient.  He looked it up.  And I said, "The

10   patient is asymptomatic, he has no symptoms whatsoever.

11   He just has a low sodium level, and his history is

12   consistent of heavy drinking."  And he said, "But he's

13   asymptomatic?"  And I said, "Yes."  He's like, "Well,

14   is he ICU bound?"  I go, "I don't know."  And he says,

15   "Why don't you ask a nephrologist if you would take him

16   to the ICU."

17             Dr. Agra who's a nephrologist was in the ICU.

18   I went to Dr. Agra.  I talked to him about the patient,

19   and he stated that he would not take this patient to

20   the ICU.  So I went back to Dr. Collar who's a staff

21   critical care physician, and I asked him, "Dr. Agra

22   said he would not take this patient to the ICU floor."

23   So he says, "Then why don't you call Dr. Tamaskar and

24   tell him that."  I called Dr. Tamaskar.  The moment I

64

1    called Dr. Tamaskar, he started cussing, screaming,

2    yelling on the phone, saying -- I don't know if I'm

3    allowed to --

4         Q.   You can say anything you need to.

5         A.   Saying "Fuck you, ICU residents.  All you

6    damn people don't want to take any of our fucking

7    patients.  I'm going to kick your ass.  I'm going to

8    kick your fucking ass if you don't take this patient

9    right now," and he would not let me speak during that

10   time.

11            I was so upset by the way he was talking to

12   me.  There was an OB-GYN resident sitting next to me, I

13   think her name was Mai Vu, and she was shocked by that

14   as well because she could hear him screaming through

15   the phone, and she's like, "Let's just take him."

16            So I just took him.  I admitted him.  I

17   called the nephrologist.  I'm trying to remember his

18   name.  I don't recall the nephrologist's name off the

19   top of my head.  It was part of Dr. Ramaswamy's group,

20   and he said, "Okay.  Don't bother with the patient.

21   I'll manage him the entire night and correct his

22   sodium.  Have the nurses in the ICU just call me with

23   all the labs, and I'll give the orders."  And I said,

24   "Okay."

65

1           So I admitted him, and the next day we
2     discharged him from the ICU.  And then I went to
3     Dr. Weiss's office, because I knew Dr. Tamaskar was
4     there, to have a word with him on his language, because
5     we have a history of this with him.  He's done this
6     before, using these inappropriate words that "I'm going
7     to kick your ass" or "fuck you" in front of other
8     attending physicians, including Dr. Easterday, which I
9     reported to him, and he witnessed it at the beginning
10    of the year, and he said he would talk to him about
11    that.
12           Right when I walked in the office, Dr. Weiss
13    was sitting down.  Dr. Easterday was in the room, and
14    Dr. Tamaskar was in the room.  And I said,
15    "Dr. Tamaskar" -- and quickly he interrupted me and
16    said, "I'm going to kick your ass.  What the fuck is
17    his sodium now?  Do you know what his fucking sodium
18    level is?"  And he was screaming and yelling, and I was
19    like, "Dr. Tamaskar, I did not manage his sodium," and
20    he's like "I'm going to report you."  And he's picking
21    up the phone.  "I'm going to kick your fucking ass,"
22    you know, and I said, "Dr. Tamaskar, do it.  I want to
23    see you try to kick my ass," and my hands were in the
24    air.  "I want to see you try to kick my ass," because

66

1   he was in my face.

2           He was sitting in his desk with his face down

3   the entire time, Dr. Weiss was.  He knew that.  And Dr.

4   Easterday was sitting in the back with his face down,

5   too, and I explained to him, "Listen.  I am not the one

6   who tried to prevent this man from coming to the ICU."

7   Because he brought that up to.  I said, "This was

8   Dr. Collar, and Dr. Romaswamy's partner managed his

9   sodium the entire night, and then he goes, "Oh, you

10  didn't tell me that."  And I said, "Because you don't

11  listen.  You're too busy cussing at me, threatening me.

12  How can you listen?  You don't listen to us," and I

13  said, "This is the problem.  Every resident is tired of

14  this."

15          There's residents who told me before coming

16  to him, before going to Dr. Weiss' office that "We want

17  to report him," you know, "You report him, and we will

18  back you up on this because he said inappropriate stuff

19  to us, too."  He says, "I'm going to shove a stick up

20  your MICU ass."

21          They treat us bad when we're on the ICU,

22  because they don't like the ICU rotation, and they

23  think we support the ICU and not support them, but that

24  is not the case.  We are residents.  We do our job on

67

1    the ICU okay?  None of us like to be there because of

2    the excessive hours and the stress.

3        After that incident, Dr. Weiss said, "You

4    know, you were really professional.  I appreciate you

5    not going to Li Tang with this matter and handling it

6    with us first, and I'm going to talk to all the

7    residents, and he had a meeting with it regarding what

8    Tamaskar usually says to people, and he said --

9    Dr. Weiss was saying "You did the right thing by coming

10   to us first and not reporting it," but he also said,

11   "If you're going to report it, I wouldn't go to Li

12   Tang, I would go to Rick Streck to report it," giving

13   me some advice regarding that.  And then the other

14   times after that incident, Dr. Weiss would always see

15   me, and he'd be like this (indicating), you know,

16   because he knew that he made a mistake and he was

17   laughing about it, and I said that's fine, whatever.

18       Q.   Dr. Weiss would do this or Dr. Tamaskar?

19       A.   No.  I'm sorry.  Dr. Tamaskar.  I apologize.

20       Q.   And by doing this, we're both motioning,

21   we're pretending to punch in the air?

22       A.   Yeah, like a joke, like a fist fight, because

23   he knew, you know -- because I said, "Are you going to

24   fight me?  Are you going to hit me?  I want to see you

68

1   try to kick my ass," because that's what he kept saying

2   to me.

3      Q.   So after this, it seems as though you and

4   Dr. Tamaskar were able to joke about it?

5      A.   He was joking about it.  I didn't find the

6   humor in that.  I don't find the humor in this.

7      Q.   What was your relationship with Dr. Tamaskar

8   after that incident?

9      A.   Professional only.  I mean all residents -- a

10   lot of residents.  I can't say all, because I don't

11   know everybody, but a lot of residents are frustrated

12   with the way he talks, even previous residents.  It's

13   just not an environment you want to be in when there's

14   verbal abuse going to.

15      Q.   Your testimony is that when you went into

16   Dr Weiss' office to talk to him about this, he was the

17   first person who threatened you to a fight, not you

18   threatening him to a fight?

19      A.   That's correct.  I never ever instigated a

20   fight with Dr. Tamaskar, never.  That is not my

21   personality.  That is not what I do.

22      Q.   Do you know whether Dr. Weiss ever spoke to

23   Dr. Tamaskar about his role in the appropriateness or

24   inappropriateness of what he did?

69

1      A.   He told me that he was going to talk

2   to Tamaskar about it, and also that he might even

3   report him, because I told him that "Residents don't

4   come to you regarding this matter because they know you

5   two are buddies, and you guys are good friends, and you

6   probably won't do anything about it," and that's why

7   other residents never reported him in the past.

8           I did not go to him when this happened in the

9   beginning.  I went to Dr. Easterday who was sitting

10  next to me when he threatened to kick my ass at the

11  beginning of the month.  He was like, "Fuck you, fuck

12  you, just shut the fuck up," is what he said in front

13  of Dr. Easterday, and I told Dr. Easterday that, and he

14  said, "I will talk to him regarding this matter."

15     Q.   Do you know if he ever did?

16     A.   I do not know.  We had multiple conversations

17  about it.  He said, "You know, why don't you talk to

18  him," and I said, "I don't want to talk to him

19  regarding this matter.  I'm offended by it."  Even

20  other residents, Usha Patel who is an intern saying

21  "This is how your attendings talk to you guys?"  He was

22  offended by it.

23          Another intern told me that he said a

24  sexually inappropriate thing to her with the witness of

70

1    another female resident, but she was afraid to mention

2    it to Dr. Weiss because of the fact that she noticed

3    that they are friends, and she doesn't want to risk her

4    career.

5        Q.   Did you report that to anybody?

6        A.   That?

7        Q.   What she had told you.

8        A.   I don't recall.  I mentioned it to Dr. Weiss

9    that day when Tamaskar left the room.

10       Q.   When she said it to you, was it close in time

11   to that, or was it previous?

12       A.   When the actual event happened?

13       Q.   Yes.

14       A.   It happened during her first year, at the

15   beginning of the year, if I recall.

16       Q.   And she was what year resident when she told

17   you about it?

18       A.   She was a first year resident.  She was one

19   of the few that said, "We are ready to report this."

20       Q.   Do you know if she ever did?

21       A.   No.  She's afraid.

22       Q.   In July of 2009, what rotation were you on?

23       A.   Night float in the ICU.

24       Q.   And what were your duties in that role with

71

1    respect to like responding to codes, code blue?

2         A.   I run the codes.

3         Q.   When you say run the codes, what does that

4    mean?

5         A.   I take over.  I'm the senior level physician.

6    I run the codes.  I give the orders to try to

7    resuscitate this person.  Interns usually do chest

8    compression.  The second year resident who's usually

9    the general house physician helps assist in line

10   placements.

11        Q.   Line placements?

12        A.   Central lines if we need IV access,

13   intubation.  If they're not comfortable with

14   intubation, I take over, because I'm the senior level

15   resident.  I have the most experience.

16        Q.   Does the hospital ever do mock codes or

17   pretend codes?

18        A.   Yes, they do.

19        Q.   What's the purpose of doing that?

20        A.   It's more of a training exercise to see who

21   shows up to the code and to see -- it's pretty much

22   like a practice.  I was part of a mock code where I'm

23   supposed to give fake orders to see if nurses or the

24   pharmacists will actually give the medications, and I'm

72

```
 1    supposed to give the wrong dose, the wrong medication,
 2    and it's exercising them as well.
 3         Q.   So it's a teaching tool?
 4         A.   It's a teaching tool.
 5         Q.   I mean is that like an important educational
 6    component for the residency?
 7         A.   Yes, it is, but we are all ACLS certified and
 8    we're trained in it as we get certifications to do it.
 9    So it's a teaching tool for everybody who shows up.
10         Q.   Do you recall in July of 2009 there being a
11    mock code that you showed up for and then left after
12    realizing it was a mock code and not a real code?
13         A.   Yes, that's correct.
14         Q.   What happened with that?
15         A.   They called it at -- I don't know the exact
16    time -- 4:30 or 5:00 in the morning.  I'm addressing
17    patients in the ICU that are really critical patients
18    in the ICU.  They're all critical, but there were
19    immediate issues, and they called a code blue outside
20    of Wendy's.
21              Naturally I'm the first one there, because
22    I'm actually up managing patients in the ICU.  My
23    intern and I run to the code.  I find out it's a mock
24    code, and I said, "Listen.  The other third year
```

73

1    resident is going to be here.  You can have my intern.

2    I cannot run this code for 30, 45 minutes because there

3    are people actively dying in the ICU, and I cannot be

4    here at this time."

5            And the nurse in the ICU who came down -- I

6    don't know if he came down when she came up to complain

7    about why I didn't show up.  He was even saying, "There

8    are people actively dying right now.  It is

9    inappropriate to call a mock code when there's no staff

10   physicians in-house to assist in the ICU while they're

11   gone and there's barely any residents."  There's a

12   total of, I think, four internal medicine residents who

13   would show up to the code, and it's inappropriate to do

14   it at 4:30, 5:00 in the morning when there's no one

15   else in the hospital, especially in the ICU setting.

16           If I leave the ICU setting, there's no one

17   there, and there is a ton of people there that are

18   dying; and at that moment, there were people that

19   needed medical assistance now.  When I found out it was

20   a fake, I said, "I cannot do this.  I have to go.  The

21   other third year resident in general house can do the

22   mock code.  You can have my intern.  I have to go."

23   And I made that very clear to her, and she was offended

24   because I could hear her yelling in the ICU, but I was

74

```
 1   managing a patient, and the nurse was saying, "Listen.
 2   You cannot call fake codes this time of day.  We need
 3   him here.  There are people dying here."
 4            I am all for these mock codes.  During the
 5   day, it makes sense.  There's 20, 30 residents that can
 6   show up, and there's attending physicians that can
 7   manage patients in the ICU if we leave the ICU; but at
 8   4:30, 5:00 in the morning, it's inappropriate, and I
 9   made that very clear that I cannot be there.
10       Q.   So you did say in the hallway, I believe,
11   "I've got dying patients"?
12       A.   "I have dying patients right now," yes.
13       Q.   If it had been a real code, what would you
14   have been required to do?
15       A.   I would have managed that patient, because I
16   would have made the clinical judgment that this patient
17   is the most sickest as he is dead.  If someone is dead,
18   they're dead.  My job is to bring them back.  So I
19   would resuscitate that patient as fast as I can and
20   efficiently as I can and get them to the unit.  This is
21   a problem with the ICU, and this is a problem Dr. Weiss
22   has been having with the ICU.  We are understaffed.
23   One resident cannot do the whole hospital.  I manage
24   the medical ICU, the CCU, the neuro ICU, the
```

75

1   cardiovascular recovery care unit, consults in the

2   surgical ICU, all code blues in the entire hospital all

3   transferred from outside facilities to this ICU and all

4   admissions in the ER to the ICU, and that's his

5   concern.  His concern from the beginning is that we are

6   doing stuff that we are not capable of doing.

7          There is no in-house fellow or critical care

8   attending, and we are doing the job of someone who is

9   supposed to have six years of training, we're doing it

10  with one to two years of training, and there's only one

11  senior resident in the ICU and one intern, and the

12  intern can be an OB-GYN or family medicine intern, and

13  they have no experience, but they're learning.  So

14  technically it's a very stressful job.

15      Q.   You gave a list before of all the things you

16  were running at the same time.  Can you go over that

17  list again?

18      A.   Our job is to manage the MICU, CCU, neuro ICU

19  patients, CVRU, consults in the surgical ICU or in the

20  CVRU.  We manage all code blues in the entire hospital

21  or anyone who is considered in distress by the RAT

22  nurse who they feel the ICU team should manage, all

23  admissions from the ER that goes to the ICU, which can

24  average anywhere from three to five plus admissions, as

76

```
 1    well as all transfers from outside facility hospitals

 2    in urban areas who feel that those patients need an ICU

 3    critical care and they don't have that in those urban

 4    areas.  So those are people who are transferred by

 5    ambulance or med flight.  We manage all those.

 6         Q.   What's MICU?

 7         A.   Medical intensive care unit.

 8         Q.   CCU?

 9         A.   Cardiac care unit.

10         Q.   Neuro ICU, is neurological ICU?

11         A.   Um-hmm.

12         Q.   CVRU?

13         A.   Cardiovascular recovery unit.

14         Q.   On July 7th of 2009, there was an incident

15    regarding an A line; is that correct?

16         A.   Um-hmm.

17         Q.   What's an A line?

18         A.   A line is an arterial line.  It's a line used

19    to monitor blood pressure as well as to draw blood so

20    that respiratory therapists don't have to constantly

21    poke the radial artery.

22         Q.   You've got to get a little more basic on me.

23    Where is the A line?

24         A.   Your pulse you feel in your wrist, that's
```

77

1    your radial artery.  So that's where we insert it.

2    It's like an IV.

3        Q.   What training have you received regarding

4    inserting A lines?

5        A.   What training?

6        Q.   Yes.

7        A.   It's just doing it.

8        Q.   Where were you trained to do that; in medical

9    school, or in the residency program?

10        A.   In medical school, we see it, because other

11    residents do it; and in the ICU setting, we place them.

12        Q.   Who can place an A line?

13        A.   Well, I know that residents can.  Medical

14    students place them.  I don't know of anyone else who

15    can or cannot place them.  I don't know the rules.

16        Q.   Do you know if Mt. Carmel had any rules about

17    who can place an A line?

18        A.   We don't get any formal introduction in terms

19    of rules or who can place lines, who can't place lines.

20    We don't have that.

21        Q.   So you don't know?

22        A.   So I don't know.

23        Q.   As a physician, is it your responsibility to

24    know what the limits are in terms of everyone's scope

78

1    of practice, for example?

2         A.   You mean as a resident?

3         Q.   As a resident, yes.

4         MR. PATMON:  Objection.  He's not an expert.

5    He's not qualified even to give an opinion on the scope

6    or practice and licensing responsibilities of all staff

7    in the hospital.

8              With that objection, you can answer the

9    question.

10         A.   I'm a resident.  I focus on my clinical

11    training, okay?  I don't know -- my job is not to know

12    whether medical students can place it or not.  I don't

13    know.  I know medical students place central lines.

14    They place A lines.  I never had a medical student do

15    that in my presence to my knowledge.  I don't know who

16    can and cannot do it.  We were never trained in that.

17    We were never told in that.  Our role is to get

18    clinical experience.  That is part of medicine

19    training.  We see patients.  We do our job, we go home,

20    come back, we do our job, we go home.  This is part of

21    training.  We read.  We study.  That's what we do.

22         Q.   Obviously you have to know something, though,

23    about who can do what.  I mean you wouldn't ask a nurse

24    to perform a surgery, correct?

79

```
 1              MR. PATMON:  Objection.

 2      A.   I'm not a surgeon.

 3              MR. PATMON:  Go ahead.

 4              Answer the question.

 5      Q.   Sure.  But my question is this --

 6              MR. PATMON:  Argumentative.  Go ahead.

 7      Q.   -- would you agree there are certain

 8  procedures that you know that you can't ask a nurse to

 9  do, for example?

10      A.   I don't know that.  I do not know that.

11      Q.   You don't that?

12      A.   No.  I'm sure the nurse should know what her

13  limitations are.

14      Q.   So you would expect a nurse to tell you if

15  you asked her to do something that was outside of her

16  scope?

17      A.   Yes, because I don't know nurses' rules or

18  laws or regulations or what they can and cannot do.  I

19  don't know what extent of scope of practice they've

20  been trained in.  If a surgeon asks a nurse to cut an

21  arm off, she should say, "I'm not a surgeon.  I can't

22  do that."  I don't know what their scope of practice

23  is.  I'm not a nurse.

24      Q.   So with respect to this A line incident on
```

80

1  the 7th of July, can you explain what happened?

2      A.    The patient, if I remember correctly, was an

3  elderly lady who had a massive heart attack, a pretty

4  bad heart attack.  I had her on a hypothermic protocol,

5  which I was kind of you could say freezing the body,

6  and the purpose of that is to protect neurological

7  function while she tries to heal based on studies.

8          Her blood pressure was dropping, and she was

9  on a lot of medications that I was giving her to try to

10  increase her blood pressure.  One of the side effects

11  of the hypothermic protocol is that it can also drop

12  the blood pressure.  So taking a blood pressure by

13  cuff, the computer does it, and it can be on anything.

14  It could take it every one minute, every 30 seconds,

15  and she's also intubated, naturally, which means she's

16  on a ventilation machine, and one of the things when

17  you're on a ventilation machine is that you draw

18  frequent ABGs, which is an arterial blood gas, and a

19  respiratory therapist comes in, takes a needle, sticks

20  it in the radial artery, draws blood from it, takes

21  that blood, analyzes it, and gives me the report on the

22  ABG, and I adjust the ventilation machine based on that

23  ABG.  The ABG is an acid-based chemistry, so it's

24  pretty much her pH in her body.

81

```
 1              So I noticed that the blood pressure was
 2    still -- due to hemodynamic instability and her blood
 3    pressure not being where I wanted it to be, I then
 4    decided to place an A line in that patient.
 5              Amanda Bowers who was the supervising nurse
 6    that night, the charge nurse, she doesn't have any
 7    patients, if I remember correctly.  The charge nurse is
 8    to supervise all nurses, as well as to assist me.
 9    She's the go to nurse.  She has the most experience in
10    the ICU.  When we don't know what to do, she tells us
11    what to do.  She advises most residents what to do
12    since she has the most experience in the ICU.  We also
13    call staff physicians as well, but she also advises us
14    as well.
15              I go in, I pull a chair, sit down, prep the
16    patient, start placing the A line.  Amanda Bowers
17    brought -- either I or Amanda Bowers -- I do not recall
18    who brought the ultrasound, but I said, "We need a
19    Doppler machine, because a Doppler will help me
20    identify the location of the radial artery."
21              As people who are on these type of
22    medications, the artery kind of squeezes because that's
23    what I'm doing, I'm squeezing the artery to increase
24    the blood pressure.  People who are also cold based on
```

82

1    the hypothermic protocol, it's very difficult to feel

2    the radial artery; and due to the fact that her blood

3    pressure is low, it's hard to feel the pulse.

4         So instead of poking and guessing where it's

5    at, to minimize it what I do is I use a Doppler to find

6    out the location.  It's an ultrasound and you can hear

7    the sound of where the artery is located, and then I go

8    at that angle to try to get it while the Doppler is on

9    the wrist.

10        After I think -- I don't know exact time --

11   15, 20 minutes of doing so, I started to get a cramp,

12   and that is common because you're in one position down

13   looking close trying to find this artery.  It's not

14   easy to get.  When I got a cramp, Amanda Bowers had

15   sterile gloves on because she was holding the Doppler,

16   I said, "Grab the A line real quick," and I kicked the

17   chair out just to bend down.

18        As soon as I bend down, Amanda is like,

19   "Sinul, Sinul, there's a flash."  I quickly came in,

20   and I pushed the guide wire in and the catheter in to

21   place the A line.

22   Q.   What do you mean when you say a flash?

23   A.   A catheter is like -- it's a needle.  It's

24   just like a syringe, except instead of the back and

83

```
 1  stuff, there's a plunger.  There's this big long
 2  glass -- it's either glass or plastic -- it's a plastic
 3  tube, and there's a guide wire in it which is like just
 4  a wire, and what happens is when you hit the artery,
 5  you see a flash of blood come up the thing; hence,
 6  you're in it, in the artery.
 7          Then what you do is you take that guide wire,
 8  it's on a little clip, and you force it down.  It's
 9  probably like this long (indicating).  I don't know
10  exact length, but maybe I would say six inches.  I'm
11  not sure.  You place that in, and then you run the
12  catheter tip through that guide wire over the guide
13  wire into the artery securing it in the artery, and
14  then you pull the guide wire back and you pull the
15  needle out.  Does that make sense?
16      Q.   I think that makes sense.
17      A.   Okay.
18      Q.   So the flash indicates that you're into the
19  artery?
20      A.   You're into the artery or you nicked it and
21  you're near it.
22      Q.   Okay.
23      A.   And then you have to manipulate it to make
24  sure you're in it by seeing a continuous flow of blood.
```

84

1      Q.    So you asked Amanda Bowers to hold -- you
2  said hold the line?
3      A.    Hold the catheter, to hold the actual A line.
4  I'm sorry.  The entire A line, yes.
5      Q.    What did that require her to do?  Was she --
6  it's hard without motioning.  We've both been
7  motioning, or you've been motioning.  Did she place her
8  hand on the patient, on the patient's wrist in order to
9  hold it in place, or was she holding the tube with both
10  of her hands?  Explain where her hands were placed when
11  she was holding the line.
12     A.    I do not recall where her hands were placed.
13  I just said, "Grab it, grab it."  She had the Doppler
14  in her hand with one hand, and either she grabbed it
15  with her left or her right.  I do not know.  I just
16  know when you have a cramp, you don't want to have a
17  needle in, so I just quickly gave it to her and moved
18  back real quick, kicked the chair back.
19     Q.    And so your hands were off of the A line
20  entirely?
21     A.    That's correct.
22     Q.    And she had one hand on it as far as you
23  know?
24     A.    I don't know I said.  I do not recall if she

85

1   had one or two.  If she dropped the Doppler just to

2   hold it, I do not know.

3      Q.   If I understand you correctly, as soon as you

4   kicked the chair back, she said there's a flash or you

5   saw a flash?  Which one happened?

6      A.   I kicked the chair back.  I stood up, and I

7   bent down to relieve the cramp in my back.  I don't

8   know the exact timing or when that actually happened,

9   but she said, "Sunil, Sunil, Sunil, there's a flash,"

10   and then I came running forward, not in my chair, but

11   came running forward, took the catheter.  Her hand

12   might have been on it, I am not sure, and I pushed --

13   because when you get the flash, you don't want to lose

14   it because it's difficult to get.  We had been at it

15   for 20 minutes, and I quickly took it.  I pushed the

16   guide wire, pushed the catheter in and pulled the

17   needle out.  It might have required me to manipulate it

18   some to get it in to continue the flash.  I do not

19   recall that.

20      Q.   How long do you think the lapse between the

21   time you kicked your chair back and the time you took

22   back over on the A line?

23      A.   Oh, not that long.

24      Q.   A matter of seconds, a minute, as best as you

86

```
 1    can ball park it?

 2              MR. PATMON:  Objection.

 3         A.   I don't know.  I mean it wasn't that long.

 4    It wasn't that long.

 5         Q.   Not as long as, say, two minutes?

 6         A.   No.

 7              MR. PATMON:  Objection.

 8         Q.   Less than a minute?

 9              MR. PATMON:  Objection again.

10              If you know.

11         A.   Possibly.  I don't know.

12         Q.   Could it have been more than a minute

13    possibly?

14              MR. PATMON:  Objection.

15         A.   I don't know.

16              MR. PATMON:  Objection.  Counselor, he said

17    he doesn't know.

18         A.   I don't know.  I mean I don't know.

19         Q.   Not impossible to be more than a minute?

20              MR. PATMON:  Objection.

21         A.   I don't know.  It's most likely less than a

22    minute.

23         Q.   Did you see what Amanda was doing while you

24    were working out your cramp?
```

87

1      A.    No.   I bent over, like I mentioned before;

2  and when she started calling my name, I quickly ran

3  forward because I saw that she was saying, "Sunil,

4  Sunil, Sunil, I'm in, there's a flash," and I quickly

5  took over.

6      Q.    So she was able to get into the artery?

7      A.    I don't know.   Like I said, I don't know if I

8  had to manipulate it to continue to get into the

9  artery.   I don't know.   Whether she accidentally did it

10 or purposefully did it, I don't know.   I did not see

11 that.

12     Q.    But what happened with the flash was what you

13 had been -- is that what you had been trying to

14 accomplish for the prior 20 minutes?

15     A.    To get a flash to get into the artery.   Like

16 I said before, a flash does not mean you're in the

17 artery.   You have to see a continuous flow of blood.

18 So when we get -- you see a flash.   You slowly try to

19 manipulate the catheter with your hand; because,

20 remember, the artery is probably smaller than that cap,

21 a lot smaller than that cap.

22     Q.    You're referring to a pen cap?

23     A.    Yes, a lot smaller, because she's on a lot of

24 medications.   So it's really, really thin, really

88

```
 1    small.  So you have to manipulate to make sure you're
 2    in, and then you push the guide wire.  Once the guide
 3    wire goes all the way in, then you know for a fact that
 4    you're possibly in the artery, and then you push the
 5    catheter in.  So manipulation, probably on my part I
 6    had to manipulate to make sure the actual artery was --
 7    or the actual needle was inserted in the artery.
 8         Q.   Had you gotten a flash before during the
 9    prior 20 minutes that you were working on her?
10         A.   I do not recall.  Like I said, you can hit a
11    tiny flash, and it doesn't mean you're in.  It's a
12    time-consuming procedure in patients that are at this
13    critical state.
14         Q.   Did you ask the nurses that were present
15    there if any one of them wanted to try and insert the A
16    line?
17         A.   No, I don't recall any nurse being in that
18    room except for Amanda and I.
19         Q.   Do you recall Lisa Cottrell being in the
20    room?
21         A.   I do not recall her being in that room.
22         Q.   You specifically recall that she wasn't, or
23    you just don't know whether she was?
24         A.   I don't recall her being in the room.
```

89

1    Q.   But she may have been, and you just don't
2    recall it?
3              MR. PATMON:  Objection.
4              Asked and answered.
5    A.   I don't recall her being in the room at all;
6    because when I kicked back the chair, I don't recall
7    anyone else being in the room.  The curtains are closed
8    from the outside because you're doing a procedure on
9    someone, and I do not recall any time -- the way it
10   works is that if a nurse is assisting you, another
11   nurse won't be in the room.  She will do something
12   else.  The charge nurse walks in the room with me.
13   She's a nurse.  She's assisting me.  I didn't see any
14   need for another nurse to be in there, and I did not
15   recall any other nurse being in that room.
16   Q.   I'm just trying to establish whether you just
17   don't recall that she was in the room or you recall
18   specifically that she wasn't.
19   A.   I do not know if she was in the room.
20   Q.   That's what I was trying to ask.
21   A.   I do not recall her being in the room.
22   Q.   Thank you.  Was Amanda Bowers there the
23   entire time?
24   A.   Yes.

90

1    Q.   Did anybody else come in or out that you
2  recall?
3    A.   I do not recall anyone else coming in or out.
4  There's only another intern, and she was managing
5  something else with another patient, working the
6  patient up.
7    Q.   Who was that intern?
8    A.   It was an OB intern.  I think her first name
9  is Clarissa.
10        (Discussion held off the record.)
11        (Short recess taken.)
12    Q.   Dr. Nayyar, you said it was common to develop
13  a cramp when you're down working on something like
14  that.  Had you ever had in the past an incident where
15  you had a cramp and you had a nurse have to hold the A
16  line?
17    A.   I've had cramps when I placed central lines,
18  and a medical student would sometimes hold stuff for me
19  or the intern.
20    Q.   Any time with a nurse?
21    A.   I do not recall, but it could be a
22  possibility.
23    Q.   Have you ever asked a nurse to insert an A
24  line?

91

1 A. No, never.

2 Q. You say that in a way that leads me to

3 believe that you feel strongly about that.

4 A. Yes, I've never asked a nurse to place an A

5 line.

6 Q. Why is that?

7 A. I don't know.  I've never had a situation

8 where I needed a nurse to place an A line.  Usually

9 there are interns and residents who need to have a

10 certain amount of A line procedures.  So if they don't

11 want to do it or they can't do it, a med student wants

12 to do it, and they're always up to doing it, so there's

13 always someone to place lines.

14 Q. Have you ever seen a nurse do it?

15 A. No.

16 Q. Do you know what Mount Carmel policy is

17 regarding whether nurses are allowed to place A lines

18 or not?

19 A. I do not know what nurses can and cannot do.

20 Q. At some point, did you learn that the A line

21 insertion on the patient we just discussed on July 7th

22 of 2009 was being investigated?

23 A. Yes.

24 Q. How did you find that out?

92

```
 1        A.    When Dr. Weiss called me post call -- I
 2   should say post shift actually -- he was telling me
 3   that -- I was still sleeping at the time, and he was
 4   telling me something about "Do you know about an A line
 5   being placed a couple days ago?"  And I said, "No.  Be
 6   more specific, because we place A lines all the time."
 7   And he mentioned a patient Mrs. W, without giving the
 8   name, because I do not recall the name either.
 9        Q.    We shouldn't anyway if we can refrain -- it
10   just makes it easier with HIPAA that we don't do that.
11        A.    And he said, "There's some issue with a
12   nurse, someone stating a nurse placed an A line."
13        Q.    Let's just stop there for a second.  Let's go
14   off the record.
15              (Pause in proceedings.)
16              (Record read back as requested.)
17        Q.    I believe the question that lead to that
18   answer was, did Dr. Weiss or was -- how did you find
19   out there was an investigation?
20        A.    Dr. Weiss told me that "A nurse made a
21   complaint against Amanda saying that she placed an A
22   line and didn't mention your name.  So I want you to
23   stay home today.  Don't worry about coming in tonight.
24   I have your shift covered and consider this like an
```

93

1    extended vacation."

2         Q.   And I just didn't hear you.  Did you say

3    didn't mention your name or did mention your name?

4         A.   Did not mention my name.

5         Q.   Did he say how they knew that it was a

6    procedure you may have been involved with?

7         A.   Did they say how --

8         Q.   Why was he calling you?  Did he say why?

9         A.   Tell me "Don't worry about coming to work

10   tonight.  We have your shift covered by Kanan Patel,"

11   is what he mentioned to me, and consider it an extended

12   vacation.

13        Q.   Did he tell you what he believed your

14   connection was to this nurse complaint?

15        A.   I do not recall.  I was sleeping.  That was

16   the problem.  I don't remember everything he said.  He

17   called me within ten hours post shift.  So I'm still

18   sleeping.  When I woke up around 6:00 or so, I can't

19   recall, I looked at my pager.  I recall him paging me,

20   and I tried multiple attempts to call him.  I called

21   the hospital operator so I could figure out what is

22   going on, because I did not recall any of that, to get

23   more entails about it.  I called the hospital operator.

24   They paged him.  I guess they paged him to home.  I'm

94

1    not sure exactly what they did, so I made multiple

2    attempts.  I even called Jonathan Borders to see if he

3    had another pager number of his or home number to call

4    him.  He didn't.

5        Q.    So then did you ever speak with Dr. Weiss in

6    response to trying to page him that night?

7        A.    I wasn't able to get a hold of him.

8        Q.    When he spoke with you the first time, did he

9    tell you not to discus the A line incident with

10   anybody?

11       A.    The first time was when he called me when I

12   was sleeping.  He did not mention anything like that,

13   and I do not recall any of that.  That's why I tried to

14   call him, to figure out what was going on, but I was

15   unable to get in touch with him.

16       Q.    And I believe your testimony is that you were

17   sleeping, though, so you don't recall that entire

18   conversation?

19       A.    That's right.  He called me within a ten-hour

20   period.

21       Q.    After you spoke with Dr. Weiss, did you

22   contact anybody about the A line incident?

23       A.    I contacted the senior ICU resident, because

24   I'm supposed to meet him at 7:00 p.m. for checkouts,

95

1    and I told him, "I am not coming, that Kanan is coming

2    based on Dr. Weiss telling me that to cover my shift,

3    but I'm not sure."  And soon after that he was like,

4    "What is going on with this matter?"  And he was asking

5    me about it, because he heard about it from Dr. Weiss.

6           I also asked Hai if the OB resident is

7    around, if she's okay, and he says, "I don't know where

8    she's at."  So I attempted to call her to see if she's

9    okay, as I'm not coming to work, and I don't know the

10    details of it, that I was -- that there's something

11    going on with an A line, and that's -- I mean I don't

12    know what else to say about that unless you want more

13    detail.

14    Q.   Did you contact anyone else?

15    A.   Yes.  I had an e-mail sent in my e-mail box

16    from Amanda Bowers saying, "Contact me.  Here's my

17    number.  I'm on administrative leave."  So I contacted

18    her.  She provided the phone number.

19    Q.   You called her?

20    A.   Yes.  She provided the phone number.

21    Q.   Do you still have that e-mail, by any chance?

22    A.   Yes, I do.

23    Q.   Did you contact anybody else besides the

24    people we've already talked about?

96

1      A.   I might have called Kanan to say, "Look, I

2  know you're covering me.  I'm sorry.  I don't know what

3  is going on."  And she said she was never told to cover

4  me.  So then I got concerned, and I think I called Hai

5  saying, Look -- or I don't know which order it went in,

6  whether I called Kanan first or Hai first, and I said,

7  "Hai, Kanan is not coming in.  She doesn't know about

8  it," if I remember correctly, but I'm not sure.  I just

9  wanted to make sure -- I was more concerned about is

10  there coverage for my shift.

11      Q.   Was Hai the senior ICU resident that you

12  referred to previously?

13      A.   Yes.

14      Q.   Did you call the chief resident?

15      A.   That night?  No.

16      Q.   Did you call the chief resident at any point

17  to talk about this incident?

18      A.   The next day.  Not to talk about this

19  incident.

20      Q.   To talk about what?

21      A.   I went in to turn in my incident report like

22  Dr. Weiss requested.  I asked him, "When is Amanda

23  Bowers going to give her statement?"  And he stated,

24  "Monday," and this was a Friday.  And I said, "Well,

97

1    why?  Why so late?  You know, get her statement in so

2    that I can get back to work."  And he says, "Let me get

3    back to you.  I'm going to contact HR to see that," and

4    he said he'd call me back.

5           I called multiple times to his office, and I

6    don't recall if I left a message or not, but then I

7    decided to call the chief resident as he would know,

8    and he's the one we go to when we have an issue, and

9    Dr. Weiss mentioned that Brian actually covered my

10   calls.

11          So first I called him and I said, "Thanks for

12   covering my call.  Did everyone do okay?  Was there any

13   problems last night in the ICU?"  Because they're my

14   patients that night, I was just concerned.  I wanted to

15   make sure everything I did was right, because the next

16   day we kind of learn whether we did the right thing on

17   this patient or not and how they're doing, and then I

18   said, "Do you know when Dr. Weiss -- did he hear

19   anything?  He's supposed to contact me."  And he said,

20   "No," and he's yawning at 6:00 or so.  "I just woke up.

21   I'm post call.  I don't know."  So I asked him if he

22   heard anything about this matter because he was

23   supposed to get in touch with me regarding her

24   statement.

98

 1      Q.   You asked the chief resident that?

 2      A.   (Indicates affirmatively.)

 3      Q.   And is Brian --

 4      A.   Alexander.

 5      Q.   When you spoke with Hai, either of the times

 6  you spoke with Hai, did you talk about what happened in

 7  the A line incident or --

 8      A.   I think --

 9      Q.   -- get the facts of what happened?

10      A.   I don't recall the details of our

11  conversation.  I do know that he was asking me, "What

12  is going on?  Dr. Weiss told the class that you're on

13  probation."  And I said, "I don't know.  I don't know

14  what is going on.  I tried to get in touch with Weiss,

15  and I could not."

16      Q.   Do you know when you talked to -- is it

17  Kanan?

18      A.   Kanan Patel.

19      Q.   Did you speak with Kanan about the facts of

20  what happened during the A line incident?

21      A.   I don't recall.

22      Q.   What about with Brian?

23      A.   Brian Alexander?

24      Q.   Yes.

99

1       A.   I mentioned that I talked to him that -- I

2   asked him, "Do you know if Weiss heard from HR

3   regarding the statement from Amanda regarding the A

4   line procedure?"  That's what I asked him.

5       Q.   Did you speak with Brian about the facts of

6   what happened in the incident?

7       A.   I do not recall.

8       Q.   Okay.

9       A.   It was a very brief, brief call.

10      Q.   Tell me about your call with Amanda Bowers.

11   What did you talk about with her?

12      A.   When I called her, she said, "I was on

13   administrative leave.  Are you?"  I said, "I think so,"

14   and she's like -- and I asked her, "What is going on?"

15   And she was telling me, "I don't know.  I think a

16   nurse" -- and I think she mentioned Lisa's name.  I'm

17   not sure on that. -- "stated that I placed an A line."

18   That was pretty much the call, and she was like

19   freaking out.  She was under a lot of stress and

20   pressure, and I started to become stressed out at that

21   point in time as well.

22      Q.   Why?

23      A.   Because I didn't know what was going on.  I

24   was trying to get in touch with Dr. Weiss.  No one is

100

1    telling me what is going on.  You just wake up from a

2    shift.  You know, you're wondering what is going on.

3        Q.  Did Amanda tell you why it would be a big

4    deal for her to have inserted an A line?

5        A.  I don't understand the question.

6            MR. PATMON:  Objection.

7        Q.  Did Amanda tell you why she was upset that

8    someone had reported her for inserting an A line?

9        A.  I don't think so.  I do not recall.

10        Q.  Did you ask her to say that she never touched

11    the A line during that conversation?

12        A.  No.

13        Q.  Did you ever ask her to say that?

14        A.  Isn't that the same question?

15        Q.  In any other conversation, did you ever ask

16    her to say that she didn't touch the A line at all?

17        A.  No, because she did.

18        Q.  So if she claims that you said that, she's

19    lying?

20        A.  Say that again.

21        Q.  If she claims that you told her to say that

22    she never even touched the A line, she'd be lying?

23        A.  That's correct, if she never touched it.  She

24    touched the A line.  She held the catheter in her hand.

101

```
 1        Q.    But the question is, if she says, "Dr. Nayyar
 2   told me to say I never even touched it" --
 3        A.    That is absolutely incorrect.  To my best
 4   recollection, that is absolutely incorrect.  She
 5   touched it.
 6        Q.    Did you also speak with -- you mentioned
 7   another intern, Clarissa.  Is that Clarissa Gutearus
 8   (sic)?
 9        A.    Yes.
10        Q.    Did you speak with her after Dr. Weiss called
11   you?
12        A.    Yes.
13        Q.    What was your conversation with Clarissa?
14        A.    I mentioned before that I was making sure she
15   was okay.  I said, "Are you okay?  I am on leave.  I
16   don't know why.  Has something to do with this A line.
17   Are you okay?  Did you get placed on leave?"  She said,
18   "No."  I said, "Okay."  But she was -- I think she was
19   working at the time, so I think she had to go.  I don't
20   recall the details, and I said I'd call her later then.
21        Q.    Did you call her later?
22        A.    I think so.  I don't know the details of
23   that.
24        Q.    Did you tell Clarissa that you were placing
```

102

1    her on leave or not to report to work?

2         A.   No.  I don't even have the authority to.

3    She's from Ohio State, and she's an OB-GYN resident.  I

4    don't have the authority to ever place anyone on leave.

5         Q.   And you didn't tell her not to show up for

6    work the next day?

7         A.   No, I did not, never.

8         Q.   Why were you concerned about whether or not

9    she was okay?

10        A.   She's my intern.  It's sort of like you're

11   their teacher, and she's younger than you.  You know,

12   you take care of your interns and residents.

13        Q.   I guess my question is, what made you

14   concerned that she wouldn't be okay, the fact that you

15   weren't going to be there or the fact of something that

16   had happened previously?

17        A.   No.  I was feeling stressed out.  I wanted to

18   make sure she's okay as well.

19        Q.   Why did you think that she might be involved?

20        A.   She was on that night with me, two days ago.

21        Q.   Because she was on the same shift?

22        A.   Yes.

23        Q.   Because she was not involved in placing the A

24   line on Mrs. W, correct?

103

1      A.   No.

2      Q.   Had she attempted to place an A line on that

3   particular patient before you stepped in?

4      A.   No.  I mentioned me and Amanda went straight

5   to that room to place that A line.

6      Q.   Did you and Amanda enter that room at the

7   same time to place that A line?

8      A.   I don't recall that.  Yeah, I think so.  She

9   was with me the whole time.

10      Q.   Do you remember any discussion between the

11   two of you before you went into the room or why she was

12   accompanying you to do that?

13      A.   She's the assistant nurse.  She's the charge

14   nurse.  Her job is to assist me, and she had time to do

15   it, so I guess she was walking with me.  She said she

16   will help assist me with this.

17      Q.   Would it be customary to have a nurse assist

18   you when you insert an A line?

19      A.   There's always a nurse present in the room

20   when you insert it because we're sterile.  So if you

21   need something, they're there to do it.  They get the

22   stuff ready.  They prepare everything.

23      Q.   When you say "We're sterile," you mean the

24   residents?

104

1    A.   The residents are sterile, yes; and then if

2  you need someone to hold a Doppler, she wears sterile

3  gloves, she can hold the Doppler while you find it.

4    Q.   At some point, did you submit a written

5  statement regarding the particular A line incident to

6  Dr. Weiss?

7    A.   The next day.

8    Q.   And to the best of your knowledge, when you

9  wrote that statement, it was 100 percent true, correct?

10   A.   Yes.

11                   - - -

12        DOCUMENT ENTITLED "INCIDENT

13        REPORT," DATED 7/9/09, WRITTEN BY

14        SUNIL NAYYAR, M.D. WAS MARKED AS

15        DEFENDANT'S EXHIBIT 1.

16                   - - -

17   Q.   I'll give you what has been marked as Exhibit

18  1, Defendant's Exhibit 1.  Let me know when you've had

19  a chance to read over that fully.

20   A.   Okay.

21   Q.   And this is your statement that you submitted

22  to Dr. Weiss; is that correct?

23   A.   Yes.

24   Q.   If you look at the fourth line from the

105

1    bottom, the sentence that starts -- in that line, it

2    says, "As I let go of the A line, Amanda must have

3    moved the A line and started to call my name as she was

4    in the artery; and at that point, I quickly took over

5    and advanced the guide wire and pushed the catheter

6    in."

7            As I read this, it sounds like, you know, two

8    days after the incident your recollection was that

9    whatever Amanda had done, she was not just nicking, but

10   she was in the artery.  Is that fair to say based on

11   this?

12       A.   She was possibly -- I don't recall the

13   details of what happened during that event, whether I

14   had to manipulate it to get in or not, but there was a

15   flash.

16       Q.   It says here she was in the artery.  Does

17   that indicate that -- could that have included a nick,

18   or would that mean that she's --

19       A.   Possibly could have included a nick.  When

20   we're in there, remember, the artery is very small.  I

21   had to manipulate it.  I possibly ended up manipulating

22   it.  I don't recall the details.  But when you see a

23   flash, you automatically assume you're in the artery.

24       Q.   So it does sound as though whatever she did

106

```
 1   was able to accomplish what you had been working on for

 2   the 20 prior minutes?

 3            MR. PATMON:  Objection; mischaracterization

 4   of his prior testimony.

 5            If you understand the question, go ahead and

 6   answer it.

 7       A.   Can you state it again?

 8       Q.   It sounds like whatever she did accomplished

 9   what you had been trying to accomplish for the prior 20

10   minutes of getting access to that artery; is that fair

11   to say?

12       A.   Possibly, yes.

13       Q.   Would it have been an option when you

14   developed a cramp to remove the catheter?

15       A.   You usually try not to, reason being is that

16   based on the fact that her temperature is low, what can

17   happen is that if you're near the artery or whatnot and

18   you pull it out and it bleeds, a hematoma can develop,

19   and that's just a bruise.  When that happens, it's a

20   lot more difficult to get the line placed.  You still

21   can still get it.  You just have to apply it higher up

22   the arm, more proximal to that hematoma, and you don't

23   want vasospasms.

24            The more you poke in and out, you can get
```

107

```
 1   vasospasms of the artery, and that can also clamp down;
 2   and when that happens, it's even more difficult to
 3   insert the A line.  You just have to wait a little bit
 4   or move higher up, and the higher up you go, the more
 5   challenging it is.
 6        Q.   Do you know what you would have done if
 7   Amanda hadn't been wearing sterile gloves and you
 8   developed a cramp?
 9             MR. PATMON:  Objection; speculation.
10        A.   I don't know.  Whether I would have pulled it
11   out, I don't know, or I would have said, "Grab gloves
12   real quick and hold it."  And they don't have to put
13   the gloves on.  They can just hold it with the glove,
14   and they do that a lot.  A lot of nurses will grab a
15   sterile glove, hold a Doppler with it, but not be
16   sterile and just place it down.  Remember, if that A
17   line gets contaminated, you can get another one.
18        Q.   Were you friends with Amanda Bowers outside
19   of work?
20        A.   I mean we're just -- it's professional.  I
21   mean you hang around these nurses all the time.
22   They're like -- you can say that you see them all the
23   time.  You're friends with them, but I mean I don't go
24   call her after hours.  I never had her number before,
```

108

1   never hung out with her before or anything like that.

2       Q.   Were you friends on Facebook?

3       A.   I do not know that for a fact, and I

4   mentioned that to them before.  I have over 100 friends

5   on Facebook.  Yeah, nurses add you all the time and you

6   accept it, but you never talk to them on it.  So I do

7   not know if she was a friend of mine on Facebook for a

8   fact.

9       Q.   Do you recall ever specifically unfriending

10  her on Facebook or that she ever did that to you?

11      A.   Again, I don't get notifications on Facebook

12  if someone defriends you, so I don't know.  Like I

13  mentioned to HR, a message did delete from her.  She

14  deleted possibly a message that was on mine making a

15  comment to what another nurse stated.  Now, you don't

16  have to be a friend to make a comment based on what

17  another friend stated, you know, so I don't know for a

18  fact.

19      Q.   What was the comment?

20      A.   I can't even recall now what that comment

21  was.  I'd have to -- I don't know.  I'd have to look to

22  see if I made a copy of it.

23      Q.   Do you know what it related to?

24      A.   I don't know.

109

1    Q.   Do you know why you were discussing it with

2  HR?

3    A.   They asked me the same questions you asked,

4  that's why.  It was a recent comment at the time, I

5  think.  I do not know for a fact.

6    Q.   So just so I can understand it correctly,

7  explain again who deleted a comment.

8    A.   I assumed she deleted the comment, because I

9  can't delete that comment.  Well, I possibly could

10  delete that comment.  I don't know how to delete a

11  comment, because I don't do that, but I don't know -- I

12  assume she deleted the comment because it disappeared.

13    Q.   She being Amanda?

14    A.   Amanda, and that's what I mentioned to them.

15    Q.   So she had made a comment that she deleted?

16    A.   Possibly.

17    Q.   Was it her own comment that she deleted is

18  the question?

19    A.   Yeah, probably, yes.

20    Q.   And it was a comment on something that

21  another nurse had posted?

22    A.   I don't know the details.  I don't know.  If

23  you have all friends and someone makes a comment on a

24  friend and they're your friend, you can see those

110

1    comments on Facebook, and then you can comment on that.

2        Q.    And how did you know that a comment had been

3    deleted?

4        A.    Because I think it was a recent comment when

5    I went on Facebook.

6        Q.    Right around the same time?

7        A.    I don't know.  I don't know for a fact.

8        Q.    In July?

9        A.    I don't know.  I really don't know.

10       Q.    And you have no idea what the comment was

11   about?

12       A.    I don't know if I made a copy of it.  I don't

13   know.

14       Q.    Is it possible that you have a copy?

15       A.    I don't know.  I'd have to check.

16       Q.    Was it something involving work?

17       A.    Again, I do not know.  I know Lisa made a

18   comment on a work-related event.  I don't know if she

19   commented on that.  I do not recall at this time.

20       Q.    Do you remember what Lisa's comment was?

21       A.    Yes, I do.

22       Q.    What was it?

23       A.    I was placing a central line; and after an

24   intern tried multiple times and the location of the

111

1  central line did not look right to me, I was getting

2  serous fluid back when I was withdrawing to see if

3  you're in the line, and it just looked odd because with

4  the ultrasound, it looked like I was in, you know, so

5  we get a chest x-ray, and I think Lisa was -- and I

6  asked Lisa, "You know, I'm getting serous fluid back on

7  this patient," and she says, "Possibly because you're

8  not in the artery," and I go, "Well, that's what I

9  assumed," and she said, "You're probably in the pleural

10  space."  Well, the x-ray confirmed that, and so she

11  made a comment on that.  I think she verbally tried to

12  write down everything on my Facebook.

13      Q.   She put something on Facebook about what had

14  happened with that incident?

15      A.   Word for word me asking her, "Man, I placed

16  the central line, got serous fluid, am I in the right

17  place?"  Not all of it was 100 percent accurate.  She

18  was making it as a joke, so she changed it a little

19  bit, but it was sort of to that extent.

20      Q.   So it sounds like she had kind of rereported

21  what she believed or what she jokingly was reporting as

22  your conversation back and forth with her in a Facebook

23  post; is that accurate?

24      A.   That's correct, she did.

112

1    Q.    And you think it's possible, but you don't

2    know that Amanda posted a comment to that?

3    A.    Maybe.  I don't know.  I don't recall.

4    Q.    And that may have been the one that was

5    deleted, but you don't know?

6    A.    I don't know.

7    Q.    When about did that happen?  About when did

8    that happen?

9    A.    That comment that Lisa made?

10   Q.    Yes.

11   A.    Beginning of July, I think.  It was during

12   that ICU month, but I don't know the exact date.

13   Q.    Were you friends with Lisa on Facebook?

14   A.    I think so, yes.  Her husband went to the

15   same school I did as a child, so I think she asked me

16   that question, and I said yes, and she added me as a

17   friend.

18   Q.    What school was that?

19   A.    St. Michael's I think elementary, middle

20   school.

21   Q.    And that's Lisa's husband?

22   A.    (Indicates affirmatively.)

23   Q.    So is he a friend of yours then from school?

24   A.    Back then.  I've lost touch since the sixth

113

1    grade or whenever.  I don't know how she knew I knew

2    him or anything like that.

3        Q.    Have you been in touch with them recently at

4    all?

5        A.    (Indicates negatively.)

6        Q.    Are you still friends with Lisa on Facebook

7    as far as you know?

8        A.    I don't know.  I think so.  I don't know.

9        Q.    And I'm just trying to remember what you

10   said.  In terms of your relationship with Amanda Bowers

11   outside of work, had you guys ever hung out outside of

12   work, ever gone out and done anything?

13       A.    Not that I can recall.  There's times you go

14   out in public places, and the nurses are there and

15   you're nice to them because you work with them, so you

16   say, "Hey, how's it going," but other than that, I

17   never made any attempt -- like I said, I never had her

18   number before, nothing like that?"

19       Q.    And she sent you an e-mail to give you her

20   number, not like a Facebook message?

21       A.    It looks like it was through Facebook.  You

22   can message anyone through Facebook and it goes through

23   your e-mail.

24       Q.    Right.  So it was originated through

114

1    Facebook?

2        A.   I think so, yes.  Yes, it was.

3        Q.   What other meetings or communications did you

4    have with Dr. Weiss or HR during the investigation of

5    the A line incident?

6        A.   I would page Dr. Weiss almost on a daily

7    basis saying, "Where are we at?"  And he kept saying

8    that "HR has left me in the dark on this.  I don't

9    know.  If I find out, I'll call you again" -- or "I'll

10   call back."  Excuse me.  I don't know.  I kept calling

11   on a daily basis, and then finally he just kept saying

12   that "I don't know yet.  I haven't heard from HR."  I

13   said, "Well, then schedule a meeting with HR.  I'd like

14   to speak to them so I can get answers," since he wasn't

15   answering anything that was going on.  He said he

16   wasn't part of anything.  So that was the meeting that

17   occurred.

18       Q.   What meeting occurred?

19       A.   The HR soon after.

20       Q.   Who was present at that meeting?

21       A.   Dr. Weiss was and Steve Kile was, and I would

22   not know the rest of the people there.  I don't recall

23   their names or -- I just don't --

24       Q.   Who were they?  Were they from HR?

115

```
 1        A.   I don't know.  I don't know who makes up HR.

 2        Q.   Jeanette Contosta, does that ring a bell?

 3        A.   I don't know their names.

 4        Q.   How many people were in the meeting?

 5        A.   I wouldn't be able to tell you, because I

 6   don't know.  I don't know.

 7        Q.   What happened at that meeting?

 8        A.   They were asking me questions about how the A

 9   line worked, and so I can explain it to them.  So I

10   explained that to them, and then all of a sudden, it

11   kind of became a little hostile with the questions.

12   They were blaming me for it, saying, "This is an

13   artery.  The person could have died."  And I was trying

14   to explain to them that this is not an artery where

15   someone can die from.  This is a peripheral artery.

16   You can't die from this or any complication of that.

17   The worst you can get is an infection, and that, too,

18   is limited because people are sterile in the room.  We

19   keep it a sterile environment.

20        Q.   So they did ask you what happened in the

21   incident?

22        A.   Um-hmm.  They were asking questions, and some

23   of them I wasn't able to answer, because I do not

24   recall.
```

116

1     Q.    Did anything else happen at the meeting other

2     than just explaining what happened?

3     A.    They asked, "Did you talk to residents or

4     others?"  And I said, "Yes."  They asked, "Why were you

5     talking to residents?"  I said, "Well, Dr. Weiss didn't

6     tell me not to talk to residents."  And the residents

7     were calling me because he had a meeting telling them

8     what happened.  So all these residents were calling me.

9     I think they looked at him, at Dr. Weiss, when I made

10    that comment.  I don't know if he was allowed to tell

11    them or not.  I don't know.  But it was a very -- it

12    felt like a very hostile environment against me.  From

13    what I thought was an investigation with her, it seemed

14    like they were blaming it on me.

15    Q.    Did they discuss anything else at the

16    meeting?

17    A.    Like what?

18    Q.    Just asking if there was anything else

19    discussed that you recall.

20    A.    They mentioned that did I speak to Amanda

21    near the end of the conversation; and at that point, I

22    said, "No," but I was kind of scared at the time

23    because everyone is yelling at me, saying, you know,

24    "This person could die.  This person could have died."

117

```
 1    I kind of got shocked by it, because I was told this
 2    was not about me, and all of a sudden they're turning
 3    it on me.  I kind of made a mistake there.
 4        Q.   So you did tell them you hadn't spoken to
 5    Amanda when, in fact, you had?
 6        A.   Right, and that was a mistake.
 7        Q.   Was there anything else that was discussed at
 8    the meeting that you recall?
 9        A.   I don't even know how long the meeting was,
10    but they mentioned "Tell residents that -- if they call
11    you, tell them you're not allowed to speak to them,"
12    and I said, "Okay," and Dr. Weiss mentioned he'll send
13    another message to them telling them not to contact me,
14    and residents still contacted me.
15        Q.   And what did you do when they contacted you?
16        A.   I told them, I said, "Look, I'm instructed
17    not to talk to you guys."
18        Q.   Was there anything else you recall discussing
19    at the meeting with HR and Dr. Weiss?
20        A.   I don't recall.
21        Q.   Was any determination made at that point
22    about your status?
23        A.   I asked them "Am I allowed to know what
24    Amanda wrote?  Who was the nurse that complained?"  And
```

118

1    Steve Kile said, "No."  I said, "How long am I going to

2    be absent from work?"  And they said, "I don't know.

3    Maybe a week or so.  I don't know."  I do not recall

4    the details of what Steve Kile mentioned to me.

5         Q.   Do you know what date that meeting was held

6    on?

7         A.   I don't know.

8         Q.   Do you know approximately how long after the

9    incident?

10        A.   It was the next week maybe.  I don't know for

11   a fact, because I was not getting any answers from

12   Dr. Weiss.  I wanted answers on what is going on.

13        Q.   At some point, you were terminated from the

14   program, correct?

15        A.   That's correct.

16        Q.   How did you learn about that?

17        A.   Dr. Weiss paged me and said call him, and I

18   asked him, "What is going on?"  He said, "You have a

19   meeting with HR."  I said, "Am I being terminated?"  He

20   said, "I cannot say."  I said, "Should I bring a legal

21   representative?"  He said, "I cannot say."

22        Q.   Why did you suspect that you might be being

23   terminated?

24        A.   Just the way of his tone of voice; and when I

119

1  asked, "What is the meeting about?" he said, "I cannot

2  say."

3      Q.   So did you then have that meeting with HR?

4      A.   I had that meeting.  I went to his office

5  first, and then him and Steve Kile took me to a room,

6  and they didn't say anything.  They just gave me a

7  sheet of paper and said everything is written on there.

8      Q.   And then what did you do?

9      A.   I read it, and I said, "This is not true."  I

10 said, "This is not true on each paragraph."  I said, "I

11 never told an OB-GYN that I could fire an OB-GYN."  I

12 said, "That's not true," and they would not say

13 anything.  And at the end of the conversation, you

14 know, I said, you know, "This investigation was on an A

15 line, and you guys are terminating me for something

16 that doesn't even involve the A line."  That didn't

17 even make sense to me.  Everything written there had

18 nothing to do with the A line investigation, and I was

19 shocked that I'm being terminated when for all this

20 time they're saying the investigation was on Amanda

21 Bowers.

22         I was never placed on probation, never given

23 anything in writing, nothing, and I told Dr. Weiss, you

24 know, "My career would be over."  I was like, "I cannot

120

```
 1    transfer to another residency as a third year."  I
 2    said, you know -- because he mentioned in the past that
 3    you have to do two years in a residency program to
 4    graduate.  That's what I was told.  I don't know if
 5    that's correct or not.  I said, "You know my career is
 6    terminated?"  And he said, "I know."  And I said, "How
 7    do you feel about this?"  And he said, "It was my
 8    decision," and then he turned to him and said, "with
 9    HR."
10         Q.   And what was your understanding after reading
11    the letter of why you were being terminated?
12         A.   What do you mean by what is my understanding?
13    I didn't understand anything in that letter.
14         Q.   Well, you said that it seemed that they
15    weren't terminating you for anything relating to the A
16    line.  So what did it seem that they were terminating
17    you for?
18         A.   They were saying that I talked to residents
19    which I was -- and it said which Dr. Weiss instructed
20    me not to, and that's incorrect.  He never told me
21    that.  In fact, the residents were calling me based on
22    his meetings with the residents.  Then it said that I
23    would make phone calls to people telling them that the
24    OB resident -- I assumed it was the OB resident, that I
```

121

1   told her that she should be removed from clinical

2   duties, and that's absolutely incorrect.  I never told

3   them that.  I never told her that; and if she

4   misinterpreted me, then I owe her an apology, like I

5   mentioned to them before in the review committee, but

6   I've never told her that.

7          Then it's saying I lacked professionalism,

8   which I've never been written up in the past, never had

9   any meetings, never had any incident reports, never

10  been on probation, to my knowledge.  Every time --

11  every year we either get a six month eval or a yearly

12  eval, and they tell you what you need to improve on,

13  and they also give you your contract at the end of the

14  year.  Never was anything negative written about me,

15  never, that I'm aware of, where they had a meeting with

16  me.

17         Usually there's an incident.  They usually

18  have you sign something is what I was told, but

19  nothing.  That's why I was shocked with that

20  termination letter.  They're claiming stuff in there

21  which I've never heard of.

22      Q.   Anything else that as far as you understand

23  it now they thought they were firing you for?

24      A.   I mean that's according to the termination

122

1    letter and based on that termination letter.  I don't

2    know what to say about it.  Other residents, senior

3    residents, said that, "Dr. Weiss is coming after you,"

4    before they graduated because I was friends with a

5    particular resident, Femi Adenuga.  In fact, a few

6    residents said that "Watch out.  They're going to come

7    after you," which didn't make sense to me, and I

8    mentioned that.  I don't know where they got that

9    information.

10          Q.    What was the name of the person?

11          A.    Femi Adenuga.

12          Q.    And who is that?

13          A.    He was a former resident who graduated.  He

14   also -- I guess according to him, they tried to

15   threaten to terminate him a couple months before he

16   graduated.

17          Q.    Did he say why?

18          A.    I don't recall.  They kept it from all of

19   them.  It was just the third year residents were

20   talking about it, and it was just them talking about

21   it.  I don't know the details of the reason why.

22          Q.    And you were friends with him?

23          A.    Yes, I'm friends with him.  I'm friends with

24   all residents.

123

```
 1        Q.    And people thought that you should watch out
 2   because you were friends with him?
 3        A.    That's what he told me.  He came to me and
 4   said that "They're coming after you.  Dr. Weiss is
 5   coming after you because your friends with me," which I
 6   did not understand, did not make much of it.
 7        Q.    Do you think that Dr. Weiss was coming after
 8   you because you were friends with him?
 9        A.    I do not know.  I felt that way at the end of
10   the termination -- or at that termination meeting.
11        Q.    You thought that the termination might have
12   been because you were friends with Femi?
13        A.    I don't know.
14        Q.    But you suspected that it might be possible?
15        A.    At that point, there was a lot of things
16   going through my head.  I was shocked by what was going
17   on.  There was a ton of things.  What am I supposed to
18   do?  What is going on?  This doesn't make sense.  And I
19   wasn't able -- and I requested my files, anything.
20   They would not give me any files.  They would not give
21   me what was going on or any explanation of the A line
22   outcome.
23                        - - -
24              TERMINATION LETTER DATED 7/22/09
```

124

```
 1              WAS MARKED AS DEFENDANT'S EXHIBIT

 2              2.

 3                         - - -

 4      Q.   I'm going to go ahead and give you what we've

 5   marked as Exhibit 2.  Let me know when you've had a

 6   chance to look at that.

 7      A.   Okay.

 8      Q.   What time did you speak with Dr. Weiss when

 9   he first called you about this incident when you were

10   sleeping?

11      A.   What time did I speak with Dr. Weiss?

12      Q.   What time of day?

13      A.   I don't know.  I was sleeping.  It was in the

14   afternoon sometime.  I don't know the exact time he

15   paged me.

16      Q.   Did you go back to sleep, or did you stay

17   awake?

18      A.   Yes, I went back asleep, because I don't get

19   up to around 6:00 and prepare for my shift, which

20   starts at 7:00.

21      Q.   Do you recall that during that conversation,

22   Dr. Weiss asked you to bring in a written statement by

23   8:00 a.m. the next morning?

24      A.   Yes.
```

125

1      Q.   So you remembered that part of the

2  conversation?

3      A.   That's correct.

4      Q.   And you did present a written statement by

5  8:00 a.m. the next morning?

6      A.   That's correct.

7      Q.   And that's what we looked at as Exhibit 1,

8  correct?

9      A.   That's correct.

10      Q.   When did you type up Exhibit 1?  What time of

11  day?

12      A.   I don't know the time of day I typed that up.

13  I was still confused on what was going on, and that's

14  why I wanted to call him and ask him information about

15  that.  I don't know the exact time of day.

16      Q.   Do you know if it was before or after you

17  called and spoke with the people we discussed before

18  that you called?

19      A.   Honestly, it was probably after.

20      Q.   In the third paragraph of Defendant's Exhibit

21  2, it says, "On July 9th at 6:00 p.m., an associate

22  received a telephone call from you."  Do you have any

23  idea who that may be referring to, a phone call you

24  made at 6:00 p.m.?

126

1      A.    Most likely Hai Bao or maybe Kanan.  I don't

2   know the exact person I called.

3      Q.    It says, "In this conversation, you outlined

4   to him the events surrounding placement of the arterial

5   line."

6      A.    Okay.

7      Q.    And do you know whether that happened?

8      A.    When I called the senior resident in ICU, if

9   that's who you guys are referring to, I did talk to

10  him.  Now, he was asking me, "Well, I heard this is

11  about an A line.  What is going?"  I said, "I don't

12  know.  I don't even remember the patient.  I don't even

13  know what they're talking about."

14         That's what we had a conversation on, besides

15  me asking is Clarissa okay, and then I told him pretty

16  much "I won't be coming in.  Kanan is covering my

17  shift."

18     Q.    So then did you or did you not outline the

19  events surrounding the placement of the line?

20     A.    I do not recall.

21     Q.    Then it says at 9:00 p.m. the same day, in

22  the fourth paragraph, you contacted an associate, that

23  you informed her that she was removed from clinical

24  duties.  I presume that refers to --

127

1      A.   The OB resident.

2      Q.   The fifth paragraph, "10:00 p.m., you

3   contacted an associate and they reported that you

4   informed her that you had spoken to a nurse and they

5   felt you should be removed from clinical duties as

6   there is an investigation."  Do you know who the

7   10:00 p.m. call may be referring to?

8      A.   I do not know.  That's why I was shocked when

9   I read this.

10      Q.   Do you know who you spoke to after you spoke

11   with Amanda?

12      A.   I don't know the timeframes of when and who I

13   called or what order I called.  I do not know that off

14   the top of my head, and I'm not sure.

15      Q.   The next day, July 10th, on the sixth

16   paragraph, at 5:52 p.m., you contacted an associate and

17   reported that you asked if he knew what was going on

18   regarding arterial line placed and a code.  My guess is

19   that call probably refers to a call to Brian Alexander,

20   the chief resident.

21      A.   Possibly, yes.

22      Q.   Does that make sense?

23      A.   Possibly, yes.

24      Q.   Anyone else it might possibly be?

128

1       A.   I do not know.

2       Q.   Okay.

3       A.   Like I said, there was a lot of residents

4    calling me throughout the day to encourage me during

5    this process.

6       Q.   The rest of this letter or at least portions

7    of the rest of this letter talk about professionalism.

8    Professionalism is one of the ACGME core competencies;

9    is that correct?

10           MR. PATMON:  Objection.

11           Answer if you know.

12      A.   Possibly, yes.

13      Q.   Are you familiar with the ACGME core

14   competencies?

15      A.   Yes.  They have us reviewed every time.

16   ACGME comes in or JCAHO comes in.

17      Q.   And do you know how many there are?

18      A.   Six, but I'm not sure.

19      Q.   Of those six, do you know whether

20   professionalism is one of them?

21      A.   Most likely.

22      Q.   Do you know what is included in

23   professionalism, what professionalism means?

24      A.   I know my role as a resident, yes.

129

```
 1          Q.    What is that?

 2          A.    My role as a resident is to make sure that I

 3    learn, I teach, I report inappropriate activities,

 4    ethical misconducts on all parts, because that is my

 5    oath, and to keep things as professional as possible,

 6    yes.  This is a professional environment we work in,

 7    just like in law firms.

 8          Q.    Does professionalism include reporting

 9    information accurately and truthfully, would you say?

10          A.    Yes.

11          Q.    Does it include following the instructions of

12    the program director, things like that?

13          A.    Well, that's a question.  If it's

14    inappropriate what they do, I have the right to refuse

15    it.  That's according to ACGME guidelines.

16          Q.    But if it's not against a rule or a policy or

17    a procedure, then you're supposed to follow what they

18    instruct you to do; is that correct?

19          A.    If you feel it's morally right, yes.

20          Q.    After you received Exhibit 2, you requested a

21    hearing by the program education committee, correct?

22          A.    I'm sorry.

23          Q.    After you received Exhibit 2 and were

24    terminated, you requested a hearing by the program
```

130

1    education committee, correct?

2         A.    That's correct.

3         Q.    Was that hearing held?

4         A.    Yes.

5         Q.    Can you describe that proceeding and what

6    happened?

7         A.    Everything was set up.  Dr. Easterday

8    contacted me, and I said -- you know, I had a legal

9    representative after I contacted Dr. Easterday, because

10   they weren't giving me any information regarding the

11   investigation.  They weren't giving me my files or

12   anything.  All I had was the terminating letter.

13   That's it.  So I hired legal counsel because I felt

14   that that's inappropriate.

15            I thought that all residents have the right

16   to their files according to ACGME guidelines, all

17   investigation material as well, and which I did not

18   have.  So I had my attorney contact Dr. Easterday

19   regarding this matter, and they also barred him from

20   actually representing me, legal right to

21   representation.  They said I am not allowed to have

22   legal representation, and that conversation was with my

23   lawyer and Mt. Carmel, which did not make sense to me.

24            So I went into that meeting and discussed

131

1    everything on the termination letter, and I mentioned

2    at the beginning -- actually Dr. Easterday stated,

3    well, you know -- I don't know the exact words he said,

4    but he stated something like "You were not given any

5    investigation materials or allowed to investigate; is

6    that correct?"  I go, "Yes.  They didn't let me

7    investigate at all."

8        Q.    What happened at the meeting, the program

9    education committee meeting?

10       A.    I did all the talking, and I just explained

11   everything here.  I said, "None of this makes sense.

12   I've never been written up."  I defended my

13   professionalism to the best that I can, because I don't

14   know what they were talking about lacking

15   professionalism here, because I've never given any

16   written notice, and I mentioned to them about how, you

17   know, I think this might be something personal against

18   me, I'm not sure, or whether it's because of what I've

19   been doing in terms of whistle blowing.  I do not know.

20   It's just all of a sudden you get terminated two weeks

21   after you sign a third year contract with no complaints

22   or no issues written against me.  I just found it

23   shady.

24             The only question I recall was from

132

1    Dr. Eckler and he said, "Did you ever tell Clarissa" --

2    if I remember to my best knowledge -- "that she is to

3    be removed from clinical duty?"  And I said, "No."  I

4    wouldn't be able to if I could.  It doesn't make any

5    sense whatsoever.  She's an Ohio State University

6    resident.  We have no jurisdiction over Ohio State

7    University, and she's in a different program, OB-GYN,

8    which doesn't make any sense whatsoever.  So I don't

9    know where she got that idea from, and I told them that

10   "If she misunderstood anything I said, I owe her an

11   apology, because that's not what I said, nor that's not

12   what I meant.  I have no jurisdiction to do that.  I'm

13   not the senior in the ICU."

14       Q.   Who were the members of the program education

15   committee; do you remember?

16       A.   At that meeting?

17       Q.   Yes.

18       A.   I think Dr. Easterday, Dr. Eckler,

19   Dr. St. John.  I know Steve Kile was there.  I don't

20   know if there was Dr. Tamaskar or not.  I don't recall.

21       Q.   Did you have any problem with the

22   constitution of the committee, with who they selected

23   to be on it?

24       A.   I felt that -- if I remember correctly, I

133

1   thought that it was supposed to also have peers on

2   there as well, which they didn't.  I felt it was wrong.

3   They're supposed to tell me who was on the board, and I

4   was never told that, if I recall correctly, so I'm

5   not --

6           Q.   Anything other than that?

7           A.   I felt it was wrong to have St. John there,

8   just because a lot of the -- he has something personal

9   against me because of the fact that I wrote a petition,

10  and he took it out on me in January of '09 with

11  witnesses, just treating me bad, yelling at me after he

12  found out that I wrote a petition, and it also affected

13  my grade, which when I talked to Dr. Weiss, they

14  said -- and Tamaskar was in the room.  They said,

15  "Don't worry about that.  You did the right thing, and

16  it doesn't matter what grade he gives you."

17          Q.   Your grade in what?

18          A.   In the ICUMA, and it's not an A, B, C, D

19  grade.  It wasn't like all previous other -- you could

20  tell he was treating me bad.  The chaplain was even

21  asking, "Why is he yelling at you?"  Anything I do, I'm

22  getting yelled at.

23               The third year resident, Femi Adenuga, who I

24  went to regarding Dr. St. John's behavior towards me

134

1    called him and asked him and said, It's because of this

2    petition that was written that you're being treated

3    bad."

4         Q.    Femi believed it was because of the petition?

5         A.    Femi talked to him and told me it's because

6    of the petition.

7         Q.    Talked to who?

8         A.    Dr. St. John and said, "John called me as

9    well."

10        Q.    What did Femi say Dr. St. John said about

11   that?

12        A.    That he is very upset about this petition,

13   that Brian Alexander stated that it was -- that you

14   signed the -- you had the meeting with the petition.

15   Dr. Weiss denied ever knowing any knowledge of the

16   petition ever being done, which was a lie, and that's

17   why I was being treated bad.

18        Q.    Why was he upset about the petition?

19        A.    Who?

20        Q.    St. John.  Did anyone ever explain why?

21        A.    Because from the beginning, Dr. Weiss and

22   Dr. Tamaskar had been trying to remove residents from

23   the ICU, as they thought it was dangerous because we

24   are doing stuff above what we are supposed to do, and

135

1    there's no critical care attending in the ICU.  He's

2    had multiple meetings many times in front of all the

3    residents to come up with ideas to get us out of the

4    ICU.  So there's been a battle between the med ed

5    department, Dr. Weiss, and St. John.

6        Q.   What's the battle?  What is the battle about?

7        A.   Removing residents from the ICU, that we

8    should not be taking call at night without an in-house

9    critical care physician, that Dr. Weiss thinks that

10   we're not critical care fellowship.  We're internal

11   medicine, and we should spend -- we should not be

12   taking calls as much as we do in the ICU.

13       Q.   You say that Dr. St. John spoke to you about

14   this issue?

15       A.   Yes.

16       Q.   What did he say?

17       A.   He called me and he said, "Why did you sign

18   this petition?  Why was this petition signed?"  He

19   asked me about -- he talked to Femi, and for a while he

20   felt that it was -- that he believed Weiss saying that

21   he had no recollection of this, that Sunil did it on

22   his own, which when I talked to all the residents, it

23   was done during the morning report hour, and no

24   attending physician was there, and he canceled the

136

1    other morning report so I could do this, and he said

2    that "I understand that Weiss knew about this the whole

3    time," which he didn't understand before.

4                              - - -

5             PETITION WAS MARKED AS DEFENDANT'S

6             EXHIBIT 3.

7                              - - -

8        Q.   I'm going to hand you what we've marked as

9    Exhibit 3.  Is that the petition that you've been

10   referring to?

11       A.   Yes.

12       Q.   You signed Exhibit 3?

13       A.   Yes.

14       Q.   Correct?

15       A.   That's correct.

16       Q.   Along with 16 others?

17       A.   Sixteen others agreed to it, yes.

18       Q.   How did this petition come about?

19       A.   Dr. Weiss gave a morning -- a lecture.  I

20   don't know if it's a morning report or noon conference

21   saying that next year schedules as third year

22   residents -- which that's what I would have been -- is

23   going to change significantly.  He said that he's going

24   to have third year residents doing intern level calls,

137

1    which means we're on call every four days, which

2    usually doesn't happen.

3            The reason that -- the benefits of being a

4    senior is that we have less calls.  The ICU will

5    change, the way the structure is made of that, and we

6    were all kind of shocked by that, by the changes he was

7    stating that's going to happen.

8            So after that, I went to the chief resident,

9    Bhavesh Patel.  I said, "Look, this is the changes

10   that's going to happen next year.  You know, we need

11   you guys to talk to him regarding these changes."  He

12   said, "I'm done with this program.  I'm done.  It's not

13   my problem no more.  You have to go talk to him

14   yourself if you want."

15           So I went to Dr. Weiss, and I said,

16   "Dr. Weiss, these changes are horrible.  Why are you

17   making third year residents do intern level call?"  And

18   we talked about that in detail, and he said, "You want

19   to know why?" and he started getting upset, he goes,

20   "Because do you know where the current third year

21   residents are?"  I go, "No."  He said, "That's a

22   problem.  They put you on a bus and they sent you off a

23   cliff, and you guys are going to have to pay for that."

24   I said, "What do you mean?"  And then he went into the

138

1    whole ICU.  "I stood up in front of administration

2    telling them that this is dangerous, and all the

3    residents feel the same thing too, and you know what

4    they said to me?"  I go, "No."  He said, "Some of the

5    residents don't have a problem with this," and he was

6    upset about that.  He goes, "All you guys do is you go

7    in and you suck St. John's dick, and you don't even

8    support your own program director."  He was upset.

9          And I said, "Listen.  Not all of us feel the

10    ICU is appropriate for us residents."  I made that very

11    clear to him.  I said, "How can we rectify this

12    matter?"  And he said, "You scratch my back.  I'll

13    scratch your back."  I said, "What do you mean?"  He

14    said, "If you say that not all residents feel about

15    this, okay, then do something."  I said, "Would a

16    petition help?"  Because I can tell you that residents

17    don't feel -- a lot of residents that I know feel that

18    this safety is an active issue, and we agree to that.

19    We don't want to be there," and I said, "The third year

20    residents, some of them like the ICU.  They're going

21    into critical care fellowships.  They like that

22    experience.  They like being there," but I told him, "A

23    lot of us do not like it because it is dangerous in

24    there, and we don't feel comfortable in that

139

1    environment."  He said, "Fine.  Have a petition signed

2    and we can discuss your other matters."  And I said,

3    "Well, I'll need morning report tomorrow."  He said,

4    "That's fine."  And I said, "But then the third year

5    residents will not agree to it."  He said, "Well, then

6    the third year residents won't come to that."

7        Q.   So then Exhibit 3 is the result, correct?

8        A.   Yes.

9        Q.   Who typed up the exhibit?

10       A.   I did.

11       Q.   That night?

12       A.   The day before, the morning report where I

13   had the talk, yes.

14       Q.   Who decided what it should say?  Were you

15   working with anyone, or was it all --

16       A.   This was all me.

17       Q.   Did you discuss anything about it with any of

18   the other residents or the chief resident or anything?

19       A.   I did talk to other third year senior level

20   residents about this, yes.  I talked to them about what

21   my conversation with him was and, you know, how he's

22   upset.  He said this and this and this.  There were

23   residents there.  You know, third year residents heard

24   this stuff, yes, including the chief resident, and I

140

1    think there were still some residents in morning report

2    and sat for this as well.  I don't know which third

3    year resident.  I'm not sure, but there was.  I think

4    it was Jorn Kaeval.

5        Q.   So it sounds like Dr. Weiss was supportive of

6    the petition?

7        A.   Supportive of it?

8        Q.   Yes.

9        A.   Yes.  He agreed to what I was going to do.

10        Q.   And then how did you get signatures on it?

11    Was that at the morning report?

12        A.   Yes, and those that were not there that I

13    typed their name up the night before, I would either

14    call them or someone else would call them that knew

15    them.

16        Q.   What happened to the petition after the

17    residents signed it?

18        A.   I gave it to Dr. Weiss, and a few others kept

19    copies.

20        Q.   Who kept copies?

21        A.   Myself, Kanan Patel, and I don't know if any

22    other residents have copies of it as well.  I don't

23    know, but she wanted a copy herself.

24        Q.   Do you know what Dr. Weiss did with it?

141

1     A.   I assumed he took it to administration,

2  because that's what the plan was.

3     Q.   Other than what we talked about with

4  Dr. St. John, did you ever hear anything about the

5  petition after this?

6     A.   Yes, when I was treated bad.  We went over

7  that.

8     Q.   Anything we haven't gone over?

9     A.   Regarding this petition?  I don't know.

10     Q.   Do you know what, if anything, the hospital

11  did to address the concerns that were raised in the

12  petition?

13     A.   I know when I asked him for follow-up

14  regarding this matter, he said, "I haven't heard

15  anything yet.  I don't know what transpired out of it.

16  We've had meetings about it."  And a lot of residents

17  were asking me "What is going to happen with the

18  schedule?  What is going to happen?  Do we have to do

19  these calls or not?"  And I said, "I don't know yet."

20     Q.   What exactly was the concern of the residents

21  that lead you to write the petition?

22     A.   The concern was that being in the ICU

23  setting, it is dangerous.  They all agreed to that.

24  They felt that we are, indeed, not critical care

142

1  fellows, and that we are practicing above our standard

2  level of care.

3       We also talked about -- I told them what

4  Dr. Weiss was saying in the meeting, as well as -- they

5  knew about the outcome of what is happening next year,

6  and they were upset about that as well.

7       Q.  Was it the number of calls or you being in

8  the ICU at all?

9       A.  Being in the ICU was a big factor.  The calls

10 are still extensive.  There's eight, nine calls as well

11 when you're an intern in the ICU.  Second and third

12 years have different call schedules.  It's a night

13 float system, and the second year prepares to be

14 transitioned into a senior level resident to handle the

15 night float by taking four calls a month in the ICU.

16 So it's sort of training them to prepare for it.

17      Q.  So it's an educational component?

18      A.  ICU?  Not to this extent, no.

19      Q.  The four calls?

20      A.  The four calls?  I didn't make the call

21 schedule.  That's something they make.  I don't know.

22 We don't decide what is considered educational; they

23 do.

24      Q.  Do you know how the ICUs are staffed after

143

1    hours at Mt. Carmel East and St. Ann's?

2        A.   There's no residents from the medicine

3    department running those facilities.

4        Q.   Do you know whether they have on-site

5    critical care specialists at both of those hospitals?

6        A.   From what I was told from Dr. Weiss' meeting,

7    that those people, they're licensed physicians there.

8        Q.   Are you aware that at St. Ann's after hours,

9    there's only nursing care, and attendings are available

10   by phone?

11       A.   I don't know.  All I know was I was told that

12   there's licensed physicians at those hospitals, but not

13   at Mt. Carmel West.  That's what I was told.

14           MR. ASENSIO:  Can we go off the record just a

15   second?

16           (Discussion held off the record.)

17           (Short recess taken.)

18   BY MR. ARMSTRONG:

19       Q.   So you have no personal knowledge then of

20   what the after hours critical care staffing is at East

21   or St. Ann's?

22       A.   There's a code team that's there at night,

23   and there are licensed physicians.

24       Q.   And you know that for a fact?

144

1      A.    I worked there in the ER and that's what I

2  was told there.

3      Q.    That's what you were told?

4      A.    Yes.

5      Q.    Do you know whether ICU staffing was an

6  ongoing issue in prior years prior to the year that you

7  raised this petition?

8      A.    I wasn't in there, so I don't know what the

9  issue was or what the schedules were like.

10     Q.    You don't know whether the class before you

11 had raised the same issues or not or similar issues?

12     A.    The class above me?

13     Q.    Yes.

14     A.    I don't know for a fact.  I don't know.

15     Q.    What was your goal with the petition?  What

16 were you trying to make happen?

17     A.    To get an in-house critical care attending if

18 we were to take the calls in the ICU.  My concerns were

19 the same as Dr. Weiss' concerns.

20     Q.    Had you ever had any conversations with

21 Dr. Li Tang about this issue?

22     A.    Yes.

23     Q.    What were your conversations with Dr. Tang?

24     A.    After I left my conversation with Dr. Weiss

145

```
 1    he told me that "If you have a problem with it, go to
 2    Li Tang."  I went to Li Tang.  She's next up the -- I
 3    should say the scale that we would go to if there's a
 4    problem, and I went in, and I showed her the schedule
 5    with the highlighted areas that I felt were of concern,
 6    which included my calls and the third year day senior
 7    calls, nine calls without any interns in the ICU, as
 8    well as I highlighted the calls with the second year
 9    showing that there's no third year backup with these
10    second years in the ICU.  I told her what Dr. Weiss
11    told me.
12         Q.   Which was?
13         A.   I said that "Without an in-house critical
14    care attending, that safety is an active issue, and I
15    mentioned that to him, and I said people will die," and
16    he said, "More to prove my point, we don't belong in
17    the ICU."  I told her that, and she said, "No, no.
18    Dr. Weiss would never say that."  I go, "Listen.  Here
19    is the schedule."  And she didn't understand how call
20    schedules work because she's not a physician.  She has
21    a Ph.D.  And so I sat with her.  In detail I explained
22    the entire call schedule, how it worked in the past and
23    how it's changed now since Dr. Weiss made the schedule
24    for the first time.  She's never made it in the past.
```

146

1   And she said that, "Don't worry.  I will talk to

2   Dr. Weiss and Brian Alexander, the chief resident,

3   regarding this and I'll get back to you."

4          A couple days later, I went to her office,

5   and I said, "Was this addressed?"  And she said, "I am

6   not going to change the call schedule.  Dr. Weiss and

7   Dr. Brian Alexander states that you're the most trained

8   resident out of all the residents, and you can handle

9   it."  I said, "That is not an appropriate response."  I

10  said, "One man cannot do this all by himself.  Hai

11  cannot run an ICU on the weekend by himself.  A second

12  year cannot be in the ICU without a third year resident

13  in the ICU.  That is dangerous."

14         And she said, "Well, you have a medical

15  student the way the schedule is assigned."  I said,

16  "The medical student is a medical student.  They're not

17  a physician.  They cannot stabilize another patient if

18  two people are dying at the same time."  And she said,

19  "Well, a first year resident is like a medical

20  student."  And I said, "No, they're not.  They're ACLS

21  and BCLS certified."  I said, "They are physicians.

22  They can give orders.  Medical students cannot give

23  orders."  And she said, "Well, I'm not going to change

24  the ICU schedule," and then I asked her, "So you're

147

```
 1   telling me if you brought your loved one" -- because I
 2   mentioned to her "I understand you're not a physician
 3   and you don't know how this schedule works or residency
 4   works," and she said, "No, I do have experience."  I
 5   said, "So you're telling me that if you brought your
 6   loved one into the ICU, you'd be okay with the way this
 7   schedule is written without a critical care attending
 8   or with one resident on?"  And she said, "No."  She
 9   said, "No," and then at that point she said she still
10   is not going to change it.
11          So then I took it to the next level, and I
12   showed the ICU schedule to Dr. St. John, and I told
13   him, "Look.  Here's the ICU schedule.  It's designed so
14   that one person will be on at night, and the second
15   year will be on without a third year backup in the
16   ICU."  And he flipped out, and he said, "This is a
17   bunch of crap.  This is a bunch of crap.  I'm going to
18   take care of it right now," and I said, "Well, I went
19   to Dr. Li Tang after talking to Dr. Weiss, and Dr. Li
20   Tang is not going to change it," and he stated that,
21   "Dr. Li Tang is not a doctor.  What does she know?  I'm
22   going to take care of it."  And a couple days later, he
23   said that "You do have an intern on with you every
24   night," but I said, "What about the second year?"  And
```

148

1     he said, "I can't change that."

2        Q.   What you've been talking about is in

3     reference to a schedule I think that came out in July;

4     is that right?

5        A.   That's correct.

6        Q.   That's not the same as the petition which I

7     believe was in January; is that --

8        A.   This is not a schedule.

9        Q.   Right, I understand that, but I'm just saying

10    it wasn't at the same time as the petition; is that

11    correct?

12       A.   No, the petition was in January of '09.  This

13    is in July.

14       Q.   I wanted to make sure I had the time line

15    right.

16       A.   ICU schedule that was made.

17       Q.   Do you believe that you were retaliated

18    against for your role in the petition?

19       A.   I feel like this all added up to it, yes.

20       Q.   Who do you believe retaliated against you for

21    your role in the petition?

22       A.   I don't know.

23       Q.   Dr. Weiss?

24       A.   Maybe.  I don't know.  Administration.  I

149

1   don't know.

2        Q.   My understanding was that Dr. Weiss supported

3   the petition; is that fair to say?

4        A.   That's correct.

5        Q.   Do you have any reason to believe that he --

6   why do you believe that he may have retaliated against

7   you for that then?

8        A.   For this petition himself?

9        Q.   Yes.

10       A.   I don't know if he retaliated against me

11  regarding this petition.  This petition is what he

12  wanted himself as well.  There was meetings after I

13  spoke to Dr. St. John at noon conference with all the

14  other residents, and they brought up the concern as

15  well with Afrina, the second year resident, being on

16  without a third year resident in the ICU, and he said,

17  "Well, if you guys want this changed, sign another

18  petition saying that we're not competent to be in the

19  ICU."

20       Q.   I'm sorry.  Who brought up that issue?

21       A.   Say that again?

22       Q.   I believe you said there was someone brought

23  up an issue with respect to Afrina.

24       A.   Right.  When I was in there, I said, "If you

150

1    guys have a problem with the ICU schedule, now is the

2    time to state it," and residents stood up and said,

3    "This is a problem.  There should not be a situation

4    where the second year is by himself in the ICU without

5    third year backup in the ICU."  That was removed for

6    the month of July.  It has never been like that before.

7        Q.    So that was a change in July then?

8        A.    That's correct.

9            MR. ARMSTRONG:  Could we go off the record a

10   second.

11           (Discussion off the record.)

12   BY MR. ARMSTRONG:

13       Q.    Since your termination, Dr. Nayyar, can you

14   tell me what employment you've had?

15       A.    I haven't had employment.  You can't get

16   employment in the middle of the year.  It's very

17   difficult to as a resident.

18       Q.    Have you been working at all in any capacity

19   not as a medical doctor?

20       A.    No.

21       Q.    Can you tell me what you've done to try and

22   find a new position or a new program?

23       A.    I've called multiple programs.  I can't list

24   how many.  I just went down the list and tried to call

151

1    as many as possible, particularly focusing in Ohio

2    first and then expanding out, and then I came across --

3    someone advised me -- and I can't recall if it was

4    through ACGME or another -- NRMP, National Residency

5    Matching Program, that advised me that AAMC has a

6    program called Find a Resident, and I applied on that

7    without any response.

8         Q.   Did you get any response from the programs

9    that you called?

10        A.   A lot of them were saying that there's no

11   spots available, some of them saying that funding is a

12   possible issue, because of the fact that I'm out of

13   funding, because Medicare only gives three years to

14   those who apply to internal medicine, and I am out,

15   because I did one year family medicine and two years of

16   internal medicine.

17        Q.   Do you know if they would be receptive to you

18   if funding could be provided?

19        A.   You know, I don't know that information.

20   Spots have to be available, and funding is an issue.

21        Q.   When you say you've called multiple programs,

22   multiple could mean three, it could be ten, it could be

23   twenty.  Can you give me a ball park?

24        A.   It was a lot.  I don't know.  Almost every

152

1    program in Ohio.  I've hit almost every school in New

2    York, Chicago.  I've tried Michigan.  I've tried weird

3    states like Iowa.  No offense to anyone who's from

4    there, or Idaho.  I even looked in Alaska.  There

5    weren't any programs there, I don't think.  Florida.

6    I've tried California.  I've tried Texas, and I don't

7    know of any -- I mean I was hitting a lot of states.

8        Q.  Are there any reasons for excluding any

9    particular states, or you just haven't gotten to them

10   yet?

11       A.  When you call them, you don't get a response

12   right away.  Some won't pick up.  You have to leave a

13   message.  You don't get messages returned.  It is very

14   difficult to call.  You're calling hundreds of schools,

15   and then I found out about Find a Resident, because

16   someone advised me about that, and they post available

17   positions at the senior level, for which I applied to

18   all of them.

19       Q.  About how many do you think you applied to?

20       A.  Maybe nine or ten.  That's all that was

21   available.  I applied to third year and second year.

22   There's only one third year spot, and I didn't hear a

23   response from them.

24       Q.  So you've applied to second year spots as

153

1    well?  You'd be willing to go into a position as a

2    second year if they would offer it?

3        A.    That's difficult to say, to repeat years that

4    you've already been certified in and passed

5    successfully.

6        Q.    But you've applied to those positions?

7        A.    But I did apply to them, because there was

8    only one third year spot available, and I haven't heard

9    anything from them.  So then I applied to second year

10   spots.

11       Q.    Have you heard anything back from any of the

12   ones you applied to?

13       A.    Not yet.  It's a difficult process.

14       Q.    How many program directors have you e-mailed?

15       A.    I don't know.

16       Q.    Have you e-mailed any?

17       A.    Yes.  I can't tell you if I e-mailed them or

18   their secretary, because online they show secretary,

19   and sometimes it's better to handle it through the

20   secretary, but I don't know exact number.

21       Q.    Say more than ten, less than ten?

22       A.    It's either calling or e-mailing or leaving

23   messages.  I would do a lot.  I don't know exactly the

24   numbers.

154

1     Q.    Have you received any offers?

2     A.    No.

3     Q.    Are you limiting your search to internal

4   medicine programs or any kind of program?

5     A.    Internal medicine.  If I do any other

6   program, I'd have to start all over.

7     Q.    What about transferring credits from your

8   internal medicine program to another program, would you

9   be able to transfer?

10    A.    That's called advanced placement, and that's

11  what I'm doing, third year spots.  I'm looking for a

12  third year residency spot.  So I'm taking my credits

13  from Mt. Carmel and going there.

14    Q.    Is there any possibility of getting into a

15  program starting out as a first or second year and then

16  accelerating once you get credit?

17    A.    Never heard of that.

18    Q.    Have you participated in the match program?

19    A.    Define match program.  I'm on Find a

20  Resident, which is a matching program.

21    Q.    I'm talking about the NRMP's match that's

22  currently going on right now.

23    A.    I can't.

24    Q.    Why not?

155

1        A.   Because, A, the deadline has already passed

2    when I attempted to; and, B, they told me that that is

3    only for first year spots.  They do not have advanced

4    placement spots beyond PGY1 level posted on that site.

5        Q.   So when was the deadline that passed; do you

6    know?

7        A.   I think it was February 24th or the 23rd.

8    I'm not sure of exact number.

9        Q.   So you're not participating in this year's

10   NRMP match?

11       A.   I cannot.

12       Q.   Why can you not?  Are you precluded from it,

13   or you just chose not to because it only offers first

14   year positions?

15       A.   A, I missed the deadline for that, which I

16   was going to attempt to as you brought it up to me that

17   there's a scramble that was brought up, but I knew the

18   scramble was never for a position beyond first year;

19   and when I called them and asked them, they say, "We do

20   not post anything beyond PGY1 levels in a scramble, and

21   I would not want to start all over.  That's like saying

22   you're going back to law school and start as a first

23   year when you've done four years.  That's ridiculous.

24       Q.   What about in a different field?

156

1       A.   I am out of funding.  I have no funding.

2 Medicare decides how you have funding.  If you choose

3 internal medicine as your first choice, that's a

4 three-year residency.  They give you three years only.

5 That is how the funding works, and it's designed so

6 that you don't continue training so you can get out and

7 work.  I have no funding.  My chances of other programs

8 is limited.

9       Q.   Let me ask you this, just so I understand how

10 it works, if you had chosen to, to go back to -- say

11 you were independently wealthy and you could self fund,

12 and you had chosen to go back into a PGY1 position, you

13 would be eligible to enter the match; is that your

14 understanding?

15       A.   Why would I claim I'm independently wealthy

16 and want to start residency all over again?  That's

17 ridiculous.

18       Q.   If you wanted to, could you have?

19       A.   Start all over again?

20       Q.   Sure.

21       A.   I can't.  I don't have the funding, and I

22 would not want to do --

23       Q.   But if funding wasn't an issue --

24       A.   -- intern level calls again.

157

1      Q.   I understand that.  I'm not asking what you

2   would like to do.  I'm saying does the -- is it NRMP?

3      A.   National Residency Matching Program.

4      Q.   Does the NRMP prohibit you from seeking that

5   out if you chose to because you've already had

6   training?

7      A.   I do not know that question.  According to

8   the military residency, when I talked to them, they

9   said, "We do not accept people to start all over.  If

10   you have the training, we do not have you start over in

11   a position that you've already completed."

12      Q.   What about in a different subspecialty or a

13   different -- not a subspecialty, but a different -- not

14   internal medicine, say --

15      A.   I want to be a cardiologist.  I need internal

16   medicine for that.  I can't be a cardiologist if I did

17   radiology or surgery.

18      Q.   Do you know whether the military -- if you

19   did want to go into radiology or surgery, do you know

20   if the military would take you having had training in

21   internal medicine?

22      A.   To go into that program and start all over

23   again?

24      Q.   To go into a different program and start from

158

1    the beginning?

2         A.   To start from the beginning?  It's a funding

3    issue again.

4         Q.   Even in the military?

5         A.   I do not know for a fact.  They are still

6    spending money.  They are paying out of their pocket to

7    pay for you.

8         Q.   Right.

9         A.   So it is a funding matter.  From what I

10   understood from her when I talked to the lady who

11   handles this, she said that "We do not want you to

12   start all over or repeat years that you've already

13   credentialed in.  That doesn't make sense."

14        Q.   Sure.

15        A.   Because I successfully passed those years.

16   So it's pointless to go back and start all over.

17        Q.   My question to you is this:  And maybe you

18   don't know the answer; but if you do, let me know.  If

19   you were to try and go into the military in a different

20   area, such as radiology or surgery, would you be able

21   to do that even though you have two years already of

22   internal medicine?

23        A.   Your question is would I be able to start all

24   over?

159

1       Q.   Would the military let you start all over in

2 a different area?

3       A.   I do not know.

4       Q.   Okay.  That's all I wanted.

5       A.   But I would not want to go into a different

6 area.

7       Q.   Can you explain just briefly the licensing

8 process for physicians to get a permanent license to

9 practice medicine?

10       A.   The details I do not know, but what I do know

11 is that you have to take Step 3.  After you take Step

12 3, you finish residency and you sit for the boards, the

13 state medical licensing boards.  The majority of

14 hospitals require you to have privileges there to be

15 either board eligible for state board certified.

16       Q.   Isn't it true that you can take Step 3 after

17 two years of clinical training?

18       A.   That's correct.

19       Q.   And you've had two years of clinical

20 training; correct?

21       A.   That's correct.

22       Q.   So you're eligible technically to take Step 3

23 if you wanted to at this point?

24       A.   You are eligible.  It doesn't mean you're

160

1  most prepared.  You try to get the courses that's on

2  Step 3 in your training, because this a clinical

3  training exam.  So some of those courses I have not

4  taken that we're only allowed to take in our third

5  year.

6      Q.  Have you made any effort to prepare for the

7  Step 3 exam outside of your residency?

8      A.  Yeah, you read books, and you study for it.

9      Q.  Have you continued those efforts since your

10  termination from the program?

11      A.  I've been trying to, yes, as well as my ABIM

12  exam, yes.

13      Q.  So you've been studying and reading books?

14      A.  Well, that and applying for residency and

15  dealing with this matter and a lot of that.  So it's

16  not continuous, but yes.

17      Q.  Have you sought employment other than in a

18  residency program, for example, in any other medical

19  setting just temporarily --

20      A.  No.

21      Q.  -- to continue clinical experiences or

22  anything?

23      A.  What kind of job?

24      Q.  I don't know.  I'm asking whether you've done

161

1    any --

2        A.   Since July until now?

3        Q.   Yes.

4        A.   No.  I've been studying and preparing for

5    this matter and applying to a program.  That's my first

6    priority.

7        Q.   Have you done any training programs through

8    Kaplan or anything like that to prepare for either the

9    ABIM exam or the Step 3 exam?

10       A.   Step 3 is MKSP program which we've had

11   through the internal medicine program, which I bought

12   the books for and studied that.

13       Q.   Okay.

14       A.   And, yes, I do have Kaplan books as well.

15       Q.   Have you attended any of their like in-person

16   courses or classes or anything like that?

17       A.   From July on?

18       Q.   Yes.

19       A.   No.  Remember, classes cannot teach clinical

20   training.  It cannot be used in terms of clinical

21   training.  Clinical training is an experience that you

22   must have in the hospital setting.  No book can explain

23   that or teach that.

24       Q.   But you've had two years of clinical training

162

1    in your internal medicine residency; is that correct?

2        A.   That's correct.

3        Q.   So your ultimate goal is to become a

4    cardiologist, correct?

5        A.   That's correct.

6        Q.   What area of the country do you hope to

7    practice in?

8        A.   I'd like to practice in Ohio.  This is my

9    home.

10       Q.   Do you have any understanding of what a newly

11   licensed cardiologist would make in this geographic

12   area per year, salary?

13       A.   Dr. Chawla who was a cardiologist at

14   Mt. Carmel -- I don't know if he's still there -- he

15   mentioned figures of close to a million a year.

16       Q.   Is he newly licensed?

17       A.   I do not know when he's been licensed.  He's

18   been practicing I don't know how long.

19       Q.   Is that your expectation, to make a million

20   dollars straight out of your cardiology program?

21       A.   I don't know.  My expectation is to be a

22   cardiologist.  It's a long process.  Training is quite

23   long.

24       Q.   How long is the cardiology training?

163

1     A.   After internal medicine or total?  It's a

2  total of seven years.

3     Q.   After internal medicine, it would be four

4  years then?

5     A.   It's a total of four years.  It depends if

6  you want to do subfellowships.  So it's three years and

7  then if you do interventional or EP, that's additional

8  years each time; and, again, the more training you do,

9  the more you get compensated for in terms of payment.

10    Q.   When you graduate from an internal medicine

11  program, do you intend to work as a board certified

12  internal medicine physician, or do you intend to go

13  straight into a cardiology program?

14    A.   I don't know.  If I don't get in, then, yeah,

15  I will work as a board certified, because it's very

16  difficult to not work without a board certification.

17    Q.   Do you have any notion of what board

18  certified internal medicine doctors make in this area?

19    A.   I don't know off the top of my head.  I can

20  guess, but I don't know.  My goal for cardiology is not

21  money driven.

22    Q.   And it's your goal through this proceeding to

23  get back into the Mt. Carmel program, correct?

24    A.   Possibly.

164

1    Q.   Do you know how many months of clinical

2    training you need to graduate from the internal

3    medicine program?

4    A.   36 months.

5    Q.   How many months have you completed?

6    A.   In internal medicine?

7    Q.   Yes.

8    A.   24.  Well, 25 if you count the ICU month in

9    July which he said he'd give me credit because I

10   completed the minimum amount.

11   Q.   So you would need nine months then?  Is my

12   math right?  You would need nine more months in order

13   to graduate?

14   A.   I don't know.  I don't know how many.

15   Q.   36 minus 25 would be 9, right?

16   A.   Okay.

17   Q.   Is that fair to say?

18   A.   Okay.

19   Q.   I think it's been previously suggested that

20   months from your PGY1 year in family medicine could

21   transfer or be counted somehow for the months that

22   you've missed in your third year of the internal

23   medicine program.  You're aware that the ABIM, the

24   American Board of Internal Medicine, would have to

165

1    approve that transfer, correct?

2        A.   Yes, I am aware of that.

3        Q.   Do you have a current understanding about

4    whether the ABIM would allow you to transfer PGY1

5    family medicine time to PGY3 internal medicine time?

6        A.   I now realize that that's not transferable

7    for PGY3.

8        Q.   So then even if you were reinstated to the

9    Mt. Carmel program, you would need to make up that nine

10   months of missing time to get to 36 months?

11       A.   That's correct.

12       Q.   So if my math is right, even if you were,

13   say, reinstated today, you would not be able to

14   complete the required number of months before June

15   graduation?

16       A.   June of this year?

17       Q.   Yes.

18       A.   That's correct.

19       Q.   It would be impossible for you to graduate in

20   June?

21       A.   That is correct.

22       Q.   And, therefore, you wouldn't be able to sit

23   for the boards in August 2010; is that also correct?

24       A.   That's correct.

166

1          Q.    Dr. Weiss has corrected me.  It's actually 11

2     months.

3          A.    Okay.

4          Q.    36 minus 25 is 11.  But it's clear to you at

5     this point that if you're reinstated, you would not be

6     able to graduate in June and sit for boards in August?

7          A.    June of this year, that's correct, not

8     anymore now.

9          Q.    Once you pass your Step 3 exam, you can be

10    permanently licensed in the State of Ohio, correct?

11         A.    Um-hmm, if they approve your license.  It's a

12    long process.

13         Q.    Is graduating from the residency program

14    required for your permanent license in the State of

15    Ohio?

16         A.    In ABIM, yes.

17         Q.    No, no.  To get a permanent license to be a

18    licensed physician in the State of Ohio, do you have to

19    graduate from a residency program?

20         A.    It depends on how you define license.  Most

21    people will not go to a physician who's only done one

22    or two years of residency when the state decides that

23    three years of residency is sufficient enough to have

24    complete training in internal medicine, okay?  It

167

```
1   affects my clinical knowledge and skills, as well as it
2   can affect the outcome of patient care, and most
3   hospitals do not allow you to even have privileges in
4   that hospital, a lot of them don't, unless you're board
5   certified or board eligible, which means you've
6   completed the minimum amount the state requires to be
7   considered licensed or board certified in internal
8   medicine.
9           Q.   Sure.  My question, though, is not about
10  being board certified in internal medicine.  My
11  question is about obtaining from the State of Ohio a
12  permanent license to practice medicine in the State of
13  Ohio.  Do you have to be board certified, to have
14  graduated from the medical residency program for that
15  to happen?
16          A.   I can have a license with just taking Step 3,
17  but that license is limited in what I can do and where
18  I can work.
19              MR. ARMSTRONG:  Bill, could we take a break
20  and can we talk?
21              (Recess taken.)
22              (Signature not waived.)
23                              - - -
24              Thereupon, at 3:55 p.m., on Friday, February
```

168

```
 1   26, 2010, the deposition was concluded.
 2                        -  -  -
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

169

```
 1                           CERTIFICATE

 2     STATE OF OHIO       :
                                          SS:
 3     COUNTY OF FRANKLIN  :

 4

 5            I, SUNIL NAYYAR, do hereby certify that I

 6     have read the foregoing transcript of my

 7     cross-examination given on February 26, 2010; that

 8     together with the correction page attached hereto

 9     noting changes in form or substance, if any, it is true

10     and correct.

11                        _____
                              SUNIL NAYYAR
12

13            I do hereby certify that the foregoing

14     transcript of the cross-examination of SUNIL NAYYAR was

15     submitted to the witness for reading and signing; that

16     after he had stated to the undersigned Notary Public

17     that he had read and examined his cross-examination, he

18     signed the same in my presence on the _____ day of

19     _____, 2010.

20

21                        _____
                             NOTARY PUBLIC - STATE OF OHIO
22

23     My Commission Expires:

24     _____, _____.
```

170

```
 1                          CERTIFICATE

 2   STATE OF OHIO      :
                                    SS:
 3   COUNTY OF FRANKLIN :

 4           I, Carol A. Kirk, a Registered Merit Reporter
     and Notary Public in and for the State of Ohio, duly
 5   commissioned and qualified, do hereby certify that the
     within-named SUNIL NAYYAR was by me first duly sworn to
 6   testify to the truth, the whole truth, and nothing but
     the truth in the cause aforesaid; that the deposition
 7   then given by him was by me reduced to stenotype in the
     presence of said witness; that the foregoing is a true
 8   and correct transcript of the deposition so given by
     him; that the deposition was taken at the time and
 9   place in the caption specified and was completed
     without adjournment; and that I am in no way related to
10   or employed by any attorney or party hereto or
     financially interested in the action; and I am not, nor
11   is the court reporting firm with which I am affiliated,
     under a contract as defined in Civil Rule 28(D).

12
             IN WITNESS WHEREOF, I have hereunto set my
13   hand and affixed my seal of office at Columbus, Ohio on
     this 1st day of March, 2010.

14

15                          _____
                            CAROL A. KIRK, RMR
16                          NOTARY PUBLIC - STATE OF OHIO

17   My Commission Expires:  April 8, 2012.

18                          - - -

19

20

21

22

23

24
```