IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

EASTERN DIVISION

- - -

| | |
|---|---|
| SUNIL NAYYAR, | : |
| | : |
| PLAINTIFF, | : |
| | : |
| VS. | : CASE NO. 2:10CV-10135-ALM-NMK |
| | : VOLUME II |
| MOUNT CARMEL HEALTH | : PAGES 171 THROUGH 355 |
| SYSTEMS, ET. AL., | : |
| | : |
| DEFENDANTS. | : |

- - -

Continued deposition of SUNIL NAYYAR, M.D.,

Plaintiff herein, called by the Defendants for

cross-examination under the applicable rules of

Federal Civil Court Procedure, taken before

Diane L. Schad, Professional Reporter and

Notary Public in and for the State of Ohio, at

the law offices of Baker & Hostetler, LLP, 65

East State Street, Columbus, Ohio 43215,

commencing on Wednesday, August 17, 2011, at

9:34 a.m.

- - -

172

```
 1        CONTINUED DEPOSITION OF SUNIL NAYYAR, M.D.

 2                      APPEARANCES

 3                        - - -

 4   WILLIAM W. PATMON, III, ESQUIRE
     PATMON L.L.C.
 5   4100 Regent Street, Suite U
     Easton Town Center
 6   Columbus, Ohio 43219
     (614) 470-9860
 7   Wpatmon@patmonlaw.com.

 8            On behalf of the Plaintiff.

 9

10   KRISTOPHER J. ARMSTRONG, ESQUIRE
     BAKER & HOSTETLER, LLP
11   65 East State Street
     Suite 2100
12   Columbus, Ohio 43215-4260
     (614) 462-4788.
13   Karmstrong@bakerlaw.com.

14            On behalf of the Defendants.

15                        - - -

16   ALSO PRESENT:

17            JOHN WEISS, M.D.
              MR. STEVEN KILE, DIRECTOR OF HUMAN RESOURCES.
18                        - - -

19

20

21

22

23

24
```

173

1                    Wednesday Morning Session

2                    August 17, 2011

3                    9:34 a.m.

4                    - - -

5              STIPULATIONS

6         It is stipulated by and between counsel for

7    the respective parties that the continued deposition

8    of SUNIL NAYYAR, M.D., Plaintiff herein, called by the

9    Defendants for cross-examination, under the applicable

10   rules of Federal Civil Court Procedure, may be taken at

11   this time in stenotype by the Notary; that said

12   continued deposition may thereafter be transcribed by

13   the Notary out of the presence of the witness; that

14   proof of the official character and qualification of

15   the Notary is waived; that the witness may sign the

16   transcript of his continued deposition before a Notary

17   other than the Notary taking his continued deposition;

18   said continued deposition to have the same force and

19   effect as though signed before the Notary taking it.

20                    - - -

21

22

23

24

174

```
 1        CONTINUED DEPOSITION OF SUNIL NAYYAR, M.D.

 2                         - - -

 3                   INDEX TO WITNESS

 4   SUNIL NAYYAR, M.D.                           PAGE

 5   CROSS-EXAMINATION BY MR. ARMSTRONG           176

 6   REDIRECT EXAMINATION BY MR. PATMON           322

 7   RECROSS-EXAMINATION BY MR. ARMSTRONG         347

 8   FURTHER DIRECT EXAMINATION BY MR. PATMON     352

 9                         - - -

10                   INDEX TO EXHIBITS

11   NAYYAR    DESCRIPTION                        PAGE

12     4                                          217

13             A POSTER OF INTERNAL MEDICINE RESIDENTS

14     5                                          236

15             AN 8/26/09 NAYYAR/WEISS LETTER

16     6                                          237

17             MOUNT CARMEL HEALTH SYSTEM, GRADUATE
               MEDICAL EDUCATION RESIDENT PHYSICIAN
18             HANDBOOK AND POLICY MANUAL

19     7                                          278

20             A 7/9/09 PRICE/COTTRELL EMAIL

21     8                                          280

22             A 7/9/09 INCIDENT REPORT OF DR. NAYYAR

23     9                                          284

24             A TWO-PAGE 7/15/09 STATEMENT FROM AMANDA C.
               BOWERS, R.N., B.S.N.
```

175

```
1                                 - - -

2                        INDEX TO EXHIBITS

3    NAYYAR   DESCRIPTION                              PAGE

4    10                                                285

5              A 8/6/09 PROGRAM EDUCATION COMMITTEE/DR.
               NAYYAR LETTER
6    11                                                288

7              AN ONLINE REPORT ON ONN WEBSITE TITLED,
               "DOCTOR ACCUSES HOSPITAL IN FIRING"
8    12                                                304

9              INTERNAL MEDICINE CALL CALENDAR JULY 2009

10                                - - -

11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

- - -

SUNIL NAYYAR, M.D.

being by me first duly sworn, as hereinafter certified, deposes and says as follows:

CROSS-EXAMINATION

BY MR. ARMSTRONG:

Q Okay. Dr. Nayyar, as you know, I'm Kris Armstrong representing Mount Carmel. We've met before. In fact, we were together for the first portion of your deposition on February 26th of 2010.

Do you remember that?

A Uh-huh.

Q Okay. Can you tell me what -- well, before we get into that let me just remind you. The court reporter is taking down everything you say so you need to answer out loud; and if the answer is yes or no, you need to say yes or no rather than head nods or grunts or things like that that she can't transcribe.

A Understood.

Q We'll try not to talk over each other. I'll let you finish your answers, you let me finish my questions, and that's easier for her.

If you want to take a break at any time, just let us know and we'll take a break once we finish the

177

1   question that's been asked.

2           Are you under the influence of any alcohol,

3   drugs or other medications this morning that might

4   affect your testimony or your memory?

5       A   No.

6       Q   Great.

7           All right.  What preparations did you

8   undertake for your deposition today?

9       A   Nothing.  Just went over some of the

10  documents that was given from the discovery.

11      Q   Okay.  Do you remember what documents you

12  looked at?

13      A   I looked at some of the statements that Lisa

14  and Amanda stated, but that's pretty much it.

15      Q   Okay.  Did you read your deposition

16  transcript from the first portion of your deposition?

17      A   No, I did not.

18      Q   Did you discuss your deposition or the case

19  with anyone other than your lawyer, Mr. Patmon, or any

20  of his associates?

21      A   Like my case itself?

22      Q   Yes.

23      A   A lot of people have asked, yes.

24      Q   Who have you discussed the case with?

178

```
 1       A     When I went to the gym there was a Dr. Patel

 2   who came up to me who works at Mount Carmel.  He pretty

 3   much said, "Do you ever worry they're going to put a

 4   hit on you?"

 5       Q     Dr. Patel asked that of you?

 6       A     Yes.

 7       Q     What is Dr. Patel's first name?

 8       A     I don't know.  He's a nephrologist.

 9       Q     What was your response?

10       A     "I would hope not."

11       Q     Anyone else that you remember talking about

12   the case with?

13       A     People have seen it online so a lot of people

14   have asked, but I try not to talk about it in detail

15   with them.

16       Q     Okay.  Can you tell us whether you've had any

17   employment since your last deposition of any kind?

18       A     A little bit.  I worked at an urgent care.  I

19   only get like about one or two days a month.  That's

20   all I can get.  I've done some things in the south,

21   Southern Ohio, but it was only limited.

22             I can't really do much, again, because of the

23   fact that I'm not board eligible/board certified, or

24   the fact that there was -- you guys said that I'm a
```

179

```
 1   patient safety risk on TV, and that also affects it.
 2        Q    Any other employment other than the urgent
 3   care and the employment you referenced in Southern
 4   Ohio?
 5        A    (Witness shaking head.)
 6        Q    Is that a no?
 7        A    No.  Sorry.
 8        Q    That's okay.
 9             What urgent care did you work at?
10        A    Polaris Urgent Care.
11        Q    Do you currently work there?
12        A    Uh-huh.
13        Q    When did you start working there?
14        A    Oh, gosh.  Probably I think May or June of
15   this year.
16        Q    And you're working one to two days a month?
17        A    Maybe one or two, yeah.  That's all I can
18   get.
19        Q    Why aren't you working more?
20        A    They just don't have the room for it.
21        Q    What are you doing there?
22        A    Patient care.
23        Q    So you're working as a physician?
24        A    Uh-huh.  That's a yes.  Sorry.
```

180

1          Q     Thank you.

2                So you're treating patients who come into the

3    urgent care.  Whatever problems they present with

4    you're assessing them and treating them?

5          A     That's correct.

6          Q     And what is your compensation for working at

7    that urgent care?

8          A     Only $85 an hour.  $85 an hour.

9          Q     Only $85 an hour?

10         A     Uh-huh.  It's less than the other physicians

11   because I'm not board eligible/board certified, and I

12   don't think insurance companies pay full price for

13   someone who's not board eligible/board certified.

14               It's one of the other risks because I was

15   told that I will not get jobs for that purpose.

16         Q     You say you think that you make less than the

17   other physicians.  Do you know for certain what they

18   make?

19         A     I don't know for a fact, but this is what I

20   was told.

21         Q     Who told you that?

22         A     Other family practice doctors.

23         Q     At that urgent care or elsewhere?

24         A     No, outside.

181

1     Q    So you don't have any personal knowledge of
2  what those physicians at that actual urgent care make?
3     A    No.
4     Q    Okay.  And do you have any personal knowledge
5  about what those insurance companies pay for your
6  services versus the services of the other doctors?
7     A    I have no clue.
8     Q    Okay.  And what was the employment you
9  referenced in Southern Ohio?
10    A    What do you mean?
11    Q    You said you worked in Southern Ohio.
12    A    That's correct.
13    Q    What did you do there?
14    A    Pain management.
15    Q    Okay.  Where at?
16    A    Southern Ohio, Portsmouth.
17    Q    What company?
18    A    Southern Ohio Pain Management, if I remember
19  correctly.
20    Q    Okay.  When did you start working there?
21    A    That was in June.  I only worked for 25 days.
22    Q    And why did you only work for 25 days?
23    A    It's dangerous.
24    Q    In what way?

182

1      A      Well, I was weaning everyone down, and I cut

2   down narcotics by 25,000 pills and the patients start

3   threatening you and so I kind of quit.  Not to mention

4   that the FBI and DEA also mentioned it's advisable to

5   quit.  It's dangerous.

6      Q      So you quit that employment?

7      A      That's correct.

8      Q      Was it your job to wean patients off of

9   narcotics?

10      A      It's my job to made an assessment, and I

11   didn't believe they needed it.  So I was practicing

12   addiction medicine and I was weaning people down.

13      Q      Were the patients seeing you for pain or for

14   addiction treatment?

15      A      Pain.

16      Q      What was your rate of compensation there?

17      A      It varied.  Anywhere from a $1,000 a day.

18   And if I work on the weekends it's a little bit more,

19   $1,500 plus.  It all depends.

20      Q      It depends on what?

21      A      It depends on how many patients I saw.  And

22   towards the end they gave me a raise because I kind of

23   wanted to leave.

24      Q      What was the raise to?

183

1       A    $1,500 a day.  And then on the weekend it was

2   $2,000 a day if I worked.

3       Q    When did that raise take effect?

4       A    My last week when I wanted to leave.

5       Q    Okay.  You say your compensation was based on

6   the number of patients you saw?

7       A    It would be more like if I saw beyond a

8   certain patient number, 31 or so, they would pay you

9   more.  But it doesn't really matter.

10      Q    What was the most you ever made in one day at

11  that job?

12      A    It would be on the weekend working, $2,000 a

13  day.

14      Q    So you never made more than $2,000?

15      A    Not in a day.

16      Q    Okay.  Per day is what I'm asking.

17           And what was the least that you made per day?

18      A    I think $1,000.

19      Q    Okay.  And that was based on the number of

20  patients seen, not the number --

21      A    Not always.  It's mainly $1,000.  And if you

22  see over or beyond a certain time, or going beyond a

23  certain patient number then they would pay you more.

24      Q    Were you paid or incentivized at all based on

184

1    the number of prescriptions you wrote?

2         A    No.

3              MR. PATMON:  Objection.

4         Q    Did you have benefits at Southern Ohio Pain

5    Management Clinic?

6         A    No.

7         Q    Any benefits at Polaris Urgent Care?

8         A    No.

9         Q    Who hired you at Southern Ohio Pain

10   Management?

11        A    Well, I went through recruiters.

12        Q    Okay.  Can you give me the name of the

13   recruiter?

14        A    There were plenty of recruiters.  I do not

15   know.  I've worked with, probably talked to

16   50-plus recruiters to try to get a job.  And

17   Jerry Ramusack was one guy who found this job.

18        Q    Found which job?

19        A    The pain management job.

20        Q    Pain management.

21             Can you spell his last name.

22        A    I really don't know.  I'm guessing

23   R-A-M-U-S-A-C-K.

24        Q    What company is he with?

185

1     A    I don't know.

2     Q    Okay.  He's the recruiter who found you the

3 Southern Ohio Pain Management position?

4     A    Yes.

5     Q    Did he also find you the Polaris Urgent Care

6 position?

7     A    No.

8     Q    How did you come about that position?

9     A    I've been calling every hospital, every

10 urgent care, and he was the one who said he will talk

11 to me, and that's Dr. Garcia.

12    Q    Do you know his first name?

13    A    No.

14    Q    And he's at Polaris Urgent Care?

15    A    He owns it.

16    Q    Where is Polaris Urgent Care located?

17    A    In the mall.

18    Q    Do you know the street address?

19    A    Not off the top of my head, no.  It's next to

20 the Polaris Mall.

21    Q    You don't even know what street it's on?

22    A    It's on the -- I don't know.  It's right next

23 to Polaris Mall, it's in that shopping center, so I

24 don't know.

186

1      Q    And Southern Ohio Pain Management is that

2   located in Portsmouth you said?

3      A    Uh-huh.

4      Q    Do you know the address?

5      A    Not off the top of my head, no.

6           I think they shut down after I left.

7      Q    You think they're no longer in business?

8      A    No.  House 93 Bill passed so it closed.

9      Q    When you worked at Southern Ohio Pain

10  Management Clinic would you drive back and forth to

11  Portsmouth or would you stay down there?

12     A    I'd stay down there in a hotel.

13     Q    How much per night was the hotel?

14     A    It varied.  $85-plus.

15     Q    When you say you worked for 25 days, were you

16  working Monday through Friday?

17     A    Like I said, sometimes I worked on the

18  weekends.

19     Q    You started in June.  When was your last day

20  there?

21     A    It was 25 days.  If I remember correctly it

22  was June 25th.

23     Q    Did you work every day?

24     A    Not every day, no.

187

```
1        Q    So you were --

2        A    Some days I'd have to work in the Polaris

3   Urgent Care so I'd drive back to Columbus.

4        Q    I'm just trying to figure out how many days

5   you actually worked --

6        A    25 days.

7        Q    25 working days?

8        A    Yes.

9        Q    Okay.  So when do you think your last day

10   was?

11       A    I don't know.

12       Q    Was it in June or July?

13       A    I think it was in June.

14       Q    When did you start working there?

15       A    I think end of May, if I remember correctly,

16   to June.

17       Q    Okay.

18       A    Somewhere around that time frame.

19       Q    Okay.  Have you had any other employment in a

20   medical capacity since your termination from Mount

21   Carmel?

22       A    No.

23       Q    Okay.  Have you had any employment in any

24   other capacity outside of the medical field?
```

188

1       A    No.

2       Q    What efforts have you undertaken to try and

3  find employment since your termination from Mount

4  Carmel?

5       A    Besides calling a lot of urgent cares and

6  hospitals in Ohio, I went through multiple recruiters,

7  put my name up on some websites for which a lot of

8  recruiters would contact me; but I was unsuccessful

9  because I'm not board eligible or board certified, and

10  possibly because of what was stated against me on-air

11  by you guys.

12       Q    Have you ever had a recruiter or an employer

13  tell you that they weren't going to hire you because of

14  something they saw on TV or in the media that Mount

15  Carmel said?

16       A    I don't know.  I don't know.  They just

17  say -- the recruiters tell me that based on your past

18  events it's difficult to get employment.

19       Q    So you've never had a recruiter or employer

20  tell you that they're not going to hire you because of

21  something they saw on TV or in the media that Mount

22  Carmel said?

23       A    They said mainly you're not board eligible

24  and board certified and due to your past events.

189

```
1        Q    My question is, did --

2        A    That's what I'm telling you, what they said.

3        Q    Okay.

4        A    Due to my past events.  That's all they said.

5        Q    So the answer to my question is no?

6        A    I do not know --

7             MR. PATMON:  Objection.

8        A    -- what they meant by that because I did not

9   ask in detail.

10       Q    Sure.  I'm not asking what they meant.  I'm

11  asking what they said to you.

12       A    And I told you what they said.

13       Q    Okay.  Let me ask my question again.  I'd

14  like you to answer it.

15       A    Okay.

16       Q    My question to you is, did a recruiter or

17  employer ever tell you specifically that they were not

18  going to hire you because of something they saw in the

19  media that Mount Carmel had said about you?

20            MR. PATMON:  Objection.

21       A    Not in specific, no.

22       Q    Thank you.

23            Okay.  Did a recruiter or an employer ever

24  tell you specifically that they were not going to hire
```

190

1    you because you are not board eligible?

2        A    Yes.

3        Q    Who told you that?

4        A    Most every recruiter.

5        Q    Can you give me any names?

6        A    Jerry Ramusack was one.  And I don't know the

7    others because there was plenty.

8            Like I said, we get calls and emails nonstop

9    through accounts, and you keep trying to respond to

10   them and ask them and send them your resume and

11   everything, and they say because you're not board

12   eligible or board certified and due to your past events

13   of termination it's unlikely to get employment.

14           Even in the military I've tried.  And I even

15   volunteered to go to Afghanistan and Iraq to help

16   wounded members, and they themselves said because you

17   were terminated and because of the fact that you're not

18   board eligible or board certified you cannot come in.

19       Q    Can you give me the names of the people in

20   the military that told you that you could not go to

21   Iraq and Afghanistan because you've been terminated?

22       A    He was in the Air Force, and I'll have to get

23   that name for you because I do not know off the top of

24   my head.

191

1   Q    Did you apply to any branches of the military
2   other than the Air Force?
3   A    Air Force, Navy.  I tried the Army and they
4   said the same thing.
5   Q    Do you remember the names of the recruiters
6   you were dealing with?
7   A    First Class Sergeant Albert Cook is the U.S.
8   Army recruiter in Columbus -- in Dublin.  He's one.
9        That's all I can think of off the top of my
10  head.  The Navy guy I do not know off the top of my
11  head.
12  Q    Do you have any records or correspondence
13  reflecting your communication with the Air Force, Navy,
14  or Army?  Emails or anything like that?  Notes?
15  A    There might be.
16  Q    Okay.
17  A    It's mainly phone conversations because I
18  called them.
19  Q    Okay.  When did you apply to the Air Force?
20  A    Oh, gosh.  Earlier this year.  I don't know
21  the exact month.
22  Q    What about the Navy?
23  A    Earlier this year as well.  Maybe around
24  March or April, May I tried the Navy.  And the Army I

192

```
 1    tried the past -- I think last year or so.

 2              I met with Sergeant Albert Cook, and he

 3    pretty much said that, you know, you can try but

 4    according to them, no, according to the emails.

 5         Q    So you have emails from this Sergeant Cook?

 6         A    Yeah, I might still have it.  Yeah.  I'm not

 7    sure.

 8         Q    Okay.  You know that you're under an

 9    obligation to maintain any correspondence that might be

10    relevant to this case; is that correct?

11         A    Okay.

12         Q    You're aware of that?

13         A    I didn't know in detail something like that.

14              It's kind of depressing when someone says no.

15    I can check my email if I have that.  Okay?

16         Q    Are you aware of whether or not you've

17    deleted any emails of your correspondence with any

18    potential employers or programs?

19         A    I would hope not, but I would have to check

20    again.

21         Q    You don't recall intentionally deleting any

22    of that information?

23         A    No.

24         Q    Can you tell me what you've done to try to
```

193

1   get into a new residency program.

2        A    I've applied.

3        Q    What programs have you applied to?

4        A    There are many.  I don't know the exact names

5   of every program.

6             I kind of go online and you go on resident

7   swap sites, and you go on FindAResident.com and you

8   just constantly apply.

9        Q    How many programs have you applied to, do you

10  know?

11       A    I don't know.  I can't tell you off the top

12  of my head.

13       Q    Is it, say, more than ten or less than ten?

14       A    Oh, it's more than ten.

15       Q    Is it more than 50 or less than 50?

16       A    I couldn't tell you an exact number, but I

17  kept documentation on that.

18       Q    I think recently you were in discussions with

19  a program in Maryland?

20       A    Uh-huh.

21       Q    What happened with that?

22       A    I requested my transcripts to be released

23  from you guys, signed the documents, and they said you

24  guys weren't releasing it and then they stopped

194

```
 1    responding after I tried to contact them.
 2         Q    By "you guys" do you mean Mount Carmel?
 3         A    Uh-huh.
 4         Q    Are you aware that Dr. Weiss sent information
 5    to that program?
 6         A    I was told later on by my attorney when he
 7    got involved, yes.  But I think at that point it was a
 8    little too late because I didn't hear a response from
 9    them.
10              Again, I applied May 31st, if I remember
11    correctly.  Well, I released the documents May 31st, to
12    sign the documents for the release, and I think
13    June 15th they stated that you did not release -- or
14    Mount Carmel did not release my documents and that's
15    when I got involved.  And start date is July 1st, so,
16    you know --
17         Q    Do you know who you were dealing with at that
18    program?
19         A    The secretary I would assume.
20         Q    Do you have the name of the person?
21         A    Not off the top of my head, no.
22         Q    Do you know who they were contacting at Mount
23    Carmel to try and get your records?
24         A    I signed a form, a release form, and they
```

195

1    faxed it to Mount Carmel.

2        Q    Do you know that or they just told you they

3    faxed it?

4        A    I would assume they would fax it since they

5    had me sign a release form --

6        Q    Sure.  But that's an assumption.

7        A    -- and they told me they sent it.

8        Q    So they told you they sent it to Mount

9    Carmel?

10       A    Yes.

11       Q    Did they tell you who they sent it to?

12       A    No.

13       Q    Did you personally contact any program

14   directors of any residency programs?

15       A    Whoever I applied to I would email every

16   program director.

17       Q    Did you call any program directors on the

18   phone?

19       A    I would try to contact them.

20       Q    How many program directors would you say you

21   tried to contact by phone?

22       A    I don't know off the top of my head.  I've

23   been applying for two years.  I mean, the number is

24   large.

196

1       Q    Do you have any records of the phone calls

2   you've made to any program directors?

3            Did you take any notes?

4       A    No.

5       Q    Or make any records regarding your phone

6   calls to program directors?

7       A    No.

8       Q    And do you still have copies of any emails

9   that you sent to program directors?

10      A    Yes.  I kept all of those.

11      Q    Okay.  Did you visit any programs in person?

12      A    Uh-huh.

13      Q    Which programs?

14      A    A program in New Jersey.  That was the only

15  program.

16      Q    What hospital was that at?

17      A    Capital Health.

18      Q    Did you have an interview there?

19      A    Yes, I went in.

20      Q    Who did you interview with?

21      A    Dr. Husain, Husaib I think.  Husain, Husabi?

22  I'm not sure of the name off the top of my head.

23      Q    Okay.  When was that interview?

24      A    In February or March of this year.

197

```
1       Q     And you did not get offered that position?

2       A     No.

3       Q     Did they tell you why?

4       A     No.

5       Q     Okay.

6       A     But they were questioning a lot about my

7   termination and I guess what they saw on the Internet.

8       Q     They asked you about something they saw on

9   the Internet?

10      A     If I remember correctly, yes.  And they were

11  going on about anything else, this lawsuit, they were

12  interested in it, but I said I cannot discuss this.

13      Q     They knew about the lawsuit?

14      A     Yes.

15      Q     Okay.  But they didn't tell you why they did

16  not give you an offer?

17      A     (Witness shaking head.)

18      Q     Is that a no?

19      A     No.

20      Q     Have you received any offers of employment in

21  a residency program?

22      A     No.

23      Q     Have you applied to only internal medicine

24  programs or have you applied to programs in others
```

198

1    areas?

2        A    I tried in other areas like radiology, sort

3    of like a sign of desperation, but I haven't heard

4    anything from them either.

5        Q    Any areas other than radiology?

6        A    Not to my knowledge.  I might have tried

7    anesthesiology but I cannot recall.

8        Q    So you might have decided to pursue a career

9    in anesthesiology but you're not certain?

10       A    I'm not certain what I've applied to.  It's

11   more of a click, click, click online and hit apply.

12   But my main focus is my third year position in internal

13   medicine.

14       Q    How many radiology programs do you think you

15   applied to?

16       A    I have that on documentation.  I don't know

17   exact numbers.  Maybe four.  Three, four.

18       Q    Would those have been third year positions or

19   you would be starting as a first year?

20       A    No, I would have to start as a first year.

21       Q    How long is the radiology residency program?

22       A    I think three or four years, I don't know, if

23   not more.

24       Q    Have you limited your search at all to

199

1    third year programs in internal medicine or have you

2    also applied to second year or first year positions?

3         A    I did apply to second year positions as well,

4    and then I was told by one program, and I don't know

5    which one, that I cannot apply to a second year spot

6    because of the fact that there's a funding issue as

7    well as the fact that you already completed your second

8    year residency.

9         Q    Which program told you that?

10        A    I don't know off the top of my head.

11        Q    Do you have any records that would indicate

12   which program told you that?

13        A    No.  Because I kept calling.  And I think one

14   program told me that.  I just don't know which program.

15   And I think that was last year or 2010 residency.

16        Q    Have you applied for any research positions?

17        A    No.

18        Q    You have experience doing research, though;

19   isn't that correct?

20        A    Uh-huh.  Yes.

21        Q    Is that a yes?

22        A    Yes.

23        Q    Thank you.

24             Did you participate in the match program this

200

1   year?

2       A   What's the match program?  You have to be

3   specific.

4       Q   The resident match program where residents

5   are matched up with residency programs.

6       A   I told you I was on FindAResident and

7   Resident Swap.  That's all I can be on.

8           Remember, the last time I told you guys that

9   I cannot apply to the match because I had documentation

10  from them stating I cannot apply to the match as a

11  second or third year resident.  It's only for first

12  year residents only --

13      Q   Do you have documentation --

14      A   -- for internal medicine.

15      Q   -- in your possession still regarding that

16  issue?

17      A   I should.  I gave it to my attorney.  And

18  that was brought up the last time.

19      Q   Okay.  And have you taken your Step 3 exam?

20      A   Uh-huh.

21      Q   Did you pass that exam?

22      A   Yes.

23      Q   So you are a licensed physician in the State

24  of Ohio now?

201

```
1        A    Yes.

2        Q    And as we've established, it's possible to

3   work in an urgent care center or, for example, a pain

4   clinic having passed your Step 3 exam in the state of

5   Ohio; that's correct?

6             MR. PATMON:  Objection.

7        A    That's a compound question.  Ask one

8   question.

9        Q    I'll be glad to rephrase it.

10            As we've established based on your prior

11  testimony, it's possible to work in an urgent care

12  center having passed your Step 3 exam in the state of

13  Ohio; isn't that correct?

14            MR. PATMON:  Objection.  You've

15  mischaracterized his prior testimony.

16            Go ahead and answer.

17       A    It's limited.  I only can work one or two

18  days a month.  It's half of what a resident's salary is

19  in a month, if that makes sense.

20       Q    There's no limitation on your license that

21  limits you to practice one or two days per month; is

22  that correct?

23       A    There is no limitation?  No, there is no

24  limitation.
```

202

```
 1        Q    You've only been able to obtain employment --
 2        A    That's correct.
 3        Q    If a full-time position was opened and
 4   offered to you, your license would permit you to work
 5   full-time in an urgent care center in the state of Ohio
 6   with your Step 3 completed and your license in place,
 7   correct?
 8        A    Possible, yes.  I just can't find that.
 9        Q    But there's nothing about the state of your
10   license that would prohibit you from doing so if it was
11   available?
12        A    Not according to my state license.  I'm fully
13   capable.
14        Q    Perfect.
15             With respect to the pain clinic, it's
16   possible for you to work in a pain clinic?
17        A    Not anymore, no.
18        Q    And why is that?
19        A    House 93 Bill.
20        Q    And what did House 93 Bill do?
21        A    I cannot work in a pain clinic.
22        Q    Why not?
23        A    Because they made rules and regulations you
24   have to be a pain physician to do that.  So all of them
```

203

1    shut down.

2         Q    And you are not a pain physician?

3         A    I'm not a specialist in pain medicine, no.  I

4    didn't do a fellowship.

5         Q    Okay.  Have you received income from any

6    sources other than the employment that we've discussed

7    since your termination from Mount Carmel?

8         A    I've done some presentations online.

9    Actually, one presentation, and they compensated me for

10   that.

11        Q    What was that presentation about?

12        A    Polycythemia vera.

13        Q    You may have to spell that.

14        A    P-O-L-Y-C-Y-T-H-E-M-I-A V-E-R-A.

15        Q    What's that?

16        A    It's just a case presentation that I did on

17   that disease.  It's just a blood disorder.

18        Q    So it's a blood disorder?

19        A    Uh-huh.

20        Q    Who did you do the presentation for?

21        A    QuantiaMD.  It's a hospitalist journal, which

22   is a common journal in the hospitals.

23        Q    You say it was Quantia?

24        A    Uh-huh, MD.

204

```
 1        Q    Is that the website?

 2        A    Uh-huh.

 3        Q    How did you do the presentation online?

 4        A    Case presentation, PowerPoint.

 5        Q    PowerPoint.  Was there any like video

 6  component to that or was it a PowerPoint presentation

 7  you put together?

 8        A    A PowerPoint presentation I put together.

 9        Q    How much did you get paid for that?

10        A    Only $250.

11             That was last year or early this year.  I

12  don't know the exact date.

13        Q    How many hours did it take you to prepare the

14  presentation?

15        A    Oh, wow.  A lot.  I would say then recording

16  and editing maybe five, six hours.

17        Q    Okay.  And when was that presentation

18  completed?

19        A    Like I say, I don't know the exact date.  It

20  was in January.  I can't remember if it was this year

21  or last year.

22        Q    So either January of 2010 or January of 2011,

23  you don't remember?

24        A    No.  I think 2011 sounds right.
```

205

1    Q    Have you done any other presentations for

2  QuantiaMD?

3    A    No, not yet.

4    Q    Okay.  Are you anticipating doing some in the

5  future?

6    A    Possibly.

7    Q    Okay.  Have they asked you about doing any

8  specific presentations?

9    A    They want me to do more if I have any more

10  case presentations to give.

11    Q    Have they specifically said we want you to do

12  a presentation about a certain topic?

13    A    Not a certain topic, but I might be doing

14  something on pain.

15    Q    Okay.  When might that happen, do you know?

16    A    I don't know.

17    Q    Okay.  Any other income other than what we've

18  already discussed since your termination from Mount

19  Carmel?

20    A    Just online surveys or whatnot, that's it.

21    Q    What are online surveys?

22    A    I think like some medical surveys you get in

23  your emails where they ask questions and then they

24  compensate you either $5 to $25.  It would vary.

206

```
 1        Q    How many of those have you done?

 2        A    Gosh, I don't know.  Maybe four or five, six.

 3   I'm not sure.

 4        Q    What are they asking you about?

 5        A    Just your opinion on certain medications and

 6   just certain topics they would ask your opinion on it.

 7        Q    Are those surveys directed to physicians?

 8        A    Uh-huh.

 9        Q    Okay.  Any other income other than what we've

10   already discussed?

11        A    I don't think so.

12        Q    Okay.  Do you live on your own or do you live

13   with your parents?

14        A    I live with my parents.

15        Q    So they've been supporting you?

16        A    Yeah.

17        Q    Are you paying them any rent or expenses for

18   housing?

19        A    No.

20        Q    Are you paying any expenses toward utilities?

21        A    No.

22        Q    Any expenses toward food?

23        A    No.

24        Q    Are you paying for a car, an automobile or
```

207

1    any other mode of transportation?

2         A    I can't.  I don't have a job.

3         Q    Any insurance or anything like that?

4         A    No.

5         Q    Do you have health insurance currently?

6         A    I do.

7         Q    What's the source of that?

8         A    What do you mean the source?  Like who's

9    paying for it?  My parents are paying for it.

10        Q    Is it a private sort of an independent policy

11   or is it through your parents' employment?

12        A    Through my parents' employment.

13        Q    Which employer is that through?

14        A    AAMCO Transmissions.

15        Q    Say that again.

16        A    AAMCO Transmissions.

17        Q    Which parent is that?

18        A    My father.

19        Q    What's his position with AAMCO?

20        A    He owns it.

21        Q    Is that a franchise or does he own any --

22        A    Franchise.

23        Q    How many locations?

24        A    One.

208

```
 1      Q    Where is that at?

 2      A    North High Street.

 3      Q    That's a long street.  What part of town?

 4      A    Clintonville.

 5      Q    Okay.  And is that his only franchise?

 6      A    Uh-huh.

 7      Q    Okay.

 8      A    Yes.

 9      Q    Thank you.

10           Someone had told me at one point, I think,

11   that your family was involved in Valvoline or oil

12   change locations.  Is that not true?

13      A    No.

14      Q    Might that have just been a reference to the

15   AAMCO location?

16      A    Probably.

17      Q    Do you have any agreement with your family

18   that you will reimburse them for any of the expenses

19   they're incurring for your room, board, any other

20   financial expenditures that they're providing you at

21   this point?

22      A    Yeah.

23      Q    And what is that agreement?

24      A    Verbal.
```

209

1       Q    What is the substance of the agreement?

2       A    Just I feel bad and I'm going to compensate

3   you guys for everything, for lawyer fees --

4            MR. PATMON:  Objection.  You can't get into

5   that.  He's talking about expenses related to that he

6   just asked questions.  You don't want to get into

7   anything we discussed.

8       A    Can you rephrase the question more specific.

9       Q    Sure.

10           The question is, do you have any agreement

11  with your parents or family members that you'll

12  reimburse them for your room and board, living

13  expenses, any expenditures they're incurring on your

14  behalf while you're unemployed?

15      A    I said I would, yes.

16      Q    Are you keeping a tally or a record of those

17  expenses?

18      A    I'm not, no.

19      Q    Are they to your knowledge?

20      A    I don't know.

21      Q    Okay.  Is there any set amount that you have

22  agreed to reimburse them?

23      A    I've never really said a set amount.

24      Q    Did they ask you to reimburse them for

210

1    anything?

2        A    No.

3        Q    Okay.

4        A    But I said I would.

5        Q    And there's nothing in writing regarding

6    this --

7        A    No.

8        Q    -- idea?

9        A    No.

10       Q    Okay.  If you were to complete and graduate

11   from an internal medicine residency program and then

12   apply to a cardiology fellowship, there would be no

13   guarantee that you would gain admittance to a

14   cardiology fellowship; is that correct?

15            MR. PATMON:  Objection.  He's not in charge

16   of a cardiology fellowship and even know what they use

17   to evaluate or how they make their decisions.

18            Go ahead and answer.

19       A    I'm not sure exactly what their criterions

20   are after this period of time being out, or because of

21   the fact that I've been terminated I heard my chances

22   are a lot less now compared to before.

23       Q    And who have you heard that from?

24       A    Other cardiologists.

211

1      Q    Are they in charge of any cardiology

2   programs?

3      A    No.

4      Q    Okay.  I guess my question is this:  If you

5   had completed your internal medicine residency program

6   at Mount Carmel on time and had applied to a fellowship

7   program in cardiology, it would be up to that

8   fellowship program whether to admit you; is that a fair

9   statement?

10      A    Yes.

11      Q    Okay.  And that's a decision that that

12   fellowship program would make independently, and you

13   might get in or you might not get into a fellowship

14   program, correct?

15      A    That's correct.  But most people apply

16   multiple times to get in.

17      Q    Okay.  Are you familiar with what your

18   in-training scores are?

19          Do you know what in-training scores mean?

20      A    Yes.  And I don't know off the top of my head

21   what they are.

22      Q    Do you know what percentile you fall into in

23   terms of in-training scores?

24      A    No.

212

1      Q    Do you know generally whether the scores are

2 good, mediocre, or poor?

3      A    I know I had to improve in a lot of those

4 areas.

5      Q    So the in-training scores were poor?

6      A    I would assume poor or mediocre.  I'm not

7 sure.

8      Q    In your communications with the residency

9 programs you've applied to what have you told them

10 about the way your employment ended at Mount Carmel?

11      A    That there was a disagreement with patient

12 safety and that I was terminated.

13      Q    Have you gone into any more detail than that?

14      A    I might have.  I just don't recall what I

15 wrote them because there aren't any programs available

16 at this time.

17      Q    So you wrote to them regarding that issue?

18      A    I wrote to them because they would ask.

19      Q    Okay.  Do you still have copies of what you

20 sent to them?

21      A    Yes.

22      Q    Okay.  Via telephone or in an interview did

23 you ever have occasion to discuss with a program how

24 your employment at Mount Carmel ended?

213

```
 1        A    I would limit it because of the fact there's
 2   a lawsuit going on, so I would not go in details of it.
 3        Q    Did you mention the lawsuit to any programs?
 4        A    I do not recall.
 5        Q    But you might have?
 6        A    I might have, yes.  Only if they asked
 7   specifics.
 8        Q    Sure.  But in person in an interview on the
 9   telephone what specifically did you tell them about why
10   you left Mount Carmel and were currently seeking
11   employment?
12        A    Said I was a whistleblower, some of them, and
13   I said -- What else did I say?  I said I was terminated
14   due to a patient safety issue in which I was being
15   accused of.  And those are pretty much it.
16        Q    So you told them that Mount Carmel thought
17   you had been involved in a patient safety violation and
18   they terminated you?
19        A    Yeah.
20        Q    And you also told some of them you believed
21   that you were terminated for being a whistleblower?
22        A    Uh-huh.  Yes.
23        Q    Isn't it true that Dr. Weiss as the program
24   director is the person responsible for selecting the
```

214

1  residents to come into the internal medicine residency

2  program at Mount Carmel?

3       MR. PATMON:  Objection.  If you know.

4    A   I don't know what the entire process is,

5  whether there is a combined effort or not.

6    Q   So you don't know who selects the residents

7  to join the program at Mount Carmel?

8    A   I don't know if it's a combined effort or

9  not.  I don't know if Dr. Tamaskar gets involved or

10  not.  I don't know.

11    Q   So the answer then is you don't know how

12  residents are selected to join the program?

13    A   I don't know.  I assume Dr. Weiss being the

14  program director would have a big say in it.  But,

15  again, I don't know who else has a say in it.

16    Q   Okay.  Did you ever hear Dr. Weiss make any

17  derogatory comments about someone's race or their

18  national origin?

19    A   I do not recall.

20    Q   Okay.  Did you ever hear Dr. Lee Tang make

21  derogatory comments about anyone's race or their

22  national origin?

23    A   No.

24    Q   Did you ever hear anyone else at Mount Carmel

215

1    in the medical residency context make any derogatory

2    comments about someone's race or their national origin?

3         A    Dr. Tamaskar said that he will never be

4    promoted to program director because he's not white.

5    That's all he mentioned to me once.

6         Q    He was referring to his own race or national

7    origin?

8         A    Uh-huh.

9         Q    Is that a yes?

10        A    Yes.

11        Q    Do you know what Dr. Tamaskar's race or

12   national origin is?

13        A    Of course I do.

14        Q    What is it?

15        A    He's Indian.

16        Q    Okay.  Other than that you didn't see or hear

17   anyone else make any derogatory references to race or

18   national origin at Mount Carmel?

19        A    Yeah.  The orthopedic department they would

20   make comments on the internal medicine department.

21   They would write it on signs there saying

22   "international medicine" or stupid stuff like that, but

23   that's about it.  I don't know who in particular wrote

24   it, but...

216

1     Q     So someone in the orthopedics department

2  referred to the internal medicine --

3     A     Possibly, yes.  Either that or general

4  surgery, yes.

5     Q     So you don't know who wrote it?

6     A     I don't know.

7     Q     So someone wrote on a bulletin board that the

8  internal medicine residency program is the

9  international medicine --

10     A     Possibly, yes.  They wrote it on the roster,

11  yes.

12     Q     Okay.  And was that a reference to the

13  various national origins that are sort of represented

14  in that program?

15     A     I don't know what they meant by that.

16     Q     You don't know what they meant?

17     A     No.

18     Q     Did you ever report that comment to anybody?

19     A     No.  That was brought up many times by

20  residents talking amongst residents and medical

21  students, but that's about it.

22     Q     When you say "that was brought up," do you

23  mean whatever was written?

24     A     The comment, yes.

217

```
 1        Q    Okay.  And you don't know who wrote it?

 2        A    No.

 3        Q    Okay.  So other than that, though, you don't

 4   recall seeing or hearing anything that was derogatory

 5   about someone's race or their national origin or

 6   anything like that?

 7        A    I don't recall.

 8             MR. ARMSTRONG:  Let's have this marked.

 9                         - - -

10             A POSTER OF INTERNAL MEDICINE RESIDENTS

11             WAS MARKED AS DR. NAYYAR DEPOSITION.

12             EXHIBIT NO. 4.

13                         - - -

14        Q    Okay.  Dr. Nayyar, we've just handed you what

15   has been marked as Exhibit 4.

16        A    Okay.

17        Q    Do you recognize what this is?

18        A    Yes.  It's a roster.

19        Q    What's it a roster for?

20        A    Residents.

21        Q    This appears to me to be a color copy of a

22   poster that shows all of the internal medicine

23   residents that were in the program.

24        A    Okay.
```

218

1      Q    Is that what it looks like to you?

2      A    Yes.

3      Q    And I think you referenced before that

4   internal medicine was sometimes referred to as

5   international medicine.

6           It appears that many of these folks have

7   national origins other than European and races other

8   than Caucasian.  Is that a fair statement?

9           MR. PATMON:  Objection.  If you know these

10  people, you can answer the question.

11     A    It looks like that way, yes.  I don't know

12  most of these.  I only know a few of these residents

13  but not every single one of them.

14     Q    Let's go through them.

15          The first resident is Bryan Alexander.  Do

16  you know what his race is?

17     A    Possibly Caucasian.

18     Q    Do you know what his national origin is?

19     A    No, I don't know what his national origin is.

20          MR. PATMON:  I'm going to object to this

21  whole line of questioning.  It's speculative.  He's not

22  a scientist.  He hasn't seen these people's birth

23  certificate or anything.  It's just completely total

24  speculation.

219

1             MR. ARMSTRONG:  The objection is noted.

2        Q    Do you know Nora Alghothani?

3        A    Yes.

4        Q    And do you know her race?

5        A    I don't know her exact race, no.

6        Q    Do you know what her national origin is?

7        A    No, I do not.  She's I'm assume Middle

8    Eastern.  But I'm not sure.

9             MR. PATMON:  Objection.  Don't speculate.

10   Give him testimony about things you know.

11            MR. ARMSTRONG:  Sure.  He may have spoken to

12   these people.  He may know their backstories and where

13   their family comes from.

14            MR. PATMON:  You and I both know speculation,

15   which you vehemently objected about during our last

16   deposition, is not testimony.

17            You need to tell him what you know.  Don't

18   speculate.

19            I think you would agree with that, right?

20            MR. ARMSTRONG:  I think Mr. Patmon at the

21   last deposition asked lots of speculative questions and

22   I permitted my witness to answer them.

23            MR. PATMON:  And you objected.

24            MR. ARMSTRONG:  And I made my objection for

220

1    the record as Mr. Patmon's objection is noted for the

2    record.

3              MR. PATMON:  101 objections.  Go ahead.

4    BY MR. ARMSTRONG:

5         Q    Afrina Aziz.  Do you know Afrina?

6         A    Yes.

7         Q    Do you know her race?

8         A    Indian, Pakistani.

9         Q    Haidong Bao?

10        A    Asian.

11        Q    And I may mispronounce this.  Nivedita

12   Bijlani?

13        A    I never met her.

14        Q    Do you recall her race or national origin?

15        A    Again, I never met her.

16        Q    Okay.  Jonathan Borders?

17        A    Yes.

18        Q    Do you know his race?

19        A    Caucasian.

20        Q    Laura Burelli?

21        A    Again, I never met her.

22        Q    Amanda Caparso?

23        A    I never met her.

24        Q    Binay Eapen?

221

1    A    Yes.

2    Q    And do you know his race?

3    A    Asian-Indian.

4    Q    Shamitha Francis?

5    A    Yes.

6    Q    Do you know her?

7    A    She's mixed.  I don't know exactly

8  everything.  You know, she's part -- I don't know,

9  multiple races.

10   Q    Stella Gandhi?

11   A    Yes.

12   Q    Do you know her race?

13   A    Indian.

14   Q    Dana Hauser.  Do you know his race?

15   A    Caucasian.

16   Q    What about Jorn Kaevel?

17   A    I think he's German.

18   Q    He is actually from Germany?

19   A    I don't know.  I assume so.  Maybe.

20   Q    Have you met Mr. Kaevel?

21   A    Yes.

22   Q    Did he speak with an accent that might

23  indicate he was not a native-born American?

24   A    I don't know.  Yeah, he had a deep accent I

222

```
 1  guess.  I don't know.
 2       Q    Marwan Mohammad.  Do you know Mr. Mohammad?
 3       A    Limited exposure.
 4       Q    Do you know his race or his national origin?
 5       A    I would assume Middle Eastern.
 6       Q    Huma Naikoo?
 7       A    I do not know her.
 8       Q    You're the next one, Sunil Nayyar, and you
 9  are of Indian race and national origin; is that
10  correct?
11       A    Yes.
12       Q    Ibiene Osuobeni.  Do you know Ms. Osuobeni?
13       A    Yes.
14       Q    Do you know her race?
15       A    I don't know exactly where she's from.
16       Q    Is she from Africa?
17       A    I would assume so.
18       Q    Chandreshkumar Parmar?
19       A    I never met him.
20       Q    And do you know his race?
21       A    I would assume he's Indian, but I don't know.
22            MR. PATMON:  Objection.
23       Q    Kanan Patel?
24       A    Yes.
```

223

```
 1      Q     And do you know Dr. Patel?

 2      A     He's Indian.

 3      Q     Okay.  Misael Purugganan?

 4      A     Yes.

 5      Q     And do you know Dr. Purugganan's race?

 6      A     I assume Asian.

 7            MR. PATMON:  Objection.

 8      Q     Pooja Roghavan.  Do you know that doctor?

 9      A     Maybe one day I met her.  I don't know.

10      Q     Do you know her race or national origin?

11      A     I would assume based on the name she's

12  Indian.

13            MR. PATMON:  Objection.

14      Q     Erum Shaikh.  You know Dr. Shaikh?

15      A     Yes.

16      Q     And do you know her race or national origin?

17      A     Asian-Pakistani.

18      Q     Sana Siddiqui?

19      A     Yes.

20      Q     And what is her race or national origin?

21      A     Pakistani.

22      Q     Kathleen Stuart?

23      A     Limited exposure.  I assume Caucasian.

24      Q     Okay.  Ashwin Uttam.  Do you know that
```

224

```
 1   doctor?

 2        A    Yes.

 3        Q    What's his race or national origin?

 4        A    Indian.

 5        Q    And Sowmya Varre.  Do you know that doctor?

 6        A    Yes.

 7        Q    And do you know her race or national origin?

 8        A    Indian.

 9        Q    Okay.

10             MR. PATMON:  Do you have any more questions

11   about this exhibit?

12             MR. ARMSTRONG:  I might.

13             MR. PATMON:  Okay.  I want to take a rest

14   room break.

15             MR. ARMSTRONG:  Okay.  Let me see if I do and

16   then we'll take a break.

17             Yeah, we can take a break now.

18             (A recess was taken.)

19   BY MR. ARMSTRONG:

20        Q    Okay.  So with respect to Exhibit 4, is this

21   the roster you were referring to that someone wrote

22   something like international medicine or something like

23   that on?

24        A    No.
```

225

1     Q     Okay.  Did you ever see what it was written
2     on?
3     A     Yes.
4     Q     Was it a roster similar to this just with
5     different people on it or was it something else?
6     A     I don't recall.  Yeah, it was a different
7     roster, different year.
8     Q     And you have no reason to believe that
9     anybody within the internal medicine residency program
10    wrote that?
11    A     I don't know.
12    Q     Okay.  One of the claims in this case is that
13    you're claiming you were discriminated against on the
14    basis of your race and national origin?
15    A     Yes.
16    Q     Who do you believe discriminated against you
17    on that basis?
18    A     The program director.
19    Q     Dr. Weiss?
20    A     (Witness nodding head.)
21    Q     Is that a yes?
22    A     Yes.
23    Q     Anyone else?
24    A     I'm not sure who else is involved in that.

226

1      Q    Do you believe that Dr. Lee Tang

2  discriminated against you on the basis of your race or

3  national origin?

4      A    I'm not sure.  I do not know.

5      Q    So, as you sit here right now you have no

6  knowledge or evidence that Dr. Tang discriminated

7  against you on the basis of your race or your national

8  origin?

9      A    I wasn't given any evidence.

10      Q    Okay.  With respect to Dr. Weiss, what did

11  Dr. Weiss do that you believe was discriminatory on the

12  basis of your race or national origin?

13      A    Well, my program director is Caucasian.  I'm

14  of Indian descent.  There was other residents like

15  Jonathan Borders who's done outrageous things from

16  year-one on.  And I've never been written up,

17  disciplined, never been on probation, never warned or

18  anything and I was terminated.

19      Q    Okay.  So you believe that you were

20  discriminated against because you believe that a

21  Caucasian resident, Dr. Borders, was treated more

22  favorably than you.  Is that fair to say?

23      A    Yes.  And other staff members.

24      Q    What other staff members?

227

1      A    Well, you have a general surgeon who's

2   Caucasian who's tested positive for either cocaine or

3   marijuana, if not both, and he's still currently

4   working.

5      Q    And what's that person's name?

6      A    Dr. Price.

7      Q    Is he in the internal medicine residency

8   program?

9      A    In general surgery.

10     Q    Is that a different residency?

11     A    He is a staff member there.

12     Q    He's a staff member, so he's not a resident?

13     A    Not currently, no.

14     Q    Do you know if Dr. Weiss is his supervisor?

15     A    No.

16     Q    Is that you don't know or he's not?

17     A    He's not.

18     Q    And on what basis -- well, let me ask you

19   this:  You said that Dr. Price tested positive for

20   drugs?

21     A    Uh-huh.  Yes.

22     Q    Did you conduct Dr. Price's drug test?

23     A    No, I did not.

24     Q    Were you involved in the drug testing of

228

1    Dr. Price?

2        A    No, I was not.

3        Q    Were you involved in any decisions whether to

4    discipline Dr. Price for testing positive for drugs?

5        A    Why would I be involved in any disciplinary

6    hearing about a general surgeon?

7        Q    So how did you come to believe Dr. Price

8    tested positive for drugs?

9        A    The State Medical Board.

10       Q    And what information from The State Medical

11   Board led you to that?

12       A    Written online.

13       Q    You found it online?

14       A    Yes.  I was told by other members.

15       Q    Who told you?

16       A    I don't recall the resident.  It was during

17   residency.

18       Q    Do you know if Dr. Price was ever reprimanded

19   or disciplined in any way for testing positive for

20   drugs?

21       A    I don't know the details of his disciplinary

22   hearing.

23       Q    Do you know if he's ever been in a recovery

24   program for alcohol or drugs?

229

1      A    I do not know the details of that.

2      Q    Okay.  And he's not a resident again, he's a

3  physician, correct?

4      A    That's correct.

5      Q    Do you know if he's employed by Mount Carmel

6  or by another entity?

7      A    I do not know that.

8      Q    Any other individuals you believe were

9  treated more favorably than you that are Caucasian?

10     A    I do not have that information.

11     Q    So Dr. Borders and Dr. Price are the only two

12 that you believe were treated more favorably than you?

13     A    Yes.

14     Q    Okay.  Dr. Borders was he an internal

15 medicine residency -- or I'm sorry -- a resident in the

16 internal medicine program?

17     A    Yes.

18     Q    Okay.  And why do you believe Dr. Borders was

19 treated more favorably than you?

20     A    He's done outrageous stuff since his first

21 year of residency all the way to his end and he was not

22 terminated.  He might have been placed on probation.

23 He might have been reprimanded.  I'm not sure of the

24 details.

230

1       Q    What outrageous stuff are you referring to?

2       A    Not coming to the hospital to work on time,

3  not waking up during his calls, not answering his

4  pages.

5           I don't know any other extensive details

6  beyond that, but there was a whole list of concerns.

7       Q    Did you ever witness Dr. Borders not come to

8  work on time?

9       A    Yes.

10      Q    Did you ever personally witness him not

11  answer a page?

12      A    I did not personally witness him not answer a

13  page.  I've heard complaints from interns, and they

14  would call me and page me in the middle of the night to

15  answer questions because he's not responding.

16      Q    Did you ever witness him not wake up for a

17  shift?

18      A    He would come late to morning reports.  But,

19  again, these interns were contacting me because they

20  couldn't get in touch with him.

21      Q    Okay.  And you have no personal knowledge of

22  anything else that Dr. Borders may have done; is that

23  correct?

24          MR. PATMON:  Objection.

231

```
1        A    I mean, I'm not sure.

2        Q    So it's correct that you have no personal

3   knowledge of other infractions that Dr. Borders may

4   have made?

5        A    Again, I --

6             MR. PATMON:  Objection.

7        A    -- do not know the details of everything, no.

8        Q    Okay.  Were you at all involved in any

9   discipline that was given to Dr. Borders?

10       A    No, I don't think so.

11       Q    Are you privy to the details of his personnel

12  file?

13       A    I don't know the details of his personal

14  files.

15       Q    So you don't know if he was counseled or

16  reprimanded or disciplined, correct?

17       A    I was told that he was by him.

18       Q    By him?

19       A    (Witness nodded head.)

20       Q    Okay.  Do you know if Dr. Borders ever asked

21  a nurse to insert an A-line into a patient?

22            MR. PATMON:  Objection.

23       A    I don't know that stuff.

24       Q    Do you know if Borders ever lied?
```

232

```
1        A    I do not know that stuff.

2        Q    Okay.  Are you aware that Dr. Borders has

3   been terminated from the medical residency program at

4   Mount Carmel?

5        A    Yes.

6        Q    So Dr. Borders -- was that a yes?

7        A    Yes.

8        Q    Do you know why Dr. Borders was terminated

9   from the program?

10       A    I've met with him and he showed me his

11  termination, but I don't recall the details of it.

12       Q    So you were terminated and Dr. Borders was

13  terminated?

14            MR. PATMON:  Objection.

15       Q    Isn't that correct?

16       A    I would assume so, yes.

17       Q    And you know Amanda Bowers, correct?

18       A    Yes.

19       Q    And she is a white female; is that correct?

20       A    Yes.

21       Q    And she was involved in the A-line incident

22  that led to your termination, correct?

23       A    That's correct.

24       Q    And Amanda Bowers was also terminated from
```

233

```
 1    Mount Carmel over that incident; isn't that correct?

 2         A    I assume so, yes.

 3         Q    After your termination you requested a

 4    hearing by the Program Education Committee, correct?

 5         A    That's correct.

 6         Q    And that hearing was held, correct?

 7         A    That's correct.

 8         Q    You had an opportunity to speak at that

 9    hearing and tell them your side of the story; is that

10    correct?

11              MR. PATMON:  Objection.

12         A    I didn't know exactly what side of the story

13    to give because nothing was given to me or what was

14    stated against me, what accusations or anything.  I

15    didn't have my personal files.  All I had was a

16    termination letter.

17         Q    But you were given the opportunity to speak

18    and --

19         A    Based on my termination letter.

20         Q    -- and tell them what happened?

21         A    Based on my termination letter.

22              Again, I was not given anything else, details

23    of why I was terminated, any accusations, any scripts,

24    nothing.
```

234

```
1        Q    No one gave you a script?

2        A    Except my termination letter.  That's all I

3   had.

4        Q    I'm sorry.  When you --

5        A    I requested every document, everything that

6   was written against me.

7        Q    When you say "script" are you referring to a

8   prescription or a script?

9        A    No.

10            Let me rephrase that.  Any documents that was

11  said against me, any statements.

12       Q    Okay.  You were given a termination letter

13  that gave Mount Carmel's reasons for your termination;

14  is that correct?

15       A    That's correct.

16       Q    And that was an exhibit in the earlier part

17  of this deposition.  Do you recall that?

18       A    A part of this current deposition?

19       Q    In February.

20       A    Yes.

21       Q    And you knew that you were terminated in part

22  in relation to an incident involving the A-line

23  insertion, correct?

24            MR. PATMON:  Objection.
```

235

```
 1      A    It did not state that, I don't think, in the
 2  letter.
 3      Q    You knew you were terminated for alleged
 4  professionalism violations; is that correct?
 5           MR. PATMON:  Objection.
 6      A    That was stated in the letter.
 7      Q    Okay.  And you received a letter informing
 8  you of the Program Education Committee's findings; is
 9  that correct?
10      A    I was just given the termination letter.
11      Q    After the Program Education Committee held
12  its hearing, you were given a letter outlining its
13  findings; is that correct?
14      A    I think so.  That's correct.
15      Q    Okay.  And you also requested an appeal --
16      A    That's correct.
17      Q    -- to the review committee that would assess
18  whether due process was followed, correct?
19      A    That's correct.
20      Q    And that committee assessed the proceedings
21  and concluded that due process had been followed,
22  correct?
23      A    I assume so, yes.
24      Q    And do you recall being informed of that?
```

236

1      A     Yes.

2            MR. ARMSTRONG:  Okay.  Mark this, if you

3      would please, as Exhibit 5.

4                          - - -

5            AB 8/26/09 NAYYAR/WEISS LETTER WAS MARKED

6            AS DR. NAYYAR DEPOSITION EXHIBIT NO. 5.

7                          - - -

8      Q     Dr. Nayyar, we've just handed you what we've

9      marked as Exhibit 5.  This appears to me to be an

10     August 26th, 2009 letter from Dr. Weiss to you letting

11     you know that the review committee had unanimously

12     concluded the appeal process was consistent with due

13     process.  Is that a fair statement?

14     A     Yes.

15     Q     That's all with that one.

16           Okay.  As a resident in the internal medicine

17     residency program your due process rights are governed

18     by the policy for due process set out in the residency

19     handbook; isn't that correct?

20           MR. PATMON:  Objection.  Calls for a legal

21     opinion.  You're not a lawyer.

22     A     I do not know the details of the handbook and

23     what it states.

24     Q     Sure.  You're aware that there is a due

237

```
 1    process policy in the handbook, correct?

 2        A    That is correct.

 3        Q    And that's what governs your right to due

 4    process if you choose to appeal your termination,

 5    correct?

 6             MR. PATMON:  Objection.  Calls for legal

 7    opinions.  He's not a lawyer.

 8        A    I would assume also ACGME.

 9                         - - -

10             MOUNT CARMEL HEALTH SYSTEM, GRADUATE MEDICAL

11             EDUCATION RESIDENT PHYSICIAN HANDBOOK AND

12             POLICY MANUAL WAS MARKED AS DR. NAYYAR

13             DEPOSITION EXHIBIT NO. 6.

14                         - - -

15        Q    Okay.  Dr. Nayyar, we've just handed you

16    what's been marked as Exhibit 6.  Do you recognize this

17    document?

18        A    Yes.

19        Q    What is it?

20        A    It's the resident physician handbook.

21        Q    Okay.  This is the handbook and the policy

22    manual that governs the internal medicine residency

23    program that you were a member of at Mount Carmel,

24    correct?
```

238

1              MR. PATMON:  Objection.

2        A    I don't know if this was an exact copy that

3   they gave me.

4        Q    But there is a document called the resident

5   physician handbook and policy manual that governs --

6        A    Again, I don't know exactly what documents

7   were given to me when I started residency.

8        Q    But you said you recognize this document?

9        A    I recognize the picture, yes.

10       Q    Okay.  I would like to direct your attention

11  to Page 10, Grievance Procedure and Due Process, letter

12  F.  Do you see that?

13       A    Uh-huh.

14       Q    Middle way down the page?

15       A    Yes.

16       Q    I would like you to take a second and read

17  through Section F for me.

18             MR. PATMON:  Take your time.

19       Q    Take as much time as you need.

20       A    Okay.

21       Q    Okay.  So you read through Subsection F,

22  Grievance Procedure and Due Process?

23       A    That's correct.

24       Q    Okay.  Did you read anywhere in that section

239

1    that a resident has a right to have an attorney

2    represent them in appeal proceedings from their

3    termination?

4         A    I don't think I see that in here.

5         Q    Okay.  Did you read anywhere in that section

6    that the resident has a right to any particular

7    documents during the appeal process?

8              MR. PATMON:  I'm going to object.  Calls for

9    legal analysis.  He's not a lawyer.

10             MR. ARMSTRONG:  He can answer the question.

11        A    I mean, again, this is written in a way that

12   it can be interpreted in different ways, and I would

13   assume I would have that right.

14        Q    But do you see it written in this particular

15   procedure here?

16             MR. PATMON:  Objection.  He's answered the

17   question.

18        A    Yes. I would assume that what it says to

19   provide evidence.  Well, how can I proceed evidence if

20   I'm not given what I'm being accused of?

21             It's like you go into court representing

22   someone and not having what he's accused of.  It's the

23   same thing.

24        Q    Can you tell me what language you're

240

1    referring to in the document?

2        A    It says here, "At the review meeting, the

3    program director and resident shall present their

4    respective arguments and evidence relevant to the

5    program's non-promotion or non-renewal decision based

6    on such factors" --

7        Q    So that just says that you have the

8    opportunity to present whatever evidence you have,

9    correct?

10            MR. PATMON:  Objection.  That's not what it

11    says.  Mischaracterizes the statement.  I'm just going

12    to object to the line of this questioning because it's

13    misleading.  That's just not what it says and you know

14    that.

15            MR. ARMSTRONG:  Okay.  You can have a

16    continuing objection to this line, but --

17        A    Again, I assume based on this thing I have

18    the right to have anything written against me.

19        Q    You assume that but it's not expressly

20    written in the --

21        A    I said that's how I interpret this.  This is

22    how I interpret this document, that I have the right to

23    be given what is used against me.

24            The program director is given the right for

241

1    his arguments based on evidence.  Well, where is my

2    evidence?

3        Q    I understand you don't think it's fair.

4        A    I never said that.

5        Q    But my question --

6        A    I said my interpretation is --

7             MR. PATMON:  Objection.

8        A    -- that I would assume based on this, I

9    interpret this as my right to have any documents that

10   is written against me.

11       Q    Okay. what words that are written in here --

12       A    I mentioned that already.

13       Q    Can you please tell me specifically.  Read me

14   the words that you believe say that.

15       A    I already did.

16       Q    Please read it again.  I don't remember which

17   words you read.

18            MR. PATMON:  Why don't we have it read back

19   by the court reporter, because we're just not going to

20   sit here and repeat stuff over and over.

21            Argumentative.

22            MR. ARMSTRONG:  It's not argumentative.  I

23   just want the record to be clear.

24            MR. PATMON:  It is clear.  Let's have the

242

1    court reporter read back his answer.  You asked that

2    question previously.

3              MR. ARMSTRONG:  If you can find the answer to

4    that question, please read it back.

5              (Answer read.)

6              MR. ARMSTRONG:  Let's go back on the record.

7    Q    And my question is, Dr. Nayyar, I'd like you

8    to point out which words within this section you are

9    basing your understanding that you have a right to have

10   documents produced by Mount Carmel on?

11   A    "At the review meeting, the program director

12   and resident shall present their respective arguments

13   and evidence relevant to the program's non-promotion or

14   non-renewal decision based on such factors as:

15   Severity and frequency of the deficiencies,

16   remediation, documented formative informal and

17   summative and evaluation results, records, and prior

18   formal and informal corrective/disciplinary actions."

19   Q    Is there any other language you are basing

20   that belief on or is that it?

21   A    I'm not a lawyer.

22   Q    I'm not asking you to be a lawyer.  I'm

23   asking what your interpretation of this document is.

24   A    It says, "The committee shall review all

243

1    related documents within 15 working days."

2               I assume related documents includes all stuff

3    that Dr. Weiss has turned in or the hospital or med.

4    ed., and I should have the rights to those documents.

5        Q    That's your opinion based on this sentence

6    "The committee shall review" --

7        A    That and others, yes.

8        Q    Okay.  Any other portions of this that leads

9    you to believe that you have a right to have Mount

10   Carmel produce documents to you prior to the hearing?

11       A    That's pretty much it.

12       Q    Okay.  Thank you.

13               Do you know whether the Program Education

14   Committee had access to your personnel file?

15       A    I do not know.  It does state here that the

16   program director will state his opinion for it, so I

17   assume they did.

18       Q    Okay.

19       A    But, again, I do not know.

20       Q    In your complaint you alleged that Mount

21   Carmel's residency program was on probation.  Do you

22   recall this?

23       A    Yes.

24       Q    Which residency program were you referring

244

1    to?

2        A    Internal medicine.

3        Q    What evidence do you have supporting your

4    belief that the residency program was on probation?

5        A    Dr. Weiss and Dr. Tamaskar stating that.

6        Q    So that's only based on something you believe

7    you heard from Dr. Weiss and Dr. Tamaskar?

8        A    They would mention it multiple times in

9    meetings.

10       Q    What did they say?

11       A    That we were on probation.

12       Q    They said the internal medicine residency

13   program was on probation?

14       A    Based on scores.

15       Q    I'm sorry.  Based on scores?

16       A    In-trainings or the scores like the pass rate

17   is what he was stating, referring to.

18       Q    So as far as you understood it any -- well,

19   let me scratch that.

20            On probation by who?  Did they say?

21       A    I don't know.  The governing body.

22            It was based on our pass rate.  And I don't

23   know if there was any other violations that we have

24   done.  I heard there were in the residency program.

245

1     Q    You're not aware of any violations of ACGME?

2     A    I don't know the details.  I do not recall

3  what they stated.

4     Q    Okay.  Do you recall them specifically saying

5  that because of the pass rate on in-training scores --

6     A    They mentioned pass rate.  They mentioned

7  other violations.  But I do not know the details.

8     Q    You don't know what other violations they may

9  have been referring to?

10     A    It was told many times.  I don't recall.

11     Q    Okay.  And you have no personal knowledge of

12  any of those violations they may have been referring

13  to, correct?

14     A    Not anymore.  I did.

15     Q    Were you involved in the violations

16  themselves?

17     A    I don't know.

18     Q    You don't know what they were talking about?

19          MR. PATMON:  Objection.

20     A    Again like I said before, they mentioned we

21  were on probation for multiple violations.  They went

22  over them.  I do not recall the details of that

23  anymore.

24     Q    And you said this was Dr. Weiss and

246

1    Dr. Tamaskar?

2        A    And Dr. Ecklar.

3        Q    And when you say you were on probation, the

4    program was on probation, do you know what body had put

5    the program on probation?

6             MR. PATMON:  Asked and answered.  Objection.

7        A    I don't know.

8        Q    Okay.  So you don't if it was the ACGME?

9        A    I do not recall.

10       Q    Did anyone from the ACGME ever discuss the

11   internal medicine residency program with you

12   personally?

13       A    During my residency time?

14       Q    Yes, or any time.

15       A    I do not recall the details.  I do know I did

16   communicate with ACGME before.

17       Q    Did anyone from ACGME ever tell you that the

18   program was on probation?

19       A    I did not ask that question.

20       Q    Did anyone ever tell you from ACGME?

21       A    From ACGME, no.

22       Q    Have you ever seen any ACGME documents

23   showing or indicating that the program was on probation

24   by the ACGME?

247

```
 1       A    No.

 2       Q    Was that a no?

 3       A    No.

 4       Q    So your belief the program was on probation

 5  is solely based, just so I'm clear, on what you believe

 6  you heard from Dr. Weiss, Dr. Tamaskar, and Dr. Ecklar?

 7       A    That's correct.

 8       Q    Okay.  And you don't remember what violations

 9  may have led to this?

10       A    I don't recall.  I told you that.

11       Q    Great.

12            Do you recall completing any evaluations of

13  the residency program for the ACGME while you were a

14  resident?

15       A    Yes.

16       Q    And do you recall what you wrote on those

17  evaluations, how you evaluated the program?

18       A    I don't recall the details of what I wrote so

19  I do know the exact details of what I wrote.

20       Q    Do you know if your evaluation was favorable

21  or unfavorable?

22       A    Well, we were told to make it favorable.

23       Q    Told by who?

24       A    By chief resident who was speaking for
```

248

1    program directors.

2         Q    What chief resident told you that?

3         A    Chirag Patel.

4         Q    Anyone else?

5         A    I do not recall.

6         Q    So just Dr. Chirag Patel?

7         A    Yes.

8         Q    And what did Dr. Patel tell you?

9         A    Pretty much we are to write positive things.

10   If not, we will get in trouble for it.

11        Q    By who?

12        A    He never mentioned in detail.

13        Q    So he said write positive things or you'll

14   get in trouble?

15        A    That's correct.

16        Q    And did he say Dr. Weiss asked me to tell you

17   this?

18        A    I do not recall.

19        Q    Do you know if Dr. Weiss or anyone in the

20   medical education department knew that Dr. Patel was

21   telling you that?

22        A    I do not recall.  I do not know.

23        Q    Did Dr. Patel's statement influence the

24   content of your evaluation in any way?

249

1      A    It influenced a lot of people's evaluation.

2      Q    I asked whether it influence your evaluation.

3      A    Of course it did.

4      Q    So you said things you wouldn't have said had

5   he not said that?

6           MR. PATMON:  Objection.

7      A    I don't recall what I said or what I wrote

8   there.

9      Q    Were you truthful in your evaluation?

10     A    Yes.  But I did fear consequences.  And,

11  again, I do not recall the details of it.

12     Q    But you didn't say anything on the evaluation

13  that you didn't believe to be true; is that correct?

14     A    I do not recall.

15     Q    So you may have lied on --

16     A    That was a while ago.

17     Q    You may have lied on the evaluation?

18          MR. PATMON:  Objection.

19     A    My purpose is not to lie, no.

20     Q    I asked not what your purpose was but what

21  you did.

22     A    I don't recall what I did.

23     Q    So you may have lied on the evaluation?

24     A    I do not recall.

250

```
 1            MR. PATMON:  Objection.
 2       A    I have been penalized in the past for not
 3  lying when I was told to lie, so...
 4       Q    So?
 5       A    So I did have fear of getting reprimanded
 6  again.
 7       Q    Were the evaluations anonymous?
 8       A    I do not know.  I would assume so but I do
 9  not know.
10       Q    Okay.  Did you ever report to anyone that
11  Dr. Patel had asked you to give a positive evaluation?
12       A    I do not recall.
13       Q    Did you believe that he was asking you to be
14  untruthful or just to focus on positive things about
15  the program and keep those in mind as you completed
16  your evaluation?
17            MR. PATMON:  Objection.
18       A    I do not recall.
19       Q    So it's possible that that may have been --
20       A    I said I do not recall.
21       Q    Has Mount Carmel ever, to your knowledge,
22  initiated a legal proceeding against you?
23            MR. PATMON:  Objection.
24       A    Define that in detail.  I do not know what
```

251

1   you mean by that.

2        Q    Well, has Mount Carmel ever brought a claim

3   or action against you in any court or --

4        A    In a court?

5        Q    -- or anything like that?

6        A    Not in a court, no, besides this.

7        Q    This lawsuit was initiated by you; is that

8   correct?

9        A    That's correct.

10       Q    Okay.  Mount Carmel has never reported you or

11  filed any charge against you with any state or federal

12  governing body governing your profession; isn't that

13  correct?

14       A    I do not know.

15       Q    Okay.  In your complaint you claim that Mount

16  Carmel destroyed evidence in this case.  Do you recall

17  that?

18       A    Yes.

19       Q    Okay.  What evidence do you believe Mount

20  Carmel destroyed?

21       A    The petition.

22       Q    And what's the basis for that belief?

23       A    From what other residents have told me.

24       Q    So you have no personal knowledge of whether

252

```
 1    that petition still exists in its original state?
 2         A    I do not know.  I just know what the resident
 3    told me Dr. Weiss --
 4         Q    What -- I'm sorry.  Go ahead.
 5         A    The resident told me that Dr. Weiss said that
 6    administration told him to destroy the petition but he
 7    kept a copy.
 8         Q    Okay.  So what resident told you that?
 9         A    Stella Gandhi.
10         Q    And did she say how she knew that?
11         A    She was walking in his office and when that
12    patient died in November, he waved his I guess some
13    report of him saying he finally got a way out of ICU,
14    he finally got a way out of ICU, and he had a grin on
15    his face.  So I was told --
16         Q    So that was all stuff you were told, you
17    didn't witness any of that?
18         A    No.  I wasn't in the hospital then.
19              And he also said -- pulled out his drawer and
20    said, I have this petition copy which they told me --
21    that administration told him to destroy.
22         Q    Did Stella tell you who Dr. Weiss said asked
23    him to destroy it?
24         A    He said administration.
```

253

1      Q    He didn't specify who?

2      A    No.

3      Q    Okay.  And this is all stuff you just heard

4 from Stella?

5      A    That's correct.

6      Q    If I told you that I had the original

7 petition in my office would you have any reason to

8 disbelieve me?

9          MR. PATMON:  Objection.

10     A    I don't know.

11         MR. PATMON:  Now we're talking about your

12 office.  Am I going to have to take the deposition of

13 you?

14         MR. ARMSTRONG:  No.  It's not there anymore.

15         MR. PATMON:  Okay.

16     Q    If I told you that Dr. Weiss had the original

17 petition in a file in his office would you have any

18 reason to disbelieve me?

19     A    No, because that's what he pulled out of his

20 drawer.

21     Q    When you were a resident was it your job to

22 do any coding of procedures or services for submission

23 for reimbursement by Medicare or Medicaid?

24     A    We would during my family practice years,

254

1   yes.

2       Q     During the internal medicine residency did

3   you?

4       A     During the internal medicine years we would

5   not code, but we would witness the coding.

6       Q     Did you ever receive any training on how to

7   code for Medicare and Medicaid in internal medicine?

8       A     Yes.  Not in internal medicine, in family

9   medicine.

10      Q     Okay.  When you say you would witness coding,

11  what do you mean by that?

12      A     In the clinic they would code in front of

13  you.

14      Q     Which clinic?

15      A     Medicine clinic.

16      Q     Is that an outpatient clinic?

17      A     Yes.

18      Q     Okay.  Did you ever witness any coding in the

19  ICU as an internal medicine resident?

20      A     Yes, I would.

21      Q     Okay.  I'm not familiar with what coding is

22  or what it looks like.  Can you tell me what you would

23  see when you say you witnessed coding.

24      A     They would mark on a card how much they're

255

1      charging for each patient they see every day.

2          Q     Okay.  Would they --

3          A     Or on a chart.

4          Q     What else would they indicate on the card?

5      Is there anything else?

6          A     I do not recall the details.

7          Q     Would they indicate like which procedures

8      were done, for example?

9          A     They would write a note so that they could

10     charge for a procedure, yes.

11         Q     Would they indicate like which nurses were

12     involved?

13         A     I do not recall.

14         Q     Would they indicate which doctors were

15     involved?

16         A     I do not recall.

17         Q     Okay.  So you don't know if the coding that

18     you saw in the ICU identified which nurses and which

19     doctors were involved in which procedures.  Do I

20     understand you correctly?

21         A     You'd have to rephrase it.  Say that again,

22     please.

23         Q     Okay.  I think what you said was you don't

24     know whether the coding that you witnessed in the ICU

256

```
 1    identified which nurses and which doctors --

 2         A    It would represent themselves.

 3         Q    -- were involved in the procedures?

 4         A    It would represent the physician writing the

 5    code.

 6         Q    Okay.  I'm confused now.  I apologize.

 7              Does the physician write the code or does

 8    someone else write the code?

 9         A    The physician would write the code.  He would

10    code for himself and the services he did.

11         Q    Okay.  So did you do coding in the ICU?

12         A    No, I did not.  I can't charge for coding, so

13    no.

14         Q    Oh, okay.  So residents can't charge?

15         A    That's correct.

16         Q    Okay.  That was because you were a resident.

17    Okay.  So who did you see coding in the ICU?

18         A    I would see Dr. St. John.  I would see the

19    other critical care doctors as well.

20         Q    Okay.  So you would see them coding for

21    procedures?

22              When you say coding -- first of all, is that

23    a yes, you would see them coding for procedures?

24         A    Yes.
```

257

1     Q    Okay.

2     A    Write notes so they can verify and back up

3     their codes.

4     Q    So were they actually writing codes that were

5     going to be submitted to somebody for a bill or were

6     they just writing notes to then go do that later?

7     A    I would assume for writing but I do not know.

8          I do not recall the practice of every

9     physician how they handled it.

10    Q    With respect to Dr. St. John, for example,

11    what specifically did you see him writing?

12    A    I do not recall the details now.

13    Q    Okay.  You don't know whether he was writing

14    notes or whether he was filling out a form that was

15    going to be submitted to somebody directly?

16    A    He would write notes saying that he was

17    present during some procedure.

18    Q    Okay.  And did you ever see him write a note

19    that said he was present during a procedure that you

20    knew he wasn't actually present for?

21    A    He wasn't in the room, yes.

22    Q    Where was he, then?

23    A    He was outside.

24    Q    Okay.  But he was present in the hospital?

258

```
 1       A    I would assume so.  Again, I don't know

 2   details.

 3       Q    Okay.  Do you know what he did with what he

 4   wrote?

 5       A    No, I do not.

 6       Q    Okay.  You don't know if he ever submitted it

 7   to anybody?

 8       A    Again, I don't know.

 9       Q    Just so I'm clear, based on your testimony

10   that you don't know what happened with the stuff that

11   you saw these people writing, my understanding is you

12   can't point me to any specific examples where an

13   improper code was actually submitted to like Medicare

14   or Medicaid --

15       A    I can't recall.

16       Q    -- at Mount Carmel?

17       A    I can't recall.

18            MR. PATMON:  Objection.

19       Q    And you can't point me to any specific

20   examples or instances where something was upcoded or

21   double billed, correct?

22       A    Are you talking medicine clinic or in the

23   ICU?

24       Q    ICU.
```

259

1       A    I do not recall.

2       Q    You mentioned the medicine clinic?

3       A    Yes.

4       Q    Is your answer different for the medicine

5  clinic?

6       A    Yes.

7       Q    What did you witness in the medicine clinic?

8       A    We would see patients and Dr. Tamaskar would

9  write in his notes that he saw the patient when he

10  didn't and then he would upcode it.

11      Q    So you saw him write it in his notes?

12      A    Yes.

13      Q    Do you know what he did with the notes after

14  that?

15      A    With the -- it goes in the chart.

16      Q    Do you know what happened to the notes that

17  he made after that?

18      A    The notes he wrote in the chart?  It's on the

19  same page I write my notes.

20      Q    Okay.

21      A    He would write "patient seen and discussed

22  with Dr. Nayyar" and he never saw the patient.  He was

23  just in his office.  And then he would upcode it.  I

24  witnessed that.

260

1    Q    When you say you witnessed that, what did you
2  see?
3    A    I'd see him circle a code.  After writing a
4  note saying he saw a patient when he didn't, then he
5  would write a code.
6    Q    And what do you mean by a write a code?
7    A    Write an office code so he can charge for the
8  patient.
9    Q    Write it where?
10   A    On some document.
11   Q    Do you know what document?
12   A    The chart.  I don't know the details of that.
13   Q    Do you know what he did with that document
14  after he wrote it?
15   A    No.  I would assume he turned it in, but --
16   Q    That's your assumption but you do not know?
17   A    No, I do not know.
18   Q    Okay. You don't know whether that information
19  he wrote was ever actually submitted to Medicare or
20  Medicaid, do you?
21   A    It's the chart.  It's the document that he
22  would turn into the nurse for submission.  It says
23  coding and he would circle.
24   Q    Do you know whether those documents were

261

 1    actually ever submitted to Medicare or Medicaid

 2    personally?

 3        A    I do not know whether it was submitted.  I

 4    would assume it was because that is a coding chart.

 5        Q    I understand you assume that, but you have no

 6    personal knowledge?

 7             MR. PATMON:  Objection.

 8        A    No.  I didn't get involved in billing.

 9             MR. PATMON:  Objection.

10        Q    All right.  Did you ever report that to

11    anyone?

12        A    No, I did not.

13        Q    Okay.  Did you ever report to anyone at Mount

14    Carmel that you believe somebody at Mount Carmel had

15    committed any violations of Medicare rules or

16    regulations?

17        A    Did I ever report it?

18        Q    Yeah.

19        A    I've reported violation of hours.  I don't

20    know if that pertains to that.

21        Q    I understand what you're referring to

22    reporting a violation of ACGME rules, correct?

23        A    Correct.

24        Q    Okay.  When you made that report, that wasn't

262

1    a report that someone's violating Medicare or

2    Medicaid -- committing Medicare or Medicaid fraud?

3        A    No, I don't think so.

4        Q    Okay.  The concern with that one was for?

5        A    My career being at risk since I've been

6    reprimanded and warned before in the past for violating

7    hours of reporting.

8        Q    So that was an ACGME hours issue?

9        A    It was violating and reporting it is what --

10       Q    Okay.  So you were concerned that residents

11   were being overworked, possibly patient safety was a

12   issue, correct?

13       A    I was.  I violated the hours and I was told

14   to lie about it to ACGME.

15       Q    Okay.  That was in the family medicine

16   program?

17       A    And I did report violation of my hours to

18   Dr. Weiss as well and the chief residents in the

19   internal medicine program in ICU.

20       Q    And when was that report made?

21       A    It was in December.  I do not recall the

22   exact year.  But I reported it.  And Chirag Patel was

23   the chief resident.

24            And then again my career was threatened at

263

1    that point in time, too, because I was warned again.

2         Q    By who?

3         A    Chirag Patel.

4         Q    Do you know if Dr. Weiss knew that he was

5    doing that?

6         A    Dr. Weiss reported it I assume to Chirag

7    Patel because he paid me a visit afterwards and started

8    yelling at me about it.

9         Q    Who yelled at you?

10        A    Chirag Patel.

11        Q    Do you know if Dr. Weiss told him to yell at

12   you?

13        A    I do not know details of it.  And then soon

14   after I could not write my hours for that violation

15   online.

16             I was wiped out of the system and I could not

17   add my hours anymore for the remainder of my residency.

18   The secretary said she was doing it for me now.  I

19   didn't have access anymore.

20        Q    I'm sorry.  To what program?

21        A    I could not write my hours anymore, log it in

22   anymore.

23        Q    What was the program?

24        A    GME-1.

264

1      Q    Do you know if you were the only one that the
2  secretary was adding -- was putting hours in for or was
3  it everyone?
4      A    I assume I was the only one.
5      Q    Do you know or it's just an assumption?
6      A    I don't know who else violated hours.  I know
7  other residents did not have problems filling it in,
8  only I did.
9      Q    Do you know that every single other
10 resident --
11     A    I don't know every single resident.  I do not
12 know.
13          MR. PATMON:  Do you want to take some time to
14 go through your notes?
15          MR. ARMSTRONG:  No.  I'm going to take a
16 short break here in just a minute.
17     Q    Professionalism is one of the six core
18 competencies in the internal medicine program; is that
19 correct?
20     A    Yes.
21     Q    Therefore, I think it's fair to say
22 professionalism is a very important component of the
23 program; is that fair?
24     A    I assume so, yes.

265

1      Q    Is honesty a part of professionalism to your

2  knowledge?

3      A    Yes.

4      Q    Would you say that in the context of

5  providing medical care as part of a team that trust is

6  important?

7      A    Yes.

8      Q    It's important to be able to trust the people

9  that you're working with?

10     A    It's important, yes.

11     Q    Do you believe it's ever professional for a

12  doctor to lie?

13     A    I don't know.  It depends on the content.

14          Again, I don't promote lying, nor do I wish

15  to lie.

16     Q    So if a doctor lies about something involving

17  someone's medical care, for example, would that be

18  unprofessional?

19     A    That's an administrative opinion.  I don't

20  know.

21     Q    In your personal opinion?

22     A    I would assume so.

23     Q    Okay.  And I think we discussed before in the

24  part of your deposition that took place in February

266

1    that during the investigation into the A-line incident

2    you were not truthful about who you had contacted as

3    part of the investigation; is that correct?

4        A    I did make a mistake of saying I did not

5    communicate with Amanda when she called me, yes.  But I

6    did correct myself in the committee where I'm supposed

7    to and I volunteered that information.

8        Q    Are you aware that Amanda also let Mount

9    Carmel know that you had contacted her?

10       A    I do not know.

11       Q    The A-line incident that led to your

12   termination was reported to Mount Carmel by a nurse

13   named Lisa Cottrell.  Do you recall that?

14       A    Yes.

15       Q    Okay.  Lisa Cottrell reported one version of

16   events to Mount Carmel; is that correct?

17       A    I assume.  I don't know what she reported.

18       Q    Are you aware that she reported to Mount

19   Carmel that you asked for a nurse's assistance in

20   putting in an A-line?

21       A    No.  Amanda -- like I mentioned before,

22   Amanda came in with me.

23       Q    Sure.  I'm not asking what happened.  I'm

24   asking if you're aware of what Lisa's report was?

267

1             MR. PATMON:  Are you talking about now or

2   then?

3             MR. ARMSTRONG:  I'm talking about right now.

4        A   I would have to see her report because I

5   don't know.

6        Q   You don't remember what was in her report?

7        A   I don't recall the details of it, no.

8        Q   Okay.  Are you aware that in the report she

9   alleged that you permitted Amanda Bowers to put in an

10  A-line herself?

11       A   That she stated that?

12       Q   Yes.

13       A   I assumed that's what she said, yes.

14       Q   Okay.  So you knew that's what she told Mount

15  Carmel?

16       A   I do now.

17       Q   I understand you're saying that's not true.

18       A   Right.

19       Q   I'm not trying to --

20       A   I don't know what she mentioned then.

21       Q   I'm asking you right now as you sit here are

22  you aware that Lisa reported that you permitted Amanda

23  to put in an A-line?

24            MR. PATMON:  I'm going to object to this

268

1    because his awareness arises from discussions that we

2    had between attorney and client.

3              I'm going to instruct you not to answer.

4              You have the exhibit, show it to him.

5              MR. ARMSTRONG:  It's not a matter of

6    attorney-client privilege because it's about a fact.

7              MR. PATMON:  The fact you're asking about is

8    has he reviewed it.  He said he didn't at the time, and

9    so how does he now know.  He now knows because I told

10   him.

11             MR. ARMSTRONG:  Right.

12             MR. PATMON:  I told him details and we talked

13   about those details.

14             MR. ARMSTRONG:  And I'm not going to ask him

15   what you guys talked about.  But if he read it on a

16   document that's not a privileged document that's

17   something that Mount Carmel produced in this

18   litigation, then he knows what her allegation was --

19             MR. PATMON:  Well, he said --

20             MR. ARMSTRONG:  -- and it's not privileged.

21             MR. PATMON:  -- he can't recall.  But it

22   occurred during a privileged conversation.

23             Now, we had the same situation and you

24   instructed your witness not to answer the question.

269

```
 1              MR. ARMSTRONG:  That was because the question
 2    was about what the discussions between the attorney and
 3    the client were, and I'm not trying to go into what
 4    your discussions about the document may have been.
 5              MR. PATMON:  It was a subject matter that was
 6    not privileged, and you said because it occurred during
 7    that conversation you instructed him not to answer.
 8              MR. ARMSTRONG:  But the contents --
 9              MR. PATMON:  I'm not going to get into a
10    battle with you because he can't recall, so ask your
11    question.  He can't recall right now.
12              MR. ARMSTRONG:  What I'm trying to do is
13    establish what he knows and what I need to refresh him
14    on.
15              MR. PATMON:  Don't talk about anything that I
16    told you.  Don't talk about my impression of those
17    facts or anything about that.  If you can recall.
18    BY MR. ARMSTRONG:
19        Q    And to be clear, I'm not asking about
20    anything that your lawyer told you.
21        A    I'm aware of that.
22        Q    I'm asking about what you may have seen in a
23    statement that Lisa made.
24        A    I told you, I don't recall.  You have to show
```

270

```
 1   me the document.
 2          MR. PATMON:  I'm troubled by this because
 3   the -- and I want to note an objection for
 4   admissibility purposes because his knowledge of this
 5   document arises during a review with his lawyer.
 6          MR. ARMSTRONG:  But the contents of the
 7   document themselves aren't privileged.  You can't make
 8   it privileged just because you talk about it with him,
 9   and you know that, Bill.
10          MR. PATMON:  You know what, I can make it
11   privileged if I give him my impression and we talked,
12   and I don't know if he's able to distinguish between
13   what he read and what I told him, and I think that's a
14   real danger here and so I'm admonishing him in that
15   regard.  And go ahead and answer his questions with
16   that caveat.
17   BY MR. ARMSTRONG:
18      Q    Sure.  And with that caveat because I'm not
19   asking you about anything Bill told you.  What I want
20   to know is what your current awareness is of the
21   allegations Lisa Cottrell made against you?
22      A    I do not recall the details like I said.
23   Show me the document and I'll answer it.
24      Q    And we may break and do that.  Before we do
```

271

1    that I want to ask a real general question.

2        A    Okay.

3        Q    Are you aware that -- you know what, let's

4    just get the document because it will go a lot easier

5    if we do that.  We can take a break and do that.

6            MR. PATMON:  Are we off the record?  Are you

7    off the record now?

8            MR. ARMSTRONG:  I may have -- let me just

9    read this.

10           MR. PATMON:  All right.

11           MR. ARMSTRONG:  Yeah, we can go off the

12   record.  Let's take a ten-minute break.

13           (A recess was taken.)

14           MR. ARMSTRONG:  Okay.  Let's go back on the

15   record.

16       Q    And, Dr. Nayyar, I just want to circle back

17   on a couple of things.

18           When did you pass your Step 3 exam?

19       A    I don't know the exact date.  It was last

20   year.

21       Q    So in 2010?

22       A    Yes.

23       Q    Do you know the month?

24       A    I don't know.  I took it in June.

272

```
1        Q    Took it in June.  Okay.

2        A    May or June.  I'm not sure of the exact date.

3        Q    Okay.  How long does it take to get results

4   back?

5        A    Four to six weeks.  I'm not sure.

6        Q    Okay.  So you probably passed it in August,

7   July, August, maybe September, something like that?

8        A    Possibly.  I'm not sure.

9        Q    Okay.  Once you pass your Step 3 exam is

10  there anything you have to do to become fully licensed

11  in the state of Ohio?

12       A    You have to apply.

13       Q    When did you submit that application?

14       A    I don't know the exact dates, but it was soon

15  after I passed.

16       Q    Okay.  So it would have been in the fall of

17  2010?

18       A    Possibly, yeah.

19       Q    And how long before you were officially

20  certified to practice medicine in the state of Ohio?

21       A    I don't know the exact date.  I think it was

22  in 2011.  The beginning of 2011.

23       Q    Okay.

24       A    January or February.
```

273

1        Q    Okay.  When did you start working in the pain

2    clinic?  May or June?

3        A    Yes, May or June.

4        Q    Had you applied to any pain clinics between

5    January and May of 2011?

6        A    I've been searching for jobs and that's the

7    only thing I could come up with.

8        Q    Had you applied to any specific pain clinics

9    in those months --

10       A    Specific?

11       Q    -- January, February?

12       A    No, I went through recruiters and that's all

13   they could find for me.

14       Q    Did you contact any pain clinics directly

15   yourself?

16       A    To look for?

17       Q    To look for employment.

18       A    I mean, once I was -- not any additional

19   ones, just the one that I was exposed to and then I

20   started communicating with him.

21       Q    Sure.  Sure.

22       A    Other than that, no.

23       Q    Okay.  And you quit that job before -- is it

24   House Bill 93 -- was passed?

274

```
1        A    Yeah.  And it just recently passed.

2        Q    Okay.  I think you mentioned that you had

3    seen someone in the clinic note that they had seen a

4    patient that you believe they hadn't seen.  Is my

5    memory serving?

6        A    I don't know what you mean.  You have to

7    clarify.

8        Q    In the medicine clinic.

9        A    As in not seeing the patient but documenting

10   seeing them?

11       Q    Yes.

12       A    Yes.

13       Q    It's possible that that doctor after making

14   that notation saw the patient after you were outside

15   of -- the doctor was outside of your vision; is that a

16   fair statement?

17            MR. PATMON:  Objection.

18       A    I cannot comment on that.

19       Q    But it's possible?  It's possible, correct?

20            MR. PATMON:  Objection.

21       A    Again, I can't comment on that.

22            That would be horrible.  It would be poor

23   practice because he's giving orders and writing notes

24   based on him seeing the patient.
```

275

```
 1        Q     But irrespective whether it's poor
 2   practice --
 3        A     You can't write a note --
 4        Q     Please let my finish the question.  It's
 5   metaphysically possible --
 6              MR. PATMON:  Let him finish the answer too.
 7              Go ahead.
 8        A     You can't.  You can't document a disease,
 9   document treatment without seeing a patient.
10        Q     If the resident reports to you what the
11   resident's observations were, could you document it and
12   then follow-up and see the patient?
13        A     I don't know.
14        Q     I mean, it's possible?  Whether --
15        A     I don't know.  I don't know.  I don't know
16   how Dr. Tamaskar practices medicine.  I don't know.
17        Q     All right.  That's fine.
18              Prior to the incident involving the A-line
19   did you know Lisa Cottrell?
20        A     Yes.  She's a nurse in ICU.
21        Q     Okay.  How well did you know her?
22        A     She's just a nurse in the ICU.  We rotate
23   once every so often in ICU so that's how I know her.
24        Q     Okay.  You knew her in a professional
```

276

1    context?

2        A    Yes.

3        Q    Do you know her in a personal context?

4        A    Never met her before in my life.

5        Q    Did you have any altercations or arguments

6    with Ms. Cottrell at any point?

7        A    On treatment of patients?

8        Q    In general on any topic.

9        A    I think so, yes.

10        Q    Can you tell me what those were about.

11        A    I don't recall.

12             I do know that there's a lot of animosity

13    between residents and nurses on how we go about

14    treating patients and whether we treat them a certain

15    way or use their advice or not.

16        Q    Okay.  Do you recall any specific instances

17    where you had an altercation or argument with Lisa

18    Cottrell in particular as opposed to just nurses in

19    general?

20        A    On one patient there was.  I think it was

21    that month, I don't know the exact date, and it was a

22    placement of a central line.

23        Q    Okay.  What was the subject of the

24    discussion?

277

```
 1        A    That I wasn't in, in the vein.

 2        Q    Okay.  Can you elaborate on that.  Was Lisa

 3   believing you were not and you thought you were?

 4        A    She didn't believe I wasn't and I wasn't

 5   sure.  And so it was kind of detailed.  And of course

 6   we waited until the x-rays.  But she was quite fired

 7   up.

 8        Q    What do you mean by quite fired up?

 9        A    She was upset.  I don't know.

10        Q    Do you remember when that incident happened?

11        A    I don't recall the date, no.

12             There's always animosity between residents

13   and nurses.  It's very common.  It's very common.

14        Q    Okay.  So it's not just Lisa in particular,

15   it's all the nurses?

16        A    It happens, yes.

17        Q    What about Amanda Bowers.  What was your

18   relationship with Amanda Bowers like?

19        A    The same thing like Lisa Cottrell.

20        Q    Okay.  Would you say your relationship with

21   one was any more favorable or unfavorable than the

22   other?

23        A    I don't know.

24
```

278

```
 1                        - - -

 2              A 7/9/09 PRICE/COTTRELL EMAIL WAS MARKED

 3              AS DR. NAYYAR DEPOSITION EXHIBIT NO. 7.

 4                        - - -

 5      Q    I'm going to hand you Exhibit 7.

 6           Other than the incident you talked about is

 7  there any particular incident you can recall where you

 8  and Lisa had an argument or anything like that?

 9      A    I mean, throughout residency there's always

10  altercations between interns and nurses and residents.

11      Q    But nothing specific in your memory?

12      A    It's common.  I don't know details.  I can't

13  comment on that.

14      Q    So the answer is no?

15      A    No, I said I can't comment on that because I

16  don't know.  It happens with multiple nurses all the

17  time.

18      Q    My question is, do you remember --

19      A    I can't recall specific instances.

20      Q    That's what I wanted.

21           Okay.  If you could take a look at what we've

22  marked as Exhibit 7, please.  Just take a look at this

23  and read it over and let me know when you're ready.

24      A    Okay.
```

279

1    Q    Okay.  Have you ever seen this document

2  before?

3    A    Yes.

4    Q    Okay.  And do you understand this to be the

5  report that Lisa Cottrell filed with Mount Carmel or

6  submitted to Mount Carmel regarding the A-line

7  incident?

8         MR. PATMON:  Objection.

9    A    I don't know.

10   Q    Okay.  This appears to be an e-mail from Lisa

11  Cottrell to Deb Price dated Thursday, July 9, 2009,

12  correct?

13   A    I would assume so.

14   Q    Is that what it says there?

15   A    It says sent July 16th, 2009.

16   Q    And you're referring to the top where --

17   A    I'm sorry.  You're right.  It says July 9th,

18  yes.

19   Q    In this email Lisa states that you were

20  attempting to insert an A-line, said I can't get it,

21  and then stated to Amanda and Lisa, do you guys want to

22  try.

23         Is that what she says in this email?

24   A    That's what it states there.

280

1     Q    She then states that she said that type of

2   procedure is outside of a nurse's scope of practice.

3          Is that what she states here in this email?

4     A    Yes.

5     Q    Then she says that Amanda Bowers stated that

6   she would try it but that this stays between us.

7          Is that what it says in this email?

8     A    Yes.

9     Q    She then says that Amanda made two attempts

10  and on the second was successful in inserting the

11  A-line.

12         Is that what it says here in this email?

13    A    Yes.

14    Q    Okay.

15         MR. ARMSTRONG:  Can we mark this as Exhibit

16  8.

17                     - - -

18         A 7/9/09 INCIDENT REPORT OF DR. NAYYAR

19         WAS MARKED AS DR. NAYYAR DEPOSITION

20         EXHIBIT NO. 8.

21                     - - -

22    Q    Please let me know once you've had a chance

23  to review this document which we've handed you which is

24  marked as Exhibit 8.

281

1      A    Okay.

2      Q    What is this document we've marked as Exhibit

3  8?

4      A    My incident report.

5      Q    This is your statement to Mount Carmel

6  regarding the A-line incident that Lisa reported,

7  correct?

8      A    That's correct.

9      Q    In your statement you say that you were

10  attempting to insert the A-line, that you developed a

11  cramp in your back and that you asked Amanda to hold

12  the A-line in position while you relieved the cramp,

13  and that while she was doing so Amanda must have

14  accidentally moved the A-line a little bit getting into

15  the artery and that then you quickly took over and

16  finished the procedure.  Is that accurate?

17      A    Well, I don't think she actually got into the

18  artery because I had to find the artery.  It was just a

19  flash.

20      Q    Okay.  Otherwise is that correct?

21      A    Yes.

22      Q    Okay.  It's very different from Lisa's

23  statement, correct?

24      A    Yes.

282

1    Q    If Mount Carmel received these two statements

2    about the same incident, both of them can't be true; is

3    that a fair statement?

4    A    I don't know.  I would assume so.  I don't

5    know.

6    Q    Okay.  So Mount Carmel would have to figure

7    out if it was trying to determine what actually

8    happened which one of these to believe; fair to say?

9         MR. PATMON:  Objection.

10   A    I'm not part of the administrative team.  I

11   don't know much what their opinions are or how they

12   handle those situations.

13   Q    Okay.  But both of these -- These statements

14   are inconsistent?

15   A    Yes.  I mentioned that.

16   Q    Okay.

17        MR. PATMON:  I'm going to object to the

18   inconsistency of the statements.

19   BY MR. ARMSTRONG:

20   Q    Are you aware of any evidence that Mount

21   Carmel was presented with that could lead it to believe

22   that Lisa was being untruthful in her statement?

23   A    Mount Carmel --

24        MR. PATMON:  Objection.

283

1       A    Mount Carmel never gave me any evidence, so

2  how am I supposed to know.

3       Q    So you don't have any such evidence?

4       A    About what?

5       Q    You have no evidence that there were any

6  facts in front of Mount Carmel that would lead it to

7  believe that Lisa was being untruthful in her

8  statement, correct?

9       A    I don't know of anything like that.  I wasn't

10 given anything.

11           MR. ARMSTRONG:  Okay.  Let's go ahead and

12 mark this as Exhibit 9.

13           Before we do that I have another question on

14 Exhibit 8, your statement.

15      Q    Did you type up the statement that's

16 reflected in Exhibit 8 yourself?

17      A    Yes.

18      Q    Okay.  Where did you type that up?

19      A    On my computer.

20      Q    Okay.  Is your computer located at your home?

21      A    Yes.

22      Q    Okay.  And did you print it at home?

23      A    I do not know.  I printed it at home or at

24 Mount Carmel.

284

```
1        Q    Okay.  Where might you have printed it at
2   Mount Carmel, if you did?
3        A    I'm not sure to tell you the truth.  Probably
4   in -- actually, it must have been at home because I
5   wouldn't know where to print it besides the residents
6   lounge, and I didn't go into the residents lounge.
7        Q    Okay.
8                           - - -
9             A TWO-PAGE 7/15/09 STATEMENT FROM AMANDA C.
10            BOWERS, R.N., B.S.N. WAS MARKED AS DR. NAYYAR
11            DEPOSITION EXHIBIT NO. 9.
12                          - - -
13       Q    Dr. Nayyar, we're handing you what's been
14   marked as Exhibit 9.  Please let me know when you've
15   had a chance to look at that.
16       A    Okay.
17       Q    Okay.  Have you ever seen Exhibit 9 before?
18       A    Yes.
19       Q    Okay.  Exhibit 9 is captioned Statement from
20   Amanda C. Bowers R.N., B.S.N., correct?
21       A    Yes.
22       Q    Okay.  Did you write this?
23       A    No, I did not.
24       Q    Did you help Amanda write it?
```

285

```
 1        A    No, I did not.

 2        Q    Did Amanda write it on your computer?

 3        A    No, she did not.

 4        Q    Did you see it before she submitted it?

 5        A    I recently seen it in my attorney's office.

 6        Q    I'm not asking about that.  Before you were

 7   preparing for this deposition had you seen this

 8   document?

 9        A    No.  The first time I saw it was in my

10   attorney's office.

11        Q    Okay.

12                        - - -

13             A 8/6/09 PROGRAM EDUCATION COMMITTEE/DR.

14             NAYYAR LETTER WAS MARKED AS DR. NAYYAR

15             DEPOSITION EXHIBIT NO. 10.

16                        - - -

17        Q    Dr. Nayyar, we've handed you what's been

18   marked as Exhibit 10.  Have you seen this document

19   before?

20        A    Yes.

21        Q    This is a letter from the Program Education

22   Committee dated August 6 of 2009 to you; is that

23   correct?

24        A    Yes.
```

286

1      Q     Okay.  And signed by Dr. Mark Easterday, the

2   committee chair; is that correct?

3      A     That's correct.

4      Q     Okay.  And this letter states the Program

5   Education Committee's determination with respect to

6   your appeal of your termination; is that correct?

7      A     Where?

8      Q     In the last paragraph.

9      A     Okay.  So what was the question again?

10      Q     This document states the Program Education

11   Committee's conclusion or determination with respect to

12   your appeal of your termination; is that correct?

13           I'll direct your attention to the last

14   sentence, which says, "In summary, we agree with the

15   decision of dismissal per the above stated guidelines."

16      A     Yes.

17      Q     So this was the Program Education Committee's

18   determination to uphold the termination of your

19   employment from Mount Carmel; is that correct?

20      A     I assume so, yes.

21      Q     Okay.

22      A     It says here "Members Present," but I think

23   if I remember correct Steve Kile was present in there

24   and it doesn't state that in here.

287

```
1        Q    Actually, if you look under Guests Present --

2        A    Oh, okay.  Right.

3        Q    -- it lists Mr. Kile, correct?

4        A    Yes.

5        Q    It misspells his name.

6             Dr. Nayyar, you contacted the media regarding

7    your termination, did you not?

8        A    Yes.

9        Q    You initiated that contact; isn't that true?

10            MR. PATMON:  Objection.

11       A    Yes.

12       Q    Prior to your contacting the media, Mount

13   Carmel had not made a statement in the media regarding

14   the reason for your termination; is that correct?

15       A    I don't know.

16       Q    You're not aware of any?

17       A    I'm not aware.

18       Q    What media outlets did you contact?

19            MR. PATMON:  I'm going to object.

20       A    ONN.

21       Q    Okay.

22                           - - -

23            AN ONLINE REPORT ON ONN WEBSITE TITLED,

24            "DOCTOR ACCUSES HOSPITAL IN FIRING," WAS
```

288

```
 1              MARKED AS DR. NAYYAR DEPOSITION EXHIBIT

 2              NO. 11.

 3                         - - -

 4      Q    Dr. Nayyar, we've handed you what's been

 5   marked as Exhibit 11.  Have you seen this before?

 6      A    Yes.

 7      Q    And what is it?

 8      A    It's documentation of what was said online.

 9      Q    This is an online report on ONN's website,

10   correct?

11      A    Yes.

12      Q    Okay.  The caption is, "Doctor Accuses

13   Hospital in Firing," correct?

14      A    Yes.

15      Q    Okay.  And this is the story that resulted in

16   your contacting ONN, correct?

17      A    Yes.

18      Q    Okay.  In this story you told the media that

19   you had been terminated wrongly by Mount Carmel,

20   correct?

21      A    That's correct.

22      Q    Okay.  And I'd like to direct your

23   attention -- when I read this it wasn't two pages.  I

24   apologize.
```

289

```
 1              On Page 2 the third paragraph it says, "ONN
 2  contacted Mount Carmel West Hospital to get their side
 3  of the story."  Correct?
 4       A    That's correct.
 5       Q    So, according to this, ONN reached out to
 6  Mount Carmel to get its statement; fair to say?
 7              MR. PATMON:  Objection.  You don't have
 8  personal knowledge of that.
 9       A    I don't know.
10       Q    You have no knowledge that Mount Carmel
11  initiated any contact with ONN, correct?
12       A    I don't know.
13       Q    Then it says, "The spokesman said they
14  couldn't comment in detail about pending litigation,
15  but said the allegations are without merit," correct?
16       A    Yes.
17       Q    And then there's a statement from the
18  spokesperson. "Dr. Nayyar was dismissed from his
19  medical residency program following a thorough
20  investigation into a patient care safety issue for
21  which he was responsible."
22       A    That's correct.
23       Q    Okay.  So you contacted ONN and made an
24  allegation to the media you were wrongfully terminated,
```

290

1    correct?

2        A    Yes.

3        Q    And ONN reached out to Mount Carmel for its

4    side of the story, correct?

5        A    You already asked that question.

6        Q    And your answer is?

7        A    You already asked that.  I don't know exactly

8    if they came to you.  I told you that.

9        Q    Okay.  And Mount Carmel responded, correct?

10       A    Yes.  It says that in here.

11       Q    Okay.  You were the one who injected your

12   termination into the media, correct?

13            MR. PATMON:  Objection.

14       A    I contacted ONN for patient safety

15   violations.

16       Q    And your termination, correct?

17       A    That's correct.

18            MR. PATMON:  I'm going to object to that.

19            You need to listen to the question.

20       A    They asked me about further results from me

21   speaking out and I said I was terminated.

22       Q    You volunteered the information to ONN that

23   you were terminated?

24            MR. PATMON:  Objection.

291

```
1      A    They asked a question --

2      Q    You voluntarily --

3      A    -- what was the result of me speaking out,

4  and I said I got terminated.

5      Q    You voluntarily answered that question,

6  correct?

7           MR. PATMON:  Objection.

8      Q    You didn't say no comment, correct?

9      A    No.

10     Q    You answered --

11     A    I said I was terminated.  And they had the

12 lawsuit file, so they are well aware of what happened.

13     Q    You contacted them.  They didn't contact you

14 initially, correct?

15     A    You asked that question twice already.

16     Q    All right.  Please --

17     A    I've answered it twice.

18     Q    And the answer is?

19     A    The same as before.

20     Q    Which is what?

21     A    That I contacted them.

22     Q    Thank you.

23          Okay.  Dr. Nayyar, you claim in this case

24 that you were terminated for reporting safety concerns;
```

292

1    is that correct?

2        A    That's correct.

3        Q    Okay.  Can you tell me what you did that you

4    believe you were retaliated against for?

5        A    Recently, is that what you're talking about

6    during the time of the events?

7        Q    What I would like to know is what activities

8    did you engage in that you believe Mount Carmel

9    retaliated against you for.

10       A    I think it was accumulative from me reporting

11   violations of my hours, getting reprimanded from that,

12   chronically -- Well, I should say constantly reporting

13   violation of hours, seeing patients beyond our

14   appropriate numbers, admitting patients that is, and

15   then reporting patient safety violations in ICU.

16            I reported it to administration what Dr.

17   Weiss told me.  I went from there.

18       Q    Okay.  So you reported hours violations and

19   you reported patient safety violations in the ICU,

20   correct?

21       A    Yes.

22       Q    When did you report hours violations?

23       A    During my intern year in family medicine;

24   then in the internal medicine program in the ICU; then

293

1    reported that we're seeing more patients than what is

2    allowed for admissions at night; and then after that

3    this event of patient safety.

4        Q    Okay.  After you reported the hours

5    violations in family medicine, Mount Carmel permitted

6    you to transfer to the internal medicine program; isn't

7    that correct?

8        A    I don't know the details of why they -- what

9    the results are from that.  I just knew I was

10    reprimanded for it.

11        Q    But after that, I mean subsequent in time,

12    Mount Carmel permitted you to transfer to internal

13    medicine; is that correct?

14        A    That's correct.

15        Q    Were they under any obligation to permit that

16    transfer?

17        A    I don't know.

18        Q    Okay.  In fact, they could have said no, you

19    have to stay in family medicine, correct?

20            MR. PATMON:  Objection.

21        A    I don't know.

22        Q    You don't know any of the basis that would

23    require them to permit the transfer, correct?

24            MR. PATMON:  Objection.

294

1      A    I don't know any of that information.

2      Q    And then after your year in internal medicine

3    they renewed your contract, correct?

4      A    Yes.

5      Q    And after your second year in internal

6    medicine, June 30 of 2009, they renewed your contact

7    again, correct?

8      A    I don't know the exact date I signed my

9    contract, but yes.

10      Q    The new contract typically starts July 1st;

11    is that correct?

12      A    That's correct.

13      Q    Do you have any knowledge of whether Mount

14    Carmel was required to renew those contracts from year

15    to year?

16      A    I don't know.

17      Q    So as far as you know if they wanted to get

18    rid of you they could have just not renewed your

19    contract; fair to say?

20            MR. PATMON:  Objection.

21      A    I don't know the process.

22      Q    Okay.  When did you report hours violations

23    in internal medicine?

24      A    I mentioned that before.  When I was in the

295

```
 1   ICU in December.
 2        Q    What year?
 3        A    It was the year that Chirag Patel was the
 4   chief resident.
 5        Q    Which year was that, your first year or
 6   second year?
 7        A    I don't know which year it was.  Whether it
 8   was the first or second I'm not sure.  I think it was
 9   the first year.
10        Q    Who did you make your report to?
11        A    I reported it to Dr. Weiss.
12        Q    Was it a written report or an oral report?
13        A    Oral.
14        Q    Do you recall what the substance of the
15   report was?
16        A    That I'm going to work over 100 hours in one
17   week time frame, and I'm going to violate the hours for
18   the entire month of an average of 80 hours a week.
19        Q    You told him that that was going to happen.
20   It hadn't happened yet?
21        A    The schedule was written.  He was aware of
22   the schedule.
23        Q    Did you actually end up going over hours?
24        A    Yes.
```

296

1      Q    Did Dr. Weiss give you any response to your

2  complaint?

3      A    No.  I don't recall the details of what his

4  response was.

5      Q    You don't remember what he said to you?

6      A    He said he will talk to the chief resident.

7      Q    And you believe you exceeded the hours

8  requirements during that month?

9      A    Oh, yes.

10      Q    Did you report that to anyone other than

11  Dr. Weiss?

12      A    I don't recall besides the resident and the

13  senior resident we do consult on for that ICU.  She's

14  the one who said you need to talk to Dr. Weiss.

15      Q    Anyone other than residents did you report it

16  to?

17      A    I don't recall.

18      Q    Okay.  Do you have any documentation

19  regarding your hours during that month?

20      A    I can't because they wiped me out of the

21  system and it was irretrievable.

22           So before I could document my violation they

23  wiped out the entire system of me being able to log on

24  or me as a resident.  And I was the only one wiped out

297

1    according to the secretary and Lori hall.

2         Q    You have no personal knowledge whether other

3    residents were unable to access the system?  I think we

4    already talked about that.  Correct?

5         A    According Lori Hall and the secretary

6    mentioned it to me.

7         Q    All right.  That's something someone else

8    told you.  I'm talking about what you yourself know.

9         A    I don't know of every single resident, no.

10   I'm not an administrator.

11        Q    You said you talked about to somebody the

12   number of admissions at night?

13        A    That's correct.

14        Q    When did you make that complaint?

15        A    It wasn't just me.  It was a lot of

16   residents.  It was during our time when we were writing

17   our evaluation to ACGME.

18        Q    Who did you make the report to?

19        A    It was a comment that the class brought up,

20   the interns did.

21        Q    Oh, so it wasn't just Sunil Nayyar going to

22   someone and saying this is a problem?

23        A    I don't know.  I don't know the details of

24   who mentioned it.  I was one who mentioned it a lot

298

1   because I was doing it a lot.

2        Q    Who did you specifically mention it to?

3        A    I think the program director, and

4   Dr. Tamaskar was present in the room.

5        Q    Do you know when that happened?

6        A    No.

7        Q    You have no idea when?

8        A    It was during my intern year.

9        Q    Okay.  And did they give you any response?

10       A    I don't recall.

11       Q    Okay.  And you said lots of other residents

12  also raised the same issue?

13       A    I think so.

14       Q    Okay.  Did any other residents bring up hours

15  issues in the ICU in the internal medicine program?

16       A    I do not recall.  I do not know.

17       Q    You don't know?

18       A    I don't know.

19       Q    Okay.  Did any other residents bring up hours

20  issues in the family medicine program?

21       A    I do not know.

22       Q    Okay.  So there may have been some, you just

23  don't know?

24       A    Like I said, I don't know.

299

1      Q    Okay.  With respect to patient safety

2   violations in the ICU, when did you make a complaint

3   regarding that?

4      A    January of 2000 I think 9.  It might have

5   been prior to that as well.  I don't know the exact

6   dates of everything.

7      Q    Okay.

8      A    Because January is when I think I wrote the

9   petition.

10      Q    So you're referring to the petition?

11      A    Yes.  And I did mention it before too.

12      Q    Are you referring to anything other than the

13   petition with respect to patient safety complaints in

14   the ICU?

15      A    Mainly focusing on that.

16      Q    Is there anything other than that you can

17   point me to?

18      A    In terms of --

19      Q    In terms of what --

20      A    Patient safety?

21      Q    -- activities you did in terms of --

22      A    Besides going over the hours and working

23   beyond the hours that's allowed?

24      Q    I'm talking about patient safety violations

300

1   in ICU.

2       A    That was patient safety violations, right.

3       Q    When I asked you what you were talking about

4   you said there were two main issues:  Hours violations

5   and then you said the patient safety issues in the ICU?

6       A    And admission rate.

7       Q    Admission rate.

8            So we talked about hours.  We talked about

9   admission rate.  So I'm talking about stuff we haven't

10  already talked about with respect to patient safety in

11  the ICU and you mentioned the petition.  Is there

12  anything other than the petition?

13      A    I can't recall if there was anything else off

14  the top of my head now.

15      Q    Is there anything that might jog your memory

16  about that?

17           MR. PATMON:  Are you talking about something

18  written or oral?

19           MR. ARMSTRONG:  Either one.

20      A    I mean, there's a lot of animosity between

21  nurses and nurses and residents and that could always

22  lead to issues.

23      Q    Right.  I'm talking about complaints that you

24  lodged or issues that you raised.

301

```
 1        A    Complaints and issues I raised was all said:
 2   Hours, admission rate, and then the lack of physicians
 3   in ICU.
 4        Q    And the lack of physicians in the ICU you
 5   brought up through the petition, correct?
 6        A    We mentioned that before.
 7        Q    Okay.  Other than the petition did you submit
 8   anything else in writing regarding patient safety in
 9   the ICU?
10        A    Not in writing, no.
11        Q    Okay.  What oral complaints did you make to
12   anyone at Mount Carmel regarding patient safety in the
13   ICU?
14        A    What oral?  The same thing like I mentioned
15   before, being placed in a situation where we're not
16   trained for.  We had multiple meetings about that.
17        Q    Multiple meetings with whom?
18        A    As a class.
19        Q    Okay.  So other residents were also voicing
20   those concerns?
21        A    I don't know if other residents voiced their
22   concerns or not.
23        Q    Who was at the meeting where you voiced
24   concerns?
```

302

```
 1        A    It was me and it was the class during noon
 2   conference.  And there's times I mentioned it, maybe
 3   times in his office.
 4        Q    I'm sorry.  Whose office?
 5        A    In Dr. Weiss' office.
 6        Q    What did you tell Dr. Weiss?
 7        A    That this is crazy.  We're placed in an ICU
 8   center where we're not trained, and it requires six to
 9   seven years of training to be an ICU doctor and we're
10   doing it in one to two years.
11        Q    Do you know if Dr. Weiss agreed with you?
12        A    I don't recall.
13        Q    Did he say what his thought was on the
14   matter?
15        A    He mentioned he was having meetings regarding
16   it, so...
17        Q    In fact, I think you testified in your prior
18   deposition that Dr. Weiss asked you to put together the
19   petition?
20        A    That's correct.
21        Q    Okay.  So was it your understanding, then,
22   that Dr. Weiss agreed that patient safety was an issue
23   based on critical care staffing in the ICU?
24        A    Yes.
```

303

1    Q    Are you aware of whether Dr. Weiss ever

2 raised that issue with the hospital?

3    A    Yes, he mentioned that.

4    Q    So Dr. Weiss also brought up that issue?

5    A    Yes, he mentioned that.

6    Q    So other than what we've already talked about

7 is there anything else that you did with respect to

8 raising these three concerns that you believe Mount

9 Carmel retaliated against you for?

10    A    In June after I signed my contract I saw him

11 make -- Well, he made the schedule for the ICU.  He's

12 never done that before, chief residents would do it,

13 and he made it for the first time, and I noticed that I

14 was placed in a situation where I would be the only one

15 at night in the ICU, only physician.  He took the extra

16 two residents and placed them -- I should have been on

17 the ICU in medicine clinic.

18    Q    When you say "he" you're referring to

19 Dr. Weiss?

20    A    Dr. Weiss or Dr. Tamaskar together.  I don't

21 know if both of them work on the schedules or not.

22    Q    So you don't know who made out the schedule?

23    A    Well, according to Dr. Weiss -- or to the

24 chief resident, Dr. Weiss did.  And when I talked to

304

1    him about it, he said he's not changing it.

2        Q    Okay.  So you went and talked to Dr. Weiss

3    about that schedule?

4        A    Yes.

5        Q    Okay.  Was that a concern for patient safety

6    or for your workload in the ICU?

7        A    Patient safety.  And the workload will be

8    doubled, which leads to patient safety issues.

9                        - - -

10              INTERNAL MEDICINE CALL CALENDAR, JULY 2009

11              WAS MARKED AS DR. NAYYAR DEPOSITION EXHIBIT

12              NO. 12.

13                       - - -

14       Q    Dr. Nayyar, we've just handed you what we've

15   marked as Exhibit 12.  Is this the schedule that you've

16   been referring to?

17       A    I believe so.

18       Q    Okay.  Because this is captioned Internal

19   Medicine Call Schedule, July of 2009, correct?

20       A    That's correct.

21       Q    Okay.  There are a couple of circles drawn on

22   this document.  Do you see those?

23       A    Yes.

24       Q    In pen it looks like.  Do you know who drew

305

1     those circles?  Was it you?

2          A     I don't recall.

3          Q     Okay.

4          A     I don't know if this is the one I turned into

5     Dr. Lee Tang or not.

6                There was a lot of writing on Dr. Lee Tang's,

7     the one I gave her, so I don't think this is mine.

8          Q     Okay.  And the concern that you brought up I

9     believe on -- for example, if you look at Wednesday,

10    the 1st, it lists you as the night float and there is

11    no intern, correct?

12         A     That's correct.

13         Q     So the intern is a first-year medical

14    resident?

15         A     That's correct.

16         Q     Okay.

17         A     Or an OB-GYN.

18         Q     But it's a first year --

19         A     Yes.

20         Q     -- fresh out of medical school?

21         A     That's correct.

22         Q     Okay.  In fact, July 1st being the first day

23    of the residency program, correct, for the intern?

24         A     I believe so.  I don't know exactly the first

306

1    day when they started.

2        Q    But they start in July?

3        A    Some might start in the end of June.  I don't

4    know the exact date.

5        Q    Okay.  So the concern with this document just

6    so I'm clear is the lack of interns being scheduled at

7    night, correct?

8        A    The lack of physicians being in the ICU at

9    night, yes.

10       Q    When you say "physicians" are you referring

11   to first-year residents or second-year residents or

12   third-year residents or someone else?

13       A    Well, particularly in this document there is

14   a lack of interns in the ICU.  In this document.

15       Q    This document doesn't refer to the scheduling

16   of critical care specialists, correct?

17       A    Well, there's no critical care specialist in

18   the hospital at night.

19       Q    Right.  But that was unique to this schedule,

20   correct?

21       A    No.

22       Q    That would have been ongoing?

23       A    That's correct.

24       Q    So the issue with this schedule was not

307

1    having an intern at night?

2        A    That's correct.

3        Q    Okay.  At night in the ICU when you were the

4    night float resident you had the ability to call in a

5    surgical team if necessary; is that correct?

6        A    Yes.

7        Q    Okay.  And you could reach the critical care

8    doctor by telephone; is that correct?

9        A    By page or telephone, yes.

10        Q    Okay.  And you could call Dr. Weiss, correct?

11        A    Dr. Weiss usually don't comment on ICU

12    patients because it's outside of his scope of practice.

13        Q    Okay. were there any other residents or any

14    other doctors that you had access to if you needed them

15    at night?

16        A    I don't know.  It's not written on this.

17        Q    I'm not asking you about the document.  I'm

18    sorry.  This is just in general.

19        A    I don't know.  I don't recall.

20        Q    Okay.  To your knowledge is Dr. Weiss still

21    employed at Mount Carmel?

22        A    I don't know.

23        Q    You have no reason to believe he's not?

24        A    I guess not.

308

1    Q    Have you ever had any training regarding the

2    standard of care for staffing in ICU?

3    A    No.

4    Q    Are you aware of any laws requiring the

5    hospital to have on-site critical care physicians 24

6    hours a day?

7    A    I don't know.  That's an administrative

8    thing.

9    Q    So you're not aware of any requirement that

10   there be a critical care doctor in the ICU at night?

11   A    Again, I don't know.  That's an

12   administrative thing.  I don't know what the laws are.

13   Q    Are you aware that in some ICUs there are no

14   doctors scheduled at night, only nurses?

15   A    Again, I'm not aware of that.  I don't know

16   what other hospitals practice in detail.

17   Q    Okay.

18   A    Maybe.  I don't know.

19        I do know OhioHealth has a critical care

20   doctor on staff.

21   Q    Have you ever worked in the ICU at St. Ann's

22   Hospital?

23   A    No.

24   Q    Do you have any personal knowledge of how

309

1    they staff St. Anns Hospital's ICU at night?

2        A    I heard from the ER doctor that there's a

3    night float system.

4        Q    Other than what you heard from other people

5    do you have any knowledge of it?

6        A    Again, I don't know the details.  I just know

7    based on what I was told when I worked in the ER.

8        Q    Have you ever worked at Mount Carmel East in

9    the ICU?

10       A    Not in the ICU, no.

11       Q    Do you have any personal knowledge about how

12   they staff the ICU at Mount Carmel East at night?

13       A    No, I do not.

14       Q    In the complaint you filed in this case you

15   attached a news article regarding a patient who died in

16   the ICU at Mount Carmel West from the H1N1 virus.  Do

17   you recall that?

18       A    Yes.

19       Q    Were you personally involved in treating that

20   patient?

21       A    No.

22       Q    That happened after you left Mount Carmel,

23   correct?

24       A    That's correct.

310

1    Q    So you have no knowledge of that person's

2  medical condition or history or what caused their

3  death, correct?

4    A    It was written in an article online.

5    Q    Other than what you read on the Internet you

6  have no knowledge of that person's history, correct?

7    A    At that time I don't know.

8    Q    You were not involved in treating that

9  patient, correct?

10   A    No, that's correct.  So I don't know exactly

11  what happened during that time in the hospital.

12   Q    Anything you know would be something you saw

13  in the news or heard from other people, correct?

14   A    That's correct.

15   Q    Your concerns about what the problems were in

16  the ICU with the staffing at night had to do with

17  patient safety, correct?

18   A    Yes.

19   Q    Did you believe that there were laws that

20  were being broken or was it a patient safety concern?

21   A    In terms of here?

22   Q    In terms of the petition and the lack of a

23  critical care specialist.

24   A    Yeah.  They wouldn't answer their phone

311

1    sometimes at night.  St. John wouldn't.

2        Q    Were you aware of any laws that were being

3    broken or any requirements that were not being met?

4        A    I don't know what all the laws are so I can't

5    comment on that.

6        Q    Okay.  So for you it was a patient safety

7    issue only?

8        A    Yes.

9        Q    Okay.  With respect to the hours violations

10   that we talked about, who sets the rules for what hours

11   residents can work?

12       A    ACGME.

13       Q    And by ACGME that's the -- I'm trying to get

14   this right -- Accreditation Council for Graduate

15   Medical Education?

16       A    I would assume so.

17       Q    Okay.  And so your belief was that the

18   hospital was violating ACGME'S rules, correct?

19       A    Yes.  And the program director also stated

20   that we can only work 80 hours a week averaged over

21   four weeks.

22       Q    Okay.  Were you concerned that there were any

23   laws that were being violated or was it an ACGME issue?

24       A    I don't know all the laws.  I told you that.

312

1     Q    So for you it was an ACGME issue?

2     A    ACGME and then patient safety concerns.

3     Q    Okay.  Were you aware of any Mount Carmel

4   policy regarding staffing in the ICU that you thought

5   was being violated by not having a critical care

6   specialist there?

7     A    I don't know their policy.  I have no idea

8   what their policy states.

9          MR. ARMSTRONG:  Okay.  Why don't we take

10   about five minutes and I'll see if I have anything

11   else.

12          MR. PATMON:  All right.

13          (A recess was taken.)

14          MR. ARMSTRONG:  All right.  Let's go back on

15   the record.

16     Q    Dr. Nayyar, we talked about software that you

17   used to log your work hours.  You mentioned GME-1?

18     A    It's either eightyhours.com or GME-1.  I

19   can't recall.

20     Q    Do you recall a program called New

21   Innovations?

22     A    I do not recall.

23     Q    When you would log into these programs and

24   enter your hours, did you have like an individual

313

1    log-in that you had to use with a password?

2         A    Yes.

3         Q    Okay.  Did you ever share that password with

4    anybody else?

5         A    No.

6         Q    Okay.  When you say that you were locked out

7    of the program, how did you get your hours submitted at

8    that point?

9         A    I had a hard time so I went to the secretary

10   and I said I can't log in, and they were trying to

11   figure out what happened.  And then Lori Hall was

12   trying.

13              And I did mention it to Dr. Weiss, too, I was

14   unable to log it in, and he said that they were logging

15   in my hours.

16        Q    So did you submit your hours to someone for

17   them to log in?

18        A    They never asked for them.  That's why I was

19   shocked.  And they said, "We'll take care of your

20   hours."

21        Q    And when did that happen?

22        A    In December.

23        Q    December of?

24        A    I don't know the year.  It was when I was in

314

1   the ICU, so it had to be either my intern year -- it

2   was my intern year.

3       Q    Okay.  And were you sort of unable to access

4   the system for just that month?

5       A    No.  I couldn't log it in for the entire the

6   rest of my career.

7       Q    So you never submitted any more hours after

8   that?

9       A    I could not.

10          There was another program that was new, but I

11  don't recall if I ever did or if someone else did for

12  me.

13      Q    Okay.

14      A    Because they could not retrieve it.  They

15  said I'm wiped out of the system.  I'm not even a

16  resident.

17      Q    And you have no knowledge of how that

18  happened or why?

19      A    I would assume it was because I went over the

20  time, because right after I complained I automatically

21  was wiped out and I couldn't log in my hours.

22      Q    That's just an assumption on your part.  You

23  have no evidence to support that conclusion; is that

24  correct?

315

1     A   No, I don't have evidence.  Just look at the

2  time frame.

3     Q   Other than the timing that's just an

4  assumption, correct?

5     A   Well, I mean, I reported it before, violation

6  of hours, and so this time it's just -- yeah, I would

7  assume it's an assumption.

8         But, I mean, that's the only way -- the only

9  thing I could figure out because I don't recall any

10  other resident having the same problem.

11     Q   So that happened in the internal medicine

12  program, right?

13     A   Yes.  The specific event, yes.

14     Q   So you mentioned that there was a new program

15  at some point.  Did you have access to that program?

16     A   I do not recall the details of it.  I don't

17  even remember if I ever logged in my hours or not.  I

18  can't recall.

19     Q   Is there a requirement that you log in your

20  hours?

21     A   Yes.

22     Q   And you didn't do that?

23     A   No, not during that time because I didn't

24  have access.

316

```
1        Q    Even when there was a new program you didn't
2  log in your hours?
3        A    I don't know if I did or not.  I can't
4  recall.
5        Q    So you may have, you just can't recall?
6        A    I just can't recall.
7        Q    Okay.  Do you know what jeopardy call means?
8        A    You'd have to define it.
9             MR. PATMON:  It's not the game show, is it?
10 I couldn't resist a joke.
11            MR. ARMSTRONG:  Yeah.  And I'm going to need
12 you to answer in the form of a question.
13       Q    My understanding is that jeopardy call is
14 where there's a PGY-2 or 3 resident who is available to
15 be called into the ICU if needed at night.  Does that
16 ring a bell?
17       A    I remember on the main hospital but not in
18 the ICU.  I don't recall.
19       Q    You don't recall?
20       A    I don't know if it's for that and it's not on
21 here, so --
22       Q    Right.  You just don't recall?
23       A    I just don't recall.
24       Q    Do you recall that there was an attending
```

317

1    anesthesiologist available if you needed assistance

2    with anesthesiology?

3        A    With intubation?

4        Q    Yes.

5        A    Yes.

6        Q    Okay.  Do you recall that there was an

7    in-house trauma surgeon, board certified, available if

8    necessary to be called into the ICU at night?

9        A    I don't know all the rules and regulations if

10   that's allowed.  That's something that's not brought up

11   to us.

12       Q    So you were not aware there was an in-house

13   trauma surgeon available to be called into the ICU if

14   necessary?

15       A    For medicine issues, for internal medicine

16   issues, or trauma like beyond medicine?

17       Q    If there was a need for any kind of surgical

18   intervention, for example placing an A-line?

19       A    Yes, I know there's residents in the

20   hospital.

21       Q    Okay.  Were you aware there was a board

22   certified trauma surgeon as well?

23       A    I don't know.

24       Q    You don't know?

318

1      A    I don't know.  If I remember correctly,

2    possibly yes.

3      Q    Okay.  When you complained about hours

4    violations in the family medicine program, did you ever

5    submit a complaint in writing or was it just oral?

6      A    I think I had to write a documented report

7    when someone from Riverside reported resident abuse.

8      Q    You think or you know?

9      A    I know now because that's what came out of

10    the meeting.

11         A secretary from family medicine at Riverside

12    Hospital called or made a phone call about resident

13    abuse at Mount Carmel.

14     Q    And then how did you come to submit something

15    in writing?

16     A    They told me to.

17     Q    Who's "they"?

18     A    The program director.

19     Q    Of the family medicine program?

20     A    Yes.

21     Q    Okay.

22     A    If I remember correctly.

23     Q    So when that hours issue was reported to

24    Mount Carmel, did that report originate with you or did

319

1    it originate with the secretary at Riverside who

2    contacted Mount Carmel?

3        A    I reported it prior to going onto that

4    rotation weeks prior, to the program director,

5    associate program director, the other staff members,

6    the residents, the chief residents, as well as the

7    other residents in the family medicine program.  Then I

8    went beyond that to the secretary of general surgery

9    and as well as the chief residents.  The family

10   medicine chief talked to the chief resident of general

11   surgery.

12       Q    And what was your report?

13       A    The outcome of it?

14       Q    No.  What was your complaint to those folks?

15       A    That I'm going to go over 80 hours, and I

16   will also violate, if I remember correctly -- well, no,

17   I think it was over 80 hours.

18       Q    Okay.  So by that point you hadn't started

19   the rotation yet?

20       A    That's correct.

21       Q    And then my understanding if I'm correct, and

22   correct me if I'm wrong, is that a secretary from

23   Riverside contacted somebody at Mount Carmel about an

24   issue, and then Mount Carmel asked you to submit

320

```
 1   something in writing based on what the secretary had

 2   said?

 3        A    I don't know the details of what the

 4   secretary told them.  That's what I had mentioned

 5   before.

 6        Q    Is that the sequence of events?

 7        A    In detail in terms of me writing something

 8   up?

 9        Q    Yes.

10        A    Yes.

11        Q    Okay.  And do you recall what you put in

12   writing?

13        A    I mean, they just said explain everything,

14   and I did about the meetings and everything.  And I

15   don't have the details down about when things were

16   written.  I don't have the timeline.  I don't know it

17   off the top of my head.

18        Q    Okay.

19        A    But it was mainly about the meetings we've

20   had and then to write something about it.

21        Q    Okay.  With respect to the hours issue that

22   you raised in the internal medicine residency program,

23   did you ever submit anything in writing regarding that?

24        A    No.  I mentioned that before.
```

321

1       Q    Those are just oral complaints?

2       A    Yes.

3       Q    And just to be clear, with respect to issues

4    regarding patient safety in the ICU, other than the

5    petition was there anything that you submitted in

6    writing regarding that issue?

7       A    I do not recall anything else.

8            MR. PATMON:  Objection.

9       Q    Dr. Weiss made the decision to terminate your

10   position in the residency program; isn't that correct?

11      A    I don't know what part of the administrative

12   process, who was involved.

13      Q    So you have no evidence or reason to believe

14   that it was someone other than Dr. Weiss, correct?

15      A    Again, I don't know.

16      Q    You just don't know?

17      A    I don't know.

18      Q    Okay.  Thirteen other residents signed the

19   petition regarding patient safety in the ICU?

20      A    Sixteen.

21      Q    There were 16.  We can count them.  Let's

22   see.

23           MR. PATMON:  Just take his word for it

24   because I know what your next question is going to be.

322

```
1        Q     Sixteen other residents signed the petition,
2   correct?
3        A     I think so, yes.
4        Q     Okay.  And --
5        A     I think there was some verbal communication.
6        Q     And some were signed by verbal order?
7        A     Right.
8        Q     Out of all of those you were the only one who
9   was terminated; is that correct, to your knowledge?
10       A     Yes.  I mean, I don't know who else was
11  terminated besides Jonathan Borders.
12       Q     After the petition was submitted in January,
13  Mount Carmel renewed your residency contract for the
14  third year; is that correct?
15       A     Yes.
16             MR. ARMSTRONG:  That's all I have.
17             MR. PATMON:  Take a quick break.
18             (A recess was taken.)
19             MR. PATMON:  We can go back on.
20                        - - -
21                   REDIRECT EXAMINATION
22  BY MR. PATMON:
23       Q     Dr. Nayyar, I have a few questions for you.
24             Can you grab Exhibit 7.
```

323

1    A    Yes.

2    Q    Now, Exhibit 7 contains an email from Lisa

3  Cottrell to a Debra Price about the July 7th incident

4  involving an A-line, correct?

5    A    Yeah, that's correct.

6    Q    And it says here in the second full sentence

7  I think it is, "Sunil Nayyar, M.D. was the resident

8  night float physician and had approximately three

9  attempts to place the arterial line in the patient's

10  right radial artery without success."

11        Do you see that?

12    A    Yes.

13    Q    Is that statement accurate?

14    A    No.

15    Q    What is meant by right radial artery?

16    A    Right arm.

17    Q    And when you were performing this procedure,

18  what is your recollection as to where the A-line was

19  placed?

20    A    If I remember correctly it was in the left

21  radial artery.

22    Q    And where would that be reflected?

23    A    I would document it in the chart of the

24  patient that I placed an A-line in, as well as it

324

1   should be documented in Mount Carmel's system, if I

2   remember correctly.

3       Q    So Mount Carmel would have in its possession

4   the notes that would reflect that it was the left arm

5   not the right, correct?

6       A    That's correct.

7       Q    And their computer system would contain

8   information showing it was the left arm not the right?

9       A    Possibly, yes.

10      Q    Okay.  Pull out Exhibit 10.

11           I must have the wrong one.  11.  I wrote the

12   wrong number.

13           11.  It's the media article that says,

14   "Doctor Accuses Hospital in Firing."

15           Do you see that?

16      A    Yes.

17      Q    You were asked a series of questions about

18   Page 2 of that document?

19      A    Yes.

20      Q    And I want to ask you a few questions.

21           You see there where it says, "Dr. Nayyar was

22   dismissed from his medical residency program following

23   a thorough investigation into a patient care safety

24   issue for which he was reasonable," said the spokesman.

325

1          Do you see that?

2     A    Yes.

3     Q    Did you ever tell the ONN reporter that you

4  were being investigated for an A-line?

5     A    No, I did not.

6     Q    Okay.  Did you ever tell the ONN reporter

7  that a patient's safety was endangered due to an A-line

8  procedure?

9     A    No, I did not.

10     Q    You can put that away.  If you could pull out

11  Exhibit 12.

12          You were asked a series of questions about

13  Exhibit 12.  What is Exhibit 12?

14     A    The schedule for July in ICU.

15     Q    2009?

16     A    That's correct.

17     Q    Okay.  Now, correct me if I'm missing your

18  prior testimony, but it's my understanding that you say

19  you provided a schedule like this to Dr. Lee Tang,

20  correct?

21     A    That's correct.

22     Q    And that schedule that you provided to

23  Dr. Lee Tang had writing on it, correct?

24     A    That's correct.

326

1     Q   What was the writing on that schedule that

2  you can recall?

3     A   It was highlighting days where all the

4  residents were by themselves in ICU at night flow and

5  on the weekend without another intern on-board, and it

6  also had information of how the schedule worked, and

7  then Dr. Lee Tang was also making notes on it as well.

8     Q   Okay.  And can you recall any detail right

9  now as you sit here about the notes that Dr. Lee Tang

10  made and that you made?

11     A   She was writing down stuff how the schedule

12  worked, how the night flow worked, and how I think I

13  talked to Dr. Weiss about it prior to coming to her

14  office and I mentioned that to her.

15     Q   And when you brought this schedule with your

16  writing on it to Dr. Lee Tang, why were you bringing

17  that to her?

18     A   Because patient safety was at risk and what

19  Dr. Weiss told me.

20     Q   What specifically did you tell her?  What was

21  your protest to her about patient safety?

22     A   I said Dr. Weiss told me -- when I brought

23  this schedule to Dr. Weiss, I said, "Patients will

24  die," and he said, "More to prove my point we don't

327

```
 1    belong in ICU."  And I went into detail about it, that

 2    there's extra residents on the internal medicine clinic

 3    that can be placed in the ICU.

 4              I talked to him about Deton (phonetic.)  Why

 5    are you doing this, someone who fought for patient

 6    safety.  Why are you making it more dangerous than what

 7    it is, and that it is above my care and I know I won't

 8    be able to perform.  And he didn't say anything, so I

 9    told him I'm going to report it to Dr. Lee Tang, and I

10    went straight in to Dr. Lee Tang.

11        Q    And you repeated this to Dr. Lee Tang?

12        A    Yes.

13        Q    During the meeting with Dr. Weiss you

14    presented this schedule, a schedule like this to him,

15    right?

16        A    That's correct.

17        Q    When you talked to Dr. Weiss is this the same

18    schedule that had writing on it?

19        A    No.

20        Q    Okay.  I'm not talking about the one in front

21    of me.  What I'm trying to establish here is that when

22    you talked -- you talked to Dr. Weiss and then you

23    talked Dr. Lee Tang, and you had his schedule in your

24    hand?
```

328

1       A    That's correct.

2       Q    Now, you told us today about a schedule that

3   had writing on it that you presented to Dr. Lee Tang?

4       A    That's correct.

5       Q    Did you also present that same schedule with

6   the writing on it to Dr. Weiss?

7       A    I highlighted the areas where the residents

8   were absent of another intern at night, and then I

9   added additional information to it before I saw Dr. Lee

10  Tang.

11      Q    Okay.  Now, you were asked a series of

12  questions about the contract that you received I

13  believe it was for your third-year residency?

14      A    That's correct.

15      Q    The two meetings that you told us about

16  today, that is, the meeting with Dr. Weiss and the

17  meeting with Dr. Lee Tang in which you were protesting

18  the scheduling, did you have these meetings after the

19  contract was given to you?

20      A    Yes, soon after.

21      Q    Okay.  All right.  You can put that aside.

22           Now, you were asked a series of questions

23  about some scores you received, and I think they were

24  called in-service scores?

329

```
 1      A    In-training.

 2      Q    In-training scores.

 3      A    Correct.

 4      Q    Now, have you provided to any residency

 5 program in which you were seeking employment the

 6 in-residency scores?

 7      A    No.

 8      Q    Have any of those programs asked for those

 9 scores?

10      A    I do not recall.

11      Q    Do you know if Mount Carmel has provided

12 those scores to any program that you were seeking

13 employment with?

14      A    I do not recall.

15      Q    Did any program ask you to acquire or request

16 those scores from Mount Carmel?

17      A    I do not recall.  I don't know what the last

18 program that they wanted my transcript, I don't know

19 the details.

20      Q    Your transcripts would include those scores,

21 right?

22      A    Possibly, yes.

23      Q    Possibly, right.

24           How many programs have asked for your
```

330

1    transcript?

2        A    I think this was the only one.  I'm not sure

3    if any others did.

4        Q    If you had to state a percentage with the

5    programs that you applied to who granted you an

6    interview, what percentage would you say that the total

7    number of programs that you applied?

8        A    There was only one.

9        Q    One out of?

10       A    I don't know the exact numbers about the

11   numbers that I applied to, but there was an extensive

12   number of schools that I applied to.

13       Q    And you only got one interview?

14       A    That's correct.

15       Q    Okay.  So you never got a chance to submit a

16   transcript or submit any information in support of your

17   application, correct?

18       A    That's correct.

19       Q    Did those programs state why they would not

20   conduct an interview with you?

21       A    No, they did not.

22       Q    Did they tell you they had some information

23   from Mount Carmel that indicated that they did not wish

24   to interview you?

331

1        A    No, they did not.

2        Q    Okay.

3        A    Besides the last program stating that they

4    would not release my documents.  They did not release

5    my documents.

6        Q    You were asked a series of questions about

7    Dr. Borders, correct?

8        A    That's correct.

9        Q    Was Dr. Borders fired after you filed this

10   lawsuit?

11       A    Yes.

12       Q    Was he fired after you asserted in this

13   lawsuit that he had been treated more favorably than

14   you?

15       A    Yes.

16       Q    Do you know of any incidents involving

17   Dr. Borders being intoxicated while on the job at Mount

18   Carmel?

19       A    Yes.

20       Q    Can you tell me about that incident.

21       A    This is per Dr. Borders, that he was -- he

22   came in the hospital intoxicated, and the nurse

23   complained about that.

24       Q    Okay.  Did Dr. Borders -- or did you ever

332

1    observe any disciplinary action by Mount Carmel

2    regarding Dr. Borders' intoxication?

3         A    No, I did not.

4         Q    Can you recall any time periods in which

5    Dr. Borders had any long-term absences from the job due

6    to discipline or remedial steps taken by Mount Carmel?

7         A    I do not recall.

8         Q    You were asked a series of questions about

9    double billing and upcoding?

10        A    That's correct.

11        Q    Okay.  And you indicated this happened in the

12   medicine clinic?

13        A    That's correct.

14        Q    Where is the medicine clinic located?

15        A    Mount Carmel West.

16        Q    Is it a part of Mount Carmel West Hospital?

17        A    Yes.

18        Q    Is it managed and supervised by Mount Carmel

19   staff?

20        A    Yes, I believe so.

21        Q    Okay.  Now, specifically as to the issue of

22   upcoding -- I don't want to talk about double billing.

23   What is upcoding?

24        A    When you're billing for a procedure and/or

333

1    service that you have not done.

2        Q    Okay.  Why is it you believe that

3    Dr. Tamaskar has engaged in upcoding?

4            MR. ARMSTRONG:  Objection.  That's pure

5    speculation.

6            MR. PATMON:  Duly noted.

7        A    I witnessed it.

8            After I saw the patient, I wrote my note, I

9    would discuss it with Dr. Tamaskar in a separate room

10   and while I'm discussing it he is writing his note.

11   And I usually see what they write just so I can learn

12   if I'm doing anything right or wrong, and he would

13   constantly write, you would see him write, Patient seen

14   and examined with Dr. Nayyar and agree with his

15   assessment and plan.  We will do this, this, this and

16   follow-up a period of time.  And then I would see him

17   code.

18       Q    Now, when he coded that he had to enter a

19   date and a time, correct, that he performed the

20   examination?

21       A    Yes.

22       Q    Right.  And that date and time overlapped the

23   date and time that you had written regarding the

24   patient, correct?

334

1       A    I believe so, yes.

2            MR. ARMSTRONG:  Bill, I'm going to object to

3    the form of these leading questions.  Can you ask him

4    questions that aren't leading, please.

5    BY MR. PATMON:

6       Q    And this is why you know -- Well, let me back

7    up with this caveat.

8            So Dr. Tamaskar's notes would be

9    reflecting --

10           MR. ARMSTRONG:  The same objection.

11      Q    -- work that he performed simultaneously with

12   you, correct?

13      A    That's correct.

14           MR. ARMSTRONG:  We can't continue with you

15   testifying and having him say yes and no.

16           MR. PATMON:  I'm trying to do the best I can.

17           MR. ARMSTRONG:  I understand, but you need to

18   ask him open-ended questions that aren't leading.

19   BY MR. PATMON:

20      Q    Let me back up here so we can clean this up

21   here.  Did Dr. Tamaskar's notes and his coding overlap

22   with services performed by you on a patient?

23      A    Yes.

24      Q    Okay.  And was Dr. Tamaskar present -- let me

335

1   back up.

2             With respect to the notes that he wrote down

3   was Dr. Tamaskar present at the time the -- let me back

4   this up.

5             With respect to the notes that he and the

6   coding that he inserted that that will reflect services

7   provided by him.  Do you understand that?

8        A    Uh-huh.

9        Q    Was Dr. Tamaskar or did Dr. Tamaskar actually

10  perform those services at the time as stated by him in

11  the record?

12       A    No.

13       Q    Okay.  Is it your belief that Dr. Tamaskar's

14  coding and statements are false?

15       A    Yes.

16       Q    Okay.  Do you believe it is fraud?

17       A    Yes.

18       Q    Okay.  The procedure by which Dr. Tamaskar

19  coded and wrote his notes, okay, you told us about

20  instances in which you believe that was fraudulent,

21  correct?

22       A    Correct.

23       Q    Looking at the totality of all of the

24  instances in which he coded and wrote notes concerning

336

1    patients that you and him and saw, do you understand

2    what I'm saying?

3         A    Uh-huh.

4         Q    Did the procedure by which you processed and

5    code and submit that information for payment did it

6    differ in the situations in which you thought he

7    engaged in fraud vis-a-vis the situations which you

8    thought he did not engage in fraud?

9         A    You're going to have to restate that.

10        Q    What I'm trying to find out is, was the

11   procedure the same?  In other words, coding and

12   submission of the information for payment did it differ

13   in the situation in which you alleged he engaged in

14   fraud?

15        A    Yeah.

16        Q    Okay.  Now, I'm not talking about the

17   procedure.  I'm talking -- let's go back.

18             Once he put his information down in the

19   record and he coded it, what happened with that

20   information next?

21        A    Once we finish the charting and he codes it

22   we give it to the nurse.

23        Q    Okay.  In every instance in which you worked

24   with him on a patient is that what he did in every

337

1     instance?

2          A     Sometimes he would see patients with me, but

3     of course I would go in with him because it's a

4     teaching environment.

5          Q     I'm asking a question about the process by

6     which when you guys are done and it's given to a nurse,

7     the processing.  Was that the process that was taken,

8     whether he saw the patient with you or he didn't see

9     the patient with you?

10         A     That's correct.

11         Q     Did it differ in any instance?

12         A     Not that I'm aware of, no.

13         Q     Okay.

14         A     Once I'm done with the chart and he's done

15    writing his notes, he gives me the chart.  I then

16    finish up writing the scripts and whatnot, and then I'm

17    done with the chart and I give it to the nurse.

18         Q     You give it to the nurse?

19         A     That's correct, I give it to the nurse.

20         Q     And who told you, you had to give it to the

21    nurse?

22         A     No one tells us.  Once we're done with

23    checking out with the physician, staff physician, if

24    there's any mistakes we would correct it.

338

1          So we finish the rest of our note or write

2     the scripts, the prescriptions that the patient needs,

3     and then when we're done we turn everything in,

4     including the code sheets and everything else.

5          Q     Okay.  Upcoding at Mount Carmel Hospital was

6     this a systemic problem?

7                MR. ARMSTRONG:  Objection.

8          A     I believe so.

9          Q     Why do you believe it was a systemic problem?

10         A     Because I have witnessed it, my previous

11    program director talking about how he made -- how he

12    saw the same amount of patients as his partner did but

13    made $30,000 more, and he said it's all about how you

14    document and how you code.

15         Q     Let's turn back to this coding.  With respect

16    to coding is there just one code that you use to say

17    that you seen a patient or are there specific codes

18    that are used for specific procedures?

19         A     Specific codes.

20         Q     Okay.  With respect to the instances in which

21    you observed Dr. Tamaskar engaged in fraud --

22                MR. ARMSTRONG:  Objection.

23                MR. PATMON:  Duly noted.

24         Q     -- engaged in upcoding, did he insert the

339

1    specific task codes?

2       A    He circled the codes himself, so that's all I

3    witnessed.

4       Q    Did he write any notes that would establish

5    that those codes were in fact performed?

6       A    All he would write is what he would state

7    underneath my document, which is patient seen with

8    Dr. Nayyar and examined, agree with the assessment and

9    plan, and he would write what he did.

10      Q    Would he write specifically the specific task

11    he did or would he simply say patient examined and

12    circle the code?

13      A    "Patient examined" and circle the code.

14      Q    Right.  But there would be no corresponding

15    note actually that would correspond to a specific code

16    and task that he performed; isn't that correct?

17      A    That's correct.

18      Q    And so if Mount Carmel were processing that

19    information to Medicaid or Medicare, someone in their

20    billing office would have to use what you specifically

21    did as it relates to a task to specifically code and

22    therefore receive payment; isn't that correct?

23      A    That's correct.

24          MR. ARMSTRONG:  Objection.  Leading and

340

1    speculation.

2        Q    What did you say, sir?

3        A    That's correct.

4        Q    Thank you.

5             Now, you were asked earlier by Mr. Armstrong

6    whether or not you had any reason to believe that the

7    patient safety issues in the ICU violated any laws?

8        A    That's correct.

9        Q    I think you stated you're not a lawyer,

10   right?

11       A    That's correct.

12       Q    With the understanding you're not a lawyer do

13   you believe based on patient safety issues that you're

14   aware of that the activities that were occurring in the

15   ICU that you protested constituted criminal activity?

16       A    In my opinion, yes.

17            MR. ARMSTRONG:  Objection.  That's completely

18   contradictory to his prior testimony.  He's just

19   perjured himself.

20            MR. PATMON:  No, he has not.

21            MR. ARMSTRONG:  That's completely

22   contradictory to his prior testimony.

23            MR. PATMON:  You asked for a law and he said

24   he doesn't know a law.  He still doesn't know a law but

341

```
1    he believes it's criminal.

2              MR. ARMSTRONG:  I asked him if it was against

3    the law and he said no.

4         A    I don't know any laws.

5              MR. PATMON:  We can understand that.  And

6    he's not a lawyer so I'm asking just for his belief.

7         Q    Do you believe it was wrong?

8         A    Yes.

9         Q    Do you believe it was criminal?

10        A    In my opinion, yes.

11        Q    Why do you believe it's criminal?

12        A    Because ultimately a patient can die.

13             I witnessed a man telling me he's increasing

14   patient safety, putting people at risk, and I reported

15   it.

16             So I believe that if you put a patient at

17   risk, that is criminal, and if they ultimately die,

18   that is criminal.

19        Q    So you believe that intentionally putting a

20   patient at risk is criminal?

21        A    Yes.

22        Q    And you believe it's a violation of some law,

23   right?

24        A    Yeah.
```

342

```
 1        Q    You just don't know which one?

 2        A    I just don't know which laws.  I'm not a

 3   lawyer.

 4        Q    Now, you're aware that The State Medical

 5   Board in the state of Ohio governs the practice --

 6             MR. ARMSTRONG:  I have to object to the form

 7   of this question.

 8             MR. PATMON:  Okay.  That's fine.

 9             MR. ARMSTRONG:  I don't want to have to call

10   Judge Marbley and talk about leading questions, but

11   this can't continue.

12             MR. PATMON:  No, you're right.

13             MR. ARMSTRONG:  So please stop.

14             MR. PATMON:  I'm just trying to get us out of

15   here pretty fast.

16             MR. ARMSTRONG:  I'm here all day, and you're

17   the one with the time concern, but --

18             MR. PATMON:  Well, no.  I let you go over

19   because I just found out that your deposition time only

20   is in excess of seven hours.  So when I finish mine,

21   you're done.

22             MR. ARMSTRONG:  We'll revisit that issue at

23   the time.

24             MR. PATMON:  We're going to revisit it
```

343

1    because I gave you a lot of room.  I gave you a lot of

2    room.

3            MR. ARMSTRONG:  And I'm willing to give

4    plenty of room on time but not on leading questions.

5    BY MR. PATMON:

6        Q    Who governs the practice of medicine in the

7    state of Ohio?

8        A    I would assume it's the Medical Board.

9        Q    What is the State Medical Board?

10       A    It's the governing body in Ohio.  Every state

11   has their own governing body.

12       Q    Okay.  Does the State Medical Board proscribe

13   rules and regulations for the practice of medicine in

14   Ohio?

15       A    I would assume so but I'm not sure.

16       Q    Okay.  Do you believe that it proscribes

17   rules and regulations that would govern resident

18   physicians?

19       A    I'm not sure.  I believe so.

20       Q    Okay.  Do you believe, because I know you're

21   not a lawyer, that what was going on in the ICU

22   violated state rules or state medical rules and

23   regulations concerning the practice of medicine in the

24   state of Ohio?

344

1    A    I don't know the exact rules and regulations.
2  I'm going based on it sounds like it's criminal when
3  someone tells you.  It's more of a common sense rule.
4         When you're saying someone's at risk, I have
5  the duty to report it to state my concern.
6    Q    All right.  You have Exhibit 10 in front of
7  you.  I know you got the right one this time.  Do you
8  see where it says Exhibit 10?
9    A    Uh-huh.
10   Q    Now, at the top it says Program Education
11 Committee, right?
12   A    That's correct.
13   Q    You were asked whether you received this,
14 correct?
15   A    That's correct.
16   Q    Now, do you believe that you would have
17 received this during the committee's hearings?
18   A    Can you repeat that again.
19   Q    Do you believe that you would have received
20 this document at sometime during the determination
21 process?
22   A    I would assume so, yes.
23   Q    Do you see there where it says, "Dr. Weiss
24 presented evidence to support the decision of dismissal

345

```
 1   citing past and recent events, poor professional
 2   conduct as outline by the ACGME core competencies."
 3           Do you see that?
 4      A   Yes.
 5      Q   Did anyone ever make you aware as to what
 6   past events they're talking about in Exhibit 10?
 7      A   No.
 8      Q   Were you allowed to access any documents
 9   regarding past events?
10      A   No.
11      Q   Were you able to access any documents
12   regarding recent events?
13      A   No.
14      Q   Now, I want you to get Exhibit 6 in your hand
15   and I want you to turn to Page 11.
16           Now, do you see there where it says, "The
17   responsibility of this administrative review committee
18   is to ensure that the grievance process in place has
19   been consistent with GME policies and due process has
20   been honored."
21           Do you see that?
22      A   Yes.
23      Q   Okay.  Now, were you given an opportunity to
24   access any documents to determine if GME policies have
```

346

1    been followed?

2         A    No.

3         Q    Were you given access to any documents to

4    determine if the termination was consistent with GME

5    policies?

6         A    No.

7         Q    Were you given access to any documents at any

8    time to determine that due process had been honored?

9         A    No.

10        Q    Okay.  You filed an appeal of the program

11   education's decision, right?

12        A    That's correct.

13        Q    And it went to the --

14             MR. ARMSTRONG:  Objection.

15             MR. PATMON:  Okay.  Is it leading?

16             MR. ARMSTRONG:  Yes.

17             MR. PATMON:  I'm trying to be efficient.

18   I'll back up.

19        Q    Did you file an appeal with the Program

20   Education Committee's decision?

21        A    Yes.

22        Q    Okay.  Now, I want you to review Page 11.

23   Okay.  Where does that appeal go to?  After you have

24   reviewed Page 11.

347

1      A    The director of medical education.

2      Q    Okay.  What is your understanding of the

3  process set forth on Page 11?

4      A    It says, "The director of medical education

5  shall form an Administrative Review Committee

6  consisting of the director of medical education, his

7  and her designee, and two program directors from other

8  residency programs."

9      Q    Did you have access to any documents at any

10  time to support your appeal to the Administrative

11  Review Committee?

12      A    No.

13           MR. PATMON:  That's all I have.

14           MR. ARMSTRONG:  Okay. I just have a few

15  follow-up questions.

16                    - - -

17              RECROSS-EXAMINATION

18  BY MR. ARMSTRONG:

19      Q    Dr. Nayyar, when you've referring to the left

20  and right radial arteries are those references to the

21  patient's left hand or right hand or as you're facing

22  the patient?

23      A    No, their left or right hand.

24      Q    As the patient would have perceived it; is

348

1    that correct?

2        A    No.  It's the patient's radial artery in

3    their left hand and the right radial artery in the

4    right hand.  So the left radial artery means the left

5    hand.

6        Q    The patient's left hand?

7        A    That's correct.

8        Q    You say that you gave Dr. Lee Tang a schedule

9    that had writing on it?

10       A    That's correct.

11       Q    How was that writing rendered?  Was it in

12   pen, pencil, highlighter?  What was it?

13       A    I did highlighter, and I did write in pen.

14       Q    Okay.  Did you read any of the notes that

15   Dr. Tang wrote on the document?

16       A    I could see some of it because I sat in her

17   office for about, I don't know, 30, 45 minutes sitting

18   down at a table and discussing it and she was

19   documenting stuff.

20       Q    Can you tell us what you read that she wrote

21   on the paper?

22       A    Mainly explaining the entire process of the

23   schedule and how it works, my concerns, what Dr.

24   Weiss -- our conversation between Dr. Weiss and I.  But

349

1  I can't --

2      Q    You read all of that on the paper?

3      A    I didn't read everything she wrote because I

4  was explaining everything and she was taking notes down

5  as I was explaining.

6      Q    All of the things that you just mentioned

7  were things that you actually read on the paper?

8      A    I can't go into detail because I don't know

9  exactly everything she wrote.

10     Q    Right.

11     A    What I did know is she was taking notes of

12 how the process worked, how the schedule worked when I

13 was explaining it to her.

14     Q    I understand that she was making notes while

15 you were discussing those topics.

16     A    Right.

17     Q    My question is, what did you actually read on

18 the paper?

19     A    I mean, I couldn't read in detail everything,

20 but I did read stuff, stuff like about my concern with

21 Dr. Weiss and how I approached Dr. Weiss and everything

22 like that.

23     Q    Okay.  Do you have any evidence that

24 Dr. Weiss knew that Dr. Borders had come to work

350

1    intoxicated?

2        A    Do I have any evidence of that?

3        Q    Right.

4        A    Besides what Dr. Borders told me.

5        Q    Other than that do you have any evidence of

6    that?

7        A    I don't have urine tests.  I don't know how

8    it works.

9        Q    Okay.  So Dr. Borders told you that he came

10   to work intoxicated, correct?

11       A    He told me what he was terminated for.

12       Q    What was that?

13       A    Well, he mentioned that -- well, he showed me

14   his termination letter.  And, again, I don't recall

15   everything in detail.

16       Q    Okay.  What do you recall about what he told

17   you?

18       A    How they said that some nurse reported him

19   being intoxicated on-call, but he continued to work at

20   night despite being intoxicated.  And I can't go into

21   detail beyond that because I don't recall.

22       Q    And was he saying that that was why he was

23   terminated?

24       A    I don't recall the details.

351

1        Q    So it may have been you just don't know?

2        A    No.  I just don't know the entire details of

3    it.  I read his termination letter but I don't recall

4    everything.

5        Q    Okay.  With respect to the paperwork you saw

6    Dr. Tamaskar filling out, you said that he would give

7    it to you and then you would give it to the nurse; is

8    that right?

9        A    That's correct.

10        Q    Do you know what the nurse did with it after

11    that?

12        A    She processed everything.

13        Q    Do you know what she did with it?

14        A    It's in the chart.  I don't know the exact

15    details.

16        Q    So you don't know what the nurse did with it

17    after you handed it to her?

18        A    She processed the chart.  You give everything

19    to her, the coding sheet, the chart, everything.  She

20    gets the script out, she might read the notes and she

21    gives it to the patient and they go.

22        Q    Okay.  Do you know what she does with it

23    after that?

24        A    No, I don't.

352

1     Q   So you never actually saw any fraudulent

2  information being submitted to the government; is that

3  correct?

4     A   I never saw?

5     Q   Right.  You never saw him --

6     A   I saw him document it.

7     Q   So you don't know what happened with it after

8  that, correct?

9     A   I don't know what happened after you guys --

10  what the process of billing is.  I don't know.

11         MR. PATMON:  You're over your time on

12  deposition.  I will give you leeway of another minute.

13         MR. ARMSTRONG:  We're done.

14         MR. PATMON:  You're done?

15         MR. ARMSTRONG:  Yeah.

16         MR. PATMON:  Okay.  You know I've been

17  gracious to you.  I tried to be nice.  I owed you one.

18  I paid you back.

19                 - - -

20           FURTHER DIRECT EXAMINATION

21  BY MR. PATMON:

22     Q   I have one question for you.

23         Prior to the A-line investigation were you

24  disciplined by Dr. Weiss?

353

```
1       A    Never.

2       Q    Were you written up by Dr. Weiss?

3       A    Never.

4            MR. PATMON:  That's all I have.

5            MR. ARMSTRONG:  That's fine.

6            Do you want to tell him about his signature?

7            MR. PATMON:  Yeah.

8            You've got a right to review it.  I think you

9    should exercise that right.  And we're done.

10                       - - -

11           Thereupon, at 1:50 p.m. on Wednesday,

12   August 17, 2011, the deposition was concluded.

13                       - - -

14

15

16

17

18

19

20

21

22

23

24
```

354

1                          CERTIFICATE

2    STATE OF OHIO          :
                                        SS:
3    COUNTY OF FRANKLIN     :

4

5              I, SUNIL NAYYAR, M.D., do hereby certify that

6    I have read the continued deposition given on

7    August 17, 2011, that together with the correction page

8    attached hereto noting changes in form or substance, if

9    any, it is true and correct.

10

                 _____
11                          SUNIL NAYYAR, M.D.

12             I do hereby certify that the foregoing

13   deposition of SUNIL NAYYAR, M.D. was submitted to the

14   witness for reading and signing; that after he had

15   stated to the undersigned Notary Public that he had

16   read and examined his continued deposition, he signed

17   the same in my presence on the _____ day of

18   _____, 2010.

19

20

                 _____
21                          NOTARY PUBLIC - STATE OF OHIO
22   My Commission Expires:

23   _____, _____.

24

355

1                          CERTIFICATE

2

    STATE OF OHIO        :
3                         SS:
    COUNTY OF FRANKLIN   :

4

            I, Diane L. Schad, a Professional Reporter
5    and Notary Public in and for the State of Ohio, duly
    commissioned and qualified, do hereby certify that the
6    within-named SUNIL NAYYAR, M.D. was by me first duly
    sworn to testify to the truth, the whole truth, and
7    nothing but the truth in the cause aforesaid; that the
    continued deposition then given by him was by me
8    reduced to stenotype in the presence of said witness;
    that the foregoing is a true and correct transcript of
9    the  deposition so given by him; that the continued
    deposition was taken at the time and place in the
10   caption specified and was completed without
    adjournment; and that I am in no way related to or
11   employed by any attorney or party hereto or financially
    interested in the action, nor is the
12   court reporting firm with which I am affiliated, under
    a contract as defined in Civil Rule 28(D).
13           IN WITNESS WHEREOF, I have hereunto set my
    hand and affixed my seal of office at Columbus, Ohio on
14   this 31st day of August, 2011.

15                          _____
                            DIANE L. SCHAD
16                          NOTARY PUBLIC - STATE OF OHIO
    My Commission Expires:  June 1, 2015.
17                              - - -

18

19

20

21

22

23

24