**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| Sunil Nayyar, | : | |
| | : | Case No. 2:10-cv-00135 |
| Plaintiff, | : | Case No. 2:12-cv-00189 |
| | : | |
| v. | : | Judge Marbley |
| | : | |
| | : | Magistrate Judge King |
| Mt. Carmel Health System, *et al.* | : | |
| | : | |
| Defendants. | : | |

**<u>PLAINTIFF SUNIL NAYYAR'S MEMORANDUM IN OPPOSITION TO</u>**
**<u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>**

Now Comes Plaintiff Sunil Nayyar, by and through counsel, and submits the attached

Memorandum in Opposition to Defendants Mount Carmel Health System, Dr. John Weiss, Dr.

Li Tang, and Dr. Richard Streck's Motion for Summary Judgment.

Respectfully submitted,

/s/ William W. Patmon III_____
William W. Patmon III, Esq. (0062204)
M. Nikol Madison, Esq. (0084137)
Kaitlin Madigan (0087891)
The Patmon Law Firm
88 East Broad Street, Suite 2070
Columbus, Ohio 43215
Phone: (614) 824-4193
Facsimile: (614) 448-4393
wpatmon@patmonlaw.com
mmadison@patmonlaw.com
kmadigan@patmonlaw.com
*Counsel for Plaintiff*

**TABLE OF CONTENTS**

I.   INTRODUCTION ............................................................................................. 6

II.  BACKGROUND AND FACTS ....................................................................... 8

     A.  The Internal Medicine Residency Program At Mount Carmel West Hospital ................. 8

     B.  ACGME Hours Violations At Mount Carmel West Hospital ......................................... 10

     C.  Pre-A Line Incidents Involving Plaintiff Nayyar.......................................................... 11

     D.  The January 2009 Whistle Blowing Petition By All Internal Medicine Residents .......... 11

     E.  The July 2009 Whistle Blowing Event .......................................................................... 11

          1.  Intentional Spoliation of Evidence.......................................................................... 12

     F.  The A-Line Incident And Inquiry .................................................................................. 13

     G.  Termination of Plaintiff Nayyar.................................................................................... 15

     H.  Dr. Jonathan Borders' History of Misconduct and Termination ...................................... 16

     I.  Defendants' Retaliation Against Plaintiff Nayyar In The News Media ........................... 17

III. LAW AND ARGUMENT ................................................................................ 18

     A.  The Summary Judgment Standard Precludes Pre-Trial Judgment in This Case. ............. 18

          •  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

          •  *Chiles v. Scott*, No. 2:06-cv-0579, 2007 WL 1795957 (S.D. Ohio June 2007)

     B.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Race And National
         Origin Claims................................................................................................................. 19

          1.  Plaintiff and Dr. Borders Are Similarly Situated In All Relevant Respects............... 19

               •  *Brantley v. Cinergy Corp.*, 2007 WL 2462652 (S.D. Ohio 2007)

               •  *Eroegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344, 351-352 (6th Cir.
                  1998)

2.  Plaintiff Was Not Progressively Disciplined Like a Similarly Situated Caucasian Resident ........................................................................................................ 20

3.  The A-Line Investigation Was Not Impeded. ............................................... 21

4.  Defendants' Sham A-Line Investigation and Termination Processes Are Pretexts for Unlawful Discrimination ......................................................................... 22

5.  Defendants' Termination of Dr. Borders Constitutes A Conspiracy To Defeat Plaintiff's Race And National Origin Claims. ........................................... 23

C.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Whistleblower Statute Cause of Action ................................................................................................ 23

1.  The Procedural Requirements Of The Whistle Blowing Statute Are Met. ................. 24

a.  Plaintiff Had A Reasonable Belief That A Crime Was Being Committed. .......... 24

- *Fox v. City of Bowling Green*, 76 Ohio St. 3d 534 (Ohio 1996)

- *Dargart v. Ohio Dept. of Transportation*, 2005 WL 894868, at *2-3 (Ohio Ct. of Claims March 23, 2005)

- *Behm v. Progress Plastic Products*, 2007-Ohio-6357

- *Galyean v. Greenwell*, 2007 WL 453273 (Ohio App. Dist. 2007)

b.  The Lesko, Duvall and Madison Cases Are Inapposite to The Instant Case ........ 28

- *Lesko v. Riverside Methodist Hosp.*, No. 04AP-1130, 2005 WL 1482549 (Ohio Ct. App. June 23, 2005)

- *Duvall v. United Rehab. Servs. of Greater Dayton*, No 22500, 2008 WL 5064861 (Ohio Ct. App. Nov. 26, 2008)

- *Madison v. USF & G Fin. Servs. Corp.*, 118 Ohio App. 3d 431 (Ohio Ct. App. 1997)

- *See* R.C. § 2923.02

- *See* R.C. § 2923.34

- *See* R.C. § 2923.33

- *See* R.C. § 2923.04

      c.   Plaintiff Made A Reasonable, Good Faith Effort to Determine The Accuracy Of The Information He Reported. ............................................................................... 29

- *Dargart v. Ohio Dept. of Transp.*, 2005-Ohio-1808 at ¶ 23

- *Madison v. USF & G Fin. Servs. Corp.*, 118 Ohio App. 3d 431 (Ohio Ct. App. 1997)

- *Hill v. Mr. Money Finance Co.*, 309 F.App'x 950 (6th Cir. 2009)

      d.   Plaintiff Complied With The Notification Requirement Of the Whistleblower Statute. ............................................................................................................... 30

- R.C. §4114.52 (A)(1)(a)

- *Vivo v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 09AP-110, 2009-Ohio-6417

- *Wade v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 98AP-997 (June 10, 1999)

- *Rheinecker v. Forest Laboratories, Inc.*, 813 F. Supp. 1307 (S.D. Ohio 1993)

    2.   Plaintiff Nayyar Was Retaliated Against For Accusing Dr. Weiss And Mount Carmel Of Intentionally Causing The Death Of Patients In The ICU .................................... 33

D.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Claim Of Wrongful Termination In Violation Of Public Policy ...................................................................... 36

- *State v. Nelson*, No. 1999AP020007, 2007 WL 94535 (Ohio App. 5th Dist. 2000)

- *Bali v. Christiana Care Health Servs., Inc.*, No. C.A. 16433, 1999 WL 413303, at *4

E.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Abuse Of Process Claim. ................................................................................................................................. 37

F.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Intentional Infliction Of Emotional Distress Claim. .......................................................................................... 38

G.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Spoliation Of Evidence Claim. ............................................................................................................... 39

H.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Breach Of Contract
Claim..................................................................................................................... 39

- *Day v. Good Samaritan Hospital & Health Center*, No. 8062, 1983 WL 4934 (Ohio App. 2nd Dist. 1983)

I.  Defendants Are Not Entitled To Summary Judgment on Plaintiff's Promissory Estoppel
Claim..................................................................................................................... 40

- *Helmick v. Cincinnati Word Processing, Inc.*, 45 Ohio St.3d 131 (1989); *Cohen & Co. v. Messina*, 24 Ohio App. 3d 22 (1985)

IV. CONCLUSION................................................................................................................ 41

## MEMORANDUM IN SUPPPORT

### I.      INTRODUCTION

Plaintiff Sunil Nayyar's medical career is ruined because he was wrongfully terminated in the last year of his medical residency program, a medical career death sentence in the United States of America.  No medical residency program will admit him, despite numerous applications, and no credible medical employer will hire him because, having not completed his residency, he is not board eligible, a hiring requirement for virtually every medical employer in the U.S., including Defendant Mt. Carmel Health System's hospitals and clinics in Ohio and the U.S.[1]

Termination from a medical residency program, particularly in the last year, is highly unusual in the medical industry.  Residency programs invest significant time, money and resources in physician training.  For this reason, residents who make mistakes, commit medical errors, and engage in misconduct ranging from drug abuse to on-the-job misconduct are rarely fired.  The reason: all medical employers know discharge usually results in the end of the medical residency education and consequently a resident's post-residency medical career.  It is against this background and undisputed reality that this Court must evaluate and judge the decision of Defendants Mount Carmel Health System, Dr. John Weiss, Dr. Li Tang, and Dr. Richard Streck (hereinafter referred to as collectively as "Defendants") to fire Plaintiff Nayyar in the last year of his residency for a single incident of alleged misconduct by him.

---

[1] Plaintiff Nayyar's employment opportunities have been limited to jobs at urgent care facilities and pain clinics.  All major medical employers, hospitals and practices, will not only hire physicians that have not graduated from a medical residency program.  He has pursued self-employment but is having significant difficulties because major health insurers will not cover treatment because he is not board eligible.  Consequently, he is not able to treat patients who wish to pay for services through health insurance, a group that constitutes 70% plus of the health care treatment market.

The only plausible explanation for the usual, punitive termination of Plaintiff Nayyar is his race and constant, unrelenting whistle blowing about conditions in the ICU.  Contrary to Defendants' assertions, the A-line incident is not a plausible explanation—residents commonly make medical errors.  Plaintiff Nayyar's alleged professionalism issue during the A-line incident is likewise not plausible because resident's often use poor judgment, to wit: classic arrogant, condescending doctor, who are not fired.[2]

Plaintiff's alleged "lie" for talking to friends and a nurse after all evidence about the A-line incident was gathered is not a plausible explanation.  No patient was harmed and the investigation (determining whether the nurse acted outside the scope of her license) was not impeded, since all of the information was known prior to the post-investigation interrogation of Plaintiff Nayyar about calling his friends (co-residents) and the nurse.  The ruin of a much anticipated, prodigiously earned medical career for calling friends (co-residents) and the nurse (who was target of investigation) to find out what happened, is certainly not a plausible explanation and is not a punishment that fits the alleged misconduct.

The only remaining plausible explanation is race and whistle blowing.  Plaintiff Nayyar, an Indian-American, was terminated for a single incident (A-line matter) while a Caucasian resident committed multiple acts of misconduct (lying, professionalism problems) before being fired by Defendants.  The harsh, punitive treatment of Plaintiff was also motivated by his constant, unrelenting whistle blowing.  Plaintiff Nayyar led the whistle blowing event in January 2009 by obtaining the signatures, along with his own, of all residents about patient safety risks in the ICU.  (Exhibit A, January 2009 petition).  Six months later, in July 2009, Plaintiff Nayyar learned that harmful conditions in the ICU was exacerbated by Dr. Weiss, who informed Plaintiff

---

[2] See www.scrubsmag.com/how-to-deal-with-an-egotistical-doctor/

Nayyar at the time, that the ICU staff schedule was intended to kill patients.  Defendants, and in particular Defendant Weiss, were certainly motivated to terminate Plaintiff because of his exposure of an unsafe ICU, loss of accreditation, investigation and criminal conduct.

## II.     BACKGROUND AND FACTS

### A.     The Internal Medicine Residency Program At Mount Carmel West Hospital

Plaintiff Nayyar was a third year resident in the Internal Medicine Residency Program at Mount Carmel West Hospital at the time of his 2009 discharge.  His immediate supervisor was Defendant Dr. John Weiss.  The Medical Education Director was Dr. Li Tang.  Medical Residency programs are educational programs that involve the clinical training of residents.  The Internal Medicine program trains first year (new medical school grads), second year, and third year residents.

Mount Carmel West's program assigns residents to the Intensive Care Units ("ICUs") at the West hospital.  Notably, the residents assigned to the ICU receive no formal critical care training and are responsible for treating ICU patients during evening and grave yard shifts.  During these shifts, there is no on-site licensed critical care physician and residents are expected to manage, treat and run the ICUs, medical units that contain the highest risk patients in the hospital.[3]  When a resident needs assistance in treating a patient, he may call Dr. Roy St. John, the licensed critical care physician at his home.  Mount Carmel West maintains a paging and phone system to contact Dr. St. John.  (Case No. 2:10-cv-00135, Rutecki Dep. pp. 178, 181, Dkt. No. 92).

If residents are unable to reach Dr. St. John, there are other physicians in other parts of the hospital who may be available but do not supervise residents.  The physicians are not

---

[3] By contrast, Ohio Health and Ohio State University hospitals have on-site and remote on camera supervision of medical residents during these shifts.

certified in critical care medicine and are often busy treating patients during surgery, for

instance.  The ICU's fast pace and limited time to intervene in patient crisis often does not allow

residents to obtain other physician assistance and the call/paging system is also of limited help as

residents are expected to make split second decisions in the high risk ICU environment.

Medical resident ICU schedule staffing is supervised by Dr. Weiss.  The residents are

given the schedule in advance and each shift is staffed by at least senior resident and interns to

ensure ample coverage of the ICUs.

The program is accredited by the Association of Graduate Medical Education

("ACGME") based in Chicago, Illinois.  The ACGME rules prescribe rules and regulations

governing residency programs.  Importantly, ACGME rules restrict the number of hours

residents may work to prevent resident fatigue and medical errors.  From 2006 to 2009, resident

work hours were self-reported to the ACGME via an ACGME system.  Violation of the resident

work hour restrictions can result in sanctions including de-accreditation of a program.  (See

Exhibit DD, ACGME Requirements).

In addition, ACGME rules require due process and privacy protections for residents.  The

rules establish minimum procedures to ensure fairness and protection of residents during their

medical residency education.

To comply with ACGME accreditation rules, Mount Carmel West has established a

medical resident handbook.  (See Exhibit B, 2009 Handbook).  The handbook governs the

termination process, work hours, and medical personnel records privacy protections.  The

handbook prescribes termination procedures that include providing a resident access to his

personnel file and accusations against him so that a resident may defend himself during the

termination process.  (See Exhibit C, Handbook, p. 12).  It also includes an appeal process that is

limited to determining whether a resident was afforded due process during the termination process (Id., p. 12).

Importantly, although the termination process includes a committee responsible for the termination process, a resident program director's decision to terminate cannot reversed by the Committee and cannot be reversed on appeal by the Medical Education Director. This undisputed fact is critical because, as discussed below, Plaintiff Nayyar's July 2009 whistle blowing accusations were directed at Defendant Weiss (who was not removed from the termination process) and who made the decision to terminate.

**B.  ACGME Hours Violations At Mount Carmel West Hospital**

As stated above, the ACGME restricts resident work hours and expects residents to self-report their hours to an ACGME reporting system. Resident programs that violate the hours restrictions are subject to penalties including lose of accreditation. At Mount Carmel West hospital, from 2006 to 2008, residents were pressured to report compliance with ACGME's 80 hour rule when, in fact, the residents worked in excess of the "80 work rule." Plaintiff Nayyar was repeatedly intimidated and was told to falsely report compliance in violation ACGME's hour restrictions. He reported the violations to residency program managers. (Id.). However, despite reporting the violations, no action was taken to correct the violations and Plaintiff Nayyar himself was blamed for the violations. (Exhibit D, Case No. 2:10-cv-00135, Plaintiff Dep. Vol. II, pp. 261-263, 294-297, Dkt No. 62). Mount Carmel West retaliated against Plaintiff Nayyar by failing to correct the violations and by blaming Plaintiff Nayyar for working in excess of the 80 hour work rule. Plaintiff Nayyar, a salaried resident employee, had no motive to work in excess of the 80 hour work rule and he received no remuneration or recognition for working in excess of the 80 hour work rule.

**C.      Pre-A Line Incidents Involving Plaintiff Nayyar**

Plaintiff Nayyar received no disciplinary action of any kind prior to the A-line incident. In fact, Plaintiff Nayyar's job performance was rated as good.  Defendants' assertions about prior, undisciplined incidents were not a factor in his termination in 2009.  (Exhibit E, Nayyar's Termination letter).  According to his termination letter dated July 22, 2009, Plaintiff Nayyar's termination was based on A-line related incident only.  Defendants misleading attempt to include prior incidents that involved no discipline of any kind is disingenuous and misleading.

**D.      The January 2009 Whistle Blowing Petition By All Internal Medicine Residents**

In January 2009, all internal medicine residents, including Plaintiff Nayyar, signed a petition whistle blowing about unsafe conditions in the ICU.  (Exhibit A, Resident Petition).  The residents were reported that patients were at risk in the ICU.  Plaintiff Nayyar, with the approval of Defendant Weiss, gathered signatures and provided the petition to residency and hospital management.  In addition to Defendant Weiss, Medical Residency Director Dr. Gregory Rutecki, in January 2009, also believed conditions were unsafe.  (Exhibit B, Rutecki Dep. pp. 143-144). Because of the ICU conditions, Defendant Weiss presented the residents petition to clinical management staff to correct the conditions.  No action was taken, unfortunately, and the conditions continued unabated.

**E.      The July 2009 Whistle Blowing Event**

The unsafe conditions in the ICU continued unabated from January through June 2009. Plaintiff Nayyar's employment contract was renewed for the third year of residency in June 2009.  In late June or early July 2009, Plaintiff Nayyar received the July 2009 resident schedule. Plaintiff Nayyar immediately met with Defendant Weiss about the schedule because it did not have sufficient staffing to cover the residents' ICU coverage duties.  Plaintiff Nayyar presented

the July 2009 schedule with his notations and explained that the schedule will harm patients.  At this meeting, Defendant Weiss told Plaintiff Nayyar that it was his intent that patients die in the ICU because he believed that patient deaths were necessary for Mount Carmel West to place a licensed on-site critical care physician in the ICU to supervise residents.  Plaintiff Nayyar, recognizing that Defendant Weiss' gambit was criminal and a medical ethics violation, immediately reported Defendant Weiss' actions to Defendant Li Tang, the medical education director.  (Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, pp. 326-327, Dkt No. 62).  Plaintiff Nayyar brought the July 2009 schedule to his meeting with Dr. Tang which included handwriting on the schedule reporting Defendant Weiss' conduct.  (Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, pp. 305, 325, 348, Dkt. No. 62) (Exhibit E, Case No. 2:10-cv-00135, Tang Dep., pp. 172-173, Dkt. No. 93).  Plaintiff reported to Defendant Tang that Defendant Weiss intended to cause patient deaths in the ICU and that conditions in the ICU were unsafe.  Defendant Tang, however, took no action to correct or stop the July 2009 schedule from going forward.

Significantly, Dr. Tang kept the July 2009 schedule with Plaintiff Nayyar's handwriting and notations and placed it in her office files.  (Exhibit F, Tang Dep. pp. 32, 171-174, Dkt. No. 93).

A week later, on July 7, 2009, Mount Carmel launched an unjustified, retaliatory A-line investigation against Plaintiff Nayyar.

### 1.      Intentional Spoliation of Evidence

In late July 2009 and August 2009, Plaintiff Nayyar retained legal counsel regarding his termination and whistle blowing.  At this time, Defendants knew that litigation was likely and that Plaintiff Nayyar intended to pursue legal action.  (Exhibit G, Letter from former legal counsel to MCW).  The July 2009 petition, according to Defendants, no longer exists.  More to the point, prior to Defendant Tang's separation from Mount Carmel, Plaintiff Nayyar filed suit in

Franklin County, Ohio Common Pleas Court.  (Exhibit H, filed Franklin Cty Comm. Compl.).

This was the second event that Defendant had notice of potential litigation and yet the July 2009

schedule was not preserved.

Despite having notice of potential legal action as early as July 2009 and certainly by

December 1, 2009 (date service for state lawsuit was completed on Defendant Mount Carmel),

Defendants failed to preserve the July 2009 petition used by Plaintiff Nayyar to report whistle

blowing violations by Defendants Weiss and Tang.

### F.    The A-Line Incident And Investigation

The A-line incident and investigation occurred <u>after</u> Plaintiff Nayyar's July 2009 whistle

blowing event.  This is an undisputed fact.  The A-line investigation was launched almost one

week <u>after</u> the July 2009 whistle blowing event.  This is also an undisputed fact.

The A-line incident occurred when a supervising nurse allegedly observed Plaintiff

Nayyar and Nurse Amanda Bowers performing an Arterial Line procedure ("A-line") on a

patient in the ICU.[4]  The supervising nurse reported that Plaintiff Nayyar permitted Nurse

Bowers to complete the A-line, a violation of the nurse's license.  Plaintiff Nayyar and Nurse

Bowers however reported that Plaintiff Nayyar was performing the procedure when he had a

cramp in his back and asked Nurse Bowers to hold the A-line during insertion.  While holding

the A-line, Nurse Bowers accidently completed the procedure.  During these events Plaintiff

Nayyar was standing right next to Nurse Bowers.  (Exhibit D, Case No. 00135, Plaintiff Dep.

Vol. II, p. 281, Dkt. No. 62).

Plaintiff Nayyar received no training on the scope of practice for a nurse.  (Exhibit I,

Case No. 00135, Plaintiff Dep. Vol. I, p. 79, Dkt. No. 61).

---

[4] Medical Residents commonly perform A-line procedures with a nurse's assistance.

The patient was not harmed or injured by the A-line procedure.  Nevertheless, Defendants initiated an investigation against Nurse Bowers and included Plaintiff Nayyar, although he did not violate his scope of practice and did nothing wrong other than ask a nurse for assistance while suffering from a back cramp.  Defendants then placed Plaintiff Nayyar on a leave of absence without informing him of the reason for leave or that an investigation had been initiated.  (Exhibit I, Case No. 00135, Plaintiff Dep. Vol. I, p. 10, Dkt. No. 61 ).  Defendant Weiss testified that he told Plaintiff Nayyar that Defendants were looking into an incident and that he was not to talk to anyone.  Plaintiff Nayyar testified that this prohibition against talking to staff did <u>not</u> occur and Defendants gave him no written information of any kind.  (Exhibit I, Case No. 00135, Plaintiff Dep. Vol. I, pp. 116, 119, Dkt. No. 61).  Defendants have no evidence of a notice or writing of any kind informing Plaintiff Nayyar of a medical investigation and a prohibition against contacting staff.

Curious about the reason for leave and concerned about coverage of his assigned rotations, Plaintiff Nayyar contacted co-resident friends (who were not involved in the incident and had no first hand knowledge of the incident) and Nurse Bowers to find out the reason for his leave.  (Exhibit I, Case No. 00135, Plaintiff Dep. Vol. I, pp. 94, 95, 99, 101, Dkt. No. 61).  Plaintiff Nayyar did not try to impede the investigation and in fact Nurse Bowers, in her initial statement of the incident, stated that she talked to Plaintiff Nayyar on several occasions and told him only she was placed on leave and that she had heard nothing about the process yet.  (Exhibit J, Nurse Bowers July 15, 2009 statement).  The Bowers July 15, 2009 statement contains no reference to Plaintiff Nayyar trying to impede an investigation.[5]  Defendants later obtained Plaintiff Nayyar's statement about the incident.

---

[5] Nurse Bowers made a later unreliable statement <u>after</u> she was informed that she would be terminated.  This statement should be given no weight by the Court because it is self-serving and unreliable.  The July 15, 2009 was

After Defendants had gathered all of the facts needed to investigate, Defendants confronted Plaintiff about calling his friends and Nurse Bowers during an interrogation that occurred post-investigation.  Plaintiff, afraid and unaware of the purpose of the interrogation, initially told Defendants that he had not called his friends and Nurse Bowers; however, later in the termination process, Plaintiff Nayyar corrected this statement, stating that he had called friends and Nurse Bowers to find out the reason for his leave of absence.  (Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 266, Dkt. No. 62).

G.      **Termination of Plaintiff Nayyar**

Plaintiff Nayyar was discharged on July 22, 2009.  The alleged basis for his discharge is stated in termination letter dated July 22, 2009.  On August 6, 2009, Plaintiff Nayyar challenged the termination, pursuant to Mount Carmel's Resident Handbook, policy section F, Grievance and Due Process, by appealing the termination decision.  (Exhibit C, Resident Handbook, p. 12-13).  In accordance with the Handbook, Defendants convened an Education Committee to evaluate the Plaintiff Nayyar's termination, a process that allows the Program Director and Resident to present evidence to the Committee.  The Committee, however, did not allow Plaintiff Nayyar access to his personnel file and the evidence used against him, as prescribed by the Resident handbook, to challenge his termination.  (Exhibit I, Nayyar's counsel August 13, 2009 letter).

The Education Committee issued a decision and reported it to Defendant Weiss who made the final decision to terminate.  (Exhibit K, Program Education Committee Decision).  Notably, Mount Carmel West's Education Committee has no final authority; all real authority

---

the earliest statement and was given only days after the incident and what occurred between her and Plaintiff Nayyar.

lies with the program director, who in the instant case is Defendant Weiss, whom Plaintiff

Nayyar whistle blew on in July 2009.  (Exhibit C, Handbook, p. 12).

Plaintiff Nayyar appealed the Education Committee and Program Director Weiss' final

decision to terminate to the Medical Education Director (Li Tang) who, in turn, formed an

Administrative Review Committee.  The Administrative Review Committee's role is limited to

ensuring compliance with ACGME regulations and due process.  (Exhibit C, Handbook, p. 12)

Plaintiff Nayyar challenged the Education Committee and Defendant Weiss's decision as

not conforming to due process because, among other things, he was not given access to the

evidence used against him.  The Committee, however, issued its decision finding the termination

complied with ACGME and due process.  (Exhibit L, Administrative Committee Decision).

### H.    Dr. Jonathan Borders' History of Misconduct and Termination

In his state and federal cases, starting in 2010, Plaintiff Nayyar identified Resident

Physician Jonathan Borders as a similarly situated Caucasian resident under Defendant Weiss's

supervision who engaged in substantially similar misconduct but was not terminated.  After

Plaintiff Nayyar identified Dr. Borders as evidence of disparate treatment, Defendants terminated

Borders for lying during a medical investigation based on his failure to show up for rotations in

the ICU and for leaving unqualified resident in ICU without help.  This lie was not his first lie on

the job; in fact, Dr. Border's lied on several other incidents but was not fired by Defendant

Weiss.  (Exhibit M, Case No. 2:10-cv-00189,Weiss Dep. II pp. 10-29, Dkt. No. 46).

In addition to Defendant Weiss' less favorable treatment of Plaintiff Nayyar—fired for a

single incident—Dr. Border's discharge itself is an unlawful pretext for disparate treatment.  Dr.

Border testifies, by affidavit, that he did not lie about the incident.  He truthfully informed

Defendant Weiss that he gave his pager to a junior resident and instructed her to call him because

he was tired, having worked in excess of the ACGME's 80 hour work rule.  (Exhibit CC,

Affidavit of Jonathan Borders).  Defendant Weiss nevertheless terminated Borders for lying about the incident.

### I.     Defendants' Retaliation Against Plaintiff Nayyar In The News Media

Defendants retaliated against Plaintiff Nayyar by providing the news media with misleading information Plaintiff Nayyar's termination in a media story published on August 18, 2010.

In the story, a Mount Carmel spokesman states "Dr. Nayyar was dismissed from his medical residency program following a thorough investigation into a patient care safety issue for which he was responsible."  (Exhibit N, ONN Media Story).  Plaintiff Nayyar did not consent to the disclosure of the information from his former employer and he did not state in the Complaint, or in statements to the media that he was fired for a patient safety issue and that he was responsible for a patient safety issue.

Mount Carmel's Resident Handbook provides limited circumstances under which information about a resident may be disclosed to a third party.  First, the handbook provides that a resident's personnel file is confidential.  (Exhibit C, Handbook, Section V, Supervision of Residents, p. 19).  Second, disclosure is only permitted without a resident's consent in the following circumstances:

> "Only the Program Director of the resident and/or Director of Medical Education may disclose the file, or portion thereof, at the request of a third party, which they judge as having a legitimate reason for accessing the information, e.g. for matters relating to the education of the trainee, the quality of the education in the program, or the quality of patient care in the program."

(Exhibit C, Handbook, p. 19).

At time of the publication of this story, Defendants were no longer training Plaintiff Nayyar and the media story has no relation to quality of the program and patient care.  Further,

ONN was not pursuing a general story the quality of patient care in the program and only

provided information from Plaintiff Nayyar's personnel file was provided to the media.

The Complaint also contains no statement providing that Plaintiff Nayyar was dismissed

from the program because of patient safety issues and that he was responsible for a patient safety

issue.  (Case No. 2:12-CV-00189 First and Second Am. Complaints, ¶¶ 40-45, Second Am.

Compl., Dkt. No. 29-1; First Am. Compl., ¶¶ 40-45, Dkt. No. 3) (Case No. 2:10-CV-00135,

Second Am. Compl., ¶¶ 31-38, Dkt No. 33).

Likewise, the termination letter does not state that Plaintiff Nayyar placed a patient at risk

and that he was responsible for doing so.  (Exhibit E, Nayyar's Termination Letter).  In point of

fact, the termination letter only provides that professionalism and communication skills are the

bases for termination—not an investigation into a patient care issue that Plaintiff Nayyar was

responsible for.  And, Defendant Weiss, the program director, does not state in deposition

testimony that Plaintiff Nayyar was fired because of a patient safety issue that he was responsible

for.  (Exhibit O, Case No. 00135, Weiss Dep. I, pp. 118-120, Dkt. No. 94)

## III.    LAW AND ARGUMENT

Defendants are not entitled to summary judgment as to causes of action in the Second

Amended Complaint.  There are significant genuine issues of material fact that preclude

summary judgment in this case.  Contrary to Defendants' overly simplified presentation of

selective facts and evidence, the record in this case presents significant fact disputes demanding

jury deliberation as to each cause of action and fact dispute.

### A.    The Summary Judgment Standard Precludes Pre-Trial Judgment in This Case.

Summary judgment is inappropriate when genuine issues of material fact exist.  *Anderson*

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "The purpose of the procedure is not to

resolve factual issues, but to determine if there are genuine issues of fact to be tried . . . the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try." *Chiles v. Scott*, No. 2:06-cv-0579, 2007 WL 1795957 (S.D. Ohio June 2007) (Exhibit N).

>   **B.**     **Defendants Are Not Entitled To Summary Judgment on Plaintiff's Race And National Origin Claims.**

Contrary to Defendants' arguments, Mount Carmel treated a Caucasian Resident physician more favorably than Plaintiff, who is Indian by race and national origin.  The gist of Defendants argument is that Plaintiff and Jonathan Borders are not similarly situated in every respect, and therefore, Plaintiff's race and national origin claims fail.  The Sixth Circuit only requires that a Plaintiff show a non-minority employee was similarly situated in all relevant respects and treated more favorably than a minority employee.  Dr. Borders, a former Caucasian resident, was certainly similarly situated in all relevant respects, and he was treated more favorably than Plaintiff.

>   **1.**     **Plaintiff and Dr. Borders Are Similarly Situated In All Relevant Respects**

Plaintiff and Dr. Borders are similarly situated in all relevant respects.  Both doctors were third-year residents, both were supervised by Dr. Weiss, and Dr. Weiss concluded that both had lied to him — Plaintiff on one occasion and Dr. Borders on several occasions.  (Exhibit O, Case No. 00135, Weiss Dep. I pp. 119-120, Dkt. No. 94; Exhibit M, Case No. 00189, Weiss Dep. II pp. 12, 18, 23, Dkt. No. 46).  Despite the obvious similarity between them, Defendants focus on irrelevant fact distinctions to distract the Court's attention from the relevant respects.  Exact similarity, however, is not required to show they are similarly situated for Title VII analysis.  *See Brantley v. Cinergy Corp.*, 2007 WL 2462652 (S.D. Ohio 2007) (citing *Eroegovich v. Goodyear Tire and Rubber Co.*, 154 F.3d 344, 351-352 (6th Cir. 1998) (A court is required to make an

independent examination as to the value of particular comparisons and should not insist on exact

correlations between the allegedly disfavored and favored employee) (Exhibit O)

### 2. Plaintiff Was Not Progressively Disciplined Like a Similarly Situated Caucasian Resident

It is undisputed that Dr. Borders, a Caucasian resident, lied to Dr. Weiss several times

and was not fired until numerous incidents involving lying had occurred.  (Exhibit M, Case No.

00189, Weiss Dep. II pp. 10-29, Dkt. No. 46).  In addition, Dr. Borders was allegedly

investigated for substance abuse on the job (a serious offense jeopardizing patients), failing to

show up for assigned rotations (jeopardizing patient health and lying), and failing to respond to

urgent pages for immediate help to treat patients (jeopardizing patient care and lying).  After

being confronted about several of his incidents of misconduct, Dr. Borders lied to Dr. Weiss

about the incidents.  (Exhibit M, Case No. 00189, Weiss Dep. II pp. 10-29, Dkt. No. 46).  Yet, he

was not fired until after he was identified by Plaintiff Nayyar as a similarly situated Caucasian

Resident who was treated more favorably than Plaintiff Nayyar.

By contrast, Plaintiff had no formal disciplinary history prior to his termination.  In fact,

his contract for a third year of residency had just been renewed just prior to his termination.  Yet,

Dr. Weiss recommended his termination because he felt that Dr. Nayyar lied to him about

matters arising from a single incident (calling his friends and a nurse) and that consequently he

could no longer trust him after one alleged mistruth.  (Exhibit O, Case No. 00135, Weiss Dep. I

pp. 119-120, Dkt. No. 94).  Had Plaintiff Nayyar been treated equally, he would have been

counseled as Dr. Borders was after he lied to Defendant Weiss time and time again.  (Exhibit M,

Case No. 00189, Weiss Dep. II pp. 10-29, Dkt. No. 46).  It was not until Dr. Borders was named

as a similarly situated non-minority that Dr. Weiss had a sudden change of heart about Dr.

Borders, and decided to terminate him.

### 3.     The A-Line Investigation Was Not Impeded.

Defendants attempt to differentiate between Dr. Weiss's reasons for terminating Plaintiff by claiming that Plaintiff interfered with an investigation is false and misleading.  There is no credible evidence in record that Defendants' investigation was impeded.  Nurse Bowers' July 15, 2009 statement contains no evidence of Plaintiff Nayyar trying to impede an investigation. (Exhibit J, Nurse Bowers' July 15, 2009 statement).  Further, the termination letter which contains Plaintiff Nayyar's contacts with co-worker friends contains no evidence that tried to impede the investigation and, indeed, none of the co-workers had first hand knowledge and therefore were not witnesses in the A-line investigation.  Defendants' flat assertion that Plaintiff Nayyar impeded the investigation has no substance.

Moreover, Dr. Weiss, the decision-maker, stated clearly that his reason for terminating Plaintiff was because he felt he lied – he did not say it was because he interfered with an investigation.  (Exhibit O, Case No. 00135, Weiss Dep. I pp. 118-120, Dkt. No. 94)

The disparate treatment of Plaintiff Nayyar and Borders cannot be distinguished based on a hollow allegation that Plaintiff Nayyar impeded an investigation.  Plaintiff Nayyar's alleged lie about calling friends and a nurse is not more egregious conduct than Border's lies about failing to show up for rotation to treat patients and failing to show up for an important morning report meeting.  More to the point, Border's conduct is more severe insofar as he lied about a significant matter that related to treating patients.  Borders had repeatedly put patients and colleagues at risk when he failed to do his job on numerous occasions prior to termination. (Exhibit M, Case No. 00189, Weiss Dep. II pp. 10-29, Dkt. No. 46).  By contrast, Plaintiff Nayyar's alleged lie concerned "impeding an investigation."

The relevant respects here are two third-year residents who Dr. Weiss concluded lied to him – one was terminated immediately (Plaintiff) and one was counseled several times (Dr. Borders) prior to termination.

### 4. Defendants' Sham A-Line Investigation and Termination Processes Are Pretexts for Unlawful Discrimination

At the outset, Plaintiff Nayyar should not have been investigated for the A-line incident. It is undisputed that Plaintiff was not aware of any ethical and treatment regulations governing A-line procedures, and certainly had no knowledge of regulations governing a nurse's scope of practice.  (Exhibit O, Case No. 00135, Weiss Dep. I pp. 29-30, Dkt. No. 94).  Nurse Bowers violated her scope of practice – not Plaintiff.  Yet, Plaintiff was investigated.  Defendants can cite no rule showing Plaintiff violated his scope of practice and that they provided training to him on a nurse's scope of practice.  Yet, despite Plaintiff's lack of culpability, he was nevertheless investigated, interrogated, and ultimately fired.

Second, the termination process was in violation of the Resident Handbook's prescribed procedures.  Defendants' "Star Chamber" like termination process barred Plaintiff Nayyar from confronting his accusers, barred him from accessing evidence needed to defend himself, and allowed the person accused, Dr. Weiss, to make the final decision to terminate.

Third, Defendants' employment practice as to a similarly situated Caucasian Resident, Borders, shows their practice is not to initiate a formal investigation and certainly not to proceed to a termination process where a resident is found to have lied and jeopardized patient safety and care.  Dr. Borders' was not subjected to formal investigation and a formal termination process for each of his pre-termination incidents, although each of them related to patient safety: (1) failing to show for rotations and causing insufficient coverage of patients and (2) failing to show up for an important morning report meeting.

     **5.**     **Defendants' Termination of Dr. Borders Constitutes A Conspiracy To Defeat Plaintiff's Race And National Origin Claims.**

Despite a long history of misconduct and problems in the internal medicine residency program, Dr. Borders was counseled for each incidence of misconduct instead of being terminated.  The last incident caused Borders' termination is indistinguishable from the prior incidents.  The last incident involved Border giving his pager to an unqualified resident and telling her to page if needed while he slept.  This conduct is in the same vein as the other pre-termination conduct.  A genuine issue of fact exists as to the real reason Defendant Weiss decided to treat the last incident (lying) differently than prior incidents (lying).  The only plausible reason is Plaintiff Nayyar's race and national origin.

     **C.**     **Defendants Are Not Entitled To Summary Judgment on Plaintiff's Whistleblower Statute Cause of Action.**

Defendants' motion for summary judgment fails to address the two whistle-blowing events in this case.  Plaintiff blew the whistle on Defendants in January 2009 and again in July 2009.  Defendants' Motion for Summary Judgment does not address the second event of whistle blowing.  The two whistle-blowing events are interrelated because each concerns (1) lack of supervision in the Intensive Care Unit ("ICU"), (2) patient safety, and (3) imminent risk of harm and death to patients.  The second event of whistle blowing rose to a higher level of concern because Plaintiff Nayyar had reason to believe Defendants Mount Carmel and Dr. Weiss were causing the death of patients.  Defendants completely avoid this accusation because, as demonstrated below, Plaintiff Nayyar's accusation of patient safety and death of patients certainly complies with the whistleblower statute and bars summary judgment.  And, there is significant evidence showing that Dr. Weiss, the Mount Carmel supervisor who made the decision to terminate Plaintiff, was motivated by protected activity, since Plaintiff's July 2009 whistle-blowing event accused Dr. Weiss himself of causing harm and death to ICU patients.

1.     **The Procedural Requirements Of The Whistle Blowing Statute Are Met.**

Defendants argue that Plaintiff Nayyar failed to undertake efforts to confirm the accuracy of his belief that a violation occurred and failed to comply with the statute's reporting requirements.  Defendants' analysis is not supported by the facts in this case.

a.     **Plaintiff Had A Reasonable Belief That A Crime Was Being Committed.**

Defendants present a distorted few lines from a two-and-a-half day deposition.  The truth is Plaintiff Nayyar presented ample testimony showing he believed Defendants' actions were criminal.  Defendants, contrary to the requirements of the statute, attempt to require Plaintiff, a non-lawyer, to state the exact laws and statutes violated.  The whistleblower statute does not require this.  Instead, Plaintiff Nayyar is only required to have a reasonable belief that patient safety was at risk (imminent risk of physical harm, and hazard to public health), and that causing the death of patients was a crime.  Nothing more is required.  *See Fox v. City of Bowling Green*, 76 Ohio St. 3d 534, 538 (Ohio 1996) (whistleblower statute does not require accuracy and certainty that a law was violated by the plaintiff).

The belief that a crime occurred still complies with the whistleblower statute even if the belief is inaccurate.  *See, generally, Dargart v. Ohio Dept. of Transportation*, 2005 WL 894868, at *2-3 (Ohio Ct. of Claims March 23, 2005) (Exhibit R) (although plaintiff's reasonable belief was determined to be wrong, the court held a belief is reasonable, even if inaccurate).  No actual violation is required to evoke whistleblower protection.  *Fox*, 76 Ohio St. 3d 534.  Public policy would not allow such a requirement.  To require that an actual violation must occur for a whistleblower to gain protection could delay, or at worst, prevent, reporting a violation which endangers the public safety.  *Id.* at 538.

Moreover, establishing a reasonable belief does not require Plaintiff Nayyar to identify a specific law, rule, or policy that was violated.  *Behm v. Progress Plastic Products*, 2007-Ohio-6357 at ¶ 22.  Plaintiff Nayyar must only have a reasonable belief and make a good faith effort to determine that a violation occurred.  *Id.*  The plaintiff in *Behm* answered a question in a deposition where he stated, as to the criminality of the violation he reported, "…as far as *knowing* a criminal thing, no."  *Id.* at ¶ 20.  On appeal of the trial court's grant of summary judgment, the court stated that "[o]ne can believe something is true without knowing that it is."  *Id.* at ¶ 21.  In the *Behm* plaintiff's affidavit accompanying his opposition memorandum, the *Behm* plaintiff clarified that he believed, although he did not know for certain, that his employer's use of improper material in its manufacturing of a product constituted a criminal violation.  *Id.* at ¶ 17.  The *Behm* plaintiff based his belief on his lengthy work experience in the plastics and manufacturing industries and his familiarity with rules regarding other types of products.  *Id.*  The appellate court found that the plaintiff met the whistleblower statute's threshold requirement of reasonably believing that a statute, work rule, or company policy was violated.  *Id.* at ¶ 23.

The isolated testimony presented by Defendants is confusing and not straightforward. Defendants asked Plaintiff if he was "aware of any laws that were being broken or any requirements that were not being met."  This is not a straightforward question.  Plaintiff cites to *Galyean v. Greenwell* for their contention that Plaintiff did not have a reasonable belief that a criminal violation had occurred.  However, the plaintiff in *Galyean* was asked a straightforward question as to whether she <u>thought</u> laws were being violated, and that plaintiff answered "no." *See Galyean v. Greenwell*, 2007 WL 453273 (Ohio App. Dist. 2007) (Exhibit S).  Defendant's deposition question asks Plaintiff to identify specific laws that were being violated, eliciting a

natural response from Plaintiff: "I don't know what all the laws are so I can't comment on that." Plaintiff never said he did not <u>believe</u> any laws were violated.  Plaintiff believed that he was being asked to identify particular laws that had been violated.  (Exhibit T, Affidavit of Sunil Nayyar, ¶¶ 42-43).  Plaintiff is not a lawyer and has no understanding of "any laws" or "requirements" that may have been broken or not met.

Like the plaintiff in *Behm*, although Plaintiff Nayyar could not identify a specific law that had been violated, he had a reasonable belief that a violation had occurred, based on his experience as a doctor and his familiarity with the oath he took and the rules and regulations he had encountered in the health field.  As a doctor, it was drilled into Plaintiff's head throughout his training that patient safety was a number-one priority, and doctors, under their oath, were not to do anything which would compromise or jeopardize the health and safety of the patients who entrusted them with their care.  Furthermore, not much investigation is required to determine that putting innocent patients at risk of death is criminal.  Also, similar to the plaintiff in *Behm*, Plaintiff Nayyar clarified in his affidavit what he believed, and his testimony supports that he believed that a crime occurred.

In the *Galyean* case, cited by Defendants, the court concluded that "[the plaintiff's] motivations for reporting the violations were due to liability concerns and risks to the hospital and herself, personally, not because of patient safety concerns."  *Galyean*, at ¶ 30.  Plaintiff has made clear throughout that his concern was for patient safety.  Plaintiff testified:

Q.     Okay.  Was that a concern for patient safety or for your workload in the ICU?

A.     Patient safety.  And the workload will be doubled, which leads to patient safety issues.

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 304, Dkt. No. 62)

Q.      Your concerns about what the problems were in the ICU with the staffing at night had to do with patient safety, correct?

A.      Yes.

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 310, Dkt. No. 62)

Q.      Okay.  So for you it was a patient safety issue only?

A.      Yes.

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 311, Dkt. No. 62)

Q.      So for you it was an ACGME issue?

A.      ACGME and then patient safety concerns.

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 312, Dkt. No. 62)

Q.      And when you brought this schedule with your writing on it to Dr. Lee (sic) Tang, why were you bringing that to her?

A.      Because patient safety was at risk and what Dr. Weiss told me.

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 326, Dkt. No. 62).  (S*ee also* Exhibit A, January 2009 Petition).  This is distinguishable from a case where the plaintiff was concerned because a qualified doctor performed surgery at a particular hospital where he was not privileged to do so like in *Galyean*.  *Id.*  Plaintiff's concern was that Dr. Weiss's actions, and in fact his intentions, would cause patients to die.

Plaintiff's Complaint and the record in this case conclusively show that Plaintiff believed three things: (1) that a patient safety violation occurred; (2) that the violation would lead to the death of patients; and (3) that the death of patients was intended by Dr. Weiss when he created the ICU schedule.  (Exhibit T, Affidavit of Sunil Nayyar, ¶¶ 43-47).  Plaintiff complained on two occasions and accused Defendants in July 2009 of causing the death of patients.  Plaintiff testified:

27

Q.      What specifically did you tell her [Dr. Li Tang, Defendant Medical Director]? What was your protest to her about patient safety?

A.      I said Dr. Weiss told me—when I brought the schedule to Dr. Weiss, I said, "Patients will die," and he said, "More to prove my point we don't belong in ICU."  And I went into detail about it . . .

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 326-27, Dkt. No. 62).

Q.      Mr. Armstrong: I asked him if it was against the law and he said no.

A.      I don't know any laws.
Mr. Patmon: We can understand that.  And he's not a lawyer so I'm asking just for his belief.

Q.      Do you believe it was wrong?

A.      Yes.

Q.      Do you believe it was criminal?

A.      In my opinion, yes.

Q.      Why do you believe it's criminal?

A.      Because ultimately a patient can die.

(Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 341, Dkt. No. 62).

### b.      The Lesko, Duvall and Madison Cases Are Inapposite to The Instant Case

The plaintiffs in *Lesko v. Riverside Methodist Hosp.*, No. 04AP-1130, 2005 WL 1482549

(Ohio Ct. App. June 23, 2005) (Exhibit G), and in *Duvall v. United Rehab. Servs. of Greater*

*Dayton*, No 22500, 2008 WL 5064861 (Ohio Ct. App. Nov. 26, 2008) (Exhibit V) both argued

that the whistleblower statute did not require a belief that the reported actions were criminal.

Similarly, in *Madison v. USF & G Fin. Servs. Corp.*, the plaintiff had a difference of opinion in

accounting methods, and while plaintiff expressed that he did not feel the method his employer

implemented was appropriate, he did not express that he thought it was a felony or a crime that

would place people in imminent risk of harm or a hazard to public health or safety.  *See*

*Madison*, 118 Ohio App. 3d 431 (Ohio Ct. App. 1997).  Nayyar's belief that intentionally placing patients at risk of death was a crime that constituted an imminent risk to the health of patients and a hazard to public health and safety is reasonable on its face.

These cases, cited by Defendants, are not on point to the facts here.  Plaintiff is not arguing for such an interpretation of the statute.  Clearly, Plaintiff's testimony that patients would "die" evinces a conscious understanding by him that criminal conduct occurred.  In fact, criminal conduct did occur.  Jeopardizing patient safety creates an imminent risk of physical harm to patients to enter Defendants' ICU and creates a hazard to the health and safety of the public who entrust their care to that ICU.  Intentionally, or even recklessly, causing the death of patients is a crime under any state's laws.  An attempt to commit an act that, if successful, would constitute or result in a crime, is a crime.  *See* R.C. § 2923.02.  Patient abuse or neglect is a crime.  *See* R.C. 2903.34.  Recklessly failing to provide patients with the treatment that is necessary to maintain their health or safety is a crime if that failure results in serious physical harm to any patient.  *See* R.C. § 2903.33.  Causing the death of patients as a proximate result of failing to provide them with the necessary treatment (due to intentional understaffing or other neglectful acts) is a crime.  *See* R.C. § 2903.04.

**c.**    **Plaintiff Made A Reasonable, Good Faith Effort to Determine The Accuracy Of The Information He Reported.**

The whistleblower statute does not require that the information reported be completely accurate.  *Dargart v. Ohio Dept. of Transp.*, 2005-Ohio-1808 at ¶ 23.  Rather, it is sufficient that the employee made a reasonable and good faith effort to determine its accuracy.  *Id.*  Where information brought to a plaintiff's attention by other employees was known to him by virtue of his position as his employer's business and human resources administrator, he was found to have made a reasonable and good faith effort to verify the information he reported.  *Id.*  Here, Plaintiff

Nayyar got his information straight from the perpetrator of the alleged violations—Defendant Weiss.  There was no further investigation for him to do — interviewing anyone else would only produce second-hand information, much less reliable than the firsthand account he had already received from Dr. Weiss.  All that was left was for him to make his oral report to someone in a supervisory role, and to leave them with a written account of the same, which he did.

The plaintiff in *Madison*, on the other hand, did not make a good faith attempt to verify the accuracy of the information he heard from the Chief Operating Officer about the future of the company, which prompted him to urge the company to employ the alternate accounting theory. *Madison*, 118 Ohio App. 3d 431.  Similarly, in *Hill v. Mr. Money Finance Co.*, also cited by Defendants, the plaintiff merely gathered and reported information reported to him by other employees, and the court found that he did not satisfy the requirement to make a reasonable, good faith effort to determine the accuracy of his belief that his employer's violations were felonies.  *Hill*, 309 F.App'x 950 (6th Cir. 2009).  In the case at bar, Plaintiff Nayyar got his information firsthand.  He did not hear Dr. Weiss's statements secondhand from someone else and report them to Dr. Tang without verifying the truth of the statements — he heard the statements from Dr. Weiss himself.  He voiced his concerns about the schedule to Dr. Weiss and Dr. Weiss spoke of a criminal violation of patient safety straight to Plaintiff.  Plaintiff then went to the next supervisor up and reported the situation.  (Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, p. 326-27, Dkt. No. 62).  There was no further investigation for Plaintiff to conduct.  His actions were all the reasonable, good faith effort required under the circumstances.

### d.    Plaintiff Complied With The Notification Requirement Of the Whistleblower Statute.

Plaintiff Nayyar can satisfy the writing requirement of the Ohio Whistleblower Act with the annotated schedule he provided to Dr. Li Tang.  The Act requires that when an employee

becomes aware of a violation of a state or federal statute, that the employee should orally notify his or her supervisor of the violation but also "subsequently shall file with that supervisor . . . a written report that provides sufficient detail to identify and describe the violation." Ohio Revised Code §4114.52 (A)(1)(a). While courts have required evidence of a written report for the plaintiff to succeed on his claim under the Act, there is no requirement that the plaintiff produce the report. *Vivo v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 09AP-110, 2009-Ohio-6417 at ¶17, citing *Wade v. Ohio Bur. of Workers' Comp.*, 10th Dist. No. 98AP-997 (June 10, 1999). To satisfy the procedural requirement of a writing under the Act, the plaintiff must show "by a preponderance of the evidence that there is a written report filed with the appropriate supervisor or other named authority and that the report provides 'sufficient detail to identify and describe the alleged violation.'" *Id.* at ¶19. According to *Vivo* and *Wade*, the plaintiff satisfies his burden of proof merely by proving the writing exists and that it describes and identifies the violation. *Id.* The proof is Plaintiff Nayyar's own testimony that he gave showed it to Weiss and Tang and Dr. Tang's corroborating testimony that she received it.

A genuine issue of material fact exists where the parties dispute whether the description of the violation is sufficient. In *Rheinecker v. Forest Laboratories, Inc.*, 813 F. Supp. 1307 (S.D. Ohio 1993), the plaintiff provided a four-page facsimile to his supervisors off-site in New York. The facsimile provided the results of a study testing the stability of a drug that failed to comply with the Federal Food, Drug and Cosmetic Act. *Id.* at 1309. Where the defendants claimed the information in the test results did not satisfy the requirement of the Ohio Whistleblower Act since it did not describe the violation with specificity, the plaintiff alleged that given the medical experience of his supervisors, the test results would indicate "the significance of the report." *Id.*

at 1311. The court determined that this issue was sufficient to withstand summary judgment and permitted the plaintiff's claim to proceed.

The schedule given to Dr. Li Tang satisfies the writing requirement of the Act since Plaintiff can prove both the writing's existence and that it identified the violation. Plaintiff is not required to provide a copy of the report; rather, he must only prove its existence and sufficiency for his claim to proceed. In the present case, Plaintiff Nayyar can prove the writing's existence since Dr. Li Tang testified to having seen and retained the writing given to her by Plaintiff at her deposition. (Exhibit F, Tang Dep., p. 173:1-17). When he confronted Dr. Tang about his concerns that too few interns were available to assure patient safety, Plaintiff provided Dr. Tang with a copy of the schedule given to him by Dr. Weiss. *Id.* Plaintiff had written notes on the schedule detailing his concerns about patient safety for lack of proper medical staff. (Exhibit D, Case No. 00135, Plaintiff Dep. Vol. II, pp. 305, 325, 348, Dkt. No. 62). As she spoke with Plaintiff, Dr. Tang circled areas on the schedule where Plaintiff was concerned about proper staffing. (Exhibit F, Tang, Dep., p. 173:1-17). Dr. Tang's testimony is sufficient proof as to the writing's existence while Plaintiff's notes about his concerns describe the violation. Additionally, Dr. Tang made notes on the schedule herself as to the concerns Plaintiff expressed to her at her meeting. The schedule given to Dr. Tang satisfies the writing requirement of the Act sufficient to permit Plaintiff's claim to proceed.

Even if Plaintiff or Dr. Tang cannot remember the exact wording on the writing, these notes and the dispute as to their meaning are sufficient to withstand summary judgment. According to the *Rheinecker* case, dispute as to the meaning of the writing requirement under the act will create a genuine issue of material fact that will make summary judgment inappropriate. While Plaintiff did not create a formal memo to Dr. Tang detailing his concerns, as medical

practitioners experienced with residents and staffing a hospital, both Plaintiff and Dr. Tang had

sufficient experience to understand the significance of the schedule and its display of Plaintiff's

concerns for patient safety.  By giving the schedule to Dr. Tang, a hospital employee who

worked with residents on a regular basis, Plaintiff believed the schedule would indicate his

concerns.  Furthermore, Plaintiff indicated to Dr. Tang with notations on the schedule what his

specific concerns were and Dr. Tang circled those areas where medical staffing was sparse on the

schedule during their meeting.  Plaintiff's situation is similar to that of *Rheinecker* sufficient to

create a genuine issue of material fact that should result in Defendants' Motion for Summary

Judgment being denied.

> **2.      Plaintiff Nayyar Was Retaliated Against For Accusing Dr. Weiss And
> Mount Carmel Of Intentionally Causing The Death Of Patients In
> The ICU.**

Defendants argue that Dr. Weiss could not have retaliated against Plaintiff because he

asked Plaintiff to become involved in the patient safety issue, and that the time-line of events

shows no retaliation.  Defendants' arguments are not credible.  If, however, this Court believes

there is some merit to them, the facts and evidence in this case unequivocally and conclusively

show that significant, genuine issues of material facts exist precluding summary judgment on

causation grounds.

Defendants attempt to avoid summary judgment on causation by arguing Dr. Weiss was

in support of Plaintiff's complaint is surreal and simply untrue.  Again, as noted previously,

Defendants' myopic recitation of the record is woefully deficient.  Defendants blatantly fail to

say anything about the fact that Plaintiff accused Dr. Weiss of scheduling residents in July 2009

without adequate back-up, the continued lack of supervision of residents (still ongoing after the

January 2009 petition), and causing the death of patients.  It belies common sense and is not

reasonable to believe that Dr. Weiss was in favor of a complaint which accused him of

committing a criminal act, and possibly homicide.  It is undisputed that Plaintiff accused Dr.

Weiss of patient safety violations and causing the death of patients.  (Exhibit D, Case No. 00135,

Plaintiff Dep. Vol. II, pp. 326-327, Dkt. No. 62) (Exhibit T, Affidavit of Sunil Nayyar, ¶¶ 20-

24).  It is undisputed that Plaintiff reported Dr. Weiss' criminal behavior to doctors Tang and St.

John.  Dr. Weiss could not have been pleased about Plaintiff's whistle-blowing, and certainly

had a motive for retaliating against Plaintiff.

The fact that other residents signed the January 2009 petition is not persuasive.  It is

undisputed that Dr. Weiss asked Plaintiff, not the other signers, to organize, gather, and lead the

January 2009 petition.[6]  It is also undisputed that Plaintiff, not the other signers, later accused

Dr. Weiss of exacerbating the patient safety problems, and accused him of intentionally causing

the death of patients.

Defendants' time-line argument is equally deficient and myopic.  First, the fact that

Plaintiff's contract was renewed in June 2009 is of no consequence because Plaintiff whistle

blew *after* his contract was renewed.  Second, the July 7, 2009 A-line incident occurred *after*

Plaintiff whistle blew about Dr. Weiss causing the death of patients, *after* Dr. Tang refused to

correct it, and *after* Dr. St. John reported it to Mount Carmel administration.  Defendants,

therefore, had ample motive to target Plaintiff for retaliation <u>before</u> the A-line-related events.

These pre-A-line-related events must be construed, pursuant to Civil Rule 56, in favor of

Plaintiff; in other words, Rule 56 demands an inference that (1) Defendants' decision to

investigate, (2) their findings, and (3) their ultimate decision to terminate, rather than counsel or

---

[6] Defendants' argument that Dr. Weiss could not have been motivated to retaliate against Plaintiff are not helpful to Defendant Mount Carmel.  There is no evidence that Mount Carmel encouraged the January 2009 petition, given the prospect of potential malpractice lawsuits arising from their ICU and evidentiary use of the January 2009 petition.

rehabilitate Plaintiff, as they had Jonathan Borders on several occasions, is evidence of retaliation.

Defendants' other arguments are also meritless.  The passage of time between the January 2009 petition and termination is unavailing because of the intervening July 2009 whistle blowing.  Dr. Weiss and Mount Carmel certainly had a motive after being accused of attempting to cause the death of patients in July 2009.

The professionalism issue also lacks true substance because Plaintiff flatly denies the professionalism events occurred.  In fact, Dr. Weiss never gave Plaintiff an opportunity to respond to all of the accusations against him, to clear up any misunderstanding, or to present evidence showing his innocence.  (Exhibit O, Case No. 00135, Weiss Dep. I pp. 119-123, Dkt. No. 94).  In addition, Mount Carmel West's self-staffed employment termination committees likewise did not give Plaintiff a chance to defend himself.  During the committee meetings, Plaintiff was only given an opportunity to answer questions, but given no access to his own personnel file or statements gathered against him, despite having requested access prior to the termination committee meetings.  (Exhibit W, Letter from Atty. Zets requesting access to evidence).  Without access to evidence, Plaintiff had no way of defending himself.  Dr. Weiss, however, was given access to Plaintiff's personnel files and evidence and used this information to obtain the Program Education Committee's agreement to terminate Plaintiff.  (Exhibit X, Program Education Committee Minutes, dated August 6, 2009).[7]  The failure to permit Plaintiff to defend himself is evidence of retaliation.

---

[7] A review of the Program Education Committee minutes conclusively shows that Dr. Weiss presented evidence to support dismissal, citing past and recent events of poor professional conduct.  By contrast, Plaintiff was given an "opportunity" to present evidence without being given access to the evidence against him, as Attorney Zets' letter demonstrates.

Even assuming this Court believes the Defendants' investigation, findings, and decision to terminate has some merit, significant issues of disputed fact exist precluding summary judgment. First and foremost, Plaintiff denies (1) that he was told not to talk to other staff about the A-line incident, (2) that he told a nurse to lie about the incident, (3) that he told an OB-GYN intern she was placed on leave, and (4) that he allowed a nurse to perform the A-line procedure. (Exhibit T, Affidavit of Sunil Nayyar, ¶¶ 28, 34-37). Second, Plaintiff was given no access to any evidence in order to defend himself. Third, Dr. Weiss was permitted to participate in the investigation and make the termination decision, even though he was the person accused of retaliation. Fourth, although he initially failed to admit that he talked to Nurse Bowers, he did admit to talking to her, yet no consideration was given to his voluntary admission. (Exhibit T, Affidavit of Sunil Nayyar, ¶¶ 59-61). These facts, taken together, conclusively show Defendants rushed to judgment in order to retaliate against Plaintiff for whistle blowing.

> **D.** **Defendants Are Not Entitled To Summary Judgment on Plaintiff's Claim Of Wrongful Termination In Violation Of Public Policy.**

Contrary to Defendants' assertion, Plaintiff's claim concerns a recognized Ohio Public Policy prohibition against intentionally causing the death of a person. *See*, generally, *State v. Nelson*, No. 1999AP020007, 2007 WL 94535 (Ohio App. 5th Dist. 2000) (attempted homicide) (Exhibit Y). Defendants again attempt to limit Plaintiff's claim to a patient safety violation only. Plaintiff alleges that Dr. Weiss scheduled residents in a manner that lead to a severe safety violation and told Plaintiff he did so to cause patient deaths. The facts in *Mitchell v. Mid-Ohio Emergency*, cited by Defendants, are inapposite to those in this case. The plaintiff in *Mitchell* never alleged that Defendants caused patient safety issues for the purpose of causing a patient's death. *Mitchell* simply has no application to this case.

In addition, the record evidence does establish Plaintiff was retaliated against for whistle blowing.  The sham termination process alone is evidence of retaliation.  As demonstrated above regarding Plaintiff's race and national origin claim, Mount Carmel's practice is to progressively discipline and counsel residents, even for serious errors and misconduct.  The reason is simple.  A terminated third-year resident's career is over if fired.  Residency programs rarely, if ever, take third-year residents, and a doctor who has no finished residency is not eligible for medical positions.  *See Bali v. Christiana Care Health Servs., Inc.*, No. C.A. 16433, 1999 WL 413303, at *4 ("Unlike an employee in a usual case who can find substitute employment, an improperly discharged resident physician can be expected to have the greatest difficulty securing a substitute position in another residency program, and thus, has little or no prospect of achieving board certification in his or her chose specialization.") (Exhibit Z).

Mount Carmel, however, did not progressively discipline and counsel Plaintiff.  Instead, Plaintiff was fired, although he had no prior formal disciplinary history.  Plaintiff's lack of formal discipline, coupled with the fact that he admitted his error, warranted punishment short of termination.[8]

### E.    Defendants Are Not Entitled To Summary Judgment on Plaintiff's Abuse Of Process Claim.

Plaintiff has a valid and enforceable abuse of process claim.  As noted earlier, the process utilized during Plaintiff's termination was a sham process in retaliation for whistle blowing.  The termination process at Mount Carmel is not a traditional, internal employment process.  Rather, the termination process is mandated by the ACGME, a national accreditation agency which accredits residency programs throughout the United States.  Certification by ACGME is required

---

[8] It is undisputed that, prior to the A-line investigation, Dr. Weiss gave Plaintiff satisfactory and high grades in the core competency areas, including professionalism.

to qualify for federal reimbursement of the cost of residency education and treatment reimbursement under Medicare and Medicaid.  The ACGME process, therefore, is the equivalent of a "legal process."

The ACGME process in Plaintiff's case was clearly perverted by an ulterior motive: retaliation for whistle blowing.  The failure to permit Plaintiff to defend himself by accessing and reviewing the evidence brought against him is a perversion, and is abusive.  Indeed, barring the accused from defending himself contravenes traditional notions and standards of due process and fair play.  The ACGME termination process was a sham and abusive process.

While the ACGME process is not a traditional legal process, in the medical residency field, it is certainly the functional equivalent.  Accordingly, Plaintiff respectfully requests this Court recognize this exception in this case.

> **F.      Defendants Are Not Entitled To Summary Judgment on Plaintiff's Intentional Infliction Of Emotional Distress Claim.**

Defendants' argument that there is no evidence that Defendants knew Plaintiff would suffer and that their conduct was not extreme and outrageous is not supported by the record evidence and common sense.

Defendant Weiss knew the termination of Plaintiff in the third year of his residency program would cause Plaintiff to suffer.  (Exhibit T, Affidavit of Sunil Nayyar, ¶ 69); *see also Bali*, at *4 ("discharged resident physician can be expected to have the greatest difficulty securing a substitute position in another residency program").  Moreover, Plaintiff has suffered significant psychological injury because he cannot get into a residency program and cannot be employed in internal medicine because he is not board certified and is not board eligible.

Defendants' conduct is also certainly outrageous and extreme.  Contrary to Defendants' assertion, this case is not simply a discrimination case.  Plaintiff's career has been ruined.

(Exhibit T, Affidavit of Sunil Nayyar, ¶¶ 62-69).  Plaintiff was targeted for investigation (by Dr. Weiss, whom he accused of attempting to cause the death of patients); taken through a sham A-line investigation (where a nurse violated her scope of practice — not Plaintiff); was subjected to a sham termination process (where he could not defend himself); and summarily fired.  This conduct is extreme and outrageous.

**G.      Defendants Are Not Entitled To Summary Judgment on Plaintiff's Spoliation Of Evidence Claim.**

Since Plaintiff filed his spoliation claim in November 2009 alleging the January 2009 petition was destroyed, numerous spoliation issues have been discovered throughout the discovery process.  Dr. Li Tang testified that she received the July 2009 schedule containing handwriting detailing Plaintiff's whistle blowing and that she deleted documents after receiving a preservation notice.  (Exhibit F, Tang Dep. pp. 171-174, 18-25).  Now, mysteriously, the schedule with Plaintiff's handwriting is nowhere to be found.  In addition, Dr. Mark Easterday, the Program Education Committee chairman, and Dr. Weiss also failed to preserve key documents needed to establish Plaintiff's claims.  And, lastly, it is clear from the record evidence that Defendants had notice of potential litigation in July or August 2009 and certainly had knowledge of a lawsuit in January 2010 when a lawsuit was filed.  Yet, despite notice of imminent litigation, Defendants failed to preserve a document needed to prove Plaintiff's whistle blower claim.

**H.      Defendants Are Not Entitled To Summary Judgment on Plaintiff's Breach Of Contract Claim.**

On June 23, 2009, Plaintiff Nayyar entered into a contract with Defendants.  The contract provides, in relevant part, that the employment contractual relationship shall comply with the Resident Handbook and Mount Carmel's Hospital Human Resources Policies and Procedures

Manual.  (Exhibit AA, GME contract).  The Resident Handbook states that Defendants will comply with ACGME regulations.

First and foremost, as stated above, the Resident Handbook, p. 12, prescribes specific procedures for termination that include defending against termination charges and a right of access to a personal file.  Plaintiff Nayyar could not defend himself because he had no access to his personnel file and the evidence against him.  This is a breach of the GME contract.  *See e.g. Day v. Good Samaritan Hospital & Health Center*, No. 8062, 1983 WL 4934 (Ohio App. 2nd Dist. 1983) (employment manual termination procedures are contractually enforceable) (Exhibit BB).

Second, both the ACGME regulations, (Exhibit DD) and Handbook, p. 18 (Exhibit C), require compliance with the 80-hour work rule and reporting system.  Plaintiff Nayyar was coerced and pressured into working in excess of the 80-hour rule and falsely reporting his hours.  This is a breach of the GME contract.

Accordingly, Defendants breached the GME contract.

**I.     Defendants Are Not Entitled To Summary Judgment on Plaintiff's Promissory Estoppel Claim.**

Plaintiff Nayyar's promissory estoppel claims are based on the failure to comply with termination procedures and publication of confidential information in his personnel file to the media.  As stated above, the GME integrates the Resident Handbook's termination procedures and personnel file confidentiality protections into the GME contract.

As to the termination procedures, Plaintiff Nayyar relied on Defendants' contractual obligation to comply with the termination procedures by giving him access to his file to defend himself.  Similarly, Plaintiff Nayyar relied on the confidentiality protections to ensure that his personnel file and the evidence used against him in the A-line investigation and termination

process would not be publicized.  Plaintiff Nayyar relied on these contractual promises to his detriment.  *See*, generally, *Helmick v. Cincinnati Word Processing, Inc.*, 45 Ohio St.3d 131 (1989); *Cohen & Co. v. Messina*, 24 Ohio App. 3d 22 (1985).  As noted earlier, Defendant did not keep the contractual promises and Plaintiff relied to his detriment.

Further, Plaintiff Nayyar relied on Defendants' practice of not terminating residents for medical errors and even lying during a residency.  Resident Dr. Borders lied repeatedly on the job and jeopardized patient care but was not fired until he had committed multiple acts of misconduct.  Plaintiff Nayyar was entitled to rely on Defendants' practices.

## IV.    CONCLUSION

Based on the foregoing reasons, Plaintiff Dr. Sunil Nayyar respectfully requests this Court deny Defendants' Motion for Summary Judgment.

Respectfully submitted,

/s/ William W. Patmon III
William W. Patmon III, Esq. (0062204)
M. Nikol Madison, Esq. (0084137)
Kaitlin Madigan (0087891)
The Patmon Law Firm
88 East Broad Street, Suite 2070
Columbus, Ohio 43215
Phone: (614) 824-4193
Facsimile: (614) 448-4393
wpatmon@patmonlaw.com
mmadison@patmonlaw.com
kmadigan@patmonlaw.com
*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the forgoing was served this 8th day of April, 2013, via

electronic mail, upon all counsel registered with this Court's electronic service.

/s/ William W. Patmon III_____

William W. Patmon III, Esq. (0062204)

M. Nikol Madison, Esq. (0084137)

Kaitlin Madigan (0087891)
