```
 1  about, documents, e-mails, okay, voice mails, is
 2  there any other repository or method by which
 3  documents or information was contained, possessed or
 4  transferred by you while you were an interim
 5  director other than the categories we've talked
 6  about just now?
 7  A.       I don't think so.
 8  Q.       Okay.  That's fine.
 9           Now, your e-mails -- when you left Mount
10  Carmel, what happened to your e-mails?
11  A.       I think either I deleted them or --
12  Q.       Okay.
13  A.       -- or they just stayed with Mount Carmel.
14  Q.       Okay.  All right.  Let's talk about -- do
15  you recall getting any notice or request from Mount
16  Carmel in July of 2009 to not delete any documents
17  from your system?
18  A.       I did.
19  Q.       You got notice from them?
20  A.       Uh-huh.
21  Q.       Okay.  And who sent you that notice?
22  A.       I believe it's the legal counsel, legal
23  counsel.
24  Q.       Legal counsel?
```

```
 1   A.         Yeah.
 2   Q.         Okay.  Is that the general counsel at
 3   Mount Carmel?
 4   A.         I believe it could be -- to my best
 5   knowledge.
 6   Q.         Okay.
 7   A.         It was Mount Carmel, I think, the -- at
 8   the advice of our legal counsel, the law firm.
 9   Q.         Was it Mr. Armstrong's law firm?
10   A.         I believe so.
11   Q.         They sent you a letter?  Did you get the
12   letter directly from Mr. Armstrong's law firm or did
13   you get it from someone else at Mount Carmel?
14   A.         I do not recall.  I'm sorry.
15   Q.         All right.
16   A.         But I did receive that.
17   Q.         And when do you recall getting that notice
18   to not delete or destroy any documents?
19   A.         I believe it was after the lawsuit was
20   officially filed.
21   Q.         Okay.
22   A.         Or -- yeah.
23   Q.         So would that have been in 2010 that you
24   got that notice?
```

```
 1  A.         No.  2009.
 2  Q.         2009?
 3  A.         Yes.
 4  Q.         Do you recall if it would have been in
 5  July of 2009?
 6  A.         I don't think so.
 7  Q.         So you got that notice after the lawsuit
 8  was filed; right?
 9  A.         To my best knowledge.
10  Q.         Okay.  All right.  Now, prior to the
11  lawsuit being filed, did you ever delete documents
12  from your e-mail?
13  A.         I do, but nothing connected to this case.
14  Q.         Okay.  All right.  But you deleted
15  documents from your e-mail; correct?
16  A.         Yes.
17  Q.         Okay.  And prior to the lawsuit being
18  filed, no one told you to preserve any of the
19  documents that were on your e-mail system; is that
20  correct?  Yes or no?
21             MR. ARMSTRONG:  Objection.  I believe
22  she's already answered the question.
23  BY MR. PATMON:
24  Q.         Yes or no?  You're obligated to answer,
```

```
 1  ma'am.  Yes or no?
 2  A.        Could you repeat the question.
 3  Q.        Prior to -- I want to confirm, prior to
 4  you testifying here today, that you received a
 5  notice after the lawsuit was filed to preserve
 6  documents.
 7  A.        Uh-huh.
 8  Q.        Okay.  So I just want to be clear that
 9  prior to the lawsuit being filed, no one sent you a
10  notice telling you to preserve documents; is that
11  correct?
12  A.        To my best knowledge.
13  Q.        Okay.  The document that you received
14  after the lawsuit was filed, where is that document
15  right now?
16  A.        I do not remember.
17  Q.        Okay.  What -- when you received the
18  document, did you receive it by e-mail or did you
19  receive it in a -- in paper form?
20  A.        Honestly speaking, I can't remember
21  either.
22  Q.        Based on your office practices and how you
23  handle things, would you have put that e-mail in a
24  particular file, and if so, what was the name of
```

```
 1  that file?
 2          MR. ARMSTRONG:  I'm going to object.
 3  Bill, she testified she didn't know if it was an
 4  e-mail or a document.
 5  BY MR. PATMON:
 6  Q.      Okay.  E-mail or document, it doesn't
 7  matter.  Based on your office practices and how you
 8  handle management of the information received by
 9  you, what type of file do you believe you would have
10  put that document in had you received it?
11  A.      It could be either way.
12  Q.      Okay.  I'm trying to figure out, do you
13  have a filing system?  Do you have a way of managing
14  your office?  If you received a letter like that,
15  where do you think you would have put it?
16  A.      The e-mail I might put into a folder --
17  Q.      Okay.
18  A.      -- electronically.
19  Q.      What would that folder have been named, to
20  the best of your recollection?
21  A.      Most likely Sunil Nayyar.
22  Q.      Okay.  And if it had been received by you
23  in paper form, where would you have put it in that
24  case?
```

| | | |
|---|---|---|
| 1 | A. | Most likely in a binder. |
| 2 | Q. | In a binder? |
| 3 | A. | Uh-huh. |
| 4 | Q. | What would that binder have been named? |
| 5 | A. | Probably also Sunil Nayyar. |
| 6 | Q. | Okay.  Now, after you received this notice |
| 7 | | to preserve documents, did you delete any documents |
| 8 | | from your e-mail system after that, after you |
| 9 | | received a notice? |
| 10 | A. | Could you clarify so-called -- |
| 11 | Q. | Okay.  That's fine. |
| 12 | A. | Okay. |
| 13 | Q. | Do you recall electronically deleting any |
| 14 | | information from any device after you received the |
| 15 | | notice to preserve documents? |
| 16 | A. | Are you referring to any documents -- |
| 17 | Q. | Any documents -- |
| 18 | A. | -- related to this case? |
| 19 | Q. | No.  I didn't ask -- any document |
| 20 | | whatsoever.  Did you delete any documents?  Do you |
| 21 | | recall deleting or shredding or throwing out any |
| 22 | | documents after you received the notice to preserve |
| 23 | | documents? |
| 24 | A. | I'm not sure -- |

**LI TANG - February 4, 2012**                                    24

```
 1   Q.        That's fine.
 2   A.        -- about this question.
 3   Q.        Now, let's go back to the notice.  Did the
 4   notice specifically give you -- did it tell you what
 5   documents to preserve?
 6   A.        Yes.
 7   Q.        Okay.  Can you recall what it told you to
 8   preserve?
 9   A.        Any communication, anything regarding
10   Dr. Nayyar's case.
11   Q.        Okay.  When you say "anything regarding
12   Dr. Nayyar's case," did it provide you with any
13   additional details about Dr. Nayyar's case, any
14   subcategories, anything beyond what you just told me
15   here today?
16   A.        I cannot recall the details.
17   Q.        Okay.
18   A.        All I recall is anything that has anything
19   to do with Dr. Nayyar.
20   Q.        Okay.  Did anyone -- let me ask you this:
21   What was your understanding then of that statement
22   you just made that you were to preserve anything
23   concerning Dr. Nayyar?  What's your understanding of
24   that?
```

 1  A.         Anything basically in writing or, like you
 2  have said, in the three formats or forms, yes.
 3  Q.         Okay.  Now, let's -- I need to dig in here
 4  and figure out what you mean by this.  Now, when you
 5  say "concerning Dr. Nayyar," are you -- did you just
 6  preserve documents concerning his termination?  I'm
 7  trying to figure out the scope of documents that you
 8  preserved.  Did it just relate to his termination or
 9  the investigation or did it relate to his entire
10  career there at Mount Carmel?
11  A.         For me, that means anything -- any
12  information that comes to me regarding Dr. Nayyar.
13  Q.         Okay.  And when you say "any information
14  that came to you," did you limit that to stuff that
15  came to you during 2009 or did it relate to other
16  periods of time?
17  A.         2009 since I became the DME.  Before that,
18  I had no business to do with information regarding
19  Dr. Nayyar.
20  Q.         Okay.  That's fine.
21             Now, you -- prior to 2009, you became --
22  let me back up.  Withdraw that.
23             In 2009, you became the interim director;
24  right?

1  director as a part of the protocol.
2  Q.         All right.  Okay.  And once the review was
3  over, what happened to that file?
4  A.         It was returned to the residency
5  program -- it was returned to the program director.
6  Q.         Okay.  And that program director's name
7  would be what?
8  A.         Dr. John Weiss.
9  Q.         Okay.  Now, when you were separated from
10 Mount Carmel, what did you do with your paper files?
11 I may have asked you that question, but I've got to
12 ask it again.  I'm sorry.
13 A.         That's okay.
14 Q.         Go ahead.
15 A.         Can you repeat that question.
16 Q.         Any paper files that you had at the time
17 of separation, what did you do with them?
18 A.         I left them with Mount Carmel.
19 Q.         Did you give them to a specific person?
20 A.         Actually, they were just -- they just
21 stayed in my office.
22 Q.         Okay.
23 A.         Yeah.  No, I did not give it to a specific
24 person.

```
 1  BY MR. PATMON:
 2  Q.        Dr. Tang, I put in front of you
 3  Exhibit P2.  It says Internal Medicine Call Schedule
 4  July 2009.  Why don't you take a minute and review
 5  that document and tell me if you've seen it before.
 6  A.        Yes, I have.
 7  Q.        Okay.  Do you recall when you first saw
 8  this document?
 9  A.        I believe it was in July 2009.
10  Q.        Okay.  Was this document given to you by
11  Dr. Sunil Nayyar?
12            Let me clarify.
13  A.        Yes, go ahead.
14  Q.        Was a document similar to this document
15  given to you by Dr. Sunil Nayyar?
16  A.        To my best recollection.
17  Q.        Okay.  Do you recall, the document that
18  Dr. Nayyar gave you, where is that document now?
19  A.        I believe it is in the file of the
20  lawsuit, I think, as one of the attachments --
21  Q.        All right.
22  A.        -- to my best recollection.
23  Q.        Did Dr. Nayyar -- when he gave you this
24  document, was it July of 2009 or do you think it was
```

**LI TANG - February 4, 2012**             172

```
 1  June?
 2  A.        That I could not remember.  It's right
 3  around that time.
 4  Q.        Let me do this.  Let me mark another
 5  exhibit.  I promise only one, but I need to refresh
 6  your recollection.  We're going to do this
 7  Exhibit P3.
 8                          - - -
 9          And, thereupon, Exhibit P3 was marked for
10  purposes of identification.
11                          - - -
12  BY MR. PATMON:
13  Q.        Dr. Tang, look at Exhibit P3.  Why don't
14  you review it and tell me whether or not that
15  refreshes your recollection as to when you got
16  Exhibit P2.
17  A.        Yes.
18  Q.        Okay.  Based on the two documents in front
19  of you, can you tell me the specific time frame or
20  day when you received Exhibit P2 from Dr. Sunil
21  Nayyar.
22  A.        I believe it was morning.
23  Q.        Okay.  On what date?
24  A.        June the 22nd.
```

**LI TANG - February 4, 2012**                173

```
 1  Q.          Okay.  Now, when Dr. Nayyar gave you a
 2  document similar to Exhibit P2, what did you do with
 3  the document that he gave you?
 4  A.          I listened to him about why he showed me
 5  this document.
 6  Q.          All right.  And he left that document with
 7  you; right?
 8  A.          I cannot be sure, but I think that was the
 9  case.
10  Q.          Okay.  And based on your recollection or
11  practice, if he had left this document with you,
12  what do you believe you would have did with it?
13  A.          I reviewed it and -- in conjunction with
14  what he was concerned about and subsequently sent
15  Dr. Weiss this note --
16  Q.          Okay.  All right.
17  A.          -- as DIO.
18  Q.          Did you put that document in your files?
19  A.          I honestly do not recall.
20  Q.          Okay.
21  A.          Yeah.
22  Q.          Do you recall looking at Exhibit P2 -- do
23  you recall the document that was similar to that
24  document that was given to you -- do you recall any
```

**LI TANG - February 4, 2012**                            174

```
 1   handwriting in the margins of that document?
 2   A.        If anything I did -- I think I circled a
 3   couple of areas.
 4   Q.        Okay.
 5   A.        That was it.
 6   Q.        Did you -- do you recall any handwriting
 7   in the margins of the document or anywhere on that
 8   document made by Dr. Nayyar?  In other words, when
 9   you were given the document, was there writing on
10   that document?
11   A.        I honestly don't recall.
12   Q.        Okay.  Do you have any reason to believe
13   that there was not any writing on that document?
14   A.        I really -- I'm sorry.  I really --
15   Q.        Did you -- after Dr. Nayyar gave you a
16   copy of this document, did you provide a copy of the
17   document he gave you to anyone else at Mount Carmel
18   West Hospital?
19   A.        I did not.
20   Q.        Did you provide a copy to anyone at
21   Trinity Hills?
22   A.        No, I did not.
23   Q.        Now, you said you circled something on
24   that document.  Can you recall what you circled on
```