# IN THE COURT OF COMMON PLEAS, FRANKLIN COUNTY, OHIO
## CIVIL DIVISION

| | | |
|---|---|---|
| SUNIL NAYYAR, | : | |
| | : | Case No. 09 CVC 11 17576 |
| **Plaintiff,** | : | JUDGE: _____ |
| | : | |
| v. | | |
| | : | |
| MOUNT CARMEL HEALTH SYSTEM | : | |
| C/O Donald A Davies | | |
| 10 West Broad St. | : | |
| Columbus, Ohio 43215 | | |
| | : | **COMPLAINT** |
| and | | |
| | : | |
| DR. JOHN WEISS, | | |
| Individually, | : | **JURY DEMAND ENDORSED** |
| Program Director | | **HEREON** |
| Internal Medicine Residency | : | |
| 793 West State Street | | |
| Columbus, OH 43222 | : | |
| | | |
| and | : | |
| | | |
| DR. LI TANG, | : | |
| Individually, | | |
| Director of Medical Education | : | |
| 793 West State Street | | |
| Columbus, OH 43222 | : | |
| | | |
| **Defendants.** | : | |

## NATURE OF CLAIMS

Now Comes Plaintiff Dr. Sunil Nayyar (hereinafter " Nayyar"), by and through the undersigned counsel, and for his Complaint states as follows:

1. This action is brought because of the unlawful and retaliatory conduct and employment practices of Defendants Mount Carmel Health Systems (hereinafter "MC"), and Defendants Doctor John C. Weiss, Program Director, Internal Medicine Residency, and Doctor Li Tang, Director of Medical Education, both employees of MC. The action arises out of the illegal and retaliatory targeting, investigation, discipline and termination of Plaintiff Nayyar in violation of Ohio whistleblower statute, and termination in violation of Ohio law public policy, among other claims.

## JURISDICTION AND VENUE

2. This Court has jurisdiction of this matters because all of events and conduct alleged herein occurred in Franklin County, Ohio.

3. Venue is proper in this Court as all the acts complained of herein occurred in the State of Ohio, County of Franklin.

## PARTIES

### Plaintiff

4. Plaintiff Nayyar, a resident of Franklin County, Ohio, was employed as a resident physician by Mount Carmel Health Systems from July 2006 to July 2009 at its West facility in Franklin County, Ohio.

### Defendants

5. At all times material herein, Defendant MC's principal place of business or agent is located in Franklin County, Ohio.

6. Defendant MC conducts business as a hospital system and represents on its website that it has "healthcare facilities

2

throughout central Ohio to take care of you and your family." The Mount Carmel Health System has four major hospitals within the Columbus area, Mount Carmel West ("MCW"), Mount Carmel East, Mount Carmel St Ann's, and the New Albany Surgical Hospital in Franklin County, Ohio. MCW has a residency training program accredited by the Accreditation Council for Graduate Medical Education ("ACGME").

7. Defendant John C. Weiss, Program Director, Internal Medicine Residency at Mount Carmel in Franklin County, Ohio is being sued in his individual capacity.

8. Defendant Li Tang, Director of Medical Education at Mt. Carmel in Franklin County, Ohio, is being sued in her individual capacity.

## FACTS

9. MCW is located on the West side of Columbus, Ohio, in an underprivileged neighborhood and frequently treats patients who either have no insurance or pay for services with Medicaid/Medicare.

10. Upon information and belief, MC places licensed on-site physicians, trained in the critical care of patients, at its intensive care units ("ICU") at its' Mount Carmel East and St. Ann's hospitals, which are located in middle and upper income areas.

11. By contrast, MC has only residents and interns at its' ICU located at MCW and no licensed, critical care physician on-site to supervise and assist residents (who have no critical care license) in treatment of patients.

12. Plaintiff Nayyar was hired as a resident physician by MC in July 2006 and assigned to MCW. Plaintiff has been an exemplary employee at MC and received exceptional reviews from his Program Directors prior to his termination on July 22nd 2009.

13. No licensed physician was placed on-site with Plaintiff Nayar and other residents and interns in the ICU unit.

3

14. Plaintiff Nayyar was placed in the ICU at MCW despite the fact that he does not have a critical care license and has limited training in the critical care of patients.

15. On or about January of 2009, Plaintiff Nayyar and 16 other residents became increasingly alarmed about the safety of the patients within the ICU at MCW. Plaintiff Nayyar was specifically worried that the lack of adequate critical care staff with the proper training in the critical care within the ICU would result in the death of patients, or the substantial deterioration in their medical conditions.

16. Plaintiff Nayyar conveyed his concerns about patient safety to his Program Director, Dr. Weiss.

17. Plaintiff Nayyar and 16 other residents signed a petition to the hospital administration which stated that "without an in-house critical care supervisor, [patient] safety is an active issue." (See Exhibit A, patient safety petition).

18. The petition was submitted to Dr. Weiss, Dr. Li Tang, and MC administration.

19. Despite the petition, no steps were taken by either MCW or Drs. Weiss and Tang to address the safety issues in the ICU at MCW.

20. On or about July 2009, Dr. Weiss gave the staffing chart in the MCW-ICU for the month of July 2009 to Plaintiff Nayyar.

21. Upon immediate review of the staffing schedule, Plaintiff Nayyar became alarmed that July 2009 ICU staffing would result in increased death and irrevocable harm to patients.

22. Plaintiff Nayyar immediately confronted Dr. Weiss about the July 2009 ICU staffing proposed by him and stated it would, in all likelihood, cause death and irrevocable harm to ICU patients.

23. Dr. Weiss responded that it was his intent that patients die in the ICU because he believed that the death of patients was

necessary for MCW to staff the ICU with licensed on-site critical care physicians.

24. Plaintiff promptly informed Dr. Li Tang, Director of Medical Education about Dr. Weiss's remarks and provided her ICU staff schedules prepared by Defendant Weiss. (Exhibit B).

25. In the course of submitting the ICU schedule, Plaintiff also informed Dr. Tang that the ICU at MCW was critically understaffed and there was a strong likelihood that patients in the ICU would die if the staffing assignments of Dr. Weiss were followed.

26. Plaintiff also pointed out to Dr. Tang that the ICU units at Mount Carmel East and St. Ann's were adequately staffed with experienced professionals, but not MCW, which is located in an underprivileged neighborhood.

27. Dr. Tang dismissed Plaintiff's concerns and indicated that the ICU was adequately staffed with one resident at night and agreed with Dr. Weiss's decision.

28. In response, Plaintiff asked Dr. Tang: "would you bring your loved ones to Mt. Carmel West's ICU with only one resident in-house and with no trained critical care staff attending."

29. Dr. Tang responded, "No."

30. MCW nevertheless proceeded with Dr. Weiss ICU staffing schedule and placed ICU patients at unreasonable risk of harm and death.

31. On July 7, 2009, Plaintiff attempted to place an A-Line (arterial line) into a patient. In the process of placing the A-Line into the patient, Plaintiff Nayyar developed a cramp. As a result, he requested his assistant, Nurse Amanda Bowers, to hold the A-Line while he relieved his cramp. A few minutes later, Plaintiff took control of the A-Line and successfully inserted the line into the patient. There were no adverse consequences to the patient during this process.

32. On July 9, 2009, Defendant Weiss called Plaintiff and orally informed him that there "may" be an investigation into the A-Line incident.

33. No <u>written notice</u> was ever given to Plaintiff Nayyar formally stating that he was being investigated and being put on probation or that he was not to speak to any hospital staff.

34. On July 10, 2009, Plaintiff Nayyar submitted a report narrating the events surrounding the A-Line incident that occurred on July 7, 2009, per Defendant Weiss' request, despite the fact that was o should have been a target of the A-line investigation.

35. On July 16, 2009, Plaintiff Nayyar requested a meeting with MC-Human Resources due to the lack of communication between Defendant Weiss and Plaintiff Nayyar. At the meeting Plaintiff Nayyar was asked to provide details about the events surrounding the A-Line incident of July 7th 2009. Plaintiff Nayyar was also asked whether he had spoken to anyone about the incident. Plaintiff Nayyar responded that he had spoken to a few colleagues to make sure that his shift was covered and to ensure that an intern was okay.

36. At no time did Plaintiff Nayyar threaten to fire any employee or resident of MCW regarding this incident.

37. At no time did he attempt to influence the investigation.

38. On July 22, 2009, Plaintiff Nayyar was terminated from the residency training program at MCW on the grounds that he lacked the necessary communication and professionalism to work effectively within the health care delivery system.

39. In contrast to other MCW residents who signed the petition, Defendants targeted Plaintiff Nayyar for termination because he effectively led the reporting from January 2009 through the date of his termination by reporting the ongoing patient safety issue and by protesting to management staff at MCW.

40. Defendants knew that Plaintiff Nayyar collected and forwarded the petition to MCW managers, that Plaintiff Nayyar alone reported the ICU scheduling and resulting danger to patients to MCW managers, and that Plaintiff Nayyar alone continued to protest and object to patient safety issues in the ICU.

41. As a consequence of the patient safety issue in MCW ICU, upon information and belief, patients have died or have been suffered unreasonably, including a patient who may have died on November 8, 2009 of the H1N1 disease as a result of improper staffing of the ICU at MCW. (See Exhibit C)

42. Plaintiff, in the past three years at MC, has never had any prior disciplinary misconduct.

43. Despite Plaintiff Nayyar's exemplary performance record and the lack of prior misconduct, MCW terminated him from the residency program.

44. In August 2009, after Plaintiff Nayyar filed a petition, an ACGME hearing was convened. In addition, an ACGME appeal was held regarding Plaintiff Nayyar's termination.

45. Despite ACGME guidelines and MC's internal human resource and medical investigation guidelines and procedures, MC failed to: (1) include a "peer" on the Program Education Committee hearing panel, which was comprised of only MC licensed physicians and not one resident; (2) failed to provide ample files and records in order for Plaintiff Nayyar to defend himself; and (3) barred his counsel from appearing during the hearing and appeal process, despite the fact that counsel demanded that he be permitted to appear at the hearing and appeal.

46. In October 2009, MC instructed staff persons to destroy the January 2009 resident petition complaining about patient safety.

47. MC instructed staff to destroy the petition to conceal the fact that patient safety then and now is active issue in the MCW-ICU.

7

48. Because of Plaintiff Nayyar's objection to his termination and pursuit of his rights in ACGME mandated hearing and appeal process, Defendants knew that it was probable that Plaintiff Nayyar may bring a lawsuit arising from the January 2009 resident petition and July 2009 ICU staffing.

## ALLEGATIONS RELEVANT TO OHIO REVISED CODE SECTION 4112 et. seq.

49. Plaintiff Nayyar is Indian by race and national origin.

50. Defendants have predominately terminated or failed minorities and Indian residents within the past 5 years.

51. Defendants' termination of Plaintiff Nayyar was motivated also by his race and national origin.

52. Similarly situated Caucasian residents have not been subjected to termination or disciplinary for conduct that was more egregious than the conduct alleged against Plaintiff Nayyar.

53. Caucasian residents have engaged in conduct that has unreasonably placed patient care at risk, but no disciplinary action was taken and no investigation was initiated.

54. By contrast, when Indian, African, and African-American residents engage in conduct less egregious and serious, they are punished and in some cases terminated.

55. Plaintiff Nayyar's alleged conduct—lack of communication skills and professionalism—did not endanger patient care.

56. Plaintiff Nayyar alleged conduct also did not cause a deterioration in morale and was not directed to a person under his supervision.

57. As a proximate result of Defendants' actions, Plaintiff Nayyar will not be able to join another residency program and has lose substantial resident time and credit due his absence from the

8

program. Moreover, the damage to his reputation and standing in the medical community has been irreparably damaged.

## First Claim for Relief
## Retaliation in Violation of Ohio Law and Public Policy

58. Plaintiff Nayyar hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 57 above.

59. Defendants intentionally, willfully, and wantonly retaliated against Plaintiff Nayyar in response to his passionate advocacy regarding patient safety issues at Mount Carmel West.

60. MC's failure to adequately protect patients within the ICU violates Ohio law and federal public policy regarding hospital and physician's duty and obligation to ensure patient safety and well being.

61. As a direct and proximate result of Defendants' retaliatory conduct, as described herein, Plaintiff Nayyar has suffered loss of income and benefits, emotional distress, anxiety, anguish, humiliation, termination, and suffered false and malicious charges of misconduct and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof.

62. As a direct and proximate result of Defendants' retaliatory conduct, Plaintiff Nayyar's earning capacity is permanently impaired insofar as he will not obtain a residency at a new hospital program due to stigma and damage to his reputation arising from his termination.

## Second Claim for Relief
## Retaliation in Violation of Ohio Whistleblower Statute

63. Plaintiff Dr. Nayyar hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 62 above.

64. Upon becoming aware that Defendant Dr. Weiss was critically understaffing the ICU at Mount Carmel West with the expectation that its patients evidently die, Plaintiff conveyed his concerns about the imminent patient safety risk to Dr. Li Tang, Director of Medical Education at Mount Carmel.

65. Plaintiff also submitted written evidence to Dr. Li Tang indicating that there was an imminent risk of physical harm to patients if the ICU was staffed in the manner proposed by Defendant Dr. Weiss.

66. In retaliation to Plaintiff's tireless efforts to prevent physical harm to the patients at Mount Carmel West, the Defendants decided to silence him by terminating his employment from the residency training program.

67. As a direct and proximate result of Defendants' retaliatory conduct, as described herein, Plaintiff Dr. Nayyar has suffered loss of income and benefits and permanent impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, termination, and suffered false and malicious charges of misconduct and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof. (Exhibit A).

### Third Claim for Relief
### Intentional Infliction of Emotional Distress in Violation of Ohio Law

68. Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 67 above.

69. Defendants intended to cause Plaintiff emotional distress.

70. Defendants were fully aware that their termination of Plaintiff from the residency program under a false pretext would cause Plaintiff Nayyar severe emotional distress. In addition, Defendants deliberately and publically humiliated Dr. Nayyar as a result of his tireless advocacy of patient safety issues at Mount Carmel West. For

10

all the reasons mentioned here, Defendants conduct is outrageous and extreme.

71. As a direct and proximate result of Defendants' outrageous conduct, Plaintiff suffered embarrassment, mental anguish, loss of reputation, and other harm.

### Fourth Claim for Relief
### Violation of Plaintiff's Due Process

72. Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 71 above.

73. Plaintiff was never provided with written notice that there was an investigation initiated against him in accordance with ACGME and MCW policies.

74. Plaintiff was never allowed to have his counsel present during his appeal and hearing before the Program Education Committee.

75. Plaintiff also was not permitted access to files and records to defend himself, and his counsel was barred from appearing in the hearing and appealing.

76. As a result, Plaintiff's due process rights were violated.

77. As a direct and proximate result of Defendants' conduct, Plaintiff suffered embarrassment, mental anguish, loss of reputation, and other harm.

### Fifth Claims for Relief
### National Origin and Ancestral Discrimination in Violation of Ohio Revised Code §§ 4112.01 and 4112.02

78. Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 77 above.

11

79. Defendants discriminated against Plaintiff on the basis of his national origin and ancestry by harassing, targeting, investigating, disciplining, terminating, making false charges and irreparably damaging his academic and professional reputation.

80. As a direct and proximate result of Defendants' creation of a hostile work environment and/or workplace harassment, employment termination, and other acts, as described herein, Plaintiff has suffered loss of income and benefits and impairment of earning capacity, emotional distress, anxiety, anguish, humiliation, and other incidental and consequential damages and expenses, all to Plaintiff's damages in an amount according to proof.

### Sixth Claim for Relief
### Spoliation of Evidence

81. Plaintiff hereby re-alleges and incorporates by reference as if fully set forth herein, the allegations of paragraphs 1 through 80 above.

82. It was probable that Plaintiff would bring a lawsuit for wrongful discharge in violation of common law public policy and the Ohio Whistleblower statute.

83. Despite Defendant Mount Carmel's knowledge of probable litigation, Defendant MC, instructed its agents and/or employees to willfully destroy evidence with the intent to disrupt claims for liability and damages in this lawsuit.

84. The residents' petition complaining about patient safety in the ICU is evidence favorable to the Plaintiff's claim liability and damages.

85. Defendant Mount Carmel's willful destruction of evidence has disrupted Plaintiff's liability and damages claims.

86. As a direct and proximate result, the Plaintiff's case has been disrupted and Plaintiff has thereby been damaged, subjecting Defendants to compensatory and punitive damages.

87. With regard to the spoliation claim only, punitive damages are appropriate against Defendant Mount Carmel because its willful and malicious conduct constitutes a flagrant disregard for the rights and safety of the public and decedent for which they are liable.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Nayyar prays for judgment, in an amount in excess of $25,000, as follows:

A. Award (i) back pay, front pay and/or reinstatement of the terms and conditions of employment and his residency; (ii) any benefits Plaintiff Nayyar enjoyed had Defendants not discriminated and retaliated against him on the basis of his national origin, ancestry and on the basis of his reporting public policy violations;

B. Six Months Credit for non-credited first year Family Practice residency work to ensure that he completes his residency in June 2010.

C. Award Plaintiff Nayyar liquidated and consequential damages for economic loss he has suffered as a proximate result of Defendants' conduct;

D. Award Plaintiff Nayyar compensation for past and future pecuniary losses resulting from Defendants' unlawful employment practices, including compensatory and punitive damages for humiliation, damage to reputation, mental and emotional distress, and pain and suffering that he experienced and endured as a result of Defendants' conduct;

E. Award Plaintiff Nayyar punitive damages for malicious and reckless conduct by Defendants in an amount in excess of $25,000;

F. Award Plaintiff Nayyar pre and post judgment interest on all sums awarded;

G. Award Plaintiff Nayyar the costs incurred in this action and reasonable attorneys' fees; and

H. Grant such other legal and equitable relief as is necessary and proper.

I. Grant Injunctive Relief directly against Defendant MC and individual defendants directing them to comply with MC and ACGME policy and procedures.

Respectfully submitted,

William W. Patmon, III
(#0062204)
Patmon LLC
Attorneys and Counselors at Law
4100 Regent Street, Suite U
Columbus, Ohio 43219
(614) 470-9860 (Phone)
(614) 470-9930 (Facsimile)
wpatmon@patmonlaw.com
*Attorney for Plaintiff Sunil Nayyar*

14

D9518 - U37

## JURY DEMAND

Plaintiff Nayyar requests a jury to hear and decide all issues of fact.

Respectfully submitted,

William W. Patmon, III
(#0062204)
Patmon LLC
Attorneys and Counselors at Law
4100 Regent Street, Suite U
Columbus, Ohio 43219
(614) 470-9860 (Phone)
(614) 470-9930 (Facsimile)
wpatmon@patmonlaw.com
*Attorney for Plaintiff Sunil Nayyar*

This is a petition from the entire residency program regarding the Medical Intensive Care Unit call. All residents who sign below agree that without an in-house Critical Care supervisor, safety is an active issue.

Bryan Alexander _____

Nora Alghothani _____

Afrina Aziz _____

Haidong Bao  Haidong Bao (V.C.) 1/20/09 _____

Jonathan Borders _____

Binay Eapen _____

Chamitha Francis _____

Erum Shaikh _____

Sowmya Varre _____

Sunil Nayyar _____

Stella Gandhi _____

Dana Houser _____

miguel Purugganan _____

Ibiene Osuoben _____

Kanan Patel _____

Ashwin Uttam _____

Sana Siddiqui _____

EXHIBIT A

D9518 - U39

Internal Medicine Call Schedule
July 2009

| Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|
| | | | 1<br>GM Senior Osuobeni<br>GM Intern Burell/Register<br>Unit Senior Bao<br>Unit Intern Mohammad<br>Night Float Nayyar | 2<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Nayyar | 3<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Gutierrez<br>Night Float Nayyar | 4<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Aziz |
| 5<br>GM Senior Osuobeni<br>GM Intern Burell/Gorantla<br>Unit Senior Bao<br>Unit Intern<br>Night Float Bao | 6<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Nayyar | 7<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Gutierrez<br>Night Float Nayyar | 8<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Nayyar | 9<br>GM Senior Osuobeni<br>GM Intern Burell/Register<br>Unit Senior Bao<br>Unit Intern Rink MS4<br>Night Float Nayyar | 10<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Nayyar | 11<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Stuart<br>Night Float Aziz |
| 12<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Aziz | 13<br>GM Senior Osuobeni<br>GM Intern Burell/Gorantla<br>Unit Senior Bao<br>Unit Intern Rink MS4<br>Night Float Nayyar | 14<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Nayyar | 15<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Stuart<br>Night Float Nayyar | 16<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Nayyar | 17<br>GM Senior Osuobeni<br>GM Intern Burell/Register<br>Unit Senior Bao<br>Unit Intern Mohammad<br>Night Float Nayyar | 18<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Bao<br>Unit Intern Gutierrez<br>Night Float Bao |
| 19<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Gutierrez<br>Night Float Bao | 20<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Nayyar | 21<br>GM Senior Borders<br>GM Intern Burell/Gorantla<br>Unit Senior Bao<br>Unit Intern Rink MS4<br>Night Float Nayyar | 22<br>GM Senior Osuobeni<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Gutierrez<br>Night Float Nayyar | 23<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Gutierrez<br>Night Float Nayyar | 24<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Nayyar | 25<br>GM Senior Osuobeni<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Mohammad |
| 26<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Aziz | 27<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Carr<br>Night Float Nayyar | 28<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Nayyar | 29<br>GM Senior Osuobeni<br>GM Intern Burell/Gorantla<br>Unit Senior Bao<br>Unit Intern Rink MS4<br>Night Float Nayyar | 30<br>GM Senior Borders<br>GM Intern Raghavan<br>Unit Senior Aziz<br>Unit Intern Mohammad<br>Night Float Nayyar | 31<br>GM Senior Varre<br>GM Intern Naikoo<br>Unit Senior Bao<br>Unit Intern Carr<br>Night Float Nayyar | 1-Aug<br>GM Senior Shaikh<br>GM Intern Parmar<br>Unit Senior Aziz<br>Unit Intern Stuart<br>Night Float Bao |
| 2-Aug<br>GM Senior Osuobeni<br>GM Intern Burell/Register<br>Unit Senior Bao<br>Unit Intern<br>Night Float Bao | | | | | | |

GM Senior 4 pm - 7 am
GM Intern 4 pm - 7 am
Unit Senior 4 pm - 7 pm
Unit Intern 4 pm - 7 am
Night Float 7 pm - 7 am

EXHIBIT B

Email this article • Print this article

11/10/2009 8:16:00 AM
# First H1N1 death reported

**Debra Gaskill**
**Managing Editor**

A 33-year-old Washington C.H. man has become the county's first H1N1 fatality.

Christopher Allen Ward, 33, of Washington C.H. died on Sunday, November 8, 2009 at the Mt. Carmel West hospital, Columbus, as a result of complications from H1N1.

"At this time, we are not aware of any underlying health conditions," said Karen Lowe, Deputy Health Commissioner, that could have lead to the man's death. "Our deepest sympathy goes out to the family."

Family members told the Record Herald that Ward was diagnosed on Monday with H1N1 and admitted to the hospital Friday with H1N1 and pneumonia. He was transported via medical helicopter to Mount Carmel Saturday.



The funeral service will be held on Thursday, Nov. 12 at 5 p.m., at the Morrow Funeral Home in Washington C.H. with Esto Haithcock officiating. Burial will be at the family's convenience. Friends may call at the Morrow Funeral Home in Washington C.H. on Thursday, Nov. 12 from 2-5 p. m.

Ward was employed at the Sugar Creek Packing Company in Washington C.H. He is survived by his mother, Estella Kellough of Bainbridge, his wife, Kim Penwell Ward , a son, Dustin Penwell Ward, two daughters, Dakendra and Mackenzie Ward all of Washington C.H., two brothers, Randy (Tracy) Newland of Bainbridge, and Scott (Ashley) Forsha of Washington C.H., a sister, Kay (Butch) Thompson of Bainbridge, special friends, Jason (Regina) McComis of Washington C.H. his mother and father in law, Chuck (Cheryl) Woolever and a brother in law, Bobby Penwell of Washington C.H. Mr. Ward is also survived by many aunts, uncles, cousins, nieces and nephews.

Memorial contributions can be directed to the family at 815 S. Main St., Washington C.H. For more information please contact, Jennifer Johnson at 740-571-6595.

While this death is the county's first, the virus is widespread throughout the county, Lowe said and efforts to vaccinate targeted groups are continuing.

The Fayette County Health Department will be holding another H1N1 flu clinic from 9 a.m. until noon Saturday, Nov. 14, 2009 at the new Washington Middle School on Elm Street in Washington C. H.

This flu vaccine is free.

Only the following targeted groups will be eligible to obtain the vaccine:

• Pregnant women

• Children 6 months- 24 years old

• Healthcare workers (a work ID must be provided)

EXHIBIT C

D9518 - U41

- Care givers and parents of infants less than 6 months old

- Those individuals 25 - 64 years of age with chronic health conditions such as heart disease, ,diabetes, pulmonary disease (including asthma), kidney disease, liver disease, neurological disease and those immunosuppressed. This group does not include those with high blood pressure or high cholesterol.

Children under 10 years old who have been vaccinated for H1N1, should have a second dose 28 days from the first dose. Please note that those children who have been vaccinated are not yet ready for the second dose if they had the first dose from the Fayette County Health Department.

http://www.recordherald.com/main.asp?SectionID=1&SubSectionID=1&ArticleID=134469