John Weiss

10

1            (Thereupon Weiss Exhibit 1 was marked.)
2       BY MS. MADISON:
3       Q.   I'll just give you a couple minutes to
4   look that over.
5       A.   Thank you.  Okay.
6       Q.   Dr. Weiss, do you recognize this
7   document that's been marked as Exhibit 1?
8       A.   Yes, I do.
9       Q.   Is that your signature on the bottom
10  left of the document?
11      A.   Yes.
12      Q.   Did you create this document?
13      A.   Yes, I did.
14      Q.   You've had a moment to read through the
15  document.  Do you recall the incident that this
16  letter is discussing?
17      A.   Yeah, I do.  I do remember -- I do
18  remember this.
19      Q.   Okay.  In the letter it states that
20  Dr. Borders was absent from morning report on
21  July 23rd, 2008; is that correct?
22      A.   That is correct.
23      Q.   Okay.  And how did you learn about
24  Dr. Borders' absence on that date?

11

1      A.   Many times we have a senior resident or
2   a chief resident take attendance to conferences.
3   And in this case the chief resident is Bhavesh
4   Patel, Dr. Patel.  Dr. Patel reported to me that
5   Dr. Borders was not at morning report.
6      Q.   Okay.  In this letter it also states
7   that Dr. Borders reported that he contacted Kelly
8   McElravey, I'm not sure if I'm saying that
9   correctly, who was the program administrator for
10  the Internal Medicine Residency, to inform her of
11  his absence on July 23rd of 2008; is that
12  correct?
13     A.   That is correct, yes.
14     Q.   And did you speak with Ms. McElravey
15  about the conversation that Dr. Borders said he
16  had with her about his absence?
17     A.   Yes, I did.
18     Q.   And what did Ms. McElravey state in that
19  meeting or discussion that you had with her?
20     A.   That she had no documentation that
21  Dr. Borders was not going to be attending that
22  conference.  He did not report to her that he was
23  going to be taking time off of that conference.
24     Q.   Okay.  Now, you said she said that she

12

1  had no documentation.  Did she also say that she
2  did not speak with Dr. Borders or just that she
3  did not document?
4       A.  She did not speak with Dr. Borders.
5       Q.  Okay.  Based on the conversation that
6  you had with Ms. McElravey, when she said that
7  she did not speak to Dr. Borders as he had said,
8  what did you conclude about Dr. Borders'
9  statement that he had spoken to her and informed
10 her of his absence?
11      A.  That he was not telling the truth.
12      Q.  After you concluded that Dr. Borders was
13 not telling the truth about that statement, what
14 actions did you take with regard to
15 Dr. Borders?
16      A.  He ultimately received this letter that
17 it's essential that for any absence that you need
18 to report this absence to the program director,
19 because if a resident or any employee, any
20 associate of Mount Carmel, is going to take time
21 off, you have to notify, in this case, me or
22 Kelly McElravey that you're going to utilize
23 personal leave time.
24      Q.  Okay.  Were there any other

13

1  repercussions to Dr. Borders in relation to this
2  particular incident, aside from I know you said
3  he got this letter?
4        A.  I sat him down and handed him this
5  letter.  Any time I hand somebody a letter, I
6  make sure that I read that letter to them and I
7  ask them if they understand this letter.
8        Q.  And who made the decision regarding what
9  actions were taken with Dr. Borders after this
10 incident occurred?
11       A.  I did.
12       Q.  Did you consider Dr. Borders
13 untrustworthy after this incident?
14       A.  No, not untrustworthy, because I've had
15 other residents before that have not come to
16 morning conference, and I've had other residents
17 in the past tell me why they've not come there or
18 tell me that they let somebody know.
19           And then after I've just dug a little
20 bit deeper, I found out that they got caught.  So
21 sometimes when they get caught, people will say
22 things.
23       Q.  Okay.
24       A.  But I wanted to make sure it was

John Weiss

14

1    documented, so if this was repeated behavior,
2    then I'd have to do something.
3            Q.   Right.  I understand.
4               (Thereupon Weiss Exhibit 2 was marked.)
5            A.   Okay, I've read this.
6            Q.   Do you recognize this document that
7    you've been handed?
8            A.   Yes, I do.
9            Q.   And is that your signature on the bottom
10   left of this document?
11           A.   Yes, ma'am, it is.
12           Q.   And did you also create this document?
13           A.   Yes, I did.
14           Q.   Do you recall the incident that this
15   letter is discussing?
16           A.   Yes, I do.
17           Q.   In this letter it states that
18   Dr. Borders was not available for rounds on, I
19   believe, the morning that the letter was written
20   on -- or on December 8th of 2009.  I apologize.
21   And when you contacted him, he reported that he
22   was meeting with the State Medical Board; is that
23   correct?
24           A.   That is correct.

John Weiss

15

1              (Thereupon Weiss Exhibit 3 was marked.)
2         BY MS. MADISON:
3         Q.   You were just handed what I believe has
4    been marked as Exhibit 3.  I'll give you a moment
5    to look over that document as well.
6         A.   I may need a little more time.
7         Q.   Yes.  I'm really just going to be
8    focusing on the three paragraphs in the middle of
9    the first page, the first one starting with
10   12/09/09 down to the one that says 12/08/09.
11        A.   Okay.
12        Q.   So you won't really have to focus on the
13   whole thing.
14        A.   Okay.
15        Q.   Dr. Weiss, are you familiar with this
16   document?
17        A.   Yeah, I'm familiar with this document.
18        Q.   Okay.  Did you create this document?
19        A.   I believe I did.
20        Q.   Okay. Do you recall the incident
21   discussed in those three paragraphs?
22             I think they're the fourth, fifth, and
23   six paragraphs, the first one starting with
24   12/09/09.

John Weiss

```
                                                      16
 1            And I think it's in reverse
 2   chronological order, so it's a little bit
 3   confusing to read it unless you read it in the
 4   other direction.
 5            Are you familiar with the incidents that
 6   are discussed in those three paragraphs sort of
 7   in the middle of the page there?
 8       A.   I'm going to start with 12/09/09 first,
 9   and then kind of identify, if I may.
10       Q.   Sure.
11       A.   So, yes, 12/09/09, yes.
12            12/08/09, yes.
13            There's another one dated 12/08/09, yes.
14       Q.   Do these paragraphs reference the same
15   incident discussed in your letter dated 12/09/09
16   that was marked as Exhibit 2?
17       A.   Yes, they do.
18       Q.   Okay.  Did you discuss this incident
19   with someone in the HR department, if you
20   recall?
21       A.   I don't remember if I discussed this
22   specific issue with HR.
23       Q.   Okay.
24       A.   I don't recall.
```

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

John Weiss

17

1    Q. In this little chronology it states that
2    Dr. Borders stated that he had been at the State
3    Medical Board all day on December 8th, 2009; is
4    that correct?
5    A. That's correct.
6    Q. Did you speak with anyone at the State
7    Medical Board about whether Dr. Borders had been
8    there all day on December 8th, 2009, as he had
9    stated?
10    A. Yeah. Generally my contact at the Board
11    at that time was Jeff Bradford, so I recall
12    asking Jeff if he, if Dr. Borders, had been
13    there. And Jeff had said -- shared with me that
14    he had not signed in at the Licensing Board.
15    Q. Okay.
16    A. He had not signed in at the Licensing
17    Board.
18    Q. Looking back at Exhibit 2, the letter,
19    in that middle paragraph it talks about you
20    speaking with Dr. Borders and communicating to
21    him that there was no record of his presence at
22    the State Medical Board. And it says at that
23    time he reported that he was not actually there
24    but that he spoke to them on the phone. Is that

```
 1   how you recall?
 2        A.   Yes.
 3        Q.   Were you able to confirm that
 4   Dr. Borders' statement about speaking to the
 5   State Medical Board on the phone was truthful?
 6        A.   I did not get confirmation from anybody
 7   that that was truthful or not.
 8        Q.   Since your contact, I believe you said
 9   his name was Jeff Bradford, confirmed that
10   Dr. Borders was not present at the State Medical
11   Board on December 8th of 2009 as he had reported,
12   would you say that Dr. Borders' statement about
13   being at the State Medical Board that day was
14   truthful?
15        A.   No, I -- no, that was not truthful.
16             Although, based on this, I may have
17   misunderstood on what he said, because what he
18   clarified later on with me was that he had spoken
19   with the State Licensing Board of Ohio.
20        Q.   Okay.  And after this incident occurred,
21   the absence from rounds and the statement about
22   being at the Medical Board was investigated and
23   found that it may not have been truthful, what
24   actions were taken with regard to Dr. Borders?
```

John Weiss

19

1     A.   I spoke with him, you know, and informed
2  him that tardiness was inappropriate, absences
3  were inappropriate, non-participation in clinical
4  or educational activities without approval of me
5  was unacceptable.
6     Q.   Okay.  And did you make the decision
7  regarding what actions were taken with
8  Dr. Borders at that time?
9     A.   Yes.
10    Q.   And did you consider Dr. Borders
11 untrustworthy after this incident?
12    A.   Yeah, I was concerned.  Yes.
13    Q.   What was your concern at that point?
14    A.   Was he really telling the truth?
15         Did I truly misinterpret what he said,
16 or was this a situation where he was caught and
17 now was just doing anything he could say to
18 protect himself?
19    Q.   Okay.
20         (Thereupon Weiss Exhibit 4 was marked.)
21    A.   I am having a rough time reading this.
22    Q.   Yeah, it's a little bit -- it's a little
23 hard to read.  I think the more things like this
24 are copied, they get even worse.  I won't ask you

John Weiss

20

1  the details about interpreting handwriting.
2      A.  Okay.
3      Q.  I really only have very few questions on
4  this exhibit, actually.
5      A.  Okay.
6      Q.  Are you familiar with this document?
7      A.  Not exactly.  Although, sometimes --
8  many times when we go to human resources, there
9  is documentation in human resources.
10     Q.  Okay.
11     A.  This may very well be what that is, but
12 I'm just speculating.
13     Q.  Okay.
14     A.  I do not recognize the writing.
15     Q.  Do you see in the middle where it says
16 your name?
17     A.  Yes, I do.
18     Q.  And then can you read what it says right
19 under your name?
20     A.  Yeah.  It says "Dr. Weiss."  Then
21 underneath it it says, "May be lying."
22     Q.  Do you recall discussing with anyone in
23 HR the details of the incident that we were
24 discussing previously about Dr. Weiss (sic)

1    saying that he was at the State Medical Board and
2    you confirming that he was not in fact -- or I'm
3    sorry -- Dr. Borders, and he, not, in fact,
4    having found to be at the State Medical Board
5    that day?
6         Let me start over.
7         A.   Thank you.
8         Q.   Do you recall discussing the incident
9    where Dr. Borders had claimed to have been at the
10   State Medical Board with anyone in the HR
11   department?
12        A.   I know many times I had been over to HR
13   to discuss things regarding Dr. Borders.  I don't
14   recall being over there specifically with this
15   incident.  But if there is documentation I was
16   there, I must have been there.
17        Q.   Okay.
18        A.   So, yes.
19        Q.   Okay.
20        A.   But I don't remember the specifics of
21   this, being over there.
22        Q.   Okay.  I understand.
23             Do you recall having a discussion with
24   anyone about that incident where you stated that

22

1  you felt that Dr. Borders may have been lying?
2      A.  I don't remember that.
3      Q.  Okay.  We'll move on from that document.
4          (Thereupon Weiss Exhibit 5 was marked.)
5      A.  Okay.
6      Q.  Okay.  Are you familiar with this
7  document that's been marked as Exhibit 5?
8      A.  Yes.
9      Q.  Did you create this document?
10     A.  Yes, I did.
11     Q.  Okay.  And do you recall the incident
12 that's discussed in the document?
13     A.  Yeah, I do.
14     Q.  Okay.  It looks like it's saying that at
15 around 10:15 on December 13th of 2009,
16 Dr. Borders didn't show up for work that morning;
17 is that correct?
18     A.  That is correct.
19     Q.  It looks like it also states that around
20 12:45 that afternoon, Dr. Borders informed you
21 that he had been in communication with
22 Dr. Shamitha Francis, Dr. Sana Siddiqui --
23     A.  Siddiqui.
24     Q.  -- and Dr. Roy St. John regarding the

John Weiss

23

1  fact that he was ill; is that also correct?
2      A.  That is correct.
3      Q.  It looks like the document states that
4  at around 1:03 that afternoon, you spoke to
5  Dr. St. John who reported that Dr. Borders did
6  not contact him and did not report to him that he
7  was ill.
8      A.  That is correct.
9      Q.  Since Dr. St. John reported that
10 Dr. Borders did not contact you and did not
11 report to him that he was ill, as Dr. Borders
12 told you he did, would you say that Dr. Borders'
13 statement was truthful?
14     A.  It was not truthful.
15     Q.  And after that absence on December 13th
16 and Dr. Borders' statement that you found not to
17 be truthful after investigating, what actions
18 were taken with regard to Dr. Borders?
19     A.  I don't remember regarding this
20 situation.
21     Q.  Was Dr. Borders terminated at that
22 time?
23     A.  I know Dr. Borders was ultimately
24 terminated, but I don't know if this was the

John Weiss

24

1   final incident.  I don't believe it was.
2       Q.   Okay.
3            (Thereupon Weiss Exhibit 6 was marked.)
4            MR. PATMON:  What's this exhibit?
5            MS. MADISON:  6.
6       A.   Okay.  I've read it.
7       Q.   Do you recognize this document?
8       A.   Yes, I do.
9       Q.   And is that your signature on the bottom
10  left?
11      A.   Yes, ma'am.
12      Q.   And did you also create this document?
13      A.   Yes, I did.
14      Q.   Okay.  And does this document discuss
15  the same incident that was discussed in Exhibit 5
16  that we looked at?
17      A.   The one dated December 13th, yes, it
18  does.
19      Q.   I'm sorry.
20      A.   Yeah, you're correct, Exhibit 5.
21      Q.   Okay.  I think it's the second paragraph
22  in this letter states that because of his
23  tardiness and non-participation in team
24  activities, Dr. Borders received an incomplete

Armstrong & Okey, Inc., Columbus, Ohio (614) 224-9481

John Weiss

25

1    for the month of December of 2009?
2         A.   That is correct.
3         Q.   And that extended his training by one
4    additional month?
5         A.   That is correct.
6         Q.   Were there any other repercussions to
7    Dr. Borders in relation to this incident?
8         A.   I don't recall the specifics, but
9    reading this letter, it looks like he was
10   supposed to outline some expectations of himself
11   to ensure his colleagues that he would be holding
12   himself to the six ACGME competencies.
13        Q.   Okay.  And did you make the decision
14   regarding what actions were taken with
15   Dr. Borders?
16        A.   This was made in consultation with my
17   core faculty --
18        Q.   Okay.
19        A.   -- because of the fact that his training
20   would be extended an additional month and we
21   would be essentially having him receive an
22   incomplete for the month.
23        Q.   Okay.  And in your consultation with the
24   core faculty regarding how you would move forward

1   with Dr. Borders after this incident, what was
2   your recommendation?
3       A.  My recommendation -- I don't recall my
4   specific recommendations to the committee.  I
5   don't remember.
6       Q.  Do you recall if you recommended
7   termination for Dr. Borders?
8       A.  I don't -- I don't believe I recommended
9   that.
10      Q.  Who made the final decision?
11      A.  (No answer given.)
12      Q.  If you -- if -- let me rephrase the
13  question.
14          If you had decided that it was
15  appropriate to terminate Dr. Borders and other
16  committee members had a different opinion, who
17  would have made that final decision?
18      A.  Ultimately the final decision is mine.
19      Q.  Okay.
20      A.  But I will always, in decisions, consult
21  with my core faculty.
22      Q.  And why at that time did you make a
23  decision not to terminate Dr. Borders?
24      A.  I don't remember the specifics on why

1    that decision was not made.
2        Q.   Do you recall why a decision was not
3    made to terminate Dr. Borders after the December
4    8th, 2009 incident?
5             That's the one where he had stated that
6    he was at the State Medical Board.
7        A.   That's Exhibit -- that's what Exhibit 2
8    is referring to; is that correct?
9        Q.   Yes.
10       A.   Well, the reason I didn't make a
11   recommendation of termination regarding the
12   incidents that happened on December 8th of 2009
13   were because I wasn't 100 percent confident that
14   maybe I had (sic) misunderstood what Dr. Borders
15   had said.
16       Q.   Okay.
17       A.   And that Dr. Borders had communicated to
18   the Medical Licensing Board but had done that
19   over the phone.
20            And given the fact that Mr. Bradford
21   didn't have record that Dr. Borders was there,
22   maybe there was truth in this.
23       Q.   Okay.  And why did you not decide to
24   terminate Dr. Borders after the incident that

John Weiss

28

1  happened in July of 2008 where he had stated that
2  he had spoke with Ms. McElravey and you found
3  that not to be truthful?
4      A.  Can you repeat that question, please?
5      Q.  Yes.
6          Why did you not decide to terminate
7  Dr. Borders after the incident that occurred in
8  July of 2008, and I think it's Exhibit 1 that we
9  looked at, where he had stated that he had talked
10 with Ms. McElravey and you found that that was
11 not truthful?
12     A.  I didn't feel this was a very severe
13 situation.  He missed a -- he missed a morning
14 report.  That, in itself, I didn't feel should be
15 termination.
16     Q.  Do you feel that your residents not
17 being truthful when they speak with you is a
18 serious situation?
19     A.  Yes, I do.
20     Q.  When you spoke with Jeff Bradford at the
21 State Medical Board and he stated to you that
22 Dr. Borders had not been at the State Medical
23 Board that day, did you feel that you may have
24 misunderstood Mr. Bradford's statements or were

John Weiss

29

1  you confident that you understood what he was
2  saying?
3      A.  I was confident what Mr. Bradford was
4  saying, because, if I recall, there is a sign-in
5  sheet at the State Licensing Board, and
6  Mr. Bradford had access to that sign-in sheet and
7  had no evidence that Dr. Borders had signed in at
8  the State Licensing Board.
9          He went down the list on the phone with
10 me, not mentioning all the names but said he did
11 not see where Dr. Borders signed in.
12     Q.  After the July 2008 incident and the
13 December 8th, 2009 incident and the December
14 13th, 2009 incident, did you consider Dr. Borders
15 untrustworthy?
16     A.  Yes.
17         MS. MADISON:  I think I only have a
18 couple more questions, but I want to just consult
19 with Mr. Patmon briefly.
20         MR. ARMSTRONG:  Sure, absolutely.  Want
21 to take a little break?
22         (Discussion off the record.)
23     BY MS. MADISON:
24     Q.  Okay.  I have a few more questions.