1  A.        Where I historically trained and where I
2  had gone through, I never recall nurses -- RNs --
3  put in arterial lines.  So that was -- That was new
4  to me when I found out that in some institutions
5  nurses could put in arterial lines.
6  Q.        They could put it in.  But you, as part
7  of your training as program director, no one told
8  you specifically that a nurse could not put in an
9  arterial line at Mount Carmel Hospital; is that
10 correct?
11 A.        That's correct.
12 Q.        Okay.  And you didn't provide any
13 training to the residents with respect to scope of
14 practice; isn't that correct -- regarding arterial
15 lines?
16 A.        Regarding nurses placing arterial lines?
17 That's correct.
18 Q.        Okay.  And you're not aware of anybody at
19 Mount Carmel Hospital providing any training with
20 respect to scope of practice for residents regarding
21 arterial lines; is that correct?
22 A.        That's correct.
23 Q.        So the first time you learned that there
24 was a specific rule or policy that had been violated

```
 1  is when you talked to Ms. Dixon; isn't that correct?
 2  A.         That is correct.
 3  Q.         Okay.  Now, who may -- Well, let's go
 4  back to the beginning when your first conversation
 5  was with Ms. Dixon.
 6             Did Ms. Dixon at any time during that
 7  conversation suggest, advise or state that there
 8  should be an investigation?
 9  A.         Did Ms. Dixon state that there should be
10  an investigation?
11  Q.         Right.
12  A.         With consultation with human resources,
13  yes.
14  Q.         Right.  Okay.
15             Now, that same day, you told me you
16  questioned Dr. Nayyar, correct?
17  A.         Uh-huh.
18  Q.         And then after that, was your questioning
19  of Dr. Nayyar before or after your conversation with
20  Ms. Dixon?
21  A.         My conversation with Dr. Nayyar was after
22  my conversation with Jeanne Dixon.
23  Q.         Okay.  And you say that the HR Department
24  recommended that they be pulled from clinical
```

```
 1  reminded him not to speak to anybody about this --
 2  the events surrounding the incident and the issue of
 3  the incident.
 4  Q.          And these warnings that you gave
 5  Dr. Nayyar, did you ever write this down or record
 6  that you had said this to him?
 7  A.          No, sir.
 8  Q.          Did you ever send him an e-mail or phone
 9  call?  I mean, other than the call, did you ever
10  send him an e-mail or provide him anything in
11  writing?
12  A.          I don't recall sending him an e-mail, but
13  I don't remember.  We may have communicated by
14  e-mail, but I don't think I would have done that.
15  Q.          Okay.  Let's go back to the room after
16  Dr. Nayyar has left.
17  A.          Okay.
18  Q.          Did anybody say anything about
19  disciplining Dr. Nayyar as a result of the
20  information that you and the other people in that
21  room had been discussing?
22  A.          Yeah, there was some discussion.
23  Q.          Okay.  Who first suggested the idea of
24  disciplining him?
```

```
 1   A.         I believe it was me.  But there may have
 2   been somebody else who had mentioned it prior to
 3   that.
 4   Q.         Okay.  And what did you recommend?
 5   A.         I was concerned about him, and that I
 6   couldn't trust him because -- and so I recommended
 7   that we -- we talked about letting him go.
 8   Q.         Why did you decide at that point that we
 9   should take the step of letting him go?
10   A.         I lost trust in him.
11   Q.         Did you consider any other possible
12   disciplinary action with respect to Dr. Nayyar?
13   A.         Yeah.  I may not have mentioned it in the
14   room.  I may have.  I don't recall.  But yeah, I
15   thought about it.
16   Q.         Did you consider counseling him about
17   this issue as a possible discipline?
18   A.         I felt that I had counseled him in the
19   sense that I had said I need you to be honest.
20   Q.         Right.  And he broke your trust, right?
21   He violated your rule, right?
22   A.         Yeah, he did.  Yes.
23   Q.         Now, we've established that.
24              Now, did you consider any other paths,
```

JOHN C. WEISS, M.D. - December 15, 2011         120

```
 1  other than termination, for Dr. Nayyar to fix this
 2  problem?
 3  A.        No.
 4  Q.        Why not?
 5  A.        Because he lied.
 6  Q.        Okay.  Prior to the A-line incident and
 7  what you say was a lie after the incident, had he
 8  ever lied to you before?
 9  A.        Not that I recall.
10  Q.        Did you have any reason to distrust him?
11  A.        Prior to this?
12  Q.        Right.
13  A.        No.
14  Q.        So this is the first time this happened,
15  right?  Isn't that correct -- with respect to
16  Dr. Nayyar?
17  A.        That he lied like this?  Yeah.
18  Q.        Right.  Was it possible to consider some
19  alternative means other than termination?
20  A.        Yeah, it was a possibility.
21  Q.        Okay.  What were those possible
22  alternatives?
23  A.        Extending his training was a possibility.
24  Q.        What else?
```

1  A.          You know, maybe putting him on a leave
2  for a period of time could have been another
3  possibility.
4  Q.          Why didn't you consider putting him on
5  leave for an extended period of time?
6  A.          Because he never admitted that he lied.
7  He had broken that trust with me.
8  Q.          Right.  Did you ever confront him with
9  the information that said, Sunil, I know you're
10 lying.  Here's the information.  This proves you're
11 lying.  Did you ever confront him with that?
12 A.          I don't know if I personally did.  I
13 don't remember doing that.
14 Q.          Would you agree that if he did lie, he
15 made a mistake, didn't he?
16 A.          Yeah.
17 Q.          Okay.  Do all mistakes that occur in a
18 residency program result in termination?
19 A.          No.
20 Q.          When you were a resident, have you ever
21 lied about anything?
22 A.          That's a long time ago, sir.  Oh, boy.  I
23 don't remember.  That was a long time ago, sir.
24 Q.          Could you understand why a young man in

```
 1  this situation would be afraid?
 2  A.         I can understand why he would be afraid.
 3  Q.         Investigations aren't the normal course
 4  of a residency program; isn't that correct?
 5  A.         Not an everyday event, no, sir.
 6  Q.         Okay.  And this concerned an incident in
 7  an ICU, didn't it?
 8  A.         Yes.
 9  Q.         Do you think now you should have given
10  him another chance or tried another path other than
11  terminating him?
12  A.         No, sir.
13  Q.         Why is that?
14  A.         Because he never admitted to me that he
15  lied.
16  Q.         We're going to talk about that.  We are
17  going to talk about that.
18             Did you ever confront him and say, You
19  lied to me?
20  A.         No.
21  Q.         Okay.  Did you ever consider it a
22  possibility that he may not have understood your
23  instructions?
24  A.         No, I didn't consider that.
```

```
 1  Q.        Okay.  You were upset, weren't you?
 2  A.        Upset?
 3  Q.        Yeah, that he lied to you.
 4  A.        I was disappointed.
 5  Q.        You were angry, weren't you?
 6  A.        Angry?
 7  Q.        Uh-huh.
 8  A.        No, sir.  I wasn't angry.
 9  Q.        Disappointed?
10  A.        Yeah, I was disappointed.
11  Q.        Okay.  Did you ever confront him at all
12  with any evidence to say, Sunil, I know you lied?
13  A.        At the point of time of termination, I
14  handed him a letter that defined why I was
15  terminating him.
16  Q.        Right.
17  A.        And that I heard different stories.  And
18  at that point in time, he still did not admit.
19  Q.        I understand that.  But that's at the
20  point he's being told he's terminated, right?  Is
21  that correct?
22  A.        Correct.
23  Q.        You didn't do any of that prior to your
24  decision to terminate him; isn't that correct?
```