Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

▷

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Claims of Ohio.
Larry R. DARGART Plaintiff
v.
OHIO DEPARTMENT OF TRANSPORTATION Defendant

No. 2002-09668.
March 23, 2005.

**Background:** Employee brought action against his employer, Ohio Department of Transportation (ODOT), alleging violation of **Whistleblower** Act, age and disability discrimination, and retaliation.

**Holding:** The Court of Claims, Clark, J., held that ODOT constructively discharged employee in violation of **Whistleblower** Act.

Judgment for plaintiff.

**States 360 ⚷53**

360 States
    360II Government and Officers
        360k53 k. Appointment or Employment and Tenure of Agents and Employees in General. Most Cited Cases

Ohio Department of Transportation (ODOT) constructively discharged employee in violation of **Whistleblower** Act; after employee reported in good faith that his supervisor had engaged in allegedly illegal acts involving misuse of funds, employee was denied pay raise and leave benefits, demands were made that he resign immediately, employee was confronted by supervisor and denied access to his files, employee's keys and state vehicle were taken, employee was moved to office remote from his staff and regular work area, employee testified that he retired under duress, and supervisor's allegation that consequences suffered by employee were in response to workplace rule violations was belied by employee's preceding 35 years of loyal service. R.C. § 4113.52.

Terry J. Lodge, Toledo, Ohio, for Plaintiff.

Larry Y. Chan, Assistant Attorney General, Columbus, Ohio, for Defendant.

*DECISION*

CLARK, J.

**\*1** {¶ 1} Plaintiff brought this action against defendant, the Ohio Department of Transportation (ODOT), alleging violation of R.C. 4113.52, Ohio's **Whistleblower** Protection Act; age and disability discrimination in violation of R.C. 4112.02; and retaliation in violation of R.C. 4112.02(I).[FN1] The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.[FN2]

> FN1. Plaintiff's complaint also asserts a common-law claim of trade defamation. However, in his post-trial filing of proposed findings of fact and conclusions of law, plaintiff concedes that the evidence adduced at trial failed to establish that claim. Therefore, it is not addressed herein.

> FN2. Subsequent to the trial, defendant filed a motion for leave to file a brief in excess of seven pages. In the interests of justice, both parties are GRANTED such leave

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

instanter. Additionally, defendant's motion to strike plaintiff's post-trial findings of fact and conclusions of law is DENIED. Plaintiff's post-trial filings are sua sponte deemed filed instanter.

{¶ 2} Plaintiff was employed at ODOT's District 2 office, in Bowling Green, Ohio for approximately 36 years. During his last four years he served as a business and human resource administrator, a position in the "Career Professional Service" governed by R.C. 5501.20 et. seq. Plaintiff alleges that, beginning in June 1999, his superiors engaged in a course of conduct that was motivated by a discriminatory and/or retaliatory animus against him, all of which culminated in his retirement from ODOT on August 1, 2000, at the age of 57. Plaintiff maintains that he retired under duress and that the conduct he was subjected to amounted to a constructive discharge. Plaintiff maintains that, but for the discriminatory practices and retaliation of his superiors, he would have continued working for ODOT indefinitely.

{¶ 3} According to plaintiff, the conduct at issue began as a result of a June 15, 1999, conversation he had with Matt Long, an investigator with ODOT's Office of Legal Counsel. The conversation concerned the possibility of certain allegedly illegal actions occurring in the District 2 workplace. During the conversation, and in his subsequent written documentation of same, plaintiff alleged that his supervisor, then acting Deputy Director Richard Martinko, had met on state time with political-party county chairpersons to lobby for the position of permanent deputy director of District 2. Plaintiff also alleged that Martinko had falsified payroll forms by various means, including working only partial days on Fridays but reporting that he had worked a full shift. Further, plaintiff alleged that Martinko signed the district deputy director's name on seven payroll forms and submitted at least four of such forms without any supervisor's signature. Finally, plaintiff alleged that Martinko had failed to sign certain required daily log sheets when he came to or left the district office.

{¶ 4} The information provided to Long was also provided to Lisa Conomy, ODOT's Chief Legal Counsel. On June 18, 1999, Conomy sent plaintiff a memo concluding that: "As requested, I have reviewed the allegations and documents you furnished and find no improprieties that require an administrative investigation. No further action is planned." (Plaintiff's Exhibit 3.) On June 28, 1999, plaintiff mailed a copy of the information that he had sent to Long and Conomy to the home of Gordon Proctor, ODOT's Director. Plaintiff advised Proctor that he wanted him to personally review the information without having it reach him through his staff. Plaintiff contends that, shortly thereafter, Proctor and Martinko began the series of actions that ultimately led to plaintiff's retirement. For example, plaintiff was denied a merit pay raise; demands were made that he resign immediately; he was subject to numerous confrontations; his office keys were taken; he was not permitted access to his files except through his staff; his phone card was taken; his use of a state vehicle was restricted; he was denied use of his accumulated leave time without prior approval by Martinko; and he was moved to an office that was remote from his staff and regular work area.

**\*2** {¶ 5} In response, defendant contends that plaintiff cannot establish the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

prima facie elements of his claims and that, even if he were to do so, defendant's actions were genuinely motivated by legitimate business purposes. For example, defendant contends that its actions were taken in accordance with R.C. 5501.20; that the actions were designed to improve plaintiff's productivity and performance; that actions were taken because plaintiff had been contemplating retirement, and it was necessary to formulate plans for uninterrupted fulfillment of plaintiff's job responsibilities; and that certain actions were taken as part of district-wide cost savings measures.

{¶ 6} After careful review of the evidence, testimony, and the parties' post-trial filings, the court finds that plaintiff has proven by a preponderance of the evidence that defendant constructively discharged him in violation of R.C. 4113.52, Ohio's **Whistleblower** Protection statute.

{¶ 7} The **Whistleblower** Protection statute prohibits the discharge or discipline of an employee whose acts are protected by its provisions. Specifically, R.C. 4113.52(A)(3) provides, in pertinent part:

{¶ 8} "If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of a violation of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation either is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety or is a felony, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation."

{¶ 9} This portion of the statute sets forth what an employee needs to do to warrant the statute's protection for reporting activities of co-workers. An employee must strictly comply with the dictates of the statute in order to receive its protection. *Contreras v. Ferro Corp.* (1995), 73 Ohio St.3d 244, 652 N.E.2d 940, at the syllabus. Thus, in order to comply, plaintiff was required to: 1) orally notify his supervisor or other responsible officer of the alleged violation(s); and 2) follow up with a written report to that person providing sufficient detail to identify and describe the allegations.

{¶ 10} The term "report" is not defined in R.C. 4113.52; however, it has been described as encompassing "more than mere idle conversation. In the context of the whistle blower statute, [the term] means delivery of accumulated information to a proper authority with an expectation that such authority will act on the information set forth." *Wood v. Dorcas* (2001), 142 Ohio App.3d 783, 790, 757 N.E.2d 17. In this case, plaintiff did orally report his suspicions to an appropriate ODOT officer; Matt Long, of the Office of Legal Counsel. He then followed up that same day with a written report and documentation of the alleged improprieties. (Plaintiff's Exhibit 3.) Although ODOT's counsel determined that none of the alleged activities warranted administrative investigation, the court finds that it was reasonable for plaintiff to expect that the information he provided, if believed, would compel someone in authority to take action.

**\*3** {¶ 11} Further, plaintiff testified quite credibly that he believed that the actions alleged could constitute felonious

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

conduct. All of the activities that he reported could reasonably be construed to constitute misuse or theft of state funds. It is the type of activity that is frequently the subject of media attention and public scrutiny inasmuch as it concerns use of taxpayers' dollars.

{¶ 12} Plaintiff was not a lawyer. Moreover, the Supreme Court of Ohio has held that: "to gain the protection of R.C. 4113.52(A)(3), an employee need not show that a co-worker had actually violated a statute, city ordinance, work rule, or company policy; it is sufficient that the employee had a reasonable belief that a violation occurred." *Fox v. City of Bowling Green,* 76 Ohio St.3d 534, 537, 668 N.E.2d 898, 1996-Ohio-104.

{¶ 13} In *Fox,* the court posited that: "[w]hen the General Assembly enacts a statute, 'it is presumed that * * * [a] just and reasonable result is intended.' R.C. 1.47(C). To require that an actual violation must occur for a whistle-blower to gain protection leads to nonsensical results which are unjust, unreasonable, and contrary to the spirit of the statute and public policy." Id. at 538, 668 N.E.2d 898.

{¶ 14} Based upon the foregoing, this court concludes that plaintiff strictly complied with the dictates of the statute and that he filed a sufficient report with a reasonable belief that there had been a violation of the law.

{¶ 15} Nevertheless, the dictates of R.C. 4113.52(A) must be construed in conjunction with R.C. 4113.52(B). " R.C. 4113.52(B) carries the statute's punch. That part of the statute sets forth what the employer may not retaliate against, and what actions bring about employer liability under the statute." Id.

{¶ 16} R.C. 4113.52(B) provides in pertinent part:

{¶ 17} " * * * No employer shall take any disciplinary or retaliatory action against an employee for making any report authorized by division (A)(3) of this section if the employee made a **reasonable** and good faith **effort** to determine the **accuracy** of any information so reported, or as a result of the employee's having made any inquiry or taken any other action to ensure the **accuracy** of any information reported under that division. For purposes of this division, disciplinary or retaliatory action by the employer includes, without limitation, doing any of the following:

{¶ 18} "(1) Removing or suspending the employee from employment;

{¶ 19} "(2) Withholding from the employee salary increases or employee benefits to which the employee is otherwise entitled;

{¶ 20} "(3) Transferring or reassigning the employee;

{¶ 21} "(4) Denying the employee a promotion that otherwise would have been received;

{¶ 22} "(5) Reducing the employee in pay or position."

{¶ 23} The statute does not require that the information reported be completely accurate. Rather, it is sufficient that "the employee made a **reasonable** and good faith **effort**" to determine its **accuracy**. *Fox* at 538, 668 N.E.2d 898. Here, the information reported by plaintiff was known to him by virtue of his position as the district's business and human resources administrator. In his written report to Long and Conomy, plaintiff stated that the incidents were

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

brought to his attention by district employees and others, specifically, the political-party county chairpersons with whom Martinko met. (Plaintiff's Exhibit 3.) Ironically, plaintiff also stated in the report that: "I have hesitated in sharing the information that was given to me for two reasons. First, I fear that I will either lose my position in the district or my superiors will make my job very difficult to perform in retaliation for the information I have sent you." Ultimately, plaintiff's fears were justified. That aside, the court finds from both the evidence and the pertinent case law that plaintiff made a reasonable and good faith effort to verify the information he reported, and that the actions taken by ODOT were of the type prohibited by R.C. 4113.52(B).

**\*4** {¶ 24} Having found that plaintiff complied with the dictates of the statute, it is next necessary to examine whether he otherwise established his claim. Specifically, in order to make a prima facie case of **whistleblower** retaliation plaintiff must show that: 1) he engaged in activity which would bring him under the protection of the statute; 2) he was subject to an adverse employment action; and 3) there was a causal link between the protected activity and the adverse employment action. *Wood,* supra at 791, 757 N.E.2d 17, citing *Chandler v. Empire Chemical* (1994), 99 Ohio App.3d 396, 400, 650 N.E.2d 950. (Additional citations omitted.)

{¶ 25} If plaintiff establishes a prima facie case, the burden shifts to the employer to articulate some legitimate, non-retaliatory reason for the actions taken. Should the employer articulate such reason, the burden then returns to the plaintiff to come forward with some evidence to show that the employer's stated reason was, in fact, a pretext for retaliation. Id. at 792, 650 N.E.2d 950.

{¶ 26} The following is a synopsis of the evidence that is relevant to the court's analysis.

{¶ 27} In May 1999, plaintiff responded to an Early Retirement Incentive (ERI) preliminary survey indicating that he was interested in the plan. Those who followed through with the plan would begin their retirement in July or August 2000. The survey included, in bold lettering, the statement that: "This survey is being conducted for budget purposes only. It in no way commits a person to the Early Retirement Incentive plan." The decision to retire could be made at any time up to and including the last date that the plan was in effect. The evidence shows that plaintiff never communicated any consistent, genuine interest in retiring.

{¶ 28} Within days of plaintiff's June 15, 1999, report to Long and Conomy, he was denied a merit pay raise by acting District Deputy Director Martinko. Defendant does not refute that each of the three other administrators at plaintiff's level in District 2 received merit pay increases. However, defendant does contend that several administrators across the state were denied merit raises, and that the decision to deny plaintiff's pay raise was not Martinko's alone.

{¶ 29} On July 23, 1999, plaintiff went to Martinko's office and attempted to make amends. The evidence is clear that plaintiff admitted that he had opposed Martinko's appointment as permanent district deputy director; that he realized he should not have done so; that he now wished to support Martinko and be a part of his team; that he believed Martinko to be the best person for the position; and that he wished

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

to "bury the hatchet" between the two. During that meeting, Martinko remarked: "excuse me if I am a bit suspicious." He also asked plaintiff more than once what had motivated his "subversive" actions. Further, Martinko repeatedly voiced his opinion that he had always treated plaintiff in a professional and courteous manner; that he had always "taken the high road" with him; and that, as far as he was concerned, there was no hatchet to bury. (Plaintiff's Exhibit 4.)

**\*5** {¶ 30} On July 26, 1999, Martinko presented plaintiff with a "Memorandum of Understanding" (Plaintiff's Exhibit 4) regarding the July 23, 1999, meeting. The memorandum acknowledges Martinko's suspicion of plaintiff and notes that plaintiff agreed that Martinko had always treated plaintiff professionally and courteously. Plaintiff refused to sign the document. In response, Martinko advised that he intended to notify Director Proctor of the matter.

{¶ 31} As promised, Martinko sent the unsigned Memorandum of Agreement along with a short memo (Defendant's Exhibit XX) to Director Proctor, the Chief Legal Counsel, and a host of other high-ranking ODOT officials. He notes in his memo that plaintiff stated to him that he (plaintiff) had thought that the conversation was confidential and stated that it was "low" of Martinko to expect him to sign the Memorandum of Agreement. According to the memo, plaintiff also inquired as to whether he had done anything illegal and Martinko advised him that he had not.

{¶ 32} According to plaintiff, on September 2, 1999, Director Proctor visited his office and informed him that he was appointing Martinko as the permanent district deputy director. Although the court ruled that much of this testimony was inadmissible, both parties' proposed findings of fact and conclusions of law reference this conversation. Proctor did not testify at trial. Plaintiff testified that Proctor expressed dissatisfaction with his conduct and demanded that he resign as quickly as possible. Plaintiff further testified that he told Proctor that he did not want to resign and asked for time to think it over.

{¶ 33} Thereafter, on September 14, 1999, Martinko met with plaintiff to discuss his future plans. Plaintiff testified that Martinko specifically wanted to know why he had not yet resigned. He also instructed plaintiff to put together an "action plan" and to deliver it to his office within two days. However, effective immediately, plaintiff was required to surrender his ODOT telephone credit card, his office and building keys, and the keys to the staff car that had been assigned to him for several years. (Plaintiff's Exhibit 6, Page 1.) Also effective immediately were requirements that plaintiff keep his office door open at all times; log all of his phone calls and faxes for Martinko's daily review; place all phone calls through his secretary (rather than dialing them himself); have all files retrieved for him by his secretary; discontinue use of "flex-time"; and cease working any overtime hours. (Plaintiff's Exhibit 6, Page 2.) Plaintiff delivered a handwritten action plan to Martinko, detailing the additional expectations of him, as discussed at the meeting. (Plaintiff's Exhibit 6, Pages 3-4.) The written plan required, among other things, that plaintiff inform his subordinate staff of the action plan and the limitations it imposed; that he remain at the District 2 offices and not visit any off-site facilities; that he cease attending any meetings involving the departments he supervised (i.e., the Safety, Data Systems, Pur-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

chasing, Payroll, Personnel, and Facilities departments); that he have all leave time pre-approved by Martinko; and that he meet with Martinko once each month for the six-month period that the plan would remain in effect.

**\*6** {¶ 34} It is undisputed that plaintiff was a Career Professional Employee whose employment was governed by R.C. 5501.20. Defendant maintains that plaintiff's work performance had been unacceptable and that, under such circumstances, the statute mandated that he be given an action plan allowing at least six months for his work to improve. According to defendant, plaintiff lacked basic understanding of his job functions and the areas he was responsible for administering. Further, defendant maintained that many of the restrictions enumerated in the plan were designed to assist plaintiff by relieving him of menial tasks he had been performing for himself. R.C. 5501.20 also required periodic evaluations during the six-month plan.

{¶ 35} Also in September 1999, plaintiff was notified that ODOT was charging him with supervisory intimidation, creation of a hostile work environment, failure of good behavior, and neglect of duty. The intimidation, hostile work environment, and failure of good behavior charges stemmed from allegations by two of plaintiff's female subordinates and were related to conduct that allegedly occurred in February 1999. The women did not report the conduct until May of that year. The "neglect of duty" charge concerned an allegation that plaintiff had been observed sleeping on May 20, 1999, during an important strategic planning meeting at defendant's central offices in Columbus, Ohio. Defendant maintains that it was plaintiff's knowledge of these charges, and the ensuing investigation of them, that led him to report Martinko's conduct to Matt Long in June 1999. Plaintiff maintains that he had no notice of any such reports or investigation(s) until September 15, 1999.

{¶ 36} A pre-disciplinary hearing on the charges was held on December 9, 1999. At the hearing, plaintiff offered various exhibits, his own statement, and a brief outline of his health history dating from the late 1970s. (Plaintiff's Exhibit 10.) Plaintiff stated at the outset that he felt that the charges were being levied against him in retaliation for his June 15, 1999, report. He also questioned the length of the delay involved in the charges being brought, expressed his feeling that the reports of the two females were exaggerated and, while admitting only that it was possible that he had fallen asleep at the meeting, questioned why no one had attempted to rouse him if they witnessed such conduct. Additionally, his medical statement advised that plaintiff had been prescribed four different medications between 1998 and 1999, each of which had a side effect of causing drowsiness.

{¶ 37} Martinko was not present at the pre-disciplinary hearing. However, he soon learned of the medical history that plaintiff had submitted. As a result, he notified Kathleen Barber, Administrator of Human Resources at defendant's central offices, and requested that arrangements be made for medical and psychological evaluations of plaintiff. (Defendant's Exhibits CCC and DDD.) In his memos to Barber, Martinko stated that the information provided by plaintiff had raised concerns over defendant's potential liability should plaintiff be involved in a motor vehicle accident while driving a state car, and whether the decisions he made in his fiduciary capacity

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

and as a staff manager should be called into question.

***7** {¶ 38} On December 10, 1999, plaintiff was summoned from a district staff meeting and brought to Martinko's office. Martinko informed plaintiff that he was being placed on an indefinite, paid, administrative leave "as a result of previous medical history/circumstances and information that you have provided and authorized for release." (Plaintiff's Exhibit 10.) Plaintiff's personal items were searched, he was escorted from the building, and he was ordered to stay away from defendant's premises for the duration of the leave.

{¶ 39} The leave lasted for six weeks. During that time, plaintiff cooperated with the medical investigation undertaken by defendant and he was pronounced fit to return to work without condition. Plaintiff also obtained statements from other doctors attesting to his fitness to continue to work at his occupation. Additionally, during plaintiff's leave, Martinko sent him two letters. The first letter notified plaintiff that defendant was "considering a disability separation on [plaintiff's] behalf" and scheduled a meeting "to review the facts that are pertinent" to such action. The second letter canceled the meeting without explanation. (Plaintiff's Exhibits 73 and 74.)

{¶ 40} On December 13, 1999, shortly after plaintiff was placed on administrative leave, the pre-disciplinary hearing officer issued his written report. (Defendant's Exhibit EEE.) The officer found that there was evidence to support the charges against plaintiff and that just cause existed for "the appropriate level of discipline as determined by management." Consequently, when plaintiff returned from his administrative leave, on January 24, 2000, he was given a discipline order (dated December 13, 1999) suspending him from work for three days based upon the wrongdoing alleged at the hearing. (Defendant's Exhibit N.)

{¶ 41} Also on January 24, 2000, plaintiff met with Martinko and Christine Dietsch, an ODOT labor relations officer. According to the minutes of that meeting, the purpose was to welcome plaintiff back and to outline the "commendable job" that Kelli Burkhardt, then 37 years old, had been performing in his absence. (Defendant's Exhibit QQ.) Martinko also advised that Burkhardt would be continuing in plaintiff's stead due to the "number of operatives and initiatives that she has been very involved in and needs to bring * * * to an appropriate conclusion." The minutes further state that a meeting would be held in early February 2000 to establish an action plan for plaintiff and that, while plaintiff was functioning substantially in accordance with the action plan, Burkhardt would continue to report directly to Martinko. Previously, Burkhardt had been a supervisor who reported to plaintiff, while plaintiff reported directly to Martinko.

{¶ 42} On February 3, 2000, Martinko met with plaintiff and presented him with a document that plaintiff considered to be a very negative performance evaluation for the period from August 3, 1998, to February 2, 2000. (Plaintiff's Exhibit 13.) Martinko considered the document to be the finalized form of the September 1999 action plan. Martinko described the action plan as setting forth the various corrective measures and responsibilities plaintiff needed to accomplish. The document was, in fact, captioned: "ODOT Employee Achievement Management System Evaluation" a title that suggests both evaluation and perform-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

ance planning.

**\*8** {¶ 43} Plaintiff objected to the February 3, 2000, document inasmuch as he was a long-time employee of ODOT and previous evaluations by Martinko's predecessor had been satisfactory. (See, e .g., Plaintiff's Exhibits 37 and 38.) In an e-mail to Martinko plaintiff stated that: "[y]ou have set several deadlines on projects for me to complete. Since you have removed the duties of Business & Human Resources Administrator from me previously, relocated my office to the other end of the district office complex and taken away the use of my Administrative Assistant on February 4, 2000; these deadlines will be impossible to meet." Martinko's response to that e-mail was accusatory, and implied that plaintiff was exaggerating or mischaracterizing the course of events. Martinko stated that: "[i]n summary, your performance evaluation fairly and accurately reflects your performance during the period noted in addition it clearly outlines an ACTION PLAN consistent with the duties and skills required of the [Business and Human Resources] administrator including deliverables and deadlines. Your mischaracterization of your elimination of duties and lack of clerical support is in direct conflict with our discussions * * * this kind of behavior and judgement is indicative as to why your performance review was poor * * * otherwise expect that the ACTION PLAN you were given shall be completed as enumerated."

{¶ 44} As mentioned in the above-quoted e-mail, Martinko also informed plaintiff on February 3, 2000, that he was to move his office from the suite where it was located, where it included a secretary and Martinko's office, to a location that was down one floor and several hundred feet away. Plaintiff had occupied his office suite for nine years. Defendant maintains that it needed the space for an additional conference room and did, indeed, create such a space after plaintiff vacated the office.

{¶ 45} Plaintiff participated in the relocation of his office. He wore blue jeans and a sweatshirt while doing so, in part, because the office he moved to had formerly been a storage area and had not been cleaned. At some point during the move plaintiff stated to a co-worker that: "[i]f I'm going to be treated like a dog, I might as well dress like a dog." As a result of that comment, and because he had worn blue jeans to work, Martinko advised plaintiff that he would likely be disciplined for insubordination. Martinko also explained to plaintiff that if he dressed in blue jeans again he would be sent home to change. The evidence adduced at trial established that there was no dress code at District 2 that forbade the wearing of blue jeans. Plaintiff also submitted photographs of other management employees wearing blue jeans to work on days when there was no moving or cleaning being done. (Plaintiff's Exhibits 69(a) to 69(g).)

{¶ 46} On March 13, 2000, plaintiff was given a written "documentation of verbal counseling" regarding the blue jeans incident and the "dress like a dog" comment. The document states in part that, dressing in such manner was "considered to be an overt slight at [Martinko], the evaluation/action plan process, and is considered to be in direct conflict with Part A of the Personal Development Action Plan * * *." Part A of the plan required that plaintiff be supportive of all ODOT policies and procedures. (Defendant's Exhibit X.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

**\*9** {¶ 47} Plaintiff also received a second "documentation of verbal counseling" on March 13, 2000. That counseling involved an incident when plaintiff had failed to notify Martinko that Les Reel, of the Columbus Office of Legal Counsel, had visited District 2 to investigate a workplace violence allegation. Martinko chastised plaintiff because Reel had been "in our facility and needing to meet with me and my not knowing it." Martinko also cautioned that plaintiff's action plan required that he "support [Martinko] and demonstrate professionally such support in all actions. The action you took * * * shows a lack of respect for the chain of command and the intent of the Evaluation and resulting Action Plan * * * and will not be tolerated."

{¶ 48} Throughout the following months, plaintiff continued to abide by the action plan and to complete the work assigned to him by Martinko. In spring of 2000, he requested Martinko's permission to attend an ODOT-sponsored workshop to improve his writing and computer skills (Plaintiff's Exhibit 24), which request was denied. Defendant maintained that staff who were contemplating taking the ERI option were not encouraged to participate in training courses. There was, however, evidence that at least one other employee who had responded to the ERI survey was allowed to attend. (Plaintiff's Exhibits 25 and 26.)

{¶ 49} In April 2000, Martinko ordered plaintiff to spend at least 30 minutes each morning and afternoon in the Facilities department and to provide daily written summaries of what he observed, followed by cumulative weekly e-mails. Plaintiff protested due to the amount of time involved in fulfilling that requirement in addition to all of the demands enumerated in the action plan. Defendant countered that the action was needed because of concerns about workplace violence.

{¶ 50} On May 3, 2000, plaintiff received another evaluation. That evaluation was also negative, and noted many instances of plaintiff's failing to complete required projects and/or achieve deadlines. Further, it required that plaintiff provide Martinko with a report, no later than May 8, 2000, on the "status of the personnel situation in the Facilities Department * * * detailing the steps that have been taken to constructively correct the supervisor/subordinate problems that led to an investigation by Central Office." (Defendant's Exhibit RRR.) However, plaintiff was planning to attend his daughter's college graduation (at which she was to receive special honors) and to help her move her residence. He had requested time off from May 5-8, 2000, to do so. Consequently, plaintiff asked to be excused from a staff retreat in order to have the time to both complete the project and to attend to his daughter's affairs. (Plaintiff's Exhibit 29.) Martinko denied permission and plaintiff took one day less than he had requested for that period. Later, plaintiff was denied leave even after he had reached accrued leave balances that mandated that he use the time or lose it. Moreover, when he was granted sick leave, he was required to provide proof that he used the time for medical purposes. (Plaintiff's Exhibit 65.)

**\*10** {¶ 51} On or about June 20, 2000, plaintiff was again denied a merit pay increase. The other three administrators at his pay grade in District 2 were granted such increases.

{¶ 52} Ultimately, in late June/early July 2000, plaintiff elected to take advantage of the ERI program. He testified convin-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

cingly at trial that he did so under duress; that he had sincerely enjoyed working at ODOT over the many years of his career there and, in essence, that the job had been "his life." At Martinko's request, he filed a final report concerning the Facilities Department on his last day on the job. (Plaintiff's Exhibit 68.)

{¶ 53} Upon consideration of all of the evidence presented, the court finds that plaintiff has clearly established a prima facie case of retaliation. The court has previously addressed the first element and has found that plaintiff engaged in activity that brought him within the protection of the **Whistleblower** Protection statute.

{¶ 54} The court has also determined that plaintiff was subjected to an adverse employment action, and that the adverse action amounted to a constructive discharge. The test for determining such claims is "whether the employer's actions made working conditions so intolerable that a reasonable person under the circumstances would have felt compelled to resign." *Mauzy v. Kelly Services, Inc.,* 75 Ohio St.3d 578, 588-589, 664 N.E.2d 1272, 1996-Ohio-265. "In applying this test, courts seek to determine whether the cumulative effect of the employer's actions would make a reasonable person believe that termination was imminent." Id. Examples of factors to be considered include: "reductions in sales territory, poor performance evaluations, criticism in front of coemployees, [and] inquiries about retirement intentions, * * *." Id.

{¶ 55} Even a cursory review of the actions taken in this case reveals to the court that plaintiff's working conditions were made so intolerable that any reasonable person would have felt compelled to resign. The actions taken by defendant plainly fall within the categories proscribed in *Mauzy* and in R.C. 4113.52(B). For example, plaintiff was denied pay increases and leave benefits, given poor evaluations, made to humiliate himself in front of his subordinates by informing them of the restrictions imposed by the September 1999 action plan, was effectively transferred, and reassigned duties. In sum, defendant's actions had a significant effect on plaintiff's status within the District office. He lost not only the prestige associated with his title, but also the level of responsibility and the perception of his professional capabilities associated with his roles. It must have been apparent to anyone who worked with or near plaintiff that his actions were constantly called into question. Therefore, even though there was no change in plaintiff's salary or title, the court finds that defendant's actions were not only adverse but also amounted to constructive discharge. See, generally, *Fortner v. State of Kansas* (D.Kan.1996), 934 F.Supp. 1252, 1266. As such, the court concludes that plaintiff established the second prong of his prima facie case.

*11 {¶ 56} The court further finds that plaintiff has demonstrated a causal connection between the alleged employment actions and his reporting of ostensibly felonious conduct to the ODOT Office of Legal Counsel. The court is not persuaded by defendant's argument that plaintiff made the report because of the charges made against him concerning workplace rule violations. Those charges were made by persons other than Martinko and Proctor and were of far less import to plaintiff's career than the alleged conduct of Martinko that was reported by plaintiff. Simply stated, the court finds that it strains credulity that the performance of a loyal employee of more than 35 years of service had changed so drastic-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808
**(Cite as: 2005 WL 894868 (Ohio Ct.Cl.))**

ally in his final two years on the job that defendant's persistent, excessive, responsive actions could possibly have been warranted by anything other than retaliation. Accordingly, the court concludes that plaintiff has satisfied the third and final prong of his prima facie case.

{¶ 57} Having so found, the question becomes whether defendant has articulated legitimate nondiscriminatory reasons for its actions and, if so, whether plaintiff has established that defendant's proffered reasons were a mere pretext for retaliation. Of those two inquiries, the crux of the analysis is plaintiff's proof of pretext. "Pretext is established by a direct showing that a discriminatory reason more likely motivated the employer or by an indirect showing that the employer's explanation is not credible." *Detzel v. Brush Wellman, Inc.* (2001), 141 Ohio App.3d 474, 483, 751 N.E.2d 1067. Much of this inquiry involves the same evidence and analysis as the discussions with regard to constructive discharge and causal connection.

{¶ 58} As noted previously, defendant has indeed set forth plausible reasons for each of the actions at issue in this case. However, as the court held in connection with plaintiff's proof of a causal connection, the evidence fails to establish that defendant's reasons were legitimate and non-retaliatory. For example, defendant has steadfastly maintained that plaintiff failed to prove that Martinko had any knowledge of the June 15, 1999, report to Long and Conomy; that plaintiff's poor performance was the basis for Martinko's development of the action plan(s), denial of merit pay raises, and elimination of menial duties (such as making his own phone calls and photocopies and retrieving his own files); and that use of the action plan and evaluation method was mandated by the requirements of R.C. 5501.20. Defendant further has maintained that cost-savings issues motivated the decisions to take away plaintiff's telephone credit card and personal, state-owned vehicle and that taking over plaintiff's office space was motivated by concerns for better use of that area. Those were but a few of defendant's proffered reasons.

{¶ 59} As the court has stated, defendant's proffered legitimate business reasons do not survive scrutiny. The court finds it disingenuous, at best, that Martinko was not aware of plaintiff's June 15, 1999, memo when he began the course of conduct at issue.

**\*12** {¶ 60} The evidence established that Martinko and Proctor worked closely with one another and it is clear that Proctor knew of plaintiff's report, at the latest, when he received a copy of Conomy's June 18, 1999, reply memo to plaintiff. Moreover, plaintiff himself notified Proctor of the report he had made.

{¶ 61} The court also is not persuaded that defendant took actions based upon plaintiff's expressed intent to retire. As previously noted, the evidence failed to establish that plaintiff ever expressed a genuine, consistent intent to do so. Furthermore, if defendant sincerely believed that plaintiff intended to retire, it would have made little sense to subsequently urge him to resign or to threaten him with disability separation.

{¶ 62} Finally, the court finds it noteworthy that Martinko continually demanded plaintiff's complete support and respect (a demand that would have been extremely difficult to comply with under the circumstances), when he seemed none too eager to reciprocate. In short, even though Martinko

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

issued a memo stating that he had always taken the high road with plaintiff, the court finds that the evidence demonstrated otherwise.

{¶ 63} In *Mauzy,* a case that concerned age discrimination, the court stated that: "[a] sophisticated discriminating employer should not be permitted to circumvent the statute by transferring an older employee to a sham position as a prelude to discharge." Id. at 589, 664 N.E.2d 1272. Similarly, the court finds that defendant in this case should not be permitted to circumvent the **Whistleblower** Protection statute by crafty reasoning, chicanery, and a well-developed paper trail of its activities. In short, regardless of the reasons asserted, the court concludes that the weight of the evidence amply demonstrates that defendant's justifications were a mere pretext for its true motivation: retaliation against plaintiff for his June 15, 1999, report and a desire to force plaintiff out of his job, one way or another.

{¶ 64} For all the forgoing reasons, the court finds in favor of plaintiff on his claim of **whistleblower** retaliation. The court further finds that the weight of the evidence failed to establish plaintiff's claims of age and disability discrimination in violation of R.C. 4112.02, and discriminatory retaliation in violation of R.C. 4112.02(I). Judgment shall be entered accordingly.

### JUDGMENT ENTRY

{¶ 65} This case was tried to the court on the issue of liability. The court has considered the evidence and, for the reasons set forth in the decision filed concurrently herewith, judgment is rendered in favor of plaintiff on his claim of **whistleblower** retaliation. The amount of said judgment shall be determined after the damages phase of the trial. The court shall issue an entry in the near future scheduling a date for the trial on the issue of damages.

Ohio Ct.Cl.,2005.
Dargart v. Ohio Dept. of Transp.
Not Reported in N.E.2d, 2005 WL 894868 (Ohio Ct.Cl.), 2005 -Ohio- 1808

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.