UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

SUNIL NAYYAR, M.D., :

    Plaintiff, : Case No. 2:10-cv-00135

v. : Judge Marbley

MT. CARMEL HEALTH SYSTEM, et al., : Magistrate Judge King

    Defendants. :

## AFFIDAVIT OF SUNIL NAYYAR

STATE OF OHIO    )
COUNTY OF DELAWARE ) SS:

I, Sunil Nayyar, M.D., being duly cautioned and sworn, depose and state that I am competent to testify to the facts contained herein, that I have personal knowledge of the facts contained herein, and that the facts contained herein are true and accurate to the best of my belief.

1. I live in Powell, Ohio in the County of Delaware.

2. From July 2006 to July 2009 I was a resident at Mt. Carmel West Hospital.

3. I protested and complained on two occasions about the conditions in the Intensive Care Unit ("ICU") at Mount Carmel West Hospital in Columbus, Ohio in January 2009 and July 2009.

4. My protests and complaints concerned two matters: (1) lack of supervision of residents in the ICU and (2) the scheduling of residents in July 2009 in a manner that would lead to the death of a patient.

5. In the January 2009, I was joined by 16 other residents in Internal Medicine Residency Program in protesting and complaining about patient safety in the ICU. (Exhibit A, The petition)

6. I was the leader of the January 2009 petition and protest and gathered all of the signatures and submitted the January 2009 petition to the hospital administrators including Dr. John Weiss, our program director.

7. In fact, as leader, I investigated the matter and talked to residents and Dr. Weiss about the patient safety issue before organizing and preparing the January 2009 petition.

8. The January 2009 petition and protest was signed by me and all of the residents stating that "[a]ll residents who sign below agree that without an in-house Critical Care supervisor, safety is an active issue" in the ICU. (see Exhibit A, petition).

9. The January 2009 petition was created to protest and complain about dangerous and hazardous conditions in the ICU that put patients at imminent risk of harm.

10. Patients were at imminent risk of harm because I and other residents routinely made treatment decisions without the supervision of a licensed critical care physician, Dr. Roy St. John, during the night shift.

11. In fact, Dr. St. John was at home during the night shift, and Dr. John Weiss was not present during the shift.

12. I and other resident felt intimidated by Dr. St. John who warned us not make phone calls to him during the night.

13. Like the other residents, I had no training in critical care medicine, which involves treating the most vulnerable patients in the hospital.

14. I and other residents had to make split second life and death decisions in the ICU and often could not reach Dr. St. John and could not consult other physicians in the hospital because they were too busy and did not have any training in critical care medicine.

15. The second protest and complaint occurred in July 2009 and was a continuation of the January 2009 petition but included an additional complaint.

16. The additional complaint concerned Dr. Weiss's decision to schedule residents without a intern backup. Doing this exacerbated the lack of supervision in the ICU because I now had to cover more patients without backup and without supervision by a critical care doctor.

17. I immediately confronted Dr. Weiss about the July 2009 schedule.

18. In response, Dr. Weiss told me, to my surprise and shock, that he wanted patients to die to prove his point about assignment of residents (internal medicine) to the ICU.

19. I disagreed with him and told him he could not place patients in a situation that could result in their death and I told him this was criminal. He dismissed my complaint and refused to correct the schedule.

20. I then went to Dr. Li Tang, the Medical Education Director, and presented the July 2009 schedule to her and wrote in detail that the schedule would place patients at risk, that Dr. Weiss refused to change it, and stated that he wanted patients to die to prove a point.

21. I left the July 2009 schedule with the writing on it with Dr. Li Tang, who stated that she would follow-up with Dr. Weiss.

22. I understand that the July 2009 schedule cannot be found by Mount Carmel and that Dr. Li Tang threw it away after I was fired; Mount Carmel knew as early as July 2009 that I would bring suit because I was represented by a lawyer and was challenging my termination.

23. Dr. Li Tang eventually responded to the July 2009 protest and complaint by stating that she would not change the schedule and that it would remain the same.

24. I next reported the July 2009 schedule to Dr. St. John and he stated that he would take the July 2009 schedule to Mt. Carmel administration.

25. Shortly after accusing Weiss and Mt. Carmel, I was told I was being removed from clinical service because of an A-Line incident.

26. Because I treat numerous patients, I had no idea what the incident was, when it occurred, or who it involved.

27. I later learned that a nurse was accused of performing an A-line procedure while working with me, and that this was outside of her authorized practice.

28. The accusations against Nurse Bowers are untrue because I myself inserted the A-line not Nurse Bowers.

29. I have never been told or trained by Mount Carmel regarding a nurse' scope of practice and assumed the nurse could assist me in performing the procedure.

30. I however was later informed that I was being investigated about the incident.

31. As of the date of this affidavit, I have never been taught or informed that a nurse cannot actively assist a resident with an A-Line procedure.

32. Despite the fact I have never been told about a nurse's scope of practice, or that it is prohibited for a resident to permit a nurse to actively perform an A-line procedure, I was nevertheless targeted for investigation by Mount Carmel and Dr. Weiss.

33. Once the investigation began, I had a discussion with Dr. Weiss about the incident.

34. Dr. Weiss never told me not to talk to other residents and staff about the incident.

35. I was also not told to talk to Amanda Bowers, the nurse involved in the A-line incident and I never told Ms. Bowers to lie about the incident.

36. Indeed, I had no reason to tell her to lie because I, at that time, had no knowledge of a nurse's scope of practice or no knowledge I did anything wrong.

37. I never told an OB GYN resident that she was placed on leave because of the A-line incident.

38. I was not given an opportunity to defend myself during the termination process.

39. I was not allowed access to my personnel file and records despite the fact that my termination was based on alleged "current" and "past" misconduct.

40. I was not permitted to have legal representation during the termination process, even though nothing in Mount Carmel's regulations prohibits legal representation.

41. Prior to my termination, I had never been written up or formally disciplined at Mount Carmel West.

42. During my deposition on August 17, 2011, I was asked by Mount Carmel's lawyer whether I was aware of any laws that were being broken or any requirements that were not being met. In response, I said "I don't know what all laws are so I can't comment on that." (Nayyar Dep. 311).

43. When I was asked this question, I did not know that I was being asked if Mount Carmel's conduct was criminal; rather, I thought he was asking me to identify particular laws that were broken.

44. I still do not know the specific laws that were being violated by Mount Carmel and Dr. Weiss because I am not a lawyer.

45. I did know that it was criminal.

46. I was not asked if I believed the conduct of Mount Carmel and Dr. Weiss was criminal or illegal. Had I been asked this specific question, I would have said it was criminal, but I don't know the specific law that was violated and still don't know the specific laws violated.

47. I only know that Dr. Weiss stated that the July 2009 schedule would result in patients dying and that it is wrong and criminal to purposefully endanger patient safety to a point where patients will die.

48. I believe that I was discriminated against because Dr. Jonathan Borders routinely placed patients at risk by coming on the job intoxicated (no discipline), arriving late (patients not covered), failing to respond to calls (patient care delayed) and other problems.

49. Dr. Borders, who is white, was given numerous chances and warnings from Mount Carmel prior to his termination and was ultimately fired after I identified him during this lawsuit as a comparable person who was treated more favorably than me.

50. I was never given a chance or warning. I was summarily fired and was not given a chance to respond to the "evidence" against me.

51. Borders, however, was given multiple chances.

52. I understand that Mount Carmel stated that Borders had a "problem" and that they were working with him; however, because of the serious nature of medical practice, Mount Carmel's policy does not permit a person with a "problem" that affects patient care to continue clinical treatment of patients, yet Dr. Border continued to treat patients.

53. I never threatened Dr. Tamaskar, as alleged by him.

54. Threatening a manager is certainly grounds for disciplinary action.

55. I was not disciplined in any manner for this because it did not occur.

56. Nurse Bowers, who allegedly acted outside of her scope of practice, was fired by the same Mount Carmel administration that fired me.

57. Nurse Bowers however was given a severance and was permitted to transition to a new hospital.

58. By contrast, Mount Carmel gave me no severance, gave an unsolicited report to the American Board of Internal Medicine stating that I did not finish my third year of residency, has adversely affected my chances of obtaining new employment by providing negative information to prospective employers and delaying the transfer of my records, and has reported to the media that I endangered patient safety when, in fact, the patient was not harmed and publically disseminated private, confidential information contained in my personnel file to the general public.

59. Lastly, when interrogated about the A-Line incident, I initially did not tell the truth, but I later recanted, told the truth, and explained that I was afraid during an interrogation.

60. I recanted and told the truth before my termination was completed.

61. I made a mistake but believe I should have been given a chance like Dr. Borders.

62. My life as physician is ruined due to the stigma of being fired in the third year of residency.

63. In order to get a meaningful job, even one at Mount Carmel, a physician must be board eligible or board certified.

64. I am not board eligible or board certified because I have not completed the third year of residency.

65. I just want to finish my third year of residency and get my life back together.

66. Mount Carmel has refused to re-admit me to the program and allow me to finish.

67. I have applied to hundreds of residency programs and cannot gain admission.

68. I have even applied to serve in Afghanistan but was not admitted to the U.S. Army's program.

69. Dr. Weiss told me that my career would be ruined if I was terminated and he is right.

Further, Affiant Sayeth Naught.

SUNIL NAYYAR, M.D.

Sworn and Subscribed before me this 23 day of January 2012.

Notary Public
Commission Expiration Date: 6-30-2014

SEEMA NAYYAR
Notary Public, State of Ohio
My Commission Expires 06-30-2014