Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.
Ahmad BALI, M.D., an individual, Plaintiff,
v.
CHRISTIANA CARE HEALTH SERVICES, INC., a Delaware corporation, Defendant.

No. C.A. 16433 NC.
June 16, 1999.

John L. Reed, (argued), of Blank, Rome, Comisky & McCauley, LLP, Wilmington, Delaware; Victor F. Battaglia, and Philip B. Bartoshesky, of Biggs & Battaglia, Wilmington, Delaware, for Plaintiff.

William J. Wade, and John T. Dorsey, (argued), of Richards, Layton & Finger, Wilmington, Delaware, for Defendant.

MEMORANDUM OPINION

LAMB, Vice Chancellor.

I. INTRODUCTION

*1 Plaintiff seeks an order directing the defendant hospital to continue plaintiff's participation in its surgical residency program. The predicate for this motion is a finding made earlier by me that the hospital breached its contract with the resident when it acted to "demote" him to a more junior year in the program and to change his status from "categorical" to "preliminary." FN1 *See Bali v. Christiana Care Health Serv.,* Del. Ch., C.A. No. 16433, Lamb, V.C. (Sept. 22, 1998). For the reasons explained in this opinion, I now conclude that it is appropriate to require the hospital to place the plaintiff in a position as a fourth year categorical resident.

> FN1. The designation of the position as "categorical" (as opposed to "preliminary") signifies a mutual expectation of the parties that, subject to the resident's satisfactory performance, his contract will be renewed from year to year until the completion of the full residency program. A resident in a preliminary position has no contractually based expectation of continuation in the program beyond the one-year term of the contract. In the five-year surgical residency program at issue here, all PGY-4 and PGY-5 residents are in categorical positions.

II. BACKGROUND

In a letter opinion to counsel dated September 22, 1998 (the "September 1998 Opinion"), I decided that defendant Christiana Care Health Services ("CCHS") breached its contract with plaintiff, Dr. Ahmad Bali ("Dr.Bali"), on November 10, 1997, when it purported to "demote" Dr. Bali from his position as a PGY-3 FN2 categorical resident to the position of a PGY-2 preliminary resident. I concluded that the actions taken by CCHS amounted to an actual or constructive discharge of Dr. Bali and, in the absence of grounds to terminate Dr. Bali's contract, were not a permissible form of discipline. Because CCHS had conceded that such grounds did not exist, it followed that CCHS' actions were in breach of contract. Moreover, I found that the breach was material "because the action to 'demote' Dr. Bali was, in practical effect, a termination of the position promised

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

him by the terms of his employment agreement and a significant and substantial alteration of both the present and the reasonably anticipated future relations created by that agreement...." September 1998 Opinion at 4. In this opinion, I will assume familiarity with the facts recited in that earlier opinion.

> FN2. As noted in the September 1998 Opinion, as used in this context, the term "PGY" is shorthand for "post graduate year." Thus, "PGY-3" refers to the third of five years in CCHS' surgical residency program.

Dr. Bali's (demoted) position as a PGY-2 preliminary resident ended on June 30, 1998. In anticipation of that event, I entered a consent order on June 22, 1998 ("June 1998 Order"), that required Dr. Bali's participation in CCHS' surgical residency program in a PGY-3 preliminary position beginning July 1, 1998 "subject to Christiana's right to discontinue Dr. Bali in that position if he does not ultimately prevail on the merits of his claim for injunctive relief." That position will end on June 30, 1999.

Although the effect of the June 1998 Order was to retain Dr. Bali in CCHS' surgical residency program on an interim basis, it did not fully restore him to the position he would have occupied had there been no breach because that order required his retention as a PGY-3 preliminary, rather than a PGY-4 categorical, resident. Had there been no breach of contract, Dr. Bali would have been entitled to advance to PGY-4 categorical status as of July 1, 1998. At the time the June 1998 Order was entered, however, CCHS was unable to promote Dr. Bali to PGY-4 categorical status for several reasons. First, Dr. Bali's improper demotion to PGY-2 preliminary status prevented him from completing the requirements of the PGY-3 year. Second, because CCHS filled Dr. Bali's PGY-3 categorical position with another resident in January 1998, that new resident was expected to occupy the PGY-4 categorical position to which Dr. Bali would otherwise have been entitled. Finally, at the time, CCHS was unauthorized by its accrediting authority to create an additional PGY-4 categorical position. The most CCHS could do was to place Dr. Bali in a PGY-3 preliminary position.

**\*2** Following the September 1998 Opinion, the parties engaged in substantial efforts to mediate the remaining issues in this case. Ultimately, these efforts failed and the plaintiff moved for an order requiring CCHS to promote him to PGY-4 categorical status in the residency program. Argument on this motion took place on May 24, 1999. After argument, I asked CCHS to clarify whether or not a PGY-4 categorical position could be made available to Dr. Bali if I granted the relief requested in his motion. By letter dated May 25, 1999, counsel for CCHS informed the Court that, if the Court granted the relief requested, CCHS would be able to obtain authorization for such a position.

### III. DISCUSSION

The issues to be decided are (i) whether contracts of the sort at issue here are specifically enforceable and, if so, (ii) whether the circumstances of this case justify the relief sought by plaintiff. It is important to note that, in connection with my consideration of the latter issue, CCHS has not asked me to rely on any evidence that Dr. Bali is not qualified for promotion to PGY-4 categorical status.FN3

> FN3. On June 15, 1999, counsel for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

CCHS wrote to inform me that CCHS had recently placed Dr. Bali on clinical probation. At Dr. Bali's request, he will soon appear before the Surgical Education Committee of the hospital with respect to that disciplinary action. Counsel's letter continues as follows: "Understandably, plaintiff's counsel expressed to me some concern that [CCHS] might argue to the Court that Dr. Bali cannot be promoted to a PGY-4 resident, even if the Court ordered it, because Dr. Bali is on clinical probation. I have already informed plaintiff's counsel that [CCHS] will not make that argument. I also want to assure the Court that, if Your Honor determines that it is appropriate to grant plaintiff's motion regarding specific performance and to order Dr. Bali back into the program as a PGY-4 resident, [CCHS] will not attempt to use the fact that Dr. Bali has been placed on probation as a means to avoid the Court's order."

A. Can this Contract Be Specifically Enforced?

The remedy of specific performance "may be defined as the actual accomplishment of a contract by the party bound to fulfil it.... It is an equitable remedy available in appropriate circumstances to protect rights under contract." *Potter v. Potter,* Del. Ch., 251 A.2d 578, 580 (1968); *see also* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery,* § 12-3, p. 816 (1998) [hereinafter *Wolfe & Pittenger* ] (Specific performance "aims to protect the expectations of the parties to a contract by giving the party who seeks such remedy the benefit of his or her contract in *specie* by compelling the other party to the contract to do that which he or she has agreed to do.").

CCHS argues, citing authority from Delaware and other jurisdictions,[FN4] that "[i]t is a well-settled principal of equity jurisprudence that 'performance of a contract for personal services, even of a unique nature, will not be affirmatively and directly enforced.' " Def's. Ans. Br. at 10 (quoting *Northern Del. Indus. Dev. Corp. v. E.W. Bliss Co.,* Del. Ch., 245 A.2d 431, 434 (1968)). This is also the position taken in the *Restatement (Second) of Contracts § 367(l) (1981)* ("A promise to render personal service will not be specifically enforced.").

> FN4. *See Bethlehem Eng'g Export Co. v. Christie,* 2d Cir., 105 F.2d 933, 934-35 (1939); *Burger King Corp. v. Agad,* S.D. Fla., 911 F.Supp. 1499, 1506 (1995); *Kurle v. Evangelical Hosp.,* Ill.App.Ct., 411 N.E.2d 326, 332 (1980); *Zannis v. Lake Shore Radiologists, Ltd.,* Ill.App.Ct., 392 N.E.2d 126, 128-29 (1979); *Fitzpatrick v. Michael,* Md. Ct. Spec.App., 9 A.2d 639, 641 (1939); *Hoffman Candy & Ice Cream Co. v. Department of Liquor Control,* Ohio Supr., 96 N.E.2d 203, 206 (1950); *Felch v. Findlay College,* Ohio Ct.App., 200 N.E.2d 353, 354-55 (1963); *Fanney v. Virginia Inv. and Mortgage Corp.,* Va.Supr., 107 S.E.2d 414, 421 (1959); *State ex rel. Schoblom v. Anacortes Veneer, Inc.,* Wash.Supr., 255 P.2d 379, 381 (1953).

There are several good reasons why courts will not, generally, enforce contracts for personal service, even against an employer.[FN5] Enforcement of a contract for

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

personal services, especially one spanning an extended length of time, would ordinarily entangle the court in the continuous supervision of day-to-day relations between the parties. Moreover, it is to be expected that contracts for personal services depend on the existence and maintenance of a cooperative and trusting relationship between the parties to the contract. In *Zannis v. Lake Shore Radiologists, Ltd* ., the court discussed these two principles, stating:

> FN5. Any order of specific performance against the employee would raise substantial, if not insurmountable, objections under the Thirteenth Amendment to the United States Constitution, which provides that "[n]either slavery nor involuntary servitude ... shall exist within the United States...." U.S. Const. Amend. XIII, § 1.

**\*3** When a contract calls for services over a period of time, especially when such services require special skill, knowledge, judgment or discretion, it would be impractical, if not impossible, for a court to provide the continuous supervision necessary to enforce this kind of order for specific performance. In addition, personal service contracts often require a relationship of cooperation and trust between the parties to the contract. Consequently, as a matter of public policy courts will avoid the friction that would be caused by compelling an employee to work, or an employer to hire or retain someone against their wishes. Ill.App.Ct., 392 N.E.2d 126, 129 (1979).

CCHS suggests that both reasons are applicable in the instant case, as "plaintiff's work as a surgical resident requires skill, knowledge and discretion which would make [court] supervision of a specific performance order difficult, if not impossible." Further, CCHS contends that circumstances exist that are directly contrary to "the atmosphere of cooperation and trust needed for the intimate and personal relationship which must exist between a resident and members of the teaching staff." These circumstances require the "utmost consideration ... before compelling the continued relationship between the parties" argues CCHS, due to the potential effect of a non-cooperative relationship on the public relying on CCHS for their medical care, a public who would be unaware of the hostile relationship between the parties.

In contrast, Dr. Bali cites cases involving claims for wrongful discharge[FN6] and/or breach of contract[FN7] and claims for due process violation,[FN8] where courts have ordered reinstatement of discharged employees under the principle that reinstatement is the "preferred remedy," as it is the best way to ensure that the wronged employee is "made whole." Some of these cases are predicated on violation of federal or state statutes aimed at preventing discrimination in employment.[FN9] Another is based on the substantial public policy concerns implicated by the actions of employers who discharge employees in retaliation for the exercise of legally protected conduct.[FN10] Based on this authority, Dr. Bali argues this Court must start with the premise that reinstatement is the preferred remedy for CCHS' breach of contract.

> FN6. *See McNeil v. Economics Lab., Inc,* 7th Cir., 800 F.2d 111, 118 (1986) (noting that a plaintiff is made whole when "returned to the position that such a victim would have occupied" and reinstatement is the preferred remedy to do so), *cert. denied,* 481 U.S. 1041 (1987), *over-*

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

ruled on other grounds, *Coston v. Plitt Theatres, Inc.,* 7th Cir., 860 F.2d 834, 836 (1988); *Sasser v. Averitt Express, Inc.,* Tenn. Ct.App., 839 S.W.2d 422, 432 (1992) (noting that because of the "inherently speculative nature of front pay awards," reinstatement, coupled with back pay, is the preferred remedy in cases involving discharged employees).

FN7. *Stafford v. Electronic Data Sys. Corp.,* E.D. Mich. 749 F.Supp. 781, 785 (1990) (observing that courts are finding reinstatement to be the preferred remedy, because it is the most effective relief for making the plaintiff whole);

FN8. *Volpicelli v. Jared Sydney Torrance Memorial Hosp.,* Cal. Ct.App., 109 Cal.App.3d 242 (1980) (finding plaintiff physician's termination a violation of due process, as hospital failed to provide notice and opportunity for a hearing as required by its bylaws).

FN9. *See McNeil,* 800 F.2d 111 (action brought under the Age Discrimination in Employment Act ("ADEA")).

FN10. *See Sasser,* Tenn. Ct.App., 839 S.W.2d 422 (common law cause of action created by state supreme court to protect employees wrongfully discharged for seeking workers' compensation benefits).

CCHS' contention that reinstatement is never available as a matter of equity jurisprudence cannot be harmonized with the authority cited by Dr. Bali for the proposition that reinstatement is the preferred remedy in cases of wrongful termination of an employment contract.[FN11] Moreover, while some of the cases cited by Dr. Bali are predicated on the existence of an express statutory grant of authority to impose reinstatement as a remedy[FN12] and could be less persuasive for that reason, others are not.[FN13] From my review of the authorities and my consideration of the issues presented, I conclude that I should not be bound by the hard and fast rule for which CCHS contends but, rather, should examine the nature of the contractual relationship at issue, the practicality of ordering its performance by CCHS and the consequences likely to flow from a decision to refuse a decree of performance. I will not take into consideration the nature of the conduct amounting to the breach because there has been no showing that such conduct violated any provision of statute or public policy.

FN11. There is also broad statutory authority in cases of employment discrimination for the use of reinstatement as a remedy. *See* 29 U.S.C.A. § 626(b) (1999) [the Age Discrimination in Employment Act ("ADEA")] ("In any action brought to enforce this chapter the court shall have jurisdiction to grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter, including without limitation judgments compelling ... reinstatement...."); 42 U.S.C.A. § 2000e-5(g)(1) (1994) [the Civil Rights Act of 1964 (or "Title VII")] (The court may order "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement...."); 19 *Del. C.* § 712(h) [Delaware's codification of the ADEA and Title

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

VII] (granting this Court the authority to enforce an order of the Department of Labor review board requiring reinstatement).

FN12. See *McNeil,* 800 F.2d 111 (action brought under the Age Discrimination in Employment Act ("ADEA")).

FN13. See *Stafford,* 749 F.Supp. 781 (common law cause of action for wrongful discharge/breach of contract claim remedied by reinstatement); *Sasser,* Tenn. Ct.App., 839 S.W.2d 422 (common law cause of action for retaliatory discharge remedied by reinstatement).

***4** The bases of the contractual undertakings between a resident and a teaching hospital are quite different from that encountered in a typical contract of employment and, in my opinion, more easily lend themselves to judicial enforcement. In this case, for example, a fundamental objective of the contract is the training of resident physicians in a surgical specialty, not the performance by them of work for pay. Thus, for example, the resident receives a modest annual stipend, not a salary commensurate with his or her status as a licensed physician or with the duties he or she is expected to perform. When invited to participate in the program as a categorical resident, it is with the express understanding that the resident will be promoted annually (assuming his maintenance of a satisfactory performance level) until the completion of the PGY-5 year. The term of the arrangement, although nominally year-to-year, also correlates to the five-year term of CCHS' surgical residency program. Importantly, there are also significant educational aspects to the relationship between a resident and a hospital. A resident's clinical and academic development is monitored by the appropriate authorities at the hospital who administer an elaborate disciplinary structure. The resident is also expected to take and pass a series of written examinations.

The educational or programmatic nature of the relationship created between a resident and a hospital lessens, in my view, the policy-based objections to the specific enforcement of contracts for personal services, most notably, the entanglement of the Court in supervising the day-to-day relations between the parties. The existence of an established disciplinary process and the obligation of CCHS to oversee Dr. Bali's development as a surgeon should act to prevent the Court from becoming involved in the day-to-day relations of the parties. For these reasons, I find the involvement of this Court in enforcing a contract of the nature of the one between Dr. Bali and CCHS an insufficient bar, in the abstract, to an award of specific performance.

To a lesser extent, the educational or programmatic nature of the relationship of a resident physician to the employing hospital also acts to ameliorate the concern expressed in *Zannis* that the specific enforcement of a contract of employment is inconsistent with the need to maintain a cooperative and trusting relationship between parties to such a contract. I will address, *infra,* CCHS' contentions that, in this particular situation, hostile relations between the parties make reinstatement unavailable as a practical matter.

Also weighing in favor of granting specific performance of a contract of this nature is the extreme and irreparable harm likely to befall an improperly discharged resident in the absence of an order decree-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

ing performance of the contract. Unlike an employee in a usual case who can find substitute employment, an improperly discharged resident physician can be expected to have the greatest difficulty securing a substitute position in another residency program and, thus, has little or no prospect of achieving board certification in his or her chosen specialization. Even if calculable, money damages simply cannot make a doctor whole for the lost opportunity to become a surgeon.

***5** For all of these reasons, I conclude that established precedent does not prohibit me from entering a decree requiring CCHS to make available to Dr. Bali a PGY-4 categorical position in its surgical residency program. I now turn to the second issue presented in this matter, whether the circumstances of this case warrant such relief?

B. Should an Award of Specific Performance be Granted?

*1. The Existence of Irreparable Harm*

At the time of CCHS' breach, Dr. Bali was halfway through his third year of a five-year residency program. Because of the wrongful demotion, Dr. Bali suffered three harms: the loss of his categorical position; the loss of experience associated with being demoted from a third year to a second year, and the resulting decrease in his experience and responsibility; and the loss of wages caused by the delay in his becoming a board certified surgeon. The interim order I entered alleviated the second of these losses, as it has allowed Dr. Bali to complete the requirements of a third-year resident. Monetary damages will alleviate the third of the losses, as Dr. Bali can be compensated for the delay in his certification. Plainly, however, the loss of his position as a categorical resident, with its expectation of continuation in the program until completion, is not one that can be fully repaired by an award of money damages.

During the course of this litigation, Dr. Bali has made numerous applications to hospitals throughout the country, in an attempt to find a PGY-3 or PGY-4 categorical position in the surgical residency program at another hospital. These efforts have been unsuccessful. While the possibility exists that an offer will be forthcoming, it is highly improbable. The reasons are obvious and do not require elaboration. Thus, when considering whether or not to grant the relief requested by this motion, two realities emerge: the specific enforcement of Dr. Bali's contract will provide him the opportunity to complete his surgical residency program at CCHS as he originally intended, and the refusal to do so will, in all likelihood, deny Dr. Bali the opportunity ever to become a surgeon. The loss of that opportunity is, of course, an irreparable harm, *i.e.,* one that cannot adequately be compensated by a monetary award alone.

*2. The Ability of the Parties to Work Together*

In arguing against a decree of specific performance, CCHS does not concede the availability of money damages [FN14] nor does it deny that the loss of the opportunity to become a surgeon constitutes irreparable harm.[FN15] Rather, CCHS argues that it "is no longer comfortable retaining plaintiff as a resident in its surgical residency program" and that "[t]his litigation has created a great deal of hostility which will be extremely difficult, if not impossible, to overcome." It cautions me to carefully consider the effect of such a "hostile" relationship

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

on the patients of CCHS before compelling it to fully reinstate Dr. Bali, and argues that reinstatement is not appropriate where litigation has created hostility between the parties. *See Stafford v. Electronic Data Sys. Corp.,* E.D. Mich., 749 F.Supp. 781 (1990).

> FN14. On the issue of money damages, CCHS has maintained, throughout the litigation, that no damages are awardable for its breach of contract since it has continued to pay Dr. Bali the stipend due for a PGY-3 categorical position and will do so until the contract terminates on June 30, 1998. CCHS argues that no other consequential damages are available for its breach of contract.

> FN15. On the issue of irreparability of the injury to Dr. Bali, CCHS merely argues that specific performance of employment contracts is unavailable, even where irreparable harm is threatened.

**\*6** I have given careful consideration to this point because the record does show that the relationship between these parties is strained, and that it has become so as a result of actions taken by *both* parties during the course of their relationship. Nevertheless, I note that Dr. Bali's participation in CCHS' residency program has been continuous since July 1, 1997. Throughout the 18 months period since Dr. Bali was "demoted," he has continued to function as a part of the CCHS residency program. Insofar as the record reflects, he has done so without incident. Thus, I conclude that the relationship between Dr. Bali and CCHS is not so strained as to prevent Dr. Bali's continuation in the residency program beyond July 1, 1999, assuming, as I do, that all interested persons act in good faith in carrying out this Court's orders.

In this regard, I also note that my decision to require CCHS to place Dr. Bali in a PGY-4 categorical position is not intended to displace or interfere with the ordinary and proper functioning of the hospital's system for imposing discipline on residents for clinical or academic performance. Due to the unusual circumstances of this case, I will require that Dr. Bali's participation in the program in a "categorical" status be reinstated. Once reinstated to that position, Dr. Bali will be expected to earn his right to complete the residency program on the same terms as the others doctors participating in it. In other words, his continued participation in the program will be subject, at all times, to his satisfactory performance of his duties and to the disciplinary powers of the hospital.

*3. The Equitable Doctrine of Laches*

Finally, CCHS contends any right that plaintiff has to equitable relief is barred by the equitable doctrine of laches, as plaintiff failed to pursue an internal appeal process at CCHS and, in reliance thereon, CCHS changed its position to its detriment. I reject this argument because the record does not support the claim of detrimental reliance on any action or failure to act on the part of Dr. Bali.

"Laches is an equitable principle that operates to prevent the enforcement of a claim in equity where a plaintiff has delayed unreasonably in bringing suit to the detriment of the defendant or third parties." *Wolfe & Pittenger,* § 11-5, p. 784 (citing *Scureman v. Judge,* Del. Ch., 626 A.2d 5, 13 (1992); *Kirby v. Kirby,* Del. Ch., C.A. No. 8604, Chandler, V.C., mem. op. at 10 (Sept. 26, 1989)). In order to charge a plaintiff with laches, the defend-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

ant must show: "(1) that the plaintiff had knowledge of the invasion of his rights, (2) that the plaintiff unreasonably delayed in bringing suit to vindicate those rights, and (3) that the delay resulted in injury or prejudice to the party raising the defense or to a third party." *Id.* at § 11-5(b), p. 785 (citing *Wacht v. Continental Hosts, Ltd.,* Del. Ch., C.A. No. 7954, Chandler, V.C. (Aug. 5, 1993)). What constitutes unreasonable delay depends on the facts of each case. *See generally Shanik v. White Sewing Mach. Corp.,* Del.Supr., 19 A.2d 831, 843 (1941).

**\*7** The record reflects that on December 16, 1997, Dr. Bali was informed that his initial appeal had been denied and advised that he had the right to appeal further within 30 days. In response, Dr. Bali told CCHS that he did not intend to pursue a further appeal. CCHS then told Dr. Bali that the PGY-3 categorical position he had previously held would be deemed open, and that the hospital would consider filling it. On January 13, 1998, before Dr. Bali's time to appeal had run, CCHS filled that position. On February 11, 1998, after his appeal time had expired, Dr. Bali first told a representative of CCHS that he wanted to pursue a further appeal and was told that he was out of time.

CCHS contends that "[p]laintiff's delay, and affirmative statements that he would not appeal the decision to demote him, created the very problem plaintiff now seeks to have this Court unravel." I am unable to agree. The problem that plaintiff now faces was created by CCHS when it breached the contract between it and Dr. Bali by wrongfully demoting him to a PGY-2 preliminary position. CCHS then proceeded to hire another doctor to fill Dr. Bali's old PGY-3 categorical position before the time to appeal had even elapsed. While this may be justified by the exigencies of running an efficient and effective hospital, that hardly shifts to Dr. Bali the responsibility for creating the issue now confronting the Court and the parties. Quite simply, the problem now confronted resulted from CCHS' extraordinary and improper disciplinary action, not from Dr. Bali's delay in reacting to it.[FN16] In any case, I note that CCHS has now concluded that it has the ability and the authority from its accrediting agency to create a PGY-4 categorical position for Dr. Bali, should I require it to do so. Thus, CCHS' action in hiring a replacement resident on January 13, 1998, even if that action could be attributed to Dr. Bali's delay in prosecuting his appeal, has not resulted in any detriment to CCHS.

> FN16. In this regard, I note that the central issue arising from CCHS' action in disciplining Dr. Bali was not whether grounds to impose some discipline existed, but whether the discipline chosen by the hospital was permitted by the terms of its contract with Dr. Bali. There is reason to doubt whether relief from that aspect of CCHS' disciplinary action could ever have been obtained through the administrative appeal process.

Having found that contracts of the nature of the one at issue in this litigation can be specifically enforced, that Dr. Bali will suffer irreparable harm if the contract at issue is not specifically enforced, that there is no equitable bar against enforcing the contract at issue, and that CCHS has an available PGY-4 categorical position, I hereby grant plaintiff an award of specific performance and direct CCHS to reinstate Dr. Bali as a PGY-4 categorical resident

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)
**(Cite as: 1999 WL 413303 (Del.Ch.))**

for the start of the 1999 academic year, beginning July 1, 1999.

### IV. CONCLUSION

For the reasons stated herein, plaintiff's request for specific performance is granted. Counsel are directed to submit an appropriate form of order.

Del.Ch.,1999.
Bali v. Christiana Care Health Services, Inc.
Not Reported in A.2d, 1999 WL 413303 (Del.Ch.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.