Page 1

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

C

Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Second District, Montgomery County.
DONNA J. DAY Plaintiff-Appellant
v.
GOOD SAMARITAN HOSPITAL AND HEALTH CENTER DEfendant-Appellee

CASE NO. 8062.
8062August 17, 1983.

DONALD ROY FRAKER of BOGIN & PATTERSON, 1200 Talbott Tower, 131 N. Ludlow Street, Dayton, Ohio 45402 Attorney for Plaintiff-Appellant.

ROBERT J. BROWN & JOHN W. FISCHER of SMITH & SCHNACKE, 2000 Courthouse Plaza NE, P. O. Box 1817, Dayton, Ohio 45401 Attorneys for Defendant-Appellee.

OPINION

BROGAN, P.J.

*1 Donna J. Day was **employed** as a PBX operator for the Good Samaritan Hospital and Health Center (hereinafter "Good Sam") from 1963 through May 2, 1980. On May 2, 1980, she was notified by "Good Sam" that her **employment** was **terminated** effective May 5, 1980 for excessive absenteeism.

On April 22, 1982, Donna J. Day filed suit in the Common Pleas Court of Montgomery County alleging that a certain employee manual promulgated by "Good Sam" was an **employment contract** which "Good Sam" **breached** by discharging her. Defendant admitted in its answer that it published and distributed a document entitled "Good Samaritan Employee Manual." The hospital also admitted the plaintiff was a "permanent" full time employee and that it **terminated** the plaintiff on May 2, 1980 for absenteeism.

Plaintiff and the defendant filed cross-motions for summary judgment. In support of her motion, plaintiff supplied an affidavit stating the length of her **employment**, that she was notified her job was **terminated** because she was absent from work for various periods from 1976 onward. She stated in her affidavit that her absences from work during that time frame was due to illness for which she was hospitalized for substantial periods in defendant's facilities. The defendant countered with the affidavit of David C. Vanwert, employment manager for the hospital. In his affidavit, Mr. Vanwert states the Employee Calendar contained in plaintiff's personnel files correctly states her absentee record for December, 1973 thru May, 1980. (We have not computed the exact days absent, but for the sake of argument we will accept appellant's estimate that appellant was absent 10% of her work schedule from 1976 thru May, 1980).

The defendant's cross-motion was granted and the case was dismissed. The trial court held that Good Sam's employee manual was not a contract of employment and, under the established law in Ohio, plaintiff was an employee at will who "Good Sam" could terminate without incurring liability for doing so. It is from that

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

judgment that appellant appeals. Appellant assigns as error the granting of defendant's motion for summary judgment and the denial of its motion for summary judgment.

In the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation, but makes no provision as to the duration of the employment, is not a contract for one year, but is terminable at will by either party. Henkel v. Education Research Council (1976), 45 Ohio St. 2d 249.

Plaintiff failed to allege in her complaint or her supporting evidence that her term of employment with the defendant was for a definite term. Plaintiff, however, does allege in her complaint that the personnel handbook promulgated by the defendant stated explicitly that the plaintiff could not be discharged from her employment except for good cause. The defendant admitted such handbook was in effect at the time of plaintiff's termination. The pertinent parts of the "Manua" reads as follows:

**\*2** To do the best job for yourself and Good Samaritan, you need to know how our hospital operates, what you can expect from it, and what Good Samaritan expects from you. . .

This manual has been designed to acquaint you with the more important policies and procedures of our hospital. . .

I sincerely hope you will find this manual helpful since it has been designed specifically for you. . .

/s/ James P. Fitzgerald President

We believe that Good Samaritan employees can work more purposefully if they know the goals set for the future. These goals are: . . . 3. to provide satisfaction to our employees so they truly believe that "Good Samaritan is a good place to work" (cover letter);

To do the best job for yourself and Good Samaritan, you need to know how our hospital operates (and) what you can expect from it. . .This manual has been designed to acquaint you with the more important policies and procedures of our hospital. This book is for your family, too. Share it with them so they will feel more a part of the Good Samaritan community. (cover letter); Not all Good Samaritan's guidelines for good conduct are listed in this manual. (page 1).

A career at Good Samaritan Hospital provides one of the most rewarding and satisfying professions in the employment field. . .(W)e. . .strive hard to provide our employees with the best of care.

Layoffs seldom occur at Good Samaritan. In (that) event. . ., the employee affected is offered a transfer to another department or an opportunity to retrain for another job. Because of this, an employee may realize a feeling of "job security" which will enable him to establish a lasting relationship with Good Samaritan. (page 5, section entitled "Job Security With Good Samaritan");

Your employment status classification helps you to identify the nature of your employment. . .Permanent employees (, those who have completed a probationary period,) are employed with the expectation that their employment will continue indefinitely" (page 7);

(After the probationary period,) (i)f

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

your performance is satisfactory, you will be changed to permanent status. (page 9);

An employee coming in at the minimum of his/her salary scale can look forward to growth in the job and salary advancement over a period of years. (page 13);

Your length of service is very important to you because it determines your vacation benefits, retirement income, service recognition awards, and other considerations affecting your position at Good Samaritan. (page 21);

The hospital recognizes the importance of loyal and dependable long-term employees in many ways. . . (page 21);

Employees who have completed one year of continuous service are eligible for a sick leave of absence for the length of time up to one year specified by your physician. (page 23).

Finally, the "Manual" specifically enumerates various "infractions" which might result in discharge of the employee. On pages 26-27 of the Manual, in a section entitled "Discharge" twenty-two various infractions are listed, each of which, upon examination, would appear to constitute good cause for one or more of the types of disciplinary action listed therein. The following is the "discharge" provision:

**\*3** Teamwork is important to any organization, but it is essential to a hospital. Teamwork insures the efficient operation of the hospital. That is why Good Samaritan has established rules of conduct to protect the rights of patients, employees and the hospital.

The following infractions are considered harmful to Good Samaritan discipline and may result in disciplinary action or dismissal.

1. Refusal to follow instructions of the duly assigned supervisor; refusal to accept a job assignment; failure to follow departmental rules or regulations.

2. Physical or verbal abuse of patients.

3. Negligence or irresponsibility involving patient care.

4. Unauthorized possession, use, copying or reading of patient records or disclosures of such information to unauthorized persons.

5. Larceny, misappropriation, or unauthorized possession or use of property belonging to the hospital, employee, patient, or visitor. This includes eating or taking food from patient's trays.

6. Falsification of employment records or other hospital records including time cards.

7. Unauthorized absence from duty station during regularly scheduled work hours.

8. Loitering, loafing, or sleeping while on duty.

9. Use of abusive or obscene language, acting in a defamatory manner to any employee, patient, or visitor.

10. Excessive lateness or absence, extending breaks or lunch periods, abuse of sick leave.

11. Reporting for work intoxicated or drinking intoxicating beverages while on duty.

12. Gambling or possession of gambling devices on hospital premises.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

13. Fighting, threatening, attempting to or inflicting bodily injury to another person while on duty or on hospital premises; carrying a weapon on hospital property without authorization; horseplay or annoying another employee.

14. Failure to wear required uniform or suitable clothing while on duty.

15. Drug abuse or unauthorized use or disposal of drugs.

16. Smoking in unauthorized area.

17. Unauthorized posting or removal of notices from hospital bulletin boards.

18. Disregard of one's appearance, uniform, dress, or personal hygiene.

19. Solicitation or distribution of unauthorized materials.

20. Solicitizing or accepting tips from patients, visitors, or staff.

21. Any act or conduct detrimental to patient care or hospital operation.

22. Inducing any employee to commit any breach of the foregoing rules and regulations.

The following type of disciplinary action may be taken:

- verbal counseling (with record in personnel file)

- written reprimand (with record in personnel file)

- suspension of one to five days without pay

- termination of employment

Employees discharged for any of the above reasons are not eligible for terminal vacation benefits nor will they be considered for reemployment.

The hospital also made provision in its manual for a sick leave policy:

Your sick leave policy at Good Samaritan is designed to help alleviate financial hardship for full-time employees in times of lengthy illness. While sick leave pay is not effective during the first sixty (60) days of your employment, accumulation is retroactive to the anniversary date of your employment. You deposit one day's sick leave per month in your "bank" to a maximum of sixty (60) days.

**\*4** Sick leave pay does not begin until the third consecutive day of absence unless you have ten (10) or more days accumulated in your bank, in which case benefits are paid on the first day of absence. If you are hospitalized, accumulated sick days are paid beginning with the first day of absence.

Accumulated sick pay may be used in conjunction with Maternity Leave of Absence or for complications of pregnancy. In the case of a Maternity Leave of Absence, sick pay can be used before unpaid maternity leave will begin. (Please refer to the section of this manual concerning the Maternity Leave of Absence.)

You must notify your supervisor or department head in advance of your absence; failure to do so may be cause for nonpayment of sick pay benefits. If you have been absent for five (5) or more consecutive days or at the specific request of your supervisor or department head after one or more days, you must submit a doctor's statement verifying the illness or be examined by the Employee Health Physician.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

As of January 1 of each year, if you have sixty (60) days of accumulated sick leave pay and have not used any sick pay during the previous twelve (12) months, you will have the option of receiving either an additional week of time off or an additional week of salary.

The "Manual" also provides that employees who meet age and service requirements shall be entitled to a Retirement Income Plan for which the hospital pays the entire cost. (pages 45-50 of the Manual).

The trial court specifically found in granting the summary judgment for the defendant hospital that the "Manual" was not a contract. The court found that since the defendant could unilaterally revise the manual, the defendant was not contractually bound to that which the manual may express or imply.

There is presently a split of authority as to whether an employee manual or company handbook may become part of an employment agreement to which the employer is legally bound. Compare Touissant v. Blue Cross & Blue Shield of Michigan (1980), 408 Mich. 579, 292 N.W. 2d 880 (manual binds employer); Cleary v. American Airlines, Inc. (1980), 111 Cal. App. 3d 443, 168 Cal. Reptr. 722 (same); Carter v. Kaskahia Community Action Agency (1974), 24 Ill. App. 3d 1056 (same) with Maw v. Omaha National Bank (1980), 207 Neb. 308, 299 N.W. 2d 147 (manual does not bind employer); Sargent v. Illinois Institute of Technology (1979), 78 Ill. App. 3d 117, 397 N.E. 2d (same); Johnson v. National Beef Packing Co. (1976), 220 Kan. 52, 551 P. 2d 779 (same); Shaw v. S. S. Kresge Co. (1975), 167 Ind. App. 1, 328 N.E. 3d 775 (same).

In Touissant, supra, the appellant was employed in a middle management position with Blue Cross and after being employed five years was discharged. He commenced an action against his employer claiming his discharge violated his employment which permitted discharge only for cause. Touissant inquired regarding job security whenthe was hired, and he testified he was told he would be with the company "as long as I did my job." He was also handed a manual of Blue Cross personnel policies which reinforced the oral assurance of job security. It stated that the disciplinary procedures applied to all Blue Cross employees who had completed their probationary period and that it was the "policy" of the company to release employees "for just cause only."

**\*5** In finding for the appellant, the Supreme Court of Michigan held that while employers are free to enter into **employment contracts terminable** at will without assigning cause, an **employer's** express agreement to **terminate** only for cause, or statements of company policy and **procedure** to that effect, can give rise to rights enforceable in **contract**. The court stated:

(E)mployer statements of policy. . .can give rise to **contractual** rights in employees. . .although the statement of policy. . .can be unilaterally amended by the employer without notice to the employee. . .

While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation" ( Touissant v. Blue Cross & Blue Shield of Michigan, 408 Mich. 579, 292 N.W. 2d 880, at 892 (1980).

The court in Touissant went on to hold that if there is in effect a policy to dismiss for cause only, the employer may not depart from that policy at whim simply because he was under no obligation to institute the policy in the first place; having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory. The court stated further:

We see no reason why an employment contract which does not have a definite term-the term is "indefinite"-cannot legally provide job security. When a prospective employee inquires about job security and the employer agrees that the employee shall be employed as long as he does the job, a fair construction is that the employer has agreed to give up his right to discharge at will without assigning cause and may discharge only for cause (good or just cause). The result is that the employee, if discharged without good or just cause, may maintain an action for wrongful discharge.

On November 18, 1982, the Court of Appeals of New York decided the case of Weiner v. McGraw-Hill, Inc. (1982), 57 N.Y. 2d 458, 443 N.E. 2d 441. In Weiner, supra, the court held that plaintiff, although not engaged by defendant for a fixed term of employment, pleaded a good cause of action for breach of contract, where he was allegedly discharged without the "just and sufficient cause" on the rehabilitative efforts specified in defendant's personnel handbook and allegedly promised at the time plaintiff accepted the employment; furthermore on several occasions when plaintiff had recommended that certain of his subordinates be dismissed, he was allegedly instructed to proceed in strict compliance with the handbook and policy manual.

**\*6** The court in Weiner held that "consideration" consists of either a benefit to the promisor or a detriment to the promisee; it is enough that something is promised, done, foreborne or suffer by the party to whom the promise is made as consideration for the promise made to her.

Apt too in the circumstances before us now is the following comment by Corbin: "(I)f the employer made a promise, either express or implied, not only to pay for the service but also that the employment should continue for a period of time that is either definite or capable of being determined, that employment is not terminable by him 'at will' after the employee has begun or rendered some of the requested service or has given any other consideration\* \* \*This is true even though the employee has made no return promise and has retained the power and legal privilege of terminating the employment 'at will.' The employer's promise is supported by the service

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

that has been begun or rendered or by the other executed consideration" (1A Corbin, Contracts, Section 152, p. 14). So understood, an agreement on the part of an employer not to dismiss an employee except for "good and sufficient cause only" and, if such cause was given, until the prescribed procedures to rehabilitate had failed, does not create an ineluctable employment at will.

These propositions in mind, we find in the record, inclusive of plaintiff's own affidavit, sufficient evidence of a contract and a breach to sustain a cause of action. First, plaintiff was induced to leave Prentice-Hall with the assurance that McGraw-Hill would not discharge him without cause. Second, this assurance was incorporated into the employment application. Third, plaintiff rejected other offers of employment in reliance on the assurance. Fourth, appellant alleged that, on several occasions when he had recommended that certain of his subordinates be dismissed, he was instructed by his supervisors to proceed in strict compliance with the handbook and policy manuals because employees could be discharged only for just cause. He also claims that he was told that, if he did not proceed in accordance with the strict procedures set forth in the handbook, McGraw-Hill would be liable for legal action. In our view, these factors combine to present a question for trial: Was defendant bound to a promise not to discharge plaintiff without just and sufficient cause and an opportunity for rehabilitation? (Cf. Parker v. Borock, 5 N.Y. 2d 156, 159-160, 182 N.Y.S. 2d 577, 156 N.E. 2d 297 (Collective bargaining agreement provision prohibiting discharge "without good and sufficient cause" held binding on employer though the employee otherwise would have been one at will).

Finally, on the trial, it should, of course, be remembered that Martin itself, when, in 1895, it adopted New York's at-will rule, afforded it no greater status than that of a rebuttable presumption (148 N.Y., at p. 121; see, also Mandel, Preparation of Commercial Agreements (1978 ed.), pp. 164-165 (if no definite term is fixed by contract, a hiring at will is deemed to have resulted only "in the absence of circumstances showing a different intention"). In determining whether such a presumption is overcome here, the trier of the facts will have to consider the "course of conduct" of the parties, "including their writings" ( Brown Bros. Elec. Contrs. v. Beame Constr. Corp., 41 N.Y. 2d 397, 399, 393 N.Y.S. 2d 350, 361 N.E. 2d 999) and their antecedent negotiations. Moreover, as Brown suggests (at p. 400, 393 N.Y.S. 2d 350, 361 N.E. 2d 999), it is not McGraw's subjective intent, nor "any single act, phrase or other expression," but "the totality of all of these given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain", which will control.

\*7 On April 29, 1983, the Supreme Court of Minnesota decided Pine River State Bank v. Mettille (1983), 333 N.W. 2d 622. The facts in this case are briefly the following: In early 1978 respondent Richard Mettille, then unemployed, sent his resume to the appellant. After an interview, the bank offered Mettille a job at a salary of $1,000 a month or $12,000 a year. Mettille accepted, moved to Pine River, and started work as a loan officer on April 10, 1978. The employment agreement was entirely oral. Nothing was said as to the position being permanent or for any specific term. Mettille conceded that he felt free to leave the bank and to take a better job elsewhere if he wished to do so.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

Mettille survived his 6-month probationary period and was shortly given the title of loan officer. His duties were to lend, procure insurance on loan collateral, file UCC financing statements, and prepare reports on student loans.

Late in 1978 the bank distributed to its employees, including Mettille, a printed Employee Handbook. The handbook had been drafted by the bank's president, E. A. Griffith, who relied heavily on a model handbook he had received at a recent seminar on employee relations sponsored by the Minnesota Bankers Association. The handbook contained information on the bank's employment policies, including such matters as working hours, time off, vacations, and sick leave. With respect to employee responsibilities, the handbook discussed such matters as punctuality, confidentiality of the work, personal appearance and conduct, and telephone courtesy. The handbook also contained sections on "job security" and "disciplinary policy." According to Griffith, the handbook was intended as a source of information for employees on bank procedures and as a guideline within the bank so that people would know when vacations would be available and how many days the employee would be allowed for vacations. Griffith testified that he never intended the handbook to become part of an employee's employment contract with the bank.

In April 1979 Mettille received his annual performance review and with it a 7% raise. Apparently, about this time he also took out a home improvement loan with the bank. The following September state bank officials conducted an unannounced examination of the Pine River State Bank, and after reviewing the loan portfolio, reported to Griffith that some "technical exceptions" existed, i.e., failures to comply with the applicable law and regulations. Griffith then ordered his own independent review of the 85 files noted in the examiner's report. This investigation disclosed that 58 of the 85 files contained "serious" technical exceptions and that Mettille was responsible for the serious technical exceptions in 57 of these 58 files. Thus, 28 files showed no vehicle certificate of title; 33 files showed no insurance covering the secured collateral; 4 files showed inadequate insurance; 6 files showed failure to record financing statements properly and 4 files showed expired financing statements.

Characterization of these deficiencies as "serious" was made by the bank officers, because those errors created possible loss to the bank. They testified that the defective files involved loans totaling over $600,000.

**\*8** Mettille was home ill at the time of the audit by the bank examiners and the subsequent review of the files by the bank. On September 28, 1979, Mettille returned to work. The president called Mettille into his office and fired him. The parties at this time did not review the list of technical exceptions. The disciplinary procedures outlines in the handbook were not followed, nor was the handbook even mentioned. Mettille was given 2 months' severance pay.

The reason for Mettille's dismissal and whether that dismissal was for good cause were sharply contested. The bank claimed that the only reason given for the dismissal was the existence of loan errors, although excessive sick leave and a reduction in force were also factors. Mettille alleged that he was fired because of a personality dispute with his superiors. He argued that no problems were discovered in the course

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

of previous bank examinations, that the exceptions in the 1979 audit were correctable and, in fact, were corrected within a month after he was fired. He disputed that the exceptions were "serious." There was also testimony that Mettille had never received any reprimands or complaints as to his performance prior to September 1979 and that he was loyal and "tried hard." At the time of trial Mettille was still unemployed.

In November 1980 the bank sued Mettille on two notes on which he was in default. Mettille counterclaimed, alleging that the bank had **breached** his **contract** of **employment** by dismissing him without cause and in violation of required disciplinary **procedures**. The case was tried in January 1982 and the jury found: (1) that the parties had a **contract** under which the defendant could not be **terminated** without good cause; (2) that the bank **terminated** Mettille without good cause; and (3) that Mettille sustained damages of $27,675. Both parties moved for a new trial. The bank's main argument was that Mettille's **employment contract** was at-will and that it was free to **terminate** him as it did. Mettille argued that he should have been permitted to show mental anguish to recover more damages. The trial judge denied both motions. Only the bank appealed.

The court addressed the issues in the following manner:

The issues may be broadly stated: (1) Can a personnel handbook, distributed after **employment** begins, become part of an employee's **contract** of **employment**? (2) If so, are job security provisions in the handbook enforceable when the **contract** is of indefinite duration? and (3) In this case, was the employee's summary dismissal without following the job **termination procedures** of the handbook a **breach** of **contract** by the employer? Other issues to be discussed briefly relate to evidentiary rulings and damages.

I.

Whether a handbook can become part of the **employment contract** raises such issues of **contract** formation as offer and acceptance and consideration. We need first, however, to describe the Pine River State Bank's handbook. It contains, as we have said, statements on a variety of the banks' **employment** practices or policies, ranging from vacations and sick leave to personal conduct and appearance. Our inquiry here, however, concerns only the job security provisions. A section entitled "Performance Review" provides for at least an annual review of the employee's work. Another section entitled "Job Security" speaks in general, laudatory terms about the stability of jobs in banking. The key section, central to this case, is entitled "Disciplinary Policy." This section provides for what appears to be a three-stage procedure consisting of reprimands for the first and second "offense" and thereafter suspension or discharge, but discharge only "for an employee whose conduct does not improve as a result of the previous action taken." The section concludes with the sentence, "In no instance will a person be discharged from employment without a review of the facts by the Executive Officer."

**\*9** Generally speaking, a promise of employment on particular terms of unspecified duration, if in form an offer, and if accepted by the employee, may create a binding unilateral contract. The offer must be definite in form and must be communicated to the offeree. Whether a proposal is meant to be an offer for a unilateral contract is determined by the outward mani-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

festations of the parties, not by their subjective intentions. Cederstrand v. Lutheran Brotherhood, 263 Minn. 520, 532, 117 N.W. 2d 213, 221 (1962). An employer's general statements of policy are no more than that and do not meet the contractual requirements for an offer. Thus, in Degen v. Investors Diversified Services, Inc. 260 Minn. 424, 110 N.W. 2d 863 (1961), where the employee was told he had a great future with the company and to consider his job as a "career situation," we said these statements did not constitute an offer for a lifetime employment contract.

If the handbook language constitutes an offer, and the offer has been communicated by dissemination of the handbook to the employee, the next question is whether there has been an acceptance of the offer and consideration furnished for its enforceability. In the case of unilateral contracts for employment, where an at-will employee retains employment with knowledge of new or changed conditions, the new or changed conditions may become a contractual obligation. In this manner, an original employment contract may be modified or replaced by a subsequent unilateral contract. The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer. We have so held in Stream v. Continental Machines, Inc., 261 Minn. 289, 293, 111 N.W. 2d 785, 788 (1961), and Hartung v. Billmeier, 243 Minn. 148, 66 N.W. 2d 784 (1954) ( **employer's** promise of a bonus made after the employee started working held enforceable).

An **employer's** offer of a unilateral **contract** may very well appear in a personnel handbook as the **employer's** response to the practical problem of transactional costs. Given these costs, an employer, such as the bank here, may prefer not to **write** a separate **contract** with each individual employee. See Note, Protecting At Will Employees against Wrongful Discharge: The Duty to **Terminate** Only in Good Faith, 93 Harv. L. Rev. 1816, 1830 (1980). By preparing and distributing its handbook, the employer chooses, in essence, either to implement or modify its existing **contracts** with all employees covered by the handbook. Further, we do not think that applying the unilateral **contract** doctrine to personnel handbooks unduly circumscribes the **employer's** discretion. Unilateral **contract** modification of the **employment contract** may be a repetitive process. Language in the handbook itself may reserve discretion to the employer in certain matters or reserve the right to amend or modify the handbook provisions.

**\*10** We conclude, therefore, that personnel handbook provisions, if they meet the requirements for formation of a unilateral contract, may become enforceable as part of the original employment contract.

The court then addressed as a second issue whether the job security provisions in a subsequently adopted employee handbook are enforceable. The court addressed the three reasons given for the unenforceability of job termination restrictions in an employment contract of indefinite duration, (1) the at-will rule takes precedence over any such restrictions, (2) the restrictions ordinarily lack the requisite additional consideration, (3) mutuality of obligation is missing. The court addressed each argument:

The first argument, that because the contract specifies no duration the parties did not intend any job termination restric-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

tions to be binding, is without merit. The argument misconstrues the at-will rule which is only a rule of contract construction, as a rule imposing substantive limits to the formation of a contract. See Restatement (Second) of Agency, Section 442, comment a (inference that employment is at-will may be rebutted by specific terms of the agreement). The general rule is that contracts for a specified duration can nonetheless be terminated during the period of the contract if the employer has good cause. Thomsen v. Independent School District No. 91, 309 Minn. 391, 244 N.W. 2d 282 (1976). When a contract is for an indefinite duration, the duration is not set, and a corollary is that either party may then terminate it at any time for any reason. Further, if the contract purports to establish "permanent employment," this will be interpreted as a contract for an indefinite period, and hence, also at-??. Thus, in Bussard v. College of St. Thomas, 294 Minn. 215, 223, 200 N.W. 2d 155, 161 (1972), we said, "(T)he somewhat arbitrary rule of most jurisdictions that a contract for 'permanent employment' will be construed to be terminable at the will of either party* * *is arguably too mechanical an answer to the more basic issue of ascertaining the real intent of the parties" (emphasis added). See also Note, Employment Contracts of Unspecified Duration, 42 Colum. L. Rev. 107, 120-21 (1942).

The cases which reason that the at-?? rule takes precedence over even explicit job termination restraints, simply because the contract is of indefinite duration, misapply the at-will rule of construction as a rule of substantive limitation on contract formation. See, e.g., Johnson v. National Beef Packing Co., 220 Kan. 52, 551 P. 2d 779 (1976); Shaw v. S. S. Kresge, 167 Ind. App. 1, 7, 328 N.E. 2d 775, 779 (1975); Uriarte v. Perez-Molina, 434 F. Supp. 76 (D.C.D.C. 1977). It should not be necessary for an employee to prove a contract is of "permanent" employment or for a specified term in order to avoid summary dismissal if the parties have agreed otherwise. There is no reason why the at-will presumption needs to be construed as a limit on the parties' freedom to contract. If the parties choose to provide in their employment contract of an indefinite duration for provisions of job security, they should be able to do so.

**\*11** The second argument against enforceability is, at first glance, more troublesome in view of our case law. The argument is that a provision for job security in a contract of indefinite duration, whether initially promised or subsequently added, is not binding without additional, independent considerations other than services to be performed. In Skagerberg, we noted the general rule that when an employee purchases "permanent" employment with a valuable consideration that is other than and in addition to his services, the employment will be held to be continuous and to extend as long as the employee's work is adequate and there is work to be done. This rule makes sense as a presumption in construing contracts. Where the "permanent" employment is purchased with additional consideration, we have better reason to believe that the parties, in discussing "permanent" employment, were referring to lifetime employment and were not, instead, simply making a distinction between temporary or seasonal employment and employment which is steady or continuing although nevertheless terminable at will. See Pugh v. See's Candies, Inc., 116 Cal. App. 3d 311, 326, 171 Cal. Rptr. 917, 925 (1981) (most likely explanation for the independent consideration rule is that it

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

serves an evidentiary function, citing Bussard, supra).

To say that a job security provision in a contract of indefinite duration is never enforceable without additional consideration is to misconstrue the additional consideration exception recognized in Skagerberg. The requirement of additional consideration, like the at-will rule itself, is more a rule of construction than of substance, and it does not preclude the parties, if they make clear their intent to do so, from agreeing that the employment will not be terminable by the employer except pursuant to their agreement, even though no consideration other than services to be performed is expected by the employer or promised by the employee. See Littell v. Evening Star Newspaper Co., 120 F. 2d 36, 37 (D.C. Cir. 1941); Drzewiecki v. H. & R Block, Inc., 24 Cal. App. 3d 695, 703-04, 101 Cal. Rptr. 169, 174 (1972). See also Restatement (Second) of Contracts Section 80, comment a (1981) (a single performance may furnish consideration for any number of promises).

While language in some of our cases may suggest otherwise, our discussion of additional, independent consideration in Skagerberg, Cederstrand, Bussard and Degen was primarily in the context of the employee attempting to avoid a discharge without cause by proving (albeit unsuccessfully in those cases) "lifetime" or "permanent" employment. But none of our cases purport to hold that additional, independent consideration is the exclusive means for creating an enforceable job security provision in a contract of indefinite duration. Handbook provisions relating to such matters as bonuses, severance pay and commission rates are enforced without the need for additional, new consideration beyond the services to be performed. See DeGuiseppe, The Effect of the Employment-at-will Rule on Employee Rights to Job Security and Fringe Benefits, 10 Fordham Urban L.J. 1 (1981). We see no reason why the same may not be true for job security provisions. Accord Note, Protecting At Will Employees, supra, 93 Harv. L. Rev. at 1819-20 (employee's continued labor dispute freedom to resign is ample consideration for all express or implied promises, including those relating to job security). Thus, the consideration here for the job security provision is Mettille's continued performance despite his freedom to leave. See, e.g., Carter v. Kaskaskia Community Action Agency, 24 Ill. App. 3d 1056, 1059, 322 N.E. 2d 574, 576 (1974). As such, the job security provisions are enforceable.

**\*12** Finally, the third argument is that job security provisions lack enforceability because mutuality of obligation is lacking. Since under a contract of indefinite duration the employee remains free to go elsewhere, why should the employer be bound to its promise not to terminate unless for cause or unless certain procedures are followed? The demand for mutuality of obligation, although appealing in its symmetry, is simply a species of the forbidden inquiry into the adequacy of consideration, an inquiry in which this court has, by and large, refused to engage. See Estrada v. Hanson, 215 Minn. 353, 10 N.W. 2d 223 (1943). "If the requirement of consideration is met, there is no additional requirement of\* \* \*equivalence in the values exchanged; or\* \* \*'mutuality of obligation'." Restatement (Second) of Contracts Section 79 (1981). We see no merit in the lack of mutuality argument; . . .

In summary, the trial court did not find

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

reasons advanced for unenforceability of job security provisions in an at-will hiring to be persuasive. The court held that where an employment contract is for an indefinite duration, such indefiniteness by itself does not preclude handbook provisions on job security from being enforceable when the parties have agreed to be bound thereby.

In Weaver v. Shopsmith, Inc., ---F. Supp.--- (S. D. Ohio, W.D., 1982, #C-3-81-031), Judge Rice denied the motions to dismiss and for summary judgment which the defendant/employer interposed against the plaintiff/employee's claim for wrongful discharge. The employer based its motions upon the case of Henkel v. Educational Research Council, 45 Ohio St. 2d 249, 74 Ohio Ops. 415, 344 N.E. 2d 118 (1976), the same case Defendant chiefly relies upon here, asserting that it could discharge its employee at its will because there was no contract between the parties expressing a specific term of employment (Weaver, page 3). The Court rejected that contention (page 3). It noted that, although Henkel held that the contractual statement of a yearly rate of pay does not by itself change a contract at will into one not at will, Henkel also explained that a limitation upon an employer's right to discharge may be implied from the "facts and circumstances" surrounding the employment transaction (page 3). Such facts and circumstances may "'indicate that the agreement is for a specific term'" (page 3) or otherwise "make 'provision as to the duration of employment'" (page 4).

In Weaver, the company sent the plaintiff a letter offering him employment, which he accepted by beginning work for the company (page 5). Among other things, the letter referred to an "incentive potential" bonus based upon the plaintiff's meeting of sales goals and a "first anniversary date" review of his salary (pages 5-6). The Court found that these statements in the letter were "facts and circumstances" sufficient to create an issue on the plaintiff's contention that the contract between the parties was not terminable at will by the employer (page 10). The court did not consider the effect of the terms of an employee handbook referred to in passing in the letter, but noted only that the mere reference to the handbook was not, by itself, sufficient to overcome an at-will relationship.

**\*13** In Henkel, supra, the narrow issue before the Supreme Court was "whether a hiring at a specified sum per year constituted a hiring for a year." 45 Ohio St. 2d, at 254. Henkel held that the specification of a particular salary does not, of itself, make an employment contract not having a specific term or otherwise providing for the duration of employment more than a contract at will. (emphasis ours). The court emphasized "employment contracts which are silent as to the term of employment are to be interpreted in light of all relevant circumstances; in the interpretation of contracts. . .none of these provisions should be ignored or over-looked," and a "review of all relevant facts and circumstances is a sound approach." 45 Ohio St. 2d at 251, 253, and 254.

The personnel "manual" of appellant specifically informs the employee that he needs to know what the employee can expect from the hospital, and what the hospital can expect from the employee. (see cover letter). The Manual informs the employee that he may expect job security. (page 5). Specifically, the employee is informed that if "at times during your employment should your performance fall below what is expected, you will be placed on probation

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

for a specified period." (page 10). The employee is told that he will be evaluated and he can look forward to job and salary advancement (page 13). Employees are entitled to earned sick pay, vacation time, and after one year of continuous service, a sick leave of absence (page 23). Under the title "Discharge" the "Manual" provides that appellant has established rules of conduct to protect the rights of patients, employees, and the hospital. The "Manual" then lists 22 reasons for discharge of an employee.

The "Manual" at page 21 states "the hospital recognizes the importance of loyal and dependable long term employees in many ways, including wage increases, increasing employee benefits, retirement provisions, and promotion and transfer opportunities." Notwithstanding the clear import of the above-mentioned language in the "Manual," the appellee hospital argues that the "Manual" was a unilateral gratuitous statement by them carrying no legal accountability. They cite Henkel, supra, for authority. The hospital desires loyal and dependable employees, but when "push comes to shove" they claim in this litigation that their "Manual" has no binding quality to it. If that be their intention, they need only revise their "Manual" and expressly state that it is of no legal significance.

Since the "Manual" is admitted by appellee as in force at the time of appellant's termination, we agree with the decisions above cited at length that the appellee's "Manual" creates a unilateral contract enforceable at law, and the clear import of such "Manual" is that the appellant could only be "discharged" in accordance with the manual.

Employer-employee documents subject to unilateral amendment and termination by the employer can create contractual rights. In Luli v. Sun Products Corporation (1979), 60 Ohio St. 2d 144, the Ohio Supreme Court recognized that a pension plan which could be revised at any time by the defendant corporation gave rise to enforceable pension rights.

**\*14** "'There is no doubt that the defendant (employer) has a right to terminate the contract and to relieve itself of any further liability under the contract. . .but it does not have the right to excuse itself from. . .failure on its part to perform as required by the contract during the time the contract was in operation.'" ( 60 Ohio St. 2d, at 149, quoting Briggs v. Michigan Tool Co., 369 F. Supp. 920 (E.D. Mich., S.D. 1974), at 923).

"The notion of private pension plans as gratuities is archaic in today's advancing industrial economy.

The derived benefit to the employer can be summarized as allowing management flexibility by assuring an efficient and faithful source of manpower." 60 Ohio St. 2d at 147-148.

Appellee argues that even if this court should find that the "Manual" has created a unilateral contract enforceable at law, nevertheless the undisputed facts are that the appellant was discharged in accord with the "Manual." Appellant argues that the 22 reasons listed in the "Manual" for discharge are not all inclusive. While we agree with the appellee that they may not list all the kinds of misconduct which an employee could engage in to merit discharge, they suggest clearly the types of misconduct which would merit termination. We agree with appellee that the clear implication of the "Discharge" provisions and the "Manual" as a whole is that em-

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)
**(Cite as: 1983 WL 4934 (Ohio App. 2 Dist.))**

ployees would be discharged only for good cause.

The appellee chose to list "excessive absence" as the reason for discharge. Item 10 under "Discharge Infractions" reads:

"Excessive lateness or absence, extending breaks or lunch periods, abuse of sick leave."

The "Manual" provides employees with a generous sick pay and medical leave policy. These provisions would have little substance or value if the employee would be discharged for properly availing themselves of their sick benefits when actually ill. There is no evidence before the Court that the appellant has exceeded her medical or sick leave benefits or in any way abused her sick leave.

In Schultz v. Herman's Furniture, Inc. (1976), 52 Ohio App. 2d 161, the Court of Appeals for Erie County held that absenteeism and tardiness caused by a bona fide illness reported to an employer is not just cause, in connection with the work, for a discharge.

In Sellers v. Board of Review (1981), 1 Ohio App. 3d 161, the Court of Appeals for Franklin County citing Schultz with approval, held that in order to have just cause for discharge, pursuant to R. C. 4141.29, there must be some fault on the part of the employee involved, in the absence of an overwhelming contractual provision. Such fault does not require misconduct, but nonetheless fault must be a factor in the justification for discharge.

The evidence before the trial court has created a factual dispute not ripe for summary judgment. Appellant contends she was discharged for being ill in violation of the "Manual" of the appellee. Appellee contends in its affidavit that the appellant was excessively absent. We thus remand this matter to the trial court for a determination of the factual dispute. Was appellant ill? If so, for how long? Did she exhaust her benefits?

**\*15** We do not suggest by this decision that an employer may not discharge an employee who, because of chronic illness, cannot perform her duties, particularly in a hospital where each employee is critical to its operation. However, appellee "Good Sam" has chosen to provide some degree of job security to its employees who through no fault of their own become ill. They must honor that commitment made by contract. After the employee has exhausted their medical benefits, the hospital need not continue to carry such employee on its rolls, but may seek an employee capable of meeting the daily rigors of a hospital setting. The first assignment of error is well taken; the second assignment of error is overruled.

Judgment of the trial court is Reversed and Remanded for further proceedings in accordance with this decision.

WILSON, J., and WEBER, J., concur.

Ohio App., 1983.
Day v. Good Samaritan Hospital and Health Center
Not Reported in N.E.2d, 1983 WL 4934 (Ohio App. 2 Dist.)

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.