**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **SUNIL NAYYAR, M.D.,** | : | |
| | : | |
| **Plaintiff,** | : | **Case No. 2:12-CV-00189;** |
| | : | **2:10-CV-00135** |
| | : | |
| **v.** | : | **JUDGE ALGENON L. MARBLEY** |
| | : | |
| **MT. CARMEL HEALTH SYSTEMS,** *et al.,* | : | **Magistrate Judge Norah King** |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

## I. INTRODUCTION

This matter is before the Court on Defendants' Motion for Summary Judgment ("Motion").  (Doc. 90).[1]  For the reasons set forth herein, Defendants' Motion is **GRANTED**.

## II BACKGROUND

### A. Factual Background

Plaintiff, Sunil Nayyar, M.D. ("Nayyar"), is a resident of Franklin County, Ohio and Defendant, Mount Carmel Health Systems ("MCHS"), operates four hospitals in Franklin County, Ohio.  Plaintiff also names two of his former supervisors at MCHS, Dr. John Weiss and Dr. Li Tang, as Defendants.

Plaintiff was hired into the Family Medicine Residency Program of Defendant MCHS in July 2006.  (*Plaintiff's Deposition*, Doc. 61 at 16, 18, 26).  In July 2007, Plaintiff transferred into Defendant MCHS's Internal Medicine Residency Program ("Residency Program").  (Doc. 61 at 24, 49-51).  The Residency Program is accredited by the Association of Graduate Medical Education ("ACGME").  MCHS issues a Residency Physician Handbook ("Handbook") which

---

[1] Citations to docket are to the docket numbers in the 10-cv-135 case.

incorporates ACGME standards for both the Residency Program and the Residents.  (*Handbook*, Doc. 95-3).  Residents work under one-year contracts, which incorporate by reference the provisions of the Handbook.  (*Contract*, Doc. 95-27).  Defendant Weiss was Plaintiff's immediate supervisor and Director of the Residency Program.  Defendant Li was the Director of Medical Education.

In January 2009, Plaintiff signed, and gathered signatures of other Residents, a petition stating concerns with conditions ("Petition") in the Intensive Care Unit ("ICU").  (*Petition*, Doc. 95-1).  Defendant Weiss had also supported the Petition.  (*Plaintiff's Deposition*, Doc. 61 at 149).  In late June or early July 2009, Plaintiff received a copy of the July ICU Call Schedule ("ICU Schedule") and had concerns about the staffing levels on certain shifts.  (*Id*. at 144-49).  According to Plaintiff, he approached Defendant Weiss and the following conversation occurred:

> I said that "Without an in-house critical care attending [physician], that safety is an active issue, and I mentioned that to him, and I said people will die," and he said, "More to prove my point, we don't belong in the ICU."[2]

(*Id*. at 145).  Defendant Weiss encouraged Plaintiff to take his concerns to Defendant Li.[3]  (*Id*.).  Plaintiff repeated his concerns to Defendant Li and reported his conversation with Defendant Weiss.  (*Id*. at 145-46).  Plaintiff also gave Defendant Li a copy of his ICU Schedule with some notes he had written on it.  (*Li Deposition*, Doc. 95-6 at 171-174).  Defendant Li looked into the matter and decided not to change the ICU Schedule.  (Doc. 61 at 145-46).  Plaintiff also approached Roy St. John, M.D., an Assistant Medical Director for MCHS, who decided not to change the ICU Schedule.  (*Id*. at 147-48).

---

[2] That account is taken directly from Plaintiff's Deposition (Doc. 61).  The recorder appears to have erred in the placement of quotation marks, but the Court finds that those errors do not obscure the meaning.
[3] Defendants do not concede Defendant Weiss made the statements attributed to him by Plaintiff.  The Court accepts Plaintiff's account as true only for the purposes of the Motion for Summary Judgment.

Subsequent to those conversations, on July 9, 2013, Nurse Lisa Cottrell reported, to her supervisors a MCHS, an incident involving Plaintiff which had occurred on July 7, 2013.  (*Id*. at Exh. 7).  Plaintiff made three unsuccessful attempts to insert an arterial line ("A-line") into a comatose patient.  (*Id*.).  Plaintiff then asked two nurses in the room, Cottrell and Amanda Bowers, if they would like to try. (*Id*.).  Cottrell informed Plaintiff that it was beyond the scope of a nurse's practice to insert an A-line.  (*Id*.).  Bowers agreed to insert the A-line, but told Plaintiff "this stays between us."  (*Id*.).  Bowers successfully inserted the A-line on her second attempt and Plaintiff then secured the line.  (*Id*.).  After the nursing supervisors received Cottrell's report, MCHS initiated an investigation which eventually led to the termination of Bowers.  (*Id*. at 232-33).

Defendant Weiss received notice of Plaintiff's involvement in the incident and instructed him not to appear for his next shift.  (*Id.* at 92).  Defendants state that Plaintiff was instructed not to discuss the investigation with other staff until it was finished, but Plaintiff states he received no such instruction.  (*Id*. at 116).  It is undisputed that during the investigation, Plaintiff contacted and discussed the A-line incident with multiple residents and Bowers.  (*Id*. at 95-99).  Despite this, Plaintiff later told Defendant Weiss that he had not been in contact with Bowers. (*Id.* at 116).

On July 22, 2009, following the investigation, Defendant Weiss wrote a letter to Plaintiff informing him that he was terminated and listing the reasons.  (*Termination Letter*, Doc. 61-2). The letter listed five contacts had made with MCHS personnel during the A-line investigation. (*Id*.).  The letter went on to explain that "You [Plaintiff] were specifically instructed by the Internal Medicine Residency Program Director to not discuss the events surrounding this arterial line placement with any other MCHS employee.  Your contact with multiple MCHS employees

3

made the investigation regarding the events surrounding the arterial line placement difficult." (*Id*.). Defendants determined that Plaintiff's actions failed to demonstrate the ACGME "core competencies" of Interpersonal & Communication Skills, Professionalism, and Systems-based Practice. (*Id*.). Defendants informed Plaintiff he was being terminated for failing to meet expectations in those three areas and informed him of his right to request review of the decision. (*Id*.).

Plaintiff exercised his right to have the Program Education Committee (the "Committee") review his termination. (Doc. 61 at 131). At an August 6, 2009 hearing, Plaintiff spoke in his own defense for 40 minutes. (*Committee Decision*, Doc. 47-11). The Committee reviewed the evidence and upheld Plaintiff's termination, finding that "the past and recent evidence shows a pattern of behavior of [Nayyar] that are inconsistent with both the ACGME core competency of Professionalism and the policies and standards of the Mount Carmel Heath System." (*Id*.). Plaintiff then challenged the fairness of the termination process. Defendant Li formed "a special Administrative Review Committee to review the entire process." (*Li Letter*, Doc. 47-12). The Administrative Review Committee "reached the conclusion unanimously that the appeal process in place is consistent with the [ACGME] policies and that Due Process has been honored." (*Id*.).

### B. Procedural Background

Plaintiff originally filed suit challenging his termination in this Court in 2010 (2:10-cv-135). In 2012 Plaintiff filed a similar suit in the Franklin County Court of Common Pleas, which Defendants successfully removed to this Court (2:12-cv-189). This Court consolidated the two cases. (*See* Doc. 21 in 2:12-cv-189). In the consolidated suit, there are ten causes of action pending before the Court. Defendants have filed a Motion for Summary Judgment on all counts.

Plaintiff opposes the Motion.  Briefing is completed and oral argument was held on May 16, 2013.  The matter is now ripe for adjudication.

### III. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides, in relevant part, that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." A fact is deemed material only if it "might affect the outcome of the lawsuit under the governing substantive law." *Wiley v. United States,* 20 F.3d 222, 224 (6th Cir.1994) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, (1986)).

The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). The suggestion of a mere possibility of a factual dispute is insufficient to defeat a movant's motion for summary judgment. *See Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992) (citing *Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 863 (6th Cir.1986)). Further, "summary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248.  When a plaintiff, however, invokes summary judgment "and a showing is made by the [plaintiff], the burden rests on the [defendant] to show that he has a ground of defense fairly arguable and of a substantial character."  *Pen-Ken Gas & Oil Corp. v. Warfield Natural Gas Co.*, 137 F.2d 871, 877 (6th Cir.1943).

The necessary inquiry for this Court in determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Patton v. Bearden,* 8 F.3d 343, 346 (6th Cir.1993) (quoting *Anderson,* 477 U.S. at 251–52). In evaluating such a motion, the evidence must be viewed in the light most favorable to the nonmoving party. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655 (1962). The mere existence of a scintilla of evidence in support of the opposing party's position will be insufficient; there must be evidence on which the jury could reasonably find for the opposing party. *See Anderson,* 477 U.S. at 251; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).  Self-serving affidavits, alone, are not enough to create an issue of fact sufficient to survive summary judgment. *Wolfe v. Vill. of Brice, Ohio*, 37 F. Supp. 2d 1021, 1026 (S.D. Ohio 1999).  *See Anderson,* 477 U.S. at 251; *Copeland,* 57 F.3d 476 at 479.

With regard to affidavits, Rule 56 (e) requires that affidavits submitted in support of, or in opposition to, motions for summary judgment include facts based on personal knowledge, and that personal knowledge "must be evident from the affidavit." *Reddy v. Good Samaritan Hosp. & Health Ctr.*, 137 F.Supp.2d 948, 956 (S.D. Ohio 2000).  Affidavits at the summary judgment stage also may not rely upon inadmissible hearsay because inadmissible hearsay "cannot create a genuine issue of material fact." *North American Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 83 (6th Cir.1997).

## IV. LAW & ANALYSIS

Defendant has moved for summary judgment on all ten counts remaining before this Court.  For the reasons stated below, Defendant's Motion is granted in its entirety.

### A. Race and National Origin Discrimination under 18 U.S.C. Section 1981 and O.R.C. 4112

Plaintiff brings two claims, one under 18 U.S.C. § 1981 and one under O.R.C. § 4112.02,

6

for race and national origin discrimination.[4]  This Court analyzes the federal and state claims "together, however, because 'Ohio's requirements are the same as under federal law.'" *Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008), *citing Carter v. Univ. of Toledo*, 348 F.3d 269, 272 (6th Cir. 2003).  Since Plaintiff lacks direct evidence of Defendants' alleged discrimination, he attempts to prove his "claims of disparate treatment by use of circumstantial evidence of discrimination according to the burden-shifting framework outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)." *Id*.  Under *McDonnell Douglas* a plaintiff first bears the burden of establishing a *prima facie* case of discrimination by showing that: "(1) she is a member of a protected group; (2) she was subject to an adverse employment decision; (3) she was qualified for the position; and (4) she was replaced by a person outside of the protected class." *Carter*, 348 F.3d at 273.  Where applicable, a plaintiff may satisfy the fourth prong "by adducing evidence that she 'was . . . treated differently than similarly situated non-protected employees.'" *Russell*, 537 F.3d at 604, *quoting Newman v. Fed. Express Corp.*, 266 F.3d 401, 406 (6th Cir. 2001).  In *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 584 (6th Cir. 1992), the Sixth Circuit held that in order to satisfy her burden, a plaintiff must show the non-protected employee is "similarly situated in all respects."  In *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998), however, the Sixth Circuit refined the *Mitchell* holding to clarify that a "plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in all of the *relevant* respects." (emphasis in original)

Here, there is no dispute that Plaintiff has satisfied the first three prongs of the *McDonnell Douglas* framework.  The sole issue of contention is whether Plaintiff has identified a similarly situated, non-protected employee who was treated more favorably.  Plaintiff identifies

---

[4] Plaintiff's race is "South Asian" and his national origin is "Indian," though he is a citizen of the United States.  For the purposes of Plaintiff's suit, there is no significant difference between his allegations of race and national origin discrimination.  The Court, thus, analyzes both elements together as "Defendants' alleged discrimination."

one employee whom he alleges was similarly situated and received more favorable treatment, Jonathan Border, M.D., ("Borders").  Borders was also a third-resident in the Plaintiff's residency program.  According to Plaintiff, Borders was chronically tardy or absent for both meetings and shifts.  *Weiss Deposition II*, Doc. 95-13 at 10-29.  Borders also lied to supervisors about his absences.  *Id*.  Borders was ultimately terminated shortly after Plaintiff.  *Id*.

Plaintiff argues that since both he and Borders were third-year residents in the same residency program who lied to supervisors, the lone significant difference between the two was their respective races and national origins.  Borders is Caucasian and of U.S. origin, whereas Plaintiff is South Asian and of Indian origin.  Both physicians were ultimately subject to the same adverse employment decision, termination, but Plaintiff alleges Borders received the benefit of progressive discipline while Plaintiff did not.

Plaintiff has oversimplified the situations of himself and Borders to present the illusion of similarity where little exists.  While Plaintiff accurately asserts that both he and Borders were third-year residents who lied to their supervisors with regard to disciplinary issues, that is where the similarities end.  Borders had lied about his tardiness and absenteeism.  There is no evidence Borders otherwise interfered with investigations into his conduct at any time.  Nayyar's conduct involved patient care, the insertion of an arterial line.  The Committee found that Plaintiff failed to perform adequately the procedure and then instructed an unqualified nurse to do it in his place. While the Court accepts Plaintiff's contention that absenteeism in a hospital indirectly affects patient safety, ordering nurses to perform procedures they are not qualified to perform and then lying during the investigation directly affects patient safety.  Furthermore, the record demonstrates that Plaintiff went on to contact co-workers during the investigation and discuss the incident and investigation with them.  Amongst the co-workers he contacted was the nurse whom

8

he had instructed to perform the A-line insertion.  Those contacts, regardless of Plaintiff's motives, interfered with the investigation.  That interference is misconduct that arguably goes far beyond Borders's denials of his own absences. Defendants reasonably concluded that Plaintiff was orchestrating interference with the investigation.

While the law does not task Plaintiff with the burden of identifying a fellow employee who was similarly situated in every regard, Plaintiff's argument that he and Borders were disciplined differently for the same offense of "lying" is disingenuous.  Not all instances of lying are the same.  The facts Defendants relied upon in terminating Plaintiff demonstrate Plaintiff's dishonest conduct was more egregious than that of Borders, and directly implicated patient safety.  Hence, Plaintiff has failed to identify a similarly situated employee who was more favorably treated.  Plaintiff fails to satisfy his burden of making a prima facie case under *McDonnell Douglas*.

Defendant's Motion for Summary Judgment on Plaintiff's U.S.C. § 1981 and O.R.C. § 4112.02 claims is, thus, **GRANTED**.

## B. Ohio Whistleblower Retaliation under O.R.C. § 4113.52

Plaintiff also claims that his termination violated Ohio's "whistleblower" protection statute, O.R.C. § 4113.52, which states that:

> If an employee becomes aware in the course of the employee's employment of a violation of any state or federal statute or any ordinance or regulation of a political subdivision that the employee's employer has authority to correct, and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for a contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation. If the employer does not correct the violation or make a reasonable and good faith effort to correct the violation within twenty-four hours after the oral notification or the receipt of the report, whichever is earlier, the

> employee may file a written report that provides sufficient detail to identify and
> describe the violation with the prosecuting authority of the county or municipal
> corporation where the violation occurred, with a peace officer, with the inspector
> general if the violation is within the inspector general's jurisdiction, or with any
> other appropriate public official or agency that has regulatory authority over the
> employer and the industry, trade, or business in which the employer is engaged.

O.R.C. § 4113.52(A)(1)(a).  In summary, the statute provides four requirements an employee

must satisfy before receiving the statutory protection: (1) a violation of a statute or other

regulation; (2) a reasonable belief that the violation is a criminal offense likely to cause

imminent risk of physical harm or public safety; (3) oral notice of the violation to a supervisor;

and (4) a written report with sufficient detail to identify the violation to a supervisor.  An

employee receives whistleblower protection only after satisfying the four requirements.  The

Ohio Supreme Court has held that:

> [I]n order for an employee to be afforded protection as a 'whistleblower,' such
> employee must strictly comply with the dictates of R.C. 4113.52.  Failure to do so
> prevents the employee from claiming the protections embodied in the statute.

*Contreras v. Ferro Corp.*, 652 N.E.2d 940, 946 (Ohio 1995).

Until oral argument on this Motion, Plaintiff had failed to elaborate exactly what statute

Defendants allegedly violated.  Plaintiff's counsel has now represented Plaintiff believed

Defendants had violated O.R.C. § 2903.34, which makes "patient abuse or neglect" a criminal

offense.  Of course, an attempt to commit patient abuse or neglect would also be a criminal

violation.  O.R.C. § 2923.02.  Although Plaintiff has not stated the matter so starkly, he asks the

Court to find a violation of actual, or attempted, abuse or neglect of patients in violation of

Ohio's Criminal Code.

Whether Defendants attempted to abuse or neglect patients is a threshold matter.  If they

did not, then there was no "violation of any state or federal statute" and Plaintiff cannot satisfy

any of the four requirements of O.R.C. § 4113.52(A)(1)(a).  Since there is no evidence that

patients in Mt. Carmel's ICU were actually abused or neglected, Plaintiff's claim rests on whether any of Defendants attempted to abuse or neglect patients.

Plaintiff's only evidence of such an attempt is his affidavit and deposition testimony describing a conversation he had with Defendant Weiss in early July 2009. *Plaintiff's Affidavit*, Doc. 95-4 at ¶¶ 15-21. Plaintiff had received the ICU Schedule for July and was concerned that the staffing would be insufficient for certain shifts. *Id*. Plaintiff then alerted Defendant Weiss of his concerns. *Id*. Plaintiff has described the ensuing conversation between himself and Defendant Weiss differently in his affidavit as opposed to his deposition. In Paragraph 18 of his affidavit, Plaintiff summarizes the conversation: "Dr. Weiss told me, to my surprise and shock, that he wanted patients to die to prove his point about assignment of residents (internal medicine) to the ICU." *Id*. Later, in Paragraph 47 of Plaintiff's affidavit, he recalls the same conversation thusly: "I only know that Dr. Weiss stated that the July 2009 schedule would result in patients dying." *Id*. at ¶47. In Plaintiff's deposition, however, he recalls the conversation in greater detail:

> I said that "Without an in-house critical care attending, that safety is an active
> issue, and I mentioned that to [Weiss], and I said people will die," and [Weiss]
> said, "More to prove my point, we don't belong in the ICU."

*Plaintiff's Deposition*, Doc. 61 at 145. The full account provides significant context which is lost in Plaintiff's conclusory statement that Defendant Weiss "wanted patients to die." An ICU cares for the most ill patients in any hospital. Some patients in an ICU face the inevitability of death. Defendant Weiss's recognition of that fact does not demonstrate an intent to abuse or neglect patients. Nor does the statement "More to prove my point" show Defendant Weiss wanted patients to die for the purposes of his dispute with the administration regarding ICU staffing. Weiss's statement is logical: if more than the usual number of patients dies in an ICU, a hospital

would likely increase staffing there.  There is evidence in the record that both Plaintiff and Defendant Weiss were concerned about the sufficiency of ICU staffing.  Defendant Weiss had even supported Plaintiff's petition which called for increased ICU staffing. Doc. 61 at 149. Some may deem Weiss's comment insensitive, or even ill-advised, but it does not demonstrate an intent to harm patients.  Although the Court makes every favorable inference for Plaintiff, as the nonmoving party, Plaintiff cannot create a disputed issue of material fact merely by relying on his own self-serving affidavit or legally conclusory statements.  Plaintiff has failed to adduce any evidence, aside from his affidavit, that Defendant Weiss or any Defendant, attempted to abuse, neglect, or otherwise harm patients.  Moreover, Plaintiff's deposition testimony fails to ascribe any statements to Defendants which can reasonably be construed to demonstrate intent to harm patients.  Since Plaintiff has failed to demonstrate a violation of law which would invoke the whistleblower protections of O.R.C. § 4113.52(A)(1)(a), Plaintiff's claim under that statute is dismissed.

It should be noted that even if the Court did find Plaintiff had raised a disputed issue of material fact with regard to a violation of law, the Court would still have to dismiss his § 4113.52(A)(1)(a) claim for Plaintiff's failure to comply with the written notice requirement.  A Plaintiff seeking protection under § 4113.52(A)(1)(a) must have made a "written report that provides sufficient detail to identify and describe the violation."  Plaintiff argues he satisfied the written report requirement by submitting, to Defendant Li, a copy of the ICU Schedule on which Plaintiff had written notes.  One problem for Plaintiff is that he has no copy of this schedule and no evidence, aside from his own affidavit, that he ever submitted such a writing.  The absence of evidence regarding the report's existence alone, however, does not defeat Plaintiff's claim, particularly as he elsewhere alleges spoliation of evidence.

The "report" Plaintiff claims to have submitted is insufficient because even accepting Plaintiff's explanation of its contents, the annotated schedule does not satisfy the requirement that a report put supervisors on notice that a criminal violation has occurred.  Plaintiff's supervisor, Defendant Li, had presumably already seen or could easily access the schedule Plaintiff gave her.  Plaintiff's handwritten notes indicating concerns of insufficient staffing for various shifts do not convert the ICU Schedule into a report of a criminal violation.  In Plaintiff's deposition, he was asked, "What was the writing on that schedule [that Plaintiff gave to Defendant Li] that you can recall?"  Plaintiff responded:

> It was highlighting days where all the residents were by themselves in ICU at night flow and on the weekend without another intern on-board, and it also had information of how the schedule worked, and then [Dr. Li] was also making notes on it as well."

*Plaintiff's Deposition*, Doc. 62, at 326.  Plaintiff did not testify at his deposition that he had written on the schedule Defendant Weiss's statement regarding patient deaths in the ICU, though Plaintiff's counsel did make such a representation at oral argument.  Certainly, the law does not require a plaintiff to type the report or submit it on a particular form, but this Court does not accept that handwritten notes indicating staffing shortages constitute a report of a criminal violation.  If the Plaintiff had actually believed Defendant Weiss was trying to harm patients, the suggestion that he would simply have jotted that fact down in the margins of a schedule strains the Court's credulity.  Plaintiff has, thus, failed to satisfy the written report requirement of O.R.C. § 4113.52.

Defendant's Motion for Summary Judgment on Plaintiff's claim of an O.R.C. § 4113.52 violation is **GRANTED**.

## C. Wrongful Termination in Violation of Public Policy

Plaintiff claims, under tort law, that his termination violates Ohio's public policy.  To state a claim that a termination violates Ohio's public policy, a plaintiff must demonstrate: (1) that a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the clarity element); (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); (3) the plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and (4) the employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).  *Collins v. Rizkana*, 652 N.E.2d 653, 657-58 (Ohio 1995).  The clarity and jeopardy elements are "questions of law to be determined by the court."  *Id*. at 658.

At oral argument, Plaintiff argued the public policy allegedly violated is embodied in Ohio's criminal statutes which prohibit attempts to cause injury or death to a person.  While it is clear that Ohio wishes to protect its citizens from injury, Plaintiff has cited no source for a public policy exception to employment at-will where an employee has a dispute with a supervisor over a patient care decision.  By Plaintiff's own admission, he did not report that Defendant Weiss was actively attempting to harm patients.  Rather, in Plaintiff's view, Defendant Weiss had not ensured sufficient staff coverage in the ICU, and Plaintiff believed that would result in harm to patients.  That is what Plaintiff reported to Defendant Li, as evidenced by the fact that the only document he gave her was an ICU Schedule.  He had not reported an assault on a patient, much less an incident of "intentionally causing the death of a person."  *Plaintiff's Response*, Doc. 95 at 36.  At least one Ohio court has held that there is no public policy exception to employment at-will where a physician was terminated after notifying supervisors of his concerns that a new admittance policy would negatively impact patient care.  *Mitchell v. Mid-Ohio Emergency*

14

*Services, L.L.C.*, 2004 WL 2803419 (Ohio 10th Ct. App. Sep. 30, 2004).  In light of Ohio precedent and Plaintiff's failure to satisfy the clarity element of the termination in violation of public policy claim, Plaintiff's claim is dismissed.

Defendants' Motion for Summary Judgment on Plaintiff's claim of wrongful termination in violation of public policy is **GRANTED**.

### D. Federal False Claims Act

Plaintiff states a claim for violation of the Federal False Claims Act ("FCA").  31. U.S.C. § 3730(h).  On summary judgment, a plaintiff bears the burden of making a prima facie showing on FCA claims.  *Scott v. Metroplitan Health Corp.*, 234 Fed.Appx. 341, 346 (6th Cir. 2007). Plaintiff wholly failed to address the FCA claim in his written briefing on this Motion or at oral argument.  Plaintiff has, thus, failed to make a prima facie showing.

Defendants' Motion for Summary Judgment on Plaintiff's claims under the FFCA is, therefore, **GRANTED**.

### E. Tort of Abuse of Process

Plaintiff states a claim for "abuse of process" under the common law.  To state a cognizable claim for abuse of process under the common law of Ohio, a plaintiff must allege: "(1) that a legal proceeding has been set in motion in proper form and with probable cause; (2) that the proceeding has been perverted to attempt to accomplish an ulterior purpose for which it was not designed; and (3) that direct damage has resulted from the wrongful use of process." *Yaklevich v. Kemp, Schaeffer & Rowe Co.*, 626 N.E.2d 115, 116 (Ohio 1994).  This Court has previously found that "an administrative investigation for employment purposes . . . is not a legal proceeding."  *Gillman v. Schlagetter*, 777 F.Supp.2d 1084, 1099 (S.D. Ohio 2010).  In *Gillman,* the defendant-employer was a public entity, the county sheriff's office.  Here, where the

employer is a private entity, the investigation and subsequent termination proceeding of Plaintiff is even less like a legal proceeding. The Court, therefore, finds Plaintiff's termination proceeding was not a legal proceeding for the purposes of an abuse of process claim. Hence, Plaintiff has failed state a cognizable claim for abuse of process.

Defendants' Motion for Summary Judgment on Plaintiff's abuse of process claim is **GRANTED**.

### F. Intentional Infliction of Emotional Distress

Plaintiff also alleges that his termination by Defendants was an intentional infliction of emotional distress (IIED). Under Ohio law, a plaintiff seeking to recover for IIED must prove:

> (1) that the defendant either intended to cause emotional distress, or knew or should have known that its conduct would result in serious emotional distress to the plaintiff; (2) that the defendant's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered utterly intolerable in a civilized community; (3) that the defendant's actions proximately caused psychological injury to the plaintiff; and (4) that the plaintiff suffered serious emotional distress of a nature no reasonable person could be expected to endure.

*Rhoades v. Chase Bank*, 2010 WL 5550703 (Ohio 10th Ct. App. Dec. 30, 2010). Plaintiff's claim fails to satisfy any of the four elements. There is no factual dispute that Plaintiff was terminated after lying and contacting potential witnesses in a disciplinary investigation. As discussed above, Defendants had cause to terminate Plaintiff. Moreover, Plaintiff was afforded some process, including an opportunity to be heard and an appeal. While Plaintiff may have felt dissatisfied with the extent of the process, Defendants' conduct fell short of being "extreme and outrageous." Furthermore, Plaintiff has failed to adduce any evidence that he experienced emotional distress. There is no evidence he has sought treatment for any emotional distress relating to his termination which, though not legally required, would help Plaintiff's claim satisfy the third and fourth elements of IIED. Plaintiff's own statement that he felt "distressed," without

something more, is insufficient to create a material issue of fact as to his emotional distress.

Plaintiff's claim fails to demonstrate any of the four elements of IIED required under Ohio law.

Defendants' Motion for Summary Judgment on Plaintiff's claims of intentional infliction of emotional distress is **GRANTED**.

### G. Spoliation of Evidence

Plaintiff claims Defendants either destroyed or failed to preserve evidence necessary to prove his other claims, particularly the whistle blower claims. Ohio law does recognize a claim for "interference with or destruction of evidence," the elements of which are:

> (1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts.

*Smith v. Howard Johnson Co., Inc.*, 615 N.E.2d 1037 (Ohio 1993). The sole document Plaintiff specifically alleges was destroyed is the copy of the ICU Schedule with his notes, which he gave to Defendant Li. *Plaintiff's Response*, Doc. 95, at 39. Plaintiff also asserts Defendants "failed to preserve key documents needed to establish Plaintiff's claims" without identifying what those documents are. There is simply no evidence in the record to support "willful destruction," as required to sustain a cause of action for destruction of evidence. There is no dispute that Plaintiff gave Defendant Li an ICU Schedule with notes on it. There is also no dispute that this document no longer exists. In her deposition, Defendant Li was asked whether she had put Plaintiff's Call Schedule in her files, to which she responded "I honestly do not recall." Doc. 95-6 at 173. Although she does not recall what she did with the document, Defendant Li did act on the information, as demonstrated by the e-mail she sent to Defendant Weiss regarding the ICU Schedule. *Id.* When Defendant Li received the ICU Schedule, on June 22, 2009, Plaintiff was still employed by Mt. Carmel. Neither Plaintiff nor Defendants had any reason to believe

17

litigation was probable.  It is not surprising that Defendant Li would not have filed that particular copy of the schedule.  She could easily access another copy.  There is no evidence in the record that Defendant Li willfully destroyed Plaintiff's copy of the ICU Schedule, or even had a motive to do so.

Moreover, Plaintiff has not explained how the absence of this document has prejudiced him, given that there is no dispute over the fact the document would serve to prove, namely, that Plaintiff had concerns with ICU staffing which he reported to Defendants.  A copy of the ICU Schedule is in the record and Defendants Weiss and Li have given deposition testimony that Plaintiff shared his concerns that ICU staffing was insufficient.

Plaintiff has adduced no evidence to refute Defendants' showing that they did not destroy the ICU Schedule, or any other document, in anticipation of litigation.  Hence, Defendants' Motion for Summary Judgment on Plaintiff's spoliation of evidence claim is **GRANTED**.

### H. Breach of Contract

Plaintiff also alleges that Defendants breached his employment contract with MCHS. The employment contract (Doc. 95-27) incorporates, by reference, the Residency Physician Handbook and Policies Manual (Doc. 95-3).  Under Ohio law, a party alleging breach of contract must prove that:

> (1) a contract existed, (2) the complaining party fulfilled its contractual obligations, (3) the opposing party failed to fulfill its obligations, and (4) the complaining party incurred damages as a result of this failure.

*Marion Forum, L.L.C. v. Lynick Ents., Inc.*, 2012 WL 6571399, at *2 (Ohio 3d Ct. App. Dec. 17, 2012).

There is no dispute that a contract existed, but both parties allege the other breached the contract first.  Plaintiff alleges Defendants failed to fulfill their obligations in two ways.  The

first alleged breach is Defendants' denying him the "right of access" to his personnel file during termination proceedings, citing to page 12 of the Handbook.  Contrary to Plaintiff's contention, the Court's review of page 12 of the Handbook reveals no mention of a right to access a personnel file, nor does the evidence show Plaintiff was denied any of the termination procedures guaranteed by his contract.

While the Handbook discusses termination procedures, the evidence demonstrates Plaintiff's termination complied with those procedures.  Defendant Weiss wrote a letter on July 22, 2009 listing the specific reasons Plaintiff was terminated: his misconduct during the A-line insertion and subsequent interference with Defendants' investigation. *Termination Letter*, Doc. 61-2.  The letter also identifies program expectations Plaintiff failed to meet.  *Id*.  Plaintiff subsequently appealed the termination decision to the Committee, consistent with the procedures outlined by his contract.  (Doc. 95-3 at 12)  At the review hearing, Plaintiff spoke in his own defense for forty minutes. *Committee Decision*, Doc. 95-11.  The Committee decided to uphold the termination, as it communicated in writing on August 6, 2009.  *Id*.  Plaintiff then challenged the sufficiency of the review process.  Defendant Weiss wrote a letter on August 26, 2009 that the Administrative Review Committee had considered Plaintiff's challenge and rejected it.  Doc. 62-2.  Defendants appear to have gone to great lengths to ensure Plaintiff received notice of the reasons for his termination, an opportunity to be heard, and an appeal.  Plaintiff has adduced no evidence to show Defendants' breached their contractual obligations with regard to his termination proceedings.

Plaintiff also alleges Defendants breached the 80-hour weekly limit for residents. *Handbook*, Doc. 95-3 at 18.  Plaintiff has adduced no evidence aside from his own statements

that Defendants breached the 80-hour limit, nor that they coerced residents to work in excess of 80 hours.  Plaintiff does not even make such assertions in his affidavit.

In summary, there is no evidence in the record that Defendants breached their obligations to Plaintiff under his employment contract.  The evidence in the record demonstrates that, to the contrary, Defendants did provide Plaintiff with due process following his termination.  The Court does not reach the question of whether Plaintiff's interference with the A-line incident investigation constituted a breach of contract by Plaintiff.

Defendants' Motion for Summary Judgment on Plaintiff's breach of contract claim is, thus, **GRANTED**.

## I. Promissory Estoppel and Fraudulent Misrepresentation

Plaintiff also makes a claim for promissory estoppel and fraudulent misrepresentation "based on the [Defendants'] failure to comply with termination procedures and publication of confidential information in his personnel file to the media."  *Plaintiff's Response*, Doc. 95, at 40. In Ohio, "the elements necessary to establish a claim for promissory estoppel are: (1) a promise clear and unambiguous in its terms; (2) reliance by the party to whom the promise is made; (3) the reliance must be reasonable and foreseeable; and (4) the party claiming estoppel must be injured by the reliance."  *Sims v. Village of Midvale*, 2012 WL 6681851, at *4 (Ohio 5th Ct. App. Dec. 18, 2012).  The elements of a claim for fraudulent misrepresentation with regard to a contract are: "(1) a false representation concerning a fact material to the transaction; (2) knowledge of the falsity of the statement or utter disregard for its truth; (3) intent to induce reliance on the misrepresentation; (4) reliance under circumstances manifesting a right to rely; and (5) injury resulting from the reliance."  *Dana Partners, L.L.C. v. Kovisto Constructors and Erectors, Inc.*, 2012 WL 6783637, at *11 (Ohio 11th Ct. App. Dec 31, 2012).

20

## 1. Termination Procedures

Again, Plaintiff fails to adduce any evidence of the allegations regarding his termination beyond conclusory statements that his termination, and the procedures related to it, violated Defendants' obligations to him.  The Court already explained that the evidence in the record demonstrates Defendants did comply with the promised termination procedures.  Defendants have adduced evidence that the termination procedures were fair: (1) the first letter from Defendant Weiss to Plaintiff informing him of his termination and the reasons (Doc. 61-2); (2) the second letter informing Plaintiff the Program Education Committee upheld the termination after a hearing where Plaintiff defended himself (Doc. 95-11); (3) the third letter informing the Plaintiff that the Administrative Review Committee had upheld the fairness of the appeal process (Doc. 62-2); and (4) the statement of Nurse Cottrell who observed Plaintiff instruct Bowers to insert the A-line (Doc. 62-4).  In the face of this evidence that the termination procedures were fair and the termination relied upon evidence, Plaintiff can offer only his own statements in his affidavit and deposition.  Those statements do not create an issue of material fact as to the fairness of the termination procedures.  There is no evidence that Defendants violated their contractual obligation to provide Plaintiff with due process prior to termination, nor that they falsely represented the nature of termination procedures.  Plaintiff simply states that he does not believe the procedures were fair.  Plaintiff's allegations of unfair termination procedures, thus, do not support a cause of action for either promissory estoppel or fraudulent misrepresentation.

## 2. Publication of Information in Personnel File

Plaintiff correctly asserts that the Residency Handbook (Doc. 95-3), incorporated by reference into his employment contract, states that generally a resident's personnel file is

confidential.  Doc. 95-3, at 19.  The Handbook does, however, carve out an exception to this general rule:

> Only the Program Director of the resident and/or Director of Medical Education may disclose the file, or portion thereof, at the request of a third part, which they judge as having a legitimate reason for accessing the information, e.g. for matters relating to the education of the trainee, the quality of the education in the program, or the quality of patient care in the program.

*Id*.  Plaintiff alleges that Defendants breached this obligation by making the following statement to the news media, "Dr. Nayyar was dismissed from his medical residency program following a thorough investigation into a patient care safety issue for which he was responsible."  *ONN Article*, Doc. 95-14.  The Court notes that Plaintiff's own public statements, made in various complaints before this Court, disclosed that he had been investigated for the A-line incident and subsequently terminated.  *See, e.g., Plaintiff's Second Amended Complaint*, Doc. 33, at ¶¶ 31-38.  Plaintiff has failed to explain how the A-line incident was not a patient care safety issue.  Additionally, the Court cannot imagine how an incident involving the insertion of an arterial line is not a patient care safety issue, even if no harm results.  That would bring Defendants' statement to the media within the disclosure exception for matters related to the quality of patient care in the program.  Plaintiff's suggestion that the article did not relate to patient care is confounding, particularly given Plaintiff's statements in the article expressing his concerns about patient care in the program, for example, "At night, there were no in-house critical care physicians, and that raised a lot of concerns," and "[i]f no one stands up to things like this, people will suffer and ultimately die."  *ONN Article*, Doc. 95-14.  Plaintiff filed a lawsuit alleging failings of patient care by Defendants and that his termination was the result of speaking out on those alleged failings.  He then repeated similar statements to the news media.  Defendants expressed their version of why Plaintiff was terminated in a single sentence which

gave no details not already in Plaintiff's Second Amended Complaint.  The statement manifestly

touched on "the quality of patient care in the program," which Plaintiff had criticized.  Plaintiff

offers no evidence, aside from his conclusory allegations, that Defendants broke their obligation

to keep information in his personnel file confidential, particularly as that confidentiality

provision allowed for numerous exceptions.  Plaintiff's allegations that Defendants wrongly

disclosed confidential information from his personnel file, thus, do not support a cause of action

for either promissory estoppel or fraudulent misrepresentation.

Plaintiff has failed to rebut Defendants' evidence that they did not breach obligations to

Plaintiff, explicit or implicit, regarding termination procedures or confidentiality.  Defendants'

Motion for Summary Judgment on Plaintiff's claims of promissory estoppel and fraudulent

misrepresentation is **GRANTED**.

### J. Termination of Borders in Violation of O.R.C. § 4112.02

In addition to Plaintiff's first claim for discrimination under O.R.C. § 4112.02, he states

an additional claim, alleging that Defendants terminated Dr. Borders in order to frustrate

Plaintiff's first § 4112.02 claim.  This second claim § 4112.02 has no basis in law.  Essentially,

Plaintiff contends Defendants terminated Borders so that Plaintiff could not cite Borders as an

example of a similarly situated employee under U.S.C. § 1981 and O.R.C. § 4112.  Borders's

termination, however, was not an injury to Plaintiff, nor has Plaintiff adduced any evidence that

Borders was terminated to frustrate Plaintiff's recovery.

Borders's termination is not at issue in this case.  Defendants could have terminated

Borders for any reason; Plaintiff has provided evidence that Defendants would have had cause to

terminate Borders for absenteeism and dishonesty.  Plaintiff appears to recognize this claim lacks

merit as he fails to mention it in his Response.

Since Plaintiff fails to state a cognizable claim for the termination of Dr. Borders under O.R.C. § 4112.02, Defendants' Motion for Summary Judgment on Plaintiff's second claim under O.R.C. § 4112.02 is **GRANTED**.

## V. CONCLUSION

For the reasons stated above, Plaintiff has failed to raise any disputed issues of material fact with respect to any of his pending claims against Defendants.  Thus, Defendants' Motion for Summary Judgment with respect to all Defendants and all claims is, hereby, **GRANTED**.  Plaintiff's Complaints, in cases 2:10-cv-135 and 2:12-cv-189, are **DISMISSED** in their entirety.

**IT IS SO ORDERED.**

      **s/ Algenon L. Marbley**
      **ALGENON L. MARBLEY**
      **UNITED STATES DISTRICT JUDGE**

**DATED: June 3, 2013**

24